**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Daily Gazette Company, *et al.*, | ) | Case No. 18-20028 |
| | ) | |
| Debtors. [1] | ) | (Joint Administration Requested) |

**DECLARATION OF NORMAN W. SHUMATE III**
**IN SUPPORT OF CHAPTER 11 FILINGS AND FIRST-DAY MOTIONS**

I, Norman W. Shumate III, declare under penalty of perjury as follows:

1.      I offer this Declaration in support of the chapter 11 filings and certain first-day motions of Daily Gazette Company ("Daily Gazette"), Daily Gazette Holding Company, LLC ("DGHC"), Charleston Newspapers Holdings, L.P. ("CNH"), Daily Gazette Publishing Company, LLC ("DGPC"), Charleston Newspapers, and G-M Properties, Inc. ("G-M" and together with Daily Gazette, DGHC, CNH, DGPC and Charleston Newspapers, the "Debtors").

2.      I am the President and Chief Financial Officer of Charleston Newspapers. I have held the position of Chief Financial Officer since 2004, and I have held the title of President since 2013. I am also the Vice President of Daily Gazette and have held that title since 2000.

3.      I am generally familiar with the Debtors' day-to-day operations, business affairs and books and records. Except as otherwise indicated, all facts set forth in this Declaration are offered to the best of my knowledge, information and belief, and are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' management and/or professionals working with me or under my supervision, or my informed

---

[1]      The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's taxpayer identification number are as follows: Daily Gazette Company (4480); Daily Gazette Holding Company, LLC (2981); Charleston Newspapers Holdings, L.P. (3028), Daily Gazette Publishing Company, LLC (3074),Charleston Newspapers (6079), and G-M Properties, Inc. (4124). The Debtors' headquarters are located at 1001 Virginia St. E, Charleston, West Virginia 25301.

opinion based upon my experience and knowledge of the Debtors' industry, operations and financial condition. If I were called to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

4.     On January 30, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code"). To enable the Debtors to operate effectively and preserve the value of their respective assets, the Debtors have requested various relief in certain "first-day" motions filed with the Court contemporaneously with this Declaration (collectively, the "First-Day Motions").[2]

5.     The First-Day Motions seek to preserve the Debtors' going-concern value by, among other things: (a) maintaining employee morale and confidence; (b) ensuring the Debtors' uninterrupted access to and use of cash; (c) ensuring the continuation of the Debtors' cash management systems and other business operations without interruption; (d) maintaining market and customer confidence; and (e) establishing other administrative procedures to enable the Debtors' smooth transition into chapter 11. Ensuring and maintaining the support of the Debtors' employees and customers and maintaining the Debtors' day-to-day business operations with little to no interruption will be crucial to the success of the Debtors' chapter 11 cases.

6.     This Declaration describes the Debtors' history, business and circumstances leading to the filing of these chapter 11 cases, and sets forth certain facts supporting the relief requested in the First-Day Motions and why such relief is in the best interests of the Debtors, their bankruptcy estates, their creditors and other parties-in-interest.

---

[2]     Any capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the applicable First-Day Motions.

137914546.3

## BACKGROUND

**A.     The Debtors' Business**

7.     The Debtors' family-owned business operates and publishes the Charleston Gazette-Mail, a Pulitzer Prize-winning, state capital newspaper that dates back to 1873 and that currently has daily circulation of approximately 32,000 and Sunday circulation of approximately 41,300—the largest in West Virginia.   The Charleston Gazette-Mail primarily serves West Virginia's capital city of Charleston, and Kanawha and Putnam Counties.   For the calendar year 2017, the Debtors generated approximately $19.5 million in revenue and approximately $1.5 million in earnings before interest, taxes, depreciation and amortization (EBITDA).   The Debtors have approximately 170 full-time and approximately 40 part-time employees.   Other than a limited number of staff dedicated to accounting, information systems and human resources, the majority of the Debtors' employees work in the following departments: (a) news-editorial; (b) advertising; (c) production; and (d) circulation.

8.     The Debtors also produce two zoned, weekly publications, Metro West and Metro East, as well as a stand-alone weekly, the Putnam Review.   These targeted publications contain highly localized information and act as a cost-effective vehicle for smaller advertisers.   Metro West and Metro East are inserted into Charleston Gazette-Mail copies delivered to those Kanawha County zones, as well as wrapped around a Weekend Select insert product, which is delivered to non-subscribers in Kanawha County.   The Putnam Review is sold at single-copy locations, inserted into Charleston Gazette-Mail copies delivered to Putnam County, and wrapped around Weekend Select insert packages delivered to non-subscribers in Putnam County.

9.     Some of the Debtors' additional products include a saturation mail product, Pulse, which provides advertisers with 100% household coverage in Kanawha and Putnam Counties,

and The Clipper, a monthly coupon book inserted in the Charleston Gazette-Mail.  Also, the Charleston Gazette-Mail produces a weekly real estate tab, as well as specialty publications that include Health Care Connections and WVU Game Day, which is published and distributed for WVU football weekends.  The paper's more than 50 special sections include The Best in Valley and a tab for the annual Greenbrier Classic PGA event.

10.    The Charleston Gazette-Mail also maintains a strong digital presence centered on its web-site, www.wvgazettemail.com, which averages more than 3.3 million page views and one million users per month.  Its social media audience includes approximately 72,000 Facebook followers and approximately 54,000 Twitter followers.  The web-site features special sections, including PREPS, which features extensive coverage of local high school sports.  It also publishes more than 30 blogs, including Coal Tattoo, WVU Sports, PopCult, Vines & Vittles and Capitol Notebook, which have approximately 10,500 subscribers.  Several regular newsletters are also produced, including The Weekender, WV A.M. Update, Your Mountaineers and Outdoor Pursuits.  The Debtors also maintain the following verticals: www.wvcarfinder.com; www.wvrealestatefinder.com; www.wvjobfinder.com; and www.gazettemailclassifieds.com.

11.    The Charleston Gazette-Mail's editorial staff has won awards for excellence in reporting for decades, but perhaps none more significant than the 2016 Pulitzer Prize for Investigative Journalism.  In April, 2017, it was announced that Eric Eyre of the Charleston Gazette-Mail had won the Pulitzer Price for Investigative Journalism for his coverage of the opioid crisis in small-town West Virginia.  Mr. Eyre's investigation also won the Scripps Howard First Amendment Award, was a finalist for the Selden Ring awards and won a first-place award for investigative reporting from the Association for Healthcare Journalists.

- 4 -

12.     The Charleston Gazette-Mail also was recently named the West Virginia Press Association's Best Newspaper of the Year, and took home other first-place awards at the annual contest, including: (a) Eric Eyre, best in-depth or investigative reporting; (b) Rob Byers, best news columnist; (c) Dawn Miller and Kelly Merritt, best editorial pages; (d) Ryan Quinn, best news feature; (e) Chris Atkins, best front page; (f) Mitch Vingle, best sports columnist; (g) Andrew Brown and Sam Owens, best business, economic or labor reporting; and (h) Sam Owens, best photo essay.

13.     The Debtors' operate out of a 129,000 square-foot facility located at 1001 Virginia St. E, Charleston, West Virginia. The Debtors also own a five-story parking garage located across the street, but which is connected to the Debtors' facility via a third-floor skywalk. A portion of the parking garage is used for employee parking and the approximately 200 remaining parking spaces are leased to local businesses. The Charleston Gazette-Mail is printed on the company's Goss Metroliner press, which is composed of 11 press units, three folders and a Dauphin Graphics color tower. The Debtors have several commercial printing customers, including the Huntington Herald-Dispatch and Southern West Virginia Papers, a group of small newspapers acquired by the Herald-Dispatch in May, 2017.

**B.     The Debtors' History**

**1.     The Inception of the Charleston Gazette, the Charleston Daily Mail and Their Joint Venture**

14.     The Charleston Gazette-Mail resulted from the 2015 consolidation of the Charleston Gazette and the Charleston Daily Mail—two newspapers with roots tracing back to the late 1800's. The Charleston Gazette originated in 1873, at which time it was a weekly newspaper known as the Kanawha Chronicle. It was later renamed the Kanawha Gazette, then the Daily Gazette, before officially becoming the Charleston Gazette in 1907. In 1912, the

- 5 -

Chilton family of Charleston, West Virginia acquired the Charleston Gazette, and, to this day, the family continues to own a majority interest in the Debtors' business.

15.     The Charleston Daily Mail began as the Evening Call, which was renamed the Evening Mail in 1893, but which became a morning paper known as the Charleston Mail in 1894.  The Charleston Mail changed ownership numerous times during the early 1900's before it was acquired in 1914 by Walter Eli Clark, a teacher, reporter, gold prospector and governor of Alaska.  In 1920, the Charleston Mail was renamed the Charleston Daily Mail and, in 1927, the Daily Mail moved to the Debtors' current headquarters.

16.     Walter Eli Clark passed away in 1950 and, in 1958, Daily Gazette (the owner of the Charleston Gazette) and Clay Communications (the owner of the Daily Mail) entered into a joint operating agreement, which enabled the two newspapers to share circulation, advertising, accounting and production responsibilities while at the same time retaining their own separate news and editorial identities.   The joint venture was originally known as the Charleston Newspapers Agency, but after the enactment in 1970 of The Newspaper Preservation Act, 15 U.S.C. §§ 1801, *et seq.* (the "Act"), it changed its name to Charleston Newspapers, which was and continues to be a West Virginia unincorporated joint venture.   In 1987, Clay Communications sold the Daily Mail to an affiliate of the Toronto-based Thomson Newspapers, which, in turn, sold the Daily Mail to the Denver-based MediaNews Group, Inc. ("MediaNews Group") in 1998.  An affiliate of MediaNews Group, Charleston Publishing Company ("CPC"), was created to hold title to the Daily Mail assets.

### 2.     Daily Gazette's Acquisition of MediaNews Group's Economic Interest in Charleston Newspapers

17.     In 2003, MediaNews Group agreed to sell the Daily Mail to Ogden Newspapers, which prompted Daily Gazette to exercise a right of first refusal under the joint operating

agreement to acquire the Daily Mail.   However, the transaction proved challenging and complicated because the parties needed to navigate the Act and structure the transaction to the satisfaction of the Department of Justice ("DOJ").   Accordingly, the parties agreed that: (a) Daily Gazette would acquire MediaNews Group's economic interest in the joint venture—Charleston Newspapers; (b) CPC would contribute all of the Daily Mail assets to Charleston Newspapers; and (c) CPC would retain a reversionary interest in the assets contributed to Charleston Newspapers, including the rights to the web-site "dailymail.com."   Further, a key to the parties' compliance with the Act included an agreement that MediaNews Group would retain sole responsibility for the editorial content of the Daily Mail and receive in exchange a management fee of $200,000 *per annum*.

18.    On May 7, 2004, the parties memorialized their transaction (the "2004 Transaction") pursuant to the terms and conditions of a Master Restructuring and Purchase Agreement by and among Daily Gazette, MediaNews Group, CPC and Charleston Newspapers. In connection therewith, the parties formed CNH to manage the business and affairs of Charleston Newspapers, the parties entered into a revised joint operating agreement, and Daily Gazette formed DGHC to serve as the General Partner of CNH.

**3.     The Consent Decree**

19.    Notwithstanding the parties' best efforts to comply with the Act, in May, 2007, the DOJ commenced a lawsuit challenging the 2004 Transaction under antitrust laws.   The lawsuit lingered for years until the entry of a Consent Decree on July 19, 2010.  As a result of the Consent Decree, on July 23, 2010, among other things: (a) DGHC and CPC entered into an Amended and Restated Limited Partnership Agreement for Charleston Newspapers Holdings, L.P. (the "CNH LP Agreement"); (b) Daily Gazette, DGHC, CNH, Charleston Newspapers, DGPC and CPC entered into a Second Amended and Restated Joint Operating Agreement (the

- 7 -

"<u>JOA</u>"); and (c) Daily Gazette and DGHC entered into an Amended and Restated Operating Agreement of Daily Gazette Holding Company, LLC (the "<u>DGHC LLC Agreement</u>").

20.    The only material change to the CNH LP Agreement, the JOA and the DGHC LLC Agreement was the creation of a five member board of managers for DGHC, which was to be formed with three members designated by Daily Gazette and two members designated by CPC.   Nevertheless, the day-to-day activities and operations of DGHC were vested in Daily Gazette, and all actions outside the ordinary course of business had to be approved by only a majority of the board of managers.   In other words, except as set forth below, Daily Gazette had complete authority and control over the management and business of Charleston Newspapers as the sole member of DGHC, which, in turn, is the General Partner of CNH.   The only items requiring the consent of at least four members of the board of managers were the budgeted "Editorial Expenses" for the Charleston Gazette and the Daily Mail and "news hole" and color usage allocations for the respective papers.   Other than the formation of the board of managers and an increase in CPC's management fee to $225,000 *per annum*, the operative agreements largely remained the same—CPC continued to retain a reversionary interest in the Daily Mail assets contributed to Charleston Newspapers and continued to have complete and exclusive control and direction of the editorial department and policies of the Daily Mail.   The Consent Decree, which was to run for a five-year period, required the parties' compliance with the forgoing documents and agreements.

### 4.    The Sale of DailyMail.com

21.    Operating pursuant to the Consent Decree proved complicated and inefficient, but Daily Gazette had no choice but to await its expiration prior to engaging in any internal restructuring of the business or initiating any meaningful cost saving measures.   However, in an

137914546.3

effort to raise much needed funds for the joint venture, in April, 2013, DGHC informed CPC that it was negotiating with Associated Newspapers Limited—the publisher of the Daily Mail newspaper in the United Kingdom—for the purchase and sale of the "dailymail.com" web-site. While DGHC did not deem it necessary to procure CPC's consent for such sale, DGHC nevertheless informed CPC of its negotiations and emphasized its rationale for pursuing such a transaction.

22.     In December, 2013, DGHC sold the "dailymail.com" web-site to Associated Newspapers for approximately $1.5 million, which, at the time, the Debtors are informed and believe was among the top 25 highest amounts paid for a web-site address.  Critically, of the sale proceeds, $1 million was used to pay down Charleston Newspaper's secured debt, and the balance was invested in Charleston Newspapers and used to pay certain overdue management fees to CPC pursuant to the JOA.  In other words, the sale proceeds actually inured to the benefit of CPC because the loan secured by, among other collateral, the Daily Mail assets contributed to Charleston Newspapers, was reduced and CPC directly received certain proceeds on account of its unpaid management fees.

### 5.     The Consolidation of Charleston Gazette and Charleston Daily Mail

23.     In May, 2015, and in anticipation of operating the joint venture more profitably and efficiently, Daily Gazette informed CPC that it desired to combine the Charleston Gazette and the Daily Mail after the expiration of the Consent Decree.   Notwithstanding the inefficiencies of maintaining two separate newsrooms and publishing two competing papers, CPC informed Daily Gazette that it would not agree to any such combination without at least consulting the DOJ.   Daily Gazette therefore proceeded to notify the DOJ that, after the

137914546.3

expiration of the Consent Decree, it intended to combine the Charleston Gazette and the Daily Mail.

24.     On July 20, 2015—one day after the expiration of the Consent Decree—Charleston Newspapers publicly announced that the Charleston Gazette and the Daily Mail were combining newsroom functions, and that while they would continue to publish separate editorial page content, the two newspapers would henceforth be, in all other respects, combined into a single newspaper.  Since that time, the newsrooms and editorial staffs of the two newspapers have been merged, and Charleston Newspapers has published only a single newspaper—the Charleston Gazette-Mail.  In connection therewith, Charleston Newspapers also co-opted the former editor and publisher of the Daily Mail—CPC's sole representative in Charleston—into an executive role with the Charleston Gazette-Mail.  The consolidation essentially nullified any obligation on the part of CPC under the JOA to control all of the editorial content of the Daily Mail; likewise, negating any basis for the payment of a yearly $225,000 management fee to CPC.

### 6.     MediaNews Group Arbitration

25.     On or about September 3, 2015, CPC commenced a lawsuit against Daily Gazette and DGHC in the Delaware Court of Chancery.  However, on or about April 26, 2016, the Vice Chancellor dismissed the complaint due to the arbitration provision in the parties' agreements.  Thereafter, the parties agreed to an arbitration before Edward D. McDevitt (the "Arbitrator").  MediaNews Group and CPC alleged that Daily Gazette and DGHC breached the JOA and CNH LP Agreement and requested the following damages: (a) $495,000 in unpaid management fees owed as of July 15, 2015; (b) approximately $1.8 million of future annual management fees through the expiration of the joint venture in 2024; and (c) the loss of the reversionary interest in the "dailymail.com" web-site due to its sale to Associated Newspapers for $1.5 million.  Daily

Gazette and DGHC did not contest that they owed CPC management fees in the amount of $495,000, which were incurred prior to the combination of the Charleston Gazette and Daily Mail newsrooms at the end of July, 2015.   However, Daily Gazette and DGHC strenuously opposed the additional relief requested.

26.     Despite their best efforts to defeat MediaNews Group's and CPC's claims, on August 28, 2017, the Arbitrator executed and published a Final Arbitration Award granting all of the relief requested by MediaNews Group and CPC, thereby resulting in a total award of $3,795,000 against Daily Gazette and DGHC (the "Arbitration Award").

27.     On September 5, 2017, MediaNews Group and CPC filed a Petition for Order Confirming Arbitration Award in the United States District Court for the Southern District of West Virginia, which is pending before Honorable Thomas E. Johnston as Case No. 2:17-cv-03921 (the "District Court Case").   Daily Gazette and DGHC opposed confirmation of the Arbitration Award.   Nevertheless, on January 19, 2018, the District Court confirmed the Arbitration Award.

## D.     The Debtors' Secured Loan

28.     On or about March 28, 2006, United Bank made a term loan to Charleston Newspapers in the principal amount of $31,000,000 (the "2006 Loan") pursuant to the terms of that certain Loan Agreement dated March 28, 2006 by and among the Debtors and Lender, as amended.

29.     On or about May 18, 2011, the Debtors and two of their non-debtor affiliates, ABRY/Charleston, Inc. ("ABRY") and Ridgeview Express Delivery, LLC ("Ridgeview"), and United Bank, entered into a certain Amended and Restated Loan Agreement (the "Loan Agreement"), pursuant to which United Bank made an additional term loan to Charleston

Newspapers in the principal amount of $6,000,000 (the "2011 Loan" and together with the 2006

Loan, the "Loan").[3]  The Loan is evidenced by that certain Consolidated Renewal Promissory

Note dated January 28, 2014, made by Charleston Newspapers and payable to the order of

United Bank in the principal amount of $20,738,922.22 (the "Note").

      30.    Debtors Daily Gazette, DGHC, CNH, DGPC, G-M and their non-debtor affiliates,

ABRY and Ridgeview, each executed guaranties of Charleston Newspaper's obligations to

United Bank.  To secure the Loan, the Debtors, ABRY and Ridgeview granted security interests

to United Bank in all of their tangible and intangible personal property (collectively, the

"Personal Property") pursuant to certain security documents and pledge agreements entered into

among them and United Bank (as amended, restated, supplemented, or otherwise modified from

time to time, collectively, the "Personal Property Security Documents").

      31.    To further secure the Loan, Charleston Newspapers granted a deed of trust lien to

United Bank on its real property located at 1001 Virginia St. E, Kanawha County, West Virginia

(the "Charleston Newspapers Real Property"), pursuant to that certain Amended and Restated

Deed of Trust, Security Agreement, Assignment of Leases and Rents, Financing Statement and

Fixture Filing dated May 18, 2011, granted by Charleston Newspapers to Joyce F. Ofsa, as

Trustee, for the benefit of United Bank, of record in the Office of the Clerk of the County

Commission of Kanawha County, West Virginia in Trust Deed Book 3796, at page 497 (as

amended, restated, supplemented or otherwise modified from time to time, the "Charleston

Newspapers Deed of Trust").

      32.    To further secure the Loan and to secure its obligations pursuant to that certain

Subsidiary Guaranty dated as of March 28, 2006, as amended, G-M granted a deed of trust lien

---

[3]  The purpose of the 2011 Loan was to permit Charleston Newspapers to repay in full certain
subordinated debt then outstanding with ABRY Mezzanine Partners, L.P. and ABRY Investment
Partnership, L.P.

to United Bank on the parking garage located across the street from 1001 Virginia St. E,
Kanawha County, West Virginia (the "G-M Real Property", and together with the Charleston
Newspapers Real Property, the "Real Property"; the Personal Property and the Real Property is
hereinafter collectively referred to as the "Collateral"), pursuant to that certain Amended and
Restated Deed of Trust, Security Agreement, Assignment of Leases and Rents, Financing
Statement and Fixture Filing dated May 18, 2011, granted by G-M to Joyce F. Ofsa, as Trustee,
for the benefit of United Bank, of record in the Office of the Clerk of the County Commission of
Kanawha County, West Virginia in Trust Deed Book 3796, at page 529 (as amended, restated,
supplemented or otherwise modified from time to time, the "G-M Deed of Trust" and together
with the Charleston Newspapers Deed of Trust, the "Deeds of Trust"; the Deeds of Trust and the
Personal Property Security Documents are hereinafter collectively referred to as the "Bank
Security Documents," which, together with the Loan Agreement, the Note and all other
documents executed and delivered by the Debtors, ABRY and/or Ridgeview in connection with
the Loan are hereinafter collectively referred to as the "Loan Documents"; any and all security
interests and liens on the Collateral created by the Loan Documents or otherwise created to
secure any obligations of the Debtors, ABRY and/or Ridgeview to United Bank, the "Liens").

33. Prior to the Petition Date, the Debtors defaulted under the Loan Documents for,
among other things, failing to meet certain financial covenants and failing to make timely
payments to United Bank. As a result, United Bank accelerated the obligations due pursuant to
the Note. However, United Bank did not take any action against the Debtors or the Collateral to
enforce its rights and remedies under the Loan Documents. As of the Petition Date, the Debtors
are liable to United Bank under the Loan Documents in the principal amount of $15.6 million,
plus applicable interest, fees and other charges.

137914546.3

E.      **Liabilities To The Pension Benefit Guaranty Corporation**

34.     Charleston Newspapers sponsored the Charleston Newspapers Retirement Plan (the "Plan"), a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act ("ERISA").   On October 13, 2016, Charleston Newspapers and the Pension Benefit Guaranty Corporation ("PBGC") entered into an agreement (a) terminating the Plan, (ii) establishing August 1, 2015 as the Plan's termination date under 29 U.S.C. § 1348, and (iii) appointing PBGC as statutory trustee of the Plan under 29 U.S.C. § 1342(c).   Charleston Newspapers and the other Debtors herein are jointly and severally liable to PBGC for all liabilities under Title IV of ERISA in connection with the Plan's termination (the "Title IV Liabilities"), including the Plan's unfunded benefits liabilities, due and unpaid Plan contributions, premiums and interest on each of the foregoing, which, as of the Petition Date, totaled more than $12 million.

35.     Prior to the Petition Date, the PBGC and United Bank entered into an agreement whereby, among other things, the PBGC agreed to release all of its liens against the Debtors' assets that comprised United Bank's collateral.   Accordingly, all Title IV Liabilities constitute unsecured claims against Debtors' estates, but for PBGC's purported lien against certain vacant land owned by Daily Gazette that is not part of United Bank's collateral.

F.      **Events Leading To Chapter 11 Filing**

36.     Like most newspapers, the Charleston Gazette-Mail has faced a challenging print advertising environment over the past several years at both the local and national levels.   Waning newspaper advertising spending has caused a general decline in the Debtors' revenues, which is largely attributable to, among other things, competition from internet-based advertising and financial distress in the retail industry.   Indeed, advertisers are relying more heavily than ever on

internet-based advertising, placing much greater dependence on web-site traffic than traditional print media circulation.  Also, the retail industry—upon which newspapers heavily rely for advertising revenues—has experienced significant distress over the past several years, with many notable retailers considerably downsizing or outright liquidating.

37.     In response to the challenging environment in which the Debtors' operate, the Debtors' management has undertaken efforts to right-size the Debtors' expenses and increase revenues by, among other things, reducing headcount, minimizing unprofitable activities and carefully implementing certain price increases.  Moreover, to keep pace with the rapidly changing digital marketplace, the Debtors have placed a greater emphasis on increasing their digital advertising and services, which the Debtors believe could meaningfully boost yearly revenues.

38.     Notwithstanding the Debtors' strategic measures to reduce expenses and increase revenues while maintaining the highest quality product that the Charleston region has come to expect, the Debtors have not been able to fully achieve their goals to enable them to continue operating under their current circumstances.  For example, not only have the Debtors been forced to contend with a rapidly changing newspaper environment, but also the Arbitration has drained critical resources and detracted from the Debtors' primary business objectives.  Moreover, the United Bank debt is simply no longer sustainable, as the Debtors' revenues have been insufficient to satisfy their obligations to United Bank.  These factors together with substantial Title IV Liabilities, competition from alternative news sources and declining advertising sales have left the Debtors in the unenviable position of seeking to sell their business through chapter 11.  The Debtors believe that a sale of their business will safeguard the continued viability of

their unrivaled news and information products and ensure the continued employment of more than 100 individuals.

## **FIRST-DAY MOTIONS**

**A.      Motion To Approve Bidding Procedures And Sale**

39.      On January 29, 2018, the Debtors entered into the Stalking Horse APA with the Stalking Horse Bidder.  The Stalking Horse APA evidences a value-maximizing bid with an all-in value of not less than $11,261,000 (including the Non-Competition Payments described in the motion), plus assumption of certain liabilities, including applicable cure amounts relating to the assumption and assignment of executory contracts and unexpired leases, for substantially all of the Debtors' Assets, subject to competitive bids.

40.      In the Debtors' judgment, the Stalking Horse APA preserves the Debtors' business as a going concern and provides hope that many of the Debtors' employees will have the ability to keep their jobs.  The Stalking Horse APA is not conditioned on financing or the completion of due diligence.  It is conditioned on approval by the Court of the bidding, auction, and sale procedures, including post-petition marketing and competitive bidding, in consultation with United Bank, the United States Trustee and any official committee appointed in these Chapter 11 Cases.

41.      I have reviewed the Stalking Horse APA and the proposed bidding procedures and believe that they provide the Debtors with the best opportunity to maximize the value of their assets for the benefit of their estates and all stakeholders.  Absent approval of the bidding procedures and the Stalking Horse APA, the Debtors may not be able to realize the full value of their assets, thereby jeopardizing the Debtors' maximizing value initiatives in connection with

the sale.  I believe that the sale should move forward according to the terms and conditions of the Stalking Horse APA and the bidding procedures.

**B.     Post-Petition Financing And Cash Collateral**

42.     The Debtors must have access to sufficient cash and liquidity to operate their business in the ordinary course pending a sale transaction.  Without the use of United Bank's cash collateral and access to a post-petition loan in the amount of $400,000, the Debtors may not be able to timely satisfy all of their ongoing operating expenses, included wages and taxes.  If the Debtors are unable to satisfy their debts on a timely post-petition basis, the sale process described above will be unnecessarily jeopardized, which would be devastating to the value of the Debtors' assets and business.  I have reviewed the DIP Loan Agreement and the Interim Order authorizing, among other things, the use of cash collateral, and believe that they are fair and reasonable under the current circumstances and provide the Debtors' with the cash necessary to operate in the ordinary course of business pending a sale transaction.  I am informed and believe that financing on an unsecured basis is unobtainable for the Debtors in light of their current operations and United Bank's existing liens.  Accordingly, I believe that entering into the DIP Loan Agreement and agreeing to the terms of the Interim Order authorizing the use of cash collateral is in the best interests of the Debtors' and their estates and provides the Debtors with the greatest chance to maximize the value of their assets.

**C.     Employee Wages And Benefits**

43.     As set forth above, the Debtors employ approximately 210 individuals, approximately 170 of whom are full-time and approximately 40 of whom are part-timers (collectively, the "Employees").  But for Elizabeth Chilton, Susan Shumate and myself, who are

employed by Daily Gazette Company, all of Debtors' employees are employed by Debtor Charleston Newspapers.

### 1.       Unpaid Compensation

44.       In the ordinary course of business, the Debtors incur payroll obligations to the Employees.  Such obligations comprise of wages and salaries.  Historically, the Debtors have paid all of their employees' wages and salaries on a bi-weekly basis in arrears for work performed two weeks prior and ending the Friday preceding the paycheck date.  The Debtors last paid their Employees on January 19, 2018 for the two-week period ending January 13, 2018.

45.       The Debtors next payroll is due on January 31, 2018, which will cover the two-week payroll ending on January 27, 2018, which payroll totals approximately $271,000.  In addition, the Debtors' next payroll will be due February 14, 2018, and approximately $58,000 will be due for the prepetition period, *i.e.*, Sunday, January 28 through Tuesday, January 30, 2018.  Thus, the Debtors estimate that approximately $329,000 will be owed to their Employees for pre-petition wages (collectively, the "Unpaid Wages").  Accordingly, the Debtors request authorization, in their discretion, to pay the Unpaid Wages in the ordinary course of their business.

46.       To the best of my knowledge, no Employees were owed Unpaid Compensation in excess of the $12,850 statutory priority cap imposed by sections 507(a)(4) and (5) of the Bankruptcy Code.

### 2.       Reimbursement of Expenses

47.       Prior to the Petition Date and in the ordinary course of their business, the Debtors reimbursed Employees for certain reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Business Expenses").  The Reimbursable Business Expenses include, but are not limited to, reimbursements for (a)

- 18 -

business-related travel, such as hotels, airfare, car rental, meals and related expenses; (b) mileage; (c) telephone expenses; (d) membership dues; (e) attendance at conferences; (f) office supplies and equipment; (g) publication expenses; (h) other business-related expenses that are paid by the Employee.

48.     Reimbursable Business Expenses are all incurred on the Debtors' behalf and with the understanding that the Employees will be reimbursed in the normal course of business. Accordingly, to avoid harming those who may have incurred the Reimbursable Business Expenses, the Debtors request authority, to be exercised in their sole discretion, to (a) continue paying Reimbursable Business Expenses in accordance with pre-petition practices, (b) modify their pre-petition policies relating thereto as they deem appropriate, and (c) pay all Reimbursable Business Expenses that relate to the pre-petition period and are submitted to the Debtors post-petition.  The Debtors estimate that outstanding pre-petition Reimbursable Business Expenses total not more than $15,000.

### 3.     Deductions and Withholdings

49.     During each applicable pay period, the Debtors routinely deduct certain  amounts from Employees' paychecks, including, without limitation, (a) any legally ordered deductions such as wage garnishments, child support, and tax levies, and (b) other pre-tax and after tax deductions payable pursuant to certain of the Employee benefit plans described herein, such as an Employee's share of medical, dental and vision benefits and insurance premiums, Employee contributions under flexible spending plans, and other miscellaneous deductions (collectively, the "Employee Deductions").  The Debtors forward these amounts of the Employee Deductions to the appropriate third-party recipients.  On average, the Debtor has deducted approximately $65,865 per each bi-weekly payroll.

50.    Further, the Debtors are required by law to withhold from Employees' wages amounts related to federal, state and local income taxes, social security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withheld Amounts"). The Debtors must then pay, *inter alia*, FICA, social security and Medicare taxes and federal and state unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withheld Amounts, the "Payroll Taxes"). Based on the Debtors' most recent payroll, the Payroll Tax withholdings are approximately $52,088.60 per bi-weekly payroll.

51.    Accordingly, to the extent the Debtors are authorized to pay the Unpaid Wages, the Debtors seek authority to continue on a postpetition basis to deduct the Employee Deductions, withhold all Withheld Amounts and timely pay all Payroll Taxes. Moreover, prior to the Petition Date, the Debtors withheld the appropriate amounts from Employees' earnings for the Payroll Taxes, but such funds may not yet have been forwarded to the appropriate taxing authorities. The Debtors request authority, but not direction, to forward, or to direct third parties to forward, any outstanding Payroll Taxes to the appropriate third parties, and to continue to honor and process the pre-petition payments for Payroll Taxes on a post-petition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

### 5.    Employee Benefits

52.    The Debtors maintain various plans and policies to provide their employees with various benefits, including (a) medical, dental, and vision coverage through employee benefit plans and flexible spending accounts, (b) vacation time and other paid time off, (iii) short-term and long-term disability and life insurance, and (c) retirement plans (401k) (collectively, the "Employee Benefits"). The Employee Benefits are described in greater detail below.

- 20 -

### a.  Medical and Dental Plans

53.     The Debtors currently maintain and provide medical benefits to all active eligible employees.[4]  The Debtors offer a variety of medical plans administered by BlueCross BlueShield of West Virginia, dental plans administered by Guardian-Delta Dental, and eye care plans administered by Guardian-Davis Vision (all together, the "Medical Plans").  Participation of those employees who elect to participate in the Medical Plans cost the Debtors approximately $46,000 in the aggregate per month over the most recent months.

54.     The Medical Plans represent an integral component of each participating Employee's benefits package, and without these benefits, the Debtors believe they would be unable to retain all of their personnel and would impose a severe hardship on those employees and their families. The Debtors seek authority, in their sole discretion, to (a) continue offering the Medical Plans for Employees in the ordinary course of business, (b) continue making the above-described contributions to such benefit programs, and (c) pay any amounts related thereto, including on account of any premiums, claim amounts, and administration fees to the extent that they remain unpaid as of the Petition Date.

### b.  Workers' Compensation Insurance

55.     The Debtors provide workers' compensation insurance for their Employees at the statutorily-required level for each state (the "Workers' Compensation Program").  These benefits are currently provided for West Virginia-based employees through (a) an insured plan administered by Erie Insurance at no cost to employees (for Charleston Newspapers' employees) and (b) an insured plan administered by Brickstreet Insurance at no cost to employees (for Daily Gazette Company's employees).  The Debtors pay annual insurance premiums and fees in installments to Erie Insurance in the approximate amount of $85,755.  The Debtors pay a

---

[4]      Certain part time and temporary employees are not eligible for medical benefits.

137914546.3

$852.00 annual premium to Brickstreet Insurance.  On the Petition Date, Debtors estimate that approximately $66,698.36 remains due with regard to the Workers' Compensation Program. The Debtors request authority to continue to maintain, in their sole discretion, the Workers' Compensation Program in the ordinary course of business and to pay in their sole discretion any and all pre-petition amounts related thereto including, without limitation, any payments for workers' compensation claims, deductibles, premiums and fees owed for administrative costs, and other amounts required in connection with the Workers' Compensation Program, as such amounts become due in the ordinary course of the Debtors' business.

### c.      **Vacation Time and Other Leave Time**

56.      The Debtors provide vacation time to Employees as a benefit of employment (including defined Holiday Pay, the "Vacation Time").  Accrued Vacation time is calculated and earned each pay period, with caps on amounts earned based on years of service.  When an Employee elects to take Vacation Time, generally that Employee is paid his or her regular hourly or salaried rate.  Employees may not receive pay in lieu of Vacation Time except at the time of termination.[5]  If an Employee ceases employment with the Debtors, the Employee's final paycheck will include any accrued unused vacation time.  The Debtors estimate that approximately $214,945 of earned but unused Vacation Time will have accrued as of the Petition Date for all eligible Employees.

57.      The Debtors also allows their Employees to take certain paid and unpaid leaves of absence for personal reasons, many of which are required by law (the "Sick Policy").  Sick Policy days can include family and medical leaves (which includes birth, adoption or childcare leave, family member leave, and personal medical leave).

---

[5]      The amount of paid time off accrued and payable upon termination varies among Employees and requires two (2) weeks' notice to Debtors.

58.     The Debtors request that they be authorized, but not directed, to continue to honor their Vacation Time and Sick Policy commitments in the ordinary course of business, and to honor and pay any pre-petition amounts related thereto.  Moreover, the Debtors anticipate that their Employees will utilize any accrued Vacation Time and Sick Policy allowances in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

### d.       Life and Other Insurance, and Long-Term Disability Benefits

59.     The Debtors' provide employees with basic life insurance coverage (the "Life Insurance") through Guardian Life Insurance Company at no cost to the employee.  Additionally, Employees of Debtors receive long-term disability insurance through Guardian Life Insurance Company.  The total cost to the Debtors for this insurance is approximately $2,486.17 per month.

60.     The Debtors request that the Court authorize, but not direct the Debtors to continue providing the Life Insurance and disability policies and to honor and pay any pre-petition amounts related thereto.

### e.       Flexible Benefit Plans

61.     The Debtors offer their Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for eligible out-of-pocket health care and dependent care costs (the "Flexible Benefit Plans").  The Debtors pay the costs of the Flexible Benefit Plans. Administration of the Flexible Benefit Plans costs the Debtors approximately $4,200.00 per month, and the Debtors withhold $1,803.82 per bi-weekly payroll.  The Debtors request that the Court authorize, but not direct the Debtors to continue providing and administrating the Flexible Benefit Plans and to honor and pay any pre-petition amounts related thereto.

- 23 -

### f.    **Retirement Plans**

62.     The Debtors provide to Employees a 401(k) retirement plan which is administered by RiversEdge Retirement (the "401(k) Plans").    Employees may contribute designated percentages of their gross pay, on a pretax basis, subject to the limitations provided under the Internal Revenue Code.  Gross withholdings for the 401(k) Plans fluctuates during the year, and averaged approximately $8,300.00 per bi-weekly payroll prior to the Petition Date.

### g.    **Other Benefits**

63.     The Debtors sponsor a sales commission plan (the "Sales Commission Plan") to reward certain members of their sales team for meeting monthly target goals.  The Debtors expect that the sales commission's payable for January, 2018 will include amounts that were earned prior to the Petition Date.  The Debtors seek authorization, within their discretion, to pay eligible employees under the Sales Commission Plan in the ordinary course of business, which, according to the Debtors' projections through January 26, 2018, is estimated to be not more than $25,000 (all of which was calculated prior to the Petition Date) and to continue to honor the Sales Commission Program.

### g.    **Retirement and Deferred Compensation Plans**

64.     Debtor Charleston Newspapers maintains a Supplemental Employee Retirement Plan (the "SERP") for the benefit of four current and/or former employees.  The SERP is unfunded and Charleston Newspapers has been paying the employees and/or former employees directly.  Following the Petition Date, Charleston Newspapers does not intend to fund the SERP or make any further payments to the affected employees and/or former employees.

65.     Debtor Daily Gazette Company offers an employee, Elizabeth Chilton, and a former employee deferred compensation.  This plan is likewise unfunded and Daily Gazette

137914546.3

Company has been paying these individuals directly. Following the Petition Date, Daily Gazette Company does not intend to fund this deferred compensation plan or make any further payments to the affected individuals.

66.     The Debtors believe that if they do not pay the Employee Obligations, some or all of the Employees may suffer personal hardships and may seek other employment. Given the importance of the Employees to the Debtors' business, any disruption in their services would severely jeopardize the Debtors' operations and thus would likely hinder the Debtors' ability to maximize value for the estate and administer these cases in an orderly manner.

**D.      Maintaining Insurance**

67.     In the ordinary course of business, the Debtors maintain approximately nine insurance policies (collectively, the "Insurance Policies") that are provided and/or administered by multiple third-party insurance carriers (collectively, the "Insurance Carriers"). The Insurance Policies include, among other things, libel insurance, property insurance, excess liability insurance, employment practice liability insurance, fiduciary liability insurance, crime liability insurance, commercial automobile liability insurance, umbrella policy insurance, commercial general liability insurance and workers' compensation insurance.

68.     In general terms, the Debtors' coverage can be described as follows:

> Liability Insurance. The Debtors maintain general commercial liability insurance policies that provide coverage relating to, among other things, libel, personal injury liability, employment practice liability, crime liability, workers' compensation liability, employee benefit plans and automobile-related liability (collectively, the "Liability Insurance Policies"). The Liability Insurance Policies also include umbrella insurance coverage and excess liability policies. The aggregate annual premium paid for the Liability Insurance Policies is approximately $216,525.00.

> Property Insurance. The Debtors maintain a property insurance policy that provides coverage for damages to the Debtors' real and personal property (collectively, the "Property Insurance Policy"). The aggregate annual premium paid for the Property Insurance Policy is $55,915.

- 25 -

### 1.    Insurance Premiums and Related Finance Payments

69.    The Debtors pay for the cost of insurance in the ordinary course of business (*e.g.*, monthly, quarterly, or annually) from immediately available funds.  The Debtors procured insurance premium financing through Capital Premium Financing ("CPF") for three of their Insurance Policies.  The Debtors currently owe approximately $16,840.46 to CPF.  The Debtors seek authority to honor any amounts owed to CPF to ensure uninterrupted coverage under the applicable Insurance Policies.

### 2.    Insurance Brokers

70.    The Debtors procure their Insurance Policies through Garlow Insurance Agency, Inc. ("Garlow") and Mutual Insurance Company, Ltd. ("Mutual" and together with Garlow, the "Insurance Brokers").  The Insurance Brokers assist the Debtors in obtaining comprehensive insurance coverage at competitive rates by evaluating benefit plan offerings.  The Insurance Brokers collect commissions when the Debtors purchase coverage or when they remit premiums. The Debtors do not know for certain how much is owed to the Insurance Brokers because they are paid directly by the insurance carriers.  Nevertheless, the Debtors estimate that the obligations might total approximately $32,000 to the Insurance Brokers.  The Debtors seek authority to honor any amounts owed to the Insurance Brokers to ensure uninterrupted coverage under the applicable Insurance Policies.

71.    The Debtors request: (a) authorization to (i) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business, including fees associated with their Insurance Brokers and CPF, and (ii) renew, supplement, or purchase insurance policies in the ordinary course of business, and (b) authorizing the Banks to honor and process check and electronic transfer requests related to the foregoing.

137914546.3

### E.    Maintaining Customer Programs

72.    Prior to the Petition Date, and in the ordinary course of business, the Debtors engaged in certain practices, in the form of the Customer Programs, to develop and sustain their positive reputations with subscribers, advertisers, and the marketplace generally.  Specifically, the Debtors (a) offer billing adjustments and refunds to advertisers and subscribers, (b) outsource delivery functions to third party vendors, (c) maintain circulation, website, advertising, and payment processing infrastructure, and (d) run programs designed to recruit new subscribers. The Customer Programs, which are customary in the Debtors' industry, are used to generate goodwill, meet competitive market pressures, and ensure customer satisfaction, thereby retaining current customers, attracting new ones, and ultimately enhancing revenue and profitability.  As set forth below, the Debtors currently owe money in regard to some of the Customer Programs. It is essential to the Debtors' operations that they be authorized to seamlessly continue to honor these prepetition programs after the Petition Date and pay amounts accrued prepetition after the Petition Date.   If they cannot maintain these programs, the Debtors risk harming their relationships with advertisers and subscribers, thereby jeopardizing the Debtors' ability to maximize value to stakeholders.  A summary of the Debtors' significant Customer Programs follows.

### 1.    Billing Adjustments

73.    Despite the Debtors' best efforts, from time to time in the Debtors' businesses, subscribers, advertisers, and other customers are invoiced in error for amounts that they did not actually incur.  These errors include improper invoicing (e.g., when the invoice created does not properly reflect the items ordered by a customer), duplicate payment (e.g., when a customer is charged or pays an incorrect price - either too high or too low for the Debtors' products or

- 27 -

services), adjustments for advertising errors, and various other billing and payment errors (collectively, the "Invoicing Errors"). When a customer pays the amounts invoiced in error, the Debtors correct the Invoicing Errors through billing adjustments (the "Billing Adjustments"), which typically take the form of credits to a customer's account.

74.     Because there is some delay from the time the invoice is first issued to the time the Debtors discover the Invoicing Error, it is difficult to predict with certainty the amount outstanding on account of such errors.

**2.     Refunds**

75.     Despite the Debtors' best efforts, from time to time in the Debtors' businesses, subscribers, advertisers, and other customers are invoiced incorrectly for services that they do not receive. In these instances, the Debtors owe their customers refunds (the "Refunds") for the services or products they did not receive or a cancellation of these services or products. The vast majority of these Refunds are owed when customers report that their paper was not properly delivered or when advertisements have not been run. The Debtors process these refunds in the ordinary course of business.

76.     Because there is some delay from the time the Refund is first discovered to when the Refund is processed, it is difficult to predict with certainty the amount outstanding on account of such errors. In addition, some portion of these Refunds consist of Refund checks which the Debtors mailed out but which have not yet been cashed, went stale, or were returned to the Debtors as undeliverable. As of the Petition Date, the Debtors estimate they owe Refunds to approximately 329 customers and advertisers in the total amount of approximately $7,000.

137914546.3

### 3.      Delivery Providers

77.      The Debtors contract with outside individuals or entities to deliver newspapers to subscribers and retail locations (the "Delivery Providers").  The Delivery Providers' services are critical to the Debtors' operation because without the Delivery Providers, none of the Debtors' newspapers would get to customers, effectively ending the Debtors' business.  The Debtors also contract with third party contractors, who each employ numerous individuals.  As of the Petition Date, the Debtors estimate that they owe not more than $TBD  to the Delivery Providers.

### 4.      Prepaid Newspaper Delivery and Advertising

78.      A significant portion of the Debtors' revenue comes from subscriptions and single copy newspaper sales, with the remainder primarily coming from advertising.  A large portion of the subscription income is prepaid, and the Debtors receive payments from their customers in advance of providing the newspaper delivery or advertising (the "Prepayments").  For instance, subscribers typically prepay for newspaper subscriptions in advance of being provided the newspapers (the "Prepaid Subscriptions").  The Debtors also receive payments from some advertisers in advance of providing advertising to the customer (the "Prepaid Advertisements"). The Debtors generally do not incur actual cash liability on account of the Prepaid Subscriptions and Prepaid Advertisements, but instead incur the obligation to print, insert, and deliver the prepaid subscriptions and advertisements.

79.      Continuing the Debtors' practices with respect to Prepayments is essential to the Debtors' ongoing business operations.  The Debtors operate newspapers—even a single day's interruption in newspaper delivery would threaten the operations of the Debtors.  It is therefore crucial that the Debtors obtain authorization to perform their obligations to deliver Prepaid Subscriptions to their subscribers and provide the Prepaid Advertisements.

137914546.3

80.     As of the Petition Date, the Debtors are holding approximately $800,500 on account of Prepayments, related to both subscriptions ($783,000) and advertisements ($17,500). The Debtors are not requesting to pay any amounts in connection with the foregoing, but rather solely to honor the obligations for which they received prepayments.

### 5.     Postage and Billing Obligations

81.     In the ordinary course of business, the Debtors make regular payments to the Postmaster for the payment of postage fees which are incurred when the Debtors use the United States Postal Service to mail their newspapers to their customers.   The Debtors have several Permit Numbers used for First, Second and Third Class postage.   As of the Petition Date, the Debtors have checks outstanding to the Postmaster for one Permit in an amount not exceeding $17,000.   The Debtors will owe postage for January, 2018 Second Class postage on periodicals in the approximate amount of $6,000.   This payment will be for pre-petition expenses.   Payment of this postage is critical to the delivery of the Debtors' publication to many of the Debtors' customers.

82.     Additionally, the Debtors make regular payments to a service provider for printing and mailing invoices to home delivery subscribers. As of the Petition Date, the Debtors owe not more than $5,000 to the service provider.   Payment to this provider is critical to ensure continuous revenue from the Debtors' subscriber base.

### 6.     Advertising Infrastructure

83.     The Debtors have monetary obligations connected with their online advertising infrastructure (the "Advertising Infrastructure").   The Debtors' liability for the Advertising Infrastructure relates to, inter alia, the costs of serving advertisements to visitors to the Debtors' websites.

137914546.3

84.     The Debtors estimate that they owe approximately $8,500 in claims related to the Advertising Infrastructure as of the Petition Date.  The Debtors believe that if they are not able to continue to pay amounts owed related to the Advertising Infrastructure, they will quickly lose the benefits of their online advertising revenue.

### 7.     Credit Card Processing Fees

85.     The Debtors are parties to certain agreements with credit card processors (the "Credit Card Processors") under which the Credit Card Processors accept and process credit card payments made by the Debtors' customers for subscription and advertising purchases.  The Credit Card Processors deduct a credit card processing fee from the initial charge on the credit card and then remit the balance to the Debtors, subject to certain adjustments, returns and refunds.  The Debtors desire to continue the processing arrangements in the ordinary course, including honoring software fees, adjustments, returns, and refunds that may relate to the prepetition period.

86.     Preserving the processing relationship is essential to the Debtors' ability to allow their customers to continue to pay by credit card and thus to the preservation of the customer relationship and the maximization of estate value for all stakeholders.  Losing this ability would impose a significant burden on the Debtors' customers who prefer the option of making their subscription and advertising payments by credit card and would eliminate a major avenue for conducting sales transactions with future customers.

87.     As of the Petition Date, the Debtors estimate they may owe approximately $15,000 on account of prepetition Credit Card Processing Fees, including approximately $2,000 for software fees to third party processors.

8.      **Retention & Kiosk Sales Programs**

88.     In order to best serve their customers, the Debtors have engaged the services of certain third-party vendors (the "Sales Vendors") to conduct certain retention and sales programs (the "Sales Programs").  Due to the direct level of contact between these Sales Vendors and the Debtors' customers, many customers perceive them  as direct employees of the Debtors and purchase the Debtors' products through these representatives.  As a result, the failure of these Sales Vendors to adequately perform their services could severely undermine revenue and customer loyalty. The Debtors estimate that they owe their Sales Vendors approximately $2,000 as of the Petition Date.

9.      **Trade Programs**

89.     The Debtors have entered into agreement with certain advertisers whereby the Debtors exchange advertising space in their newspapers in return for services provided to the Debtors by the advertiser (the "Trade Agreements").  Thus, in some instances, instead of receiving a cash payment from the advertiser for the running of a particular advertisement or series of advertisements, the Debtors receive a service or good from the advertiser.  The Trade Agreements are custom-negotiated by the Debtors and the advertisers.  For example, these programs currently include an exchange of free newspaper advertising provided by the Debtors for free advertising at a local sports arena.

90.     The Trade Agreements provide significant value to both the Debtors and the Debtors' advertisers.  The Trade Agreements offer the advertisers additional options and flexibility in making payments to the Debtors, which help to retain the long-term business of the advertiser.  The Debtors enjoy valuable opportunities to promote their newspapers to potential subscribers and customers at no cash expense.

137914546.3

91.     As of the Petition Date, the Debtors estimate that there is $12,000 of liability in connection with the Trade Agreements.  The Debtors do not anticipate having to make any payments on account of the Trade Agreements because the Debtors will be able to satisfy any obligations under the Trade Agreements by providing the counter parties with advertising in the publications owned by the Debtors at little marginal cost.

**10.     Circulation System Management and Website Support**

92.     The Debtors rely on third-party vendors to provide critical circulation management software and website support functions (all together, the "Software Support Providers").  The Software Support Providers provide services that ensure the Debtors can, for instance, receive and track subscriptions and ensure delivery to paid subscribers and manage their website.  Without the Software Support Providers, the Debtors would be unable to ensure accurate delivery of both print and online news content to their customers.  The Debtors estimate that they may owe as much as $5,000 to the Software Support Providers as of the Petition Date.

93.     The success and ultimate viability of the Debtors' businesses are dependent upon (a) the Debtors' ability to attract new advertisers, subscribers, and other customers, and (b) the Debtors' ability to maintain relationships with their existing customers, subscribers, and other customers.

94.     The Debtors believe that in order to attract new customers, maintain such relationships, and ensure customer loyalty, the Debtors must continue to honor the Customer Programs.  In the competitive industries in which the Debtors operate, failure to honor the Customer Programs arising from advertising, subscription, delivery, and other relationships that are the same or similar to their competitors is likely to have a material adverse impact on the Debtors' ability to attract new customers and maintain existing customers.

137914546.3

95. The Debtors' failure to honor these programs may also cause unrecoverable negative press which would undermine the Debtors' ability to attract and retain customers and maximize value to stakeholders through the sale of their assets and operations.

96. Moreover, the Debtors believe that if they are not authorized to continue the Customer Programs during the pendency of these Chapter 11 Cases, their valuable business relationships with their customers, suppliers, and advertisers will be severely jeopardized. Even a short delay by the Debtors in continuing their Customer Programs could cause serious and irreparable harm to the value of the Debtors' estates.

97. Further, some of the aforementioned parties to whom the Debtors owe various obligations may have set off or recoupment rights that would permit them, with Court approval to the extent necessary, to offset the Debtors' obligations to them against prepetition amounts they owe the Debtors. Because the obligations owing to customers who have set off or recoupment rights would be paid or satisfied from assets of the Debtors' estates if those customers exercise their setoff or recoupment rights, the payments proposed will not reduce the Debtors' assets available to other creditors.

98. The Debtors submit that the total amount to be paid or credited to customers if the Court grants the requested relief is small compared with the losses that the Debtors could suffer if the patronage of their customers erodes at the outset of the Chapter 11 Cases. In sum, maintenance of the Customer Programs is essential to the continued vitality of the Debtors' businesses and ultimately, to their prospects for a value-maximizing sale of assets. The Debtors thus submit that permitting them to continue to honor the Customer Programs and pay existing amounts owed under the Customer Programs is in the best interests of their estates, their creditors, and all other parties in interest.

137914546.3

**F.      Maintenance Of Bank Accounts And Cash Management Systems**

99.      In connection with the Debtors' ordinary course of operations, they maintain and/or actively use a total of 12 bank accounts, eight in the name of Charleston Newspapers, three in the name of Daily Gazette Company, and three in the name of G-M Properties, Inc. (collectively, the "Bank Accounts").   The applicable function of each of the Bank Accounts is described more particularly as follows (the "Cash Management System").

100.      The Debtors maintain all of their Bank Accounts with United Bank ("United Bank"), Branch Banking and Trust Company ("BB&T"), Huntington National Bank ("Huntington" and together with United Bank and BB&T, the "Banks").   The Debtors plan to close the accounts with BB&T and Huntington National Bank.   They are informed and believe that United Bank is approved by the Office of the United States Trustee.

101.      The Debtors' Bank Accounts and a description of their Cash Management System are identified below, and the balance of each account is accurate as of January 26, 2018:

**1.      Charleston Newspapers Accounts**

Operating Account (United Bank): All account balances pass to and from this account at the end of each day.   It is also used for outgoing wires and ACH payments.   The balance of the Operating Account is approximately $260,247.69.

Lockbox Account (United Bank): This is a depository account and most transactions are related to amounts received from subscribers and advertisers.   Amounts received in this Lockbox Services Account are transferred at the end of each day to the Operating Account so that there is a zero balance in this Lockbox Services Account at the end of each business day.

Merchant Account (United Bank): This is a depository account and most transactions are related to amounts received from subscribers and advertisers.   Amounts received in this Merchant Services Account are transferred at the end of each day to the Operating Account so that there is a zero balance in this Merchant Services Account at the end of each business day.

Payroll Account (United Bank): This is a Payroll liabilities account and is used only for payroll of Charleston Newspapers.  Amounts written on this account are covered by transfers at the end of each day from the Operating Account so that there is a zero balance in the Payroll Account at the end of each business day.

Medical Account (United Bank): This is a Medical Claims account and transactions are manually funded from the Operating Account. The balance of the Medical Account is $0.00.  This account is funded for only what is needed to cover weekly claims submitted.

Flex Benefits Account (BB&T): This is a Flexible Benefits account and funding for transactions are manually done from the Operating Account. The balance of the Flex Benefits Account is approximately $1,793.72.  This account is funded for only what is needed to cover weekly claims submitted.

Trust Account (BB&T): This account is no longer used by any of the Debtors.  It has a zero balance and will be closed.

Convergent Digital Media Account / Operating (Huntington): The Debtors intend to close this account and transfer the balance, if any, to the Operating Account.  Any such balance in this account is less than $10,000.

**2.      Daily Gazette Company Accounts**

Operating (United): This account is used to pay Daily Gazette payables and liabilities, such as payroll and tax liabilities.  It is manually funded from the Charleston Newspapers' Operating Account.   The funding is in exchange for management and publishing fees payable to the Daily Gazette Company.   The balance of the Operating Account is approximately $8,405.86.

Distribution Account (United): This account is no longer utilized by any of the Debtors.  It has a zero balance and will be closed.

Trust Account (BB&T):  This account is no longer utilized by any of the Debtors.  It has a zero balance and will be closed.

**3.      G-M Properties, Inc. Accounts**

Operating Account (United): This account is used to pay G-M Properties payables, such as taxes, licenses, etc., and is manually funded, as needed, from the Charleston Newspapers Operating account.  The balance of the Operating Account is $0.00.  This account is funded for only what is needed to cover payments made.

- 36 -

### 4.      Debtor's Existing Business Forms

102.     As part of the ordinary course of operating their business as a going concern, the Debtors use a variety of checks and other business forms (collectively, and as they may be modified, the "Business Forms") in the name of the Debtors.  To minimize expenses to the estate and avoid confusion on the part of creditors, the Debtors respectfully request that the Court authorize the Debtors to continue to use the Business Forms in existence immediately before the Petition Date without reference to the Debtors' status as debtors-in-possession; provided, however, that upon depletion of the Business Forms stock, the Debtors will obtain new Business Forms reflecting their status as debtors-in-possession.  With such authorization, the Debtors will be able to avoid the expense and delay of ordering entirely new Business Forms.

103.     Given the need for the Debtors to continue operating their business as a going concern, it would be unnecessary and unduly burdensome to establish an entirely new cash management system.  To comply with the UST Guidelines, the Debtors would need to execute new signatory cards and depository agreements while creating a new manual system for issuing checks and paying post-petition obligations.  The delays that would result from opening these accounts and revising cash management procedures would undoubtedly delay the efficient operation of the Debtors' business.

104.     The Debtors seek further to confirm their authority to implement changes to the Cash Management System in the ordinary course of business, without further order of the Court, in the event that the Debtors conclude that such changes in or to the Cash Management System are necessary and beneficial to their estates.

### G.      Payment Of Taxes

105.     In the ordinary course of business, the Debtors are required to pay certain taxes and fees, including, but not limited to, sales, use and other similar taxes and business and

- 37 -

regulatory fees (collectively, the "Taxes") to various governmental taxing and licensing authorities (collectively, the "Taxing Authorities"). The process by which the Debtors remit such Taxes varies depending upon the nature of the tax at issue and the Taxing Authority to which the relevant tax is paid. Prior to the Petition Date, the Debtors incurred numerous tax obligations to the Taxing Authorities and, as of the Petition Date, approximately $25,000 of Taxes were outstanding and/or had accrued but were not yet due.

106.    Payment of the Taxes to the Taxing Authorities in full and on time is undeniably justified. If the Debtors fail to timely pay the Taxes, or withhold payment of the Taxes as a precaution, the Taxing Authorities would likely take precipitous actions, which may include seeking to impose liens on the Debtors' assets. The Debtors may also experience a marked increase in audits from the Taxing Authorities. Such actions would unnecessarily divert the Debtors' attention from the bankruptcy process and waste valuable estate resources. An improper lien or the failure to pay certain taxes might also affect the Debtors' good standing, which may hinder the Debtors' ability to engage in certain transactions.

107.    Moreover, the federal government and the State of West Virginia may have laws providing that the Debtors' officers or directors or other responsible employees could, under certain circumstances, be held personally liable for the payment of "trust fund" taxes. To the extent any accrued Taxes were unpaid as of the Petition Date, the Debtors' officers and directors could be subject to lawsuits during the pendency of this chapter 11 case. Although such actions would ultimately have no merit, they would nevertheless be extremely distracting for the Debtors' principals, whose full-time focus must be to maximize the value of the Debtors' estates. These actions could also prove extremely distracting for this Court, which presumably would need to entertain numerous motions to stay or enjoin such actions.

## H.    Key Employee Incentive Plan

108.    The success of the Debtors' Sale, including their ability in the interim to preserve and enhance their cash position and to market their assets appropriately, will determine the level of recovery that the Debtors' stakeholders will ultimately realize.    The most important components of the Debtors' activities during their transition into Chapter 11 and leading up to the Sale are (a) the management of their finances, (b) maintaining business and advertising relationships, and (c) continuing to publish superior news content in an efficient and professional manner and maintaining human capital.    Accordingly, the Debtors have identified nine individuals (the "Key Employees") whose services and efforts are critical to preserving the value of the Debtor's assets and ensuring a successful Sale.    Accordingly, Daily Gazette Company's Board of Directors (the "Board"),[6] with input from the Debtors' advisors, believe that it is essential—and in the best interests of the estates and all creditors and shareholders—to motivate and incentivize the Key Employees to set forth an effort that will achieve the best and highest price for the Debtors' assets.

109.    A successful Sale will require an intensity of effort and performance from the Key Employees that goes well above the ordinary responsibilities of their positions.    It will require the coordinated efforts of the Key Employees to engage in a concerted effort to identify, target and solicit interest in the Debtors' assets from potential purchasers that may assign varying value to some or all of the Debtors' assets and personnel, depending on the integration of the Debtors' business into that of the purchaser following the Sale.    This will in turn require, *inter alia*, intimate knowledge of the current and potential value of the Debtors' relationships with their customers, advertisers, and employees as set against the mercurial news media landscape.    It will also require facilitating and conducting an expeditious diligence, auction (if required) and Sale

---

[6]        None of the Board members are participants in the KEIP.

process, while also winding down operations and limiting the Debtors' obligations to preserve cash on hand.

110.    The Key Employees are certain irreplaceable employees of the Debtors that have deep institutional knowledge and experience necessary to achieve a successful Sale.  Moreover, the Key Employees' understanding of the Debtors' employees, business processes, operations, industry contacts and relationships with the Debtors' vendors are necessary to minimize the costs of administration and promote a robust marketing and sales process.  The Debtors believe the Key Employees have developed relationships and possess knowledge that will be invaluable to further marketing the Debtors' assets, evaluating competing bids, and negotiating a successful Sale.

111.    The KEIP is narrow in scope and covers only the Key Employees who are critical to successful Sale efforts.  Indeed, the Stalking Horse APA (as defined in the Sale Motion) for the sale of the Debtors' assets requires the Debtors to use commercially reasonable best efforts to retain the services of the Key Employees pending the Sale to preserve and maximize the ongoing enterprise value of the Debtors' business, which the Stalking Horse Bidder (as defined in the Sale Motion) "deemed an essential element of [the Stalking Horse APA]."  Accordingly, the Debtors and the Board, in their sound business judgment, have developed the KEIP, and believe that it is important and necessary to quickly implement this incentive plan that would motivate and reward the continued dedication and efforts of the Key Employees.

### 1.    Key Employee Participant Groups

112.    The KEIP provides incentive-based cash awards to the Key Employees to provide efforts in maximizing the value received for the Debtors' assets.  The most senior executives of the Debtors, Norman W. Shumate III (President and Chief Financial Officer) and Susan Shumate

(Publisher), do not participate in the KEIP.  The Key Employees and their respective job titles are as follows:

> ➤ **Michael Moncada, Vice President - Advertising**:

> > o  Mr. Moncada's primarily focuses on retail and classified sales, metro advertising, marketing and art.  Mr. Moncada is a strategic digital sales and marketing leader with decades of experience in executive and national and internationals sales management, executive regional management, and strategic planning.  Mr. Moncada is invaluable to the Debtors' advertising business, which is a substantial revenue-generator for the business.

> ➤ **Linda Hennen, Controller**:

> > o  Ms. Hennen is intimately involved with all daily operations of the Debtors' accounting department.  Ms. Hennen also oversees the Debtors' computer operators, a group that conducts daily operations for circulation and accounting.  Ms. Hennen has more than 20 years of experience in office management, accounts management and bookkeeping with high-volume manufacturers.  Ms. Hennen's skills and resources are necessary to ensure proper accounting and reporting while the Debtors' operate in Chapter 11.

> ➤ **Joel Armstrong, Director of IT**:

> > o  Mr. Armstrong has been with the Charleston Gazette-Mail for more than 28 years.  Mr. Armstrong leads the Debtors' internet services department, which includes oversight of all employees under the internet services, computer services and internet technology departments.  Mr. Armstrong's extensive institutional knowledge and resources are critical to the Debtors' as they try to preserve and maximize the value of their business leading up to the Sale.

> ➤ **Jim Heady, Vice President - Circulation**:

> > o  Since 2013, Mr. Heady has held leadership roles in both the circulation and advertising departments.  Currently, Mr. Heady focuses exclusively on the Debtors' critical need to maintain, and ideally increase, the Debtors' circulation.  Mr. Heady has over 25 years of experience in circulation and marketing with other news organizations, including the Winnipeg Free Press, Athens Banner-Herald and The Florida Times Union.

> ➤ **Rob Byers, Executive Editor**:

> > o  Mr. Byers is the executive editor of the Charleston Gazette-Mail, critically ensuring that only the highest quality news, material and other information is delivered to the Debtors' customers.  Mr. Byers' services are critical to

137914546.3

maintaining the quality of news content that has come to be expected of the Charleston Gazette-Mail and any disruption in his services would directly disrupt the Debtors' ability to produce a quality product to their customers. In addition, Mr. Byers recently won the award for best news columnist from the West Virginia Press Association.

➢ **Dawn Miller, Editorial Page Editor**:

o   As Editorial Page Editor, Ms. Miller is responsible for editing daily and Sunday papers. Ms. Miller's services are critical to the Debtors' ongoing editorial content and without such services the Debtors' operations would be unnecessarily disrupted, thereby jeopardizing the Debtors' efforts to preserve and maximize the value of their business.

➢ **Eric Eyre, Ken Ward, Phil Kabler, GM's - Newsroom**:

o   Mr. Eyre, Mr. Ward and Mr. Kabler constitute the heart and soul of the Charleston Gazette-Mail's newsroom by ensuring the publication of timely, relevant and informative news. Indeed, Mr. Eyre—an 18-year veteran of the Charleston Gazette-Mail—recently won a Pulitzer Prize for investigative reporting for his coverage of the opioid crisis in small-town West-Virginia. He, along with Mr. Ward and Mr. Kabler, are critical to maintaining the integrity and professionalism of the Charleston Gazette-Mail's content. Absent their contributions to the Debtors' business, content could suffer, thereby reducing circulation and subscriber revenues.

113.    Each of the functions performed by these individuals is critical to ensuring a successful Sale at the best and highest price available.

### 2.    Overview of the KEIP

114.    Under the KEIP, each Key Employee can earn an incentive-based bonus designed to achieve a successful Sale of the Debtors' business and assets for the best and highest price. Specifically, under the KEIP, the Key Employees may earn a bonus (the "Transaction Bonus") equal to approximately twenty-five percent (25%) of their yearly salary, for a total bonus pay-out of $151,250. Each Transaction Bonus is earned only upon closing of the Sale and will only be paid from Sale proceeds, upon which United Bank has a lien.[7] Each Transaction Bonus is to be

---

[7]    United Bank, Inc. has agreed, subject to Court approval, to permit payment of the Transaction Bonuses from its collateral, *i.e.*, the proceeds of Sale.

paid upon closing of a Sale to the Key Employees who either (x) remain employed by the Debtors on the date of the closing of the Sale, or (y) are involuntarily terminated without cause, die, or become disabled prior to the closing of such Sale.

115.    On the other hand, in the event no Sale occurs, no payouts will be made under the KEIP.  Likewise, if a Key Employee is terminated for "cause" or such Key Employee voluntarily resigns from his or her position for a reason other than a material reduction in such Key Employee's salary, such Key Employee will not be entitled to a Transaction Bonus.  As such, the bonus payment under the KEIP is specifically designed to incentivize the Key Employees to go beyond their ordinary job functions and take all necessary steps to ensure that the Debtors' assets will be sold to a purchaser at the best and highest price.

116.    In formulating the KEIP with the input and assistance of their counsel and Dirks Van Essen & Murray, the Board determined that the KEIP must be (a) market-based and (b) performance-linked.  The KEIP was ultimately designed to keep the Debtor's Key Employees' total compensation at a market rate and to enhance value in the Debtors' estates.  Accordingly, the Key Employees are only eligible to earn incentive payments if the Debtors consummates a successful Sale of their business and assets.  Further, the amount of the Transaction Bonus payments is based upon a percentage of each Key Employee's annual base salary and, thus, is tied to the Key Employee's job level and duties.

**I.      Adequate Assurance Of Future Performance For Utilities**

117.    The Debtors request (a) a finding that the Utilities have adequate assurance of future payment based, *inter alia*, on the Debtors' establishment of a security deposit in a segregated account equal to 50% of the average monthly bill for each Utility, which amount may be adjusted by the Debtors for reasons specified in the motion and which is without prejudice to the Utilities' right to request additional adequate assurance according to the procedures set forth

- 43 -

below, (b) an order enjoining the Utilities from altering, refusing, discontinuing, or interfering with services to the Debtors on account of any unpaid invoice for pre-petition services, including the making of demands for security deposits or accelerated payment terms, or while a request for adequate assurance of payment in accordance with the procedures set forth herein is pending, and (c) an order establishing procedures for determining requests for additional adequate assurance and authorizing the Debtors to provide such adequate assurance to the Utilities.

118.    Utility service is essential to the Debtors' ongoing operations and the success of the Debtors' reorganization efforts.  Any disruption in utility service at the Debtors' facilities would be costly to the Debtors and harmful to their businesses and would force the Debtors to focus on finding replacement providers and services rather than focusing on operation and restructuring of their businesses, critical tasks at the outset of the Chapter 11 Cases.  Further, any disruption would likely damage customer relationships, adversely affect revenues and profits, and significantly impair the Debtors' restructuring efforts, all to the detriment of the Debtors' estates, creditors, and other parties in interest.  As further discussed below, it is therefore critical that the Utilities continue to provide uninterrupted service to the Debtors.

### 1.    Utilities

119.    In connection with the operation of their businesses and management of their property, the Debtors incur utility expenses in the ordinary course of business for, among other things, electricity, gas, local and long-distance telecom services, data services and television service, and other similar services (collectively, the "Utility Services").  On a monthly basis, the Debtors spend approximately $40,250 per month for the various Utility Services.  These Utility Services are provided by approximately 10 Utilities.  A non-exhaustive list of the Utilities is attached to the motion as Exhibit A.

- 44 -

2.      **Proposed Adequate Assurance**

120.      The Debtors intend to pay all post-petition obligations owed to the Utilities in a timely manner, consistent with the ordinary course of their businesses.  However, to provide adequate assurance of payment for future services, the Debtors propose to deposit (within twenty (20) days of the Petition Date) an amount into an interest-bearing, newly-created, segregated account (the "Adequate Assurance Account") equal in the aggregate to 50% of the average monthly bill for each Utility over the course of the last twelve months prior to the Petition Date (the "Adequate Assurance Deposit") pending further order of the Court.  Because the Debtors' approximate monthly spending on all Utility Services is approximately $40,250, the initial Adequate Assurance Deposit will be approximately one half of that amount, or $20,125.

121.      The Debtors further propose to maintain the Adequate Assurance Account with a minimum balance in the aggregate equal to 50% of the Debtors' average monthly cost of Utility Services through the final hearing on the Motion.  Thereafter, the Debtors propose to adjust the amount in the Adequate Assurance Account to reflect several factors such as: (a) the termination of Utility Services by the Debtors regardless of any Utility's Request (as defined below); (b) an agreement with any Utility pursuant to the procedures below; and (c) the amount spent on Utility Services with a Utility that already holds a deposit or other security from the Debtors.  These adjustments will permit the Debtors to maintain the Adequate Assurance Account in an amount that consistently provides the Utilities that do not otherwise hold deposits or other security with a half-month's deposit on account of such services.

122.      The Debtors submit that the Adequate Assurance Deposit taken together with the facts and circumstances of the Debtors' Chapter 11 Cases, (together, the "Proposed Adequate Assurance") constitutes sufficient adequate assurance to the Utilities.  These protections ensure that all Utilities will have adequate assurance of payment throughout these cases, and the

- 45 -

Debtors believe that no other or further assurance is necessary. As such, each Utility Provider will be unconditionally paid in full on account of services provided post-petition. However, if any Utility believes additional adequate assurance beyond that described herein is required, it must request such assurance pursuant to the procedures set forth below.

**J.     Joint Administration**

123.     The Debtors are "affiliates" as that term is defined under 11 U.S.C. § 101(2). Also, joint administration will eliminate the need to draft, replicate, file, and serve duplicative notices, applications, and orders and will, therefore, save the Debtors and their estates considerable time and expense. Numerous motions, applications, and other pleadings are expected to be filed in the Chapter 11 Cases that will affect each of the Debtors. Joint administration will allow counsel to the various parties in interest to use a single caption for the many pleadings that will be filed and served in the Chapter 11 Cases.

In conclusion, I believe that the relief requested in the first-day motions is necessary and appropriate to permit the Debtors to continue operating in the ordinary course of business and to maximize the value of their assets.

Dated: January 30, 2018

Norman W. Shumate III

137914546.3