## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Daily Gazette Company, *et al.*, | ) | Case No. 18-20028 |
| | ) | |
| Debtors. [1] | ) | (Joint Administration Requested) |

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(a), 363 AND 365 OF
THE BANKRUPTCY CODE FOR: (I) AN ORDER (A) APPROVING AND
AUTHORIZING BIDDING PROCEDURES IN CONNECTION WITH THE SALE
OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS, (B) APPROVING AND
AUTHORIZING THE BREAK-UP FEE, (C) SCHEDULING THE RELATED
AUCTION AND HEARING TO CONSIDER APPROVAL OF THE SALE,
(D) APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES, (E) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER
(A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND
OTHER INTERESTS, (B) AUTHORIZING AND APPROVING THE DEBTORS'
PERFORMANCE UNDER THE ASSET PURCHASE AGREEMENT,
(C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE
DEBTORS' EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED
THERETO, AND (D) GRANTING RELATED RELIEF**

Daily Gazette Company, and its affiliated debtors and debtors-in-possession (collectively,

the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby submit

this motion (the "Motion") for the entry of: (i) first, an order, substantially in the form attached

hereto as Exhibit A (the "Sale Procedures Order"), (a) approving and authorizing certain bidding

procedures (the "Bidding Procedures," substantially in the form attached to the proposed Sale

Procedures Order as Exhibit 1 thereto) in connection with the sale of substantially all of the

Debtors' assets (the "Assets") pursuant to the asset purchase agreement, substantially in the form

---

[1]     The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's taxpayer
identification number are as follows: Daily Gazette Company (4480); Daily Gazette Holding
Company, LLC (2981); Charleston Newspapers Holdings, L.P. (3028); Daily Gazette Publishing
Company, LLC (3074),Charleston Newspapers (6079), and G-M Properties, Inc. (4124).  The
Debtors' headquarters are located at 1001 Virginia St. E, Charleston, West Virginia 25301.

attached hereto as <u>Exhibit B</u> (the "<u>Stalking Horse APA</u>"), by and among the Debtors and

Wheeling Newspapers, Inc. (the "<u>Stalking Horse Bidder</u>"), subject to the outcome of a

competitive bidding process and, if the Debtors receive one or more timely and acceptable

Qualified Bids (as defined herein), an auction (the "<u>Auction</u>"), (b) authorizing the Debtors to pay

the Stalking Horse Bidder a fee of $400,000 (the "<u>Break-Up Fee</u>") when and if payable pursuant

to the terms of the Stalking Horse APA; (c) scheduling the Auction and hearing to consider

approval of the sale, (d) approving procedures related to the assumption and assignment of

certain of the Debtors' executory contracts and unexpired leases (the "<u>Assumption and</u>

<u>Assignment Procedures</u>"); (e) approving the form and manner of notice thereof; and (f) granting

related relief; and (ii) second, an order, substantially in the form attached hereto as <u>Exhibit C</u> (the

"<u>Sale Order</u>"), (a) authorizing the sale of Assets free and clear of liens, claims, encumbrances,

and other interests, except as provided by the Stalking Horse APA or any asset purchase

agreement constituting a Successful Bidder's Qualified Bid, (b) approving the assumption and

assignment of certain of the Debtors' executory contracts and unexpired leases related thereto,

and (c) granting related relief.  The facts and circumstances supporting this Motion are set forth

in the concurrently filed Declaration of Norman W. Shumate III in Support of Chapter 11 Filings

and First-Day Motions (the "<u>First Day Declaration</u>")[2] and Declaration of Phil Murray in Support

of the Debtors' Sale Motion (the "<u>Murray Declaration</u>"), a copy of which is attached hereto as

<u>Exhibit D</u>.  In further support of this Motion, the Debtors respectfully state as follows:

## <u>JURISDICTION AND VENUE</u>

1.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157

and 1334.

---

[2]        Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such
terms in the First Day Declaration.

138163628.1

2.      This is a core proceeding under 28 U.S.C. § 157(b), and the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and legal predicates for the relief sought herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 6004-1 and 9013-1.

## BACKGROUND

5.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue managing their properties and operating their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed in these Chapter 11 Cases.

6.      Additional information about the Debtors' business and the events leading to the commencement of these chapter 11 cases can be found in the First Day Declaration, which is incorporated herein by reference.

## RELIEF REQUESTED

7.      By this Motion, the Debtors request, first, that the Court enter the Sale Procedures Order (i) approving and authorizing the Bidding Procedures, (ii) approving and authorizing the payment of the Break-Up Fee, (iii) scheduling the Auction and hearing to consider approval of the sale, (iv) approving the Assumption and Assignment Procedures, approving the form and manner of notice thereof, and (vi) granting related relief; and that, subsequently, the Court enter

- 3 -

the Sale Order (a) approving the sale of substantially all of the Assets free and clear of all liens, claims, encumbrances, and other interests to the party or parties submitting the highest or otherwise best bid for the Assets, (b) approving the assumption, assignment, and sale of certain executory contracts and unexpired leases (and related cure amounts), and (c) granting related relief.

## EVENTS LEADING TO THE SALE

8.      The Debtors, headquartered in Charleston, West Virginia, collectively operate privately owned information and entertainment businesses consisting of the flagship newspaper, The Charleston Gazette-Mail, as well as a related website, weekly publications, a saturation mail product and the following verticals: www.wvcarfinder.com; www.wvrealestatefinder.com; www.wvjobfinder.com; and www.gazettemailclassifieds.com.     The Debtors employ, collectively, approximately 210 people, approximately 170 of which are full-time employees and 40 of which are part-timers.

9.      In the past several years, competition from alternative news sources and a general decline in newspaper readership have contributed to a decline in the Debtors' revenue. Additionally, competition from internet-based advertising alternatives has eroded traditional print media sources of revenue for the Debtors and across the newspaper industry.  In response to declining revenues, the Debtors have worked hard to implement all reasonable measures to minimize operational expenses.  As much as possible, the Debtors have reduced headcount, minimized unprofitable activities, and carefully implemented certain price increases.  The Debtors have also placed a greater emphasis on increasing their digital advertising services to keep pace with the rapidly changing digital marketplace.

10.      Notwithstanding the Debtors' strategic measures to reduce expenses and increase revenues while maintaining the highest quality product that the Charleston region has come to

138163628.1

expect, the Debtors have not been able to fully achieve their goals to enable them to continue operating under their current circumstances.  For example, not only have the Debtors been forced to contend with a rapidly changing newspaper environment, but also an arbitration award of nearly $4 million was entered and confirmed against Daily Gazette and DGHC in favor of MediaNews Group, Inc. and Charleston Publishing Company (together, the "Judgment Creditor") prior to the Petition Date, the Debtors owe more than $12 million to the Pension Benefit Guaranty Corporation ("PBGC") in connection with the prepetition termination of Charleston Newspapers' retirement plan, and the Debtors can no longer satisfy their ongoing obligations to their secured lender, United Bank, to which, as of the Petition Date, the Debtors' owed approximately $15.6 million.  Put simply, the Debtors can no longer sustain their business operations under the current circumstances.

11.     Accordingly, the Debtors have made the decision to sell substantially all of their assets pursuant to section 363 of the Bankruptcy Code.[3]  The Debtors believe that a sale of their assets and operations will maximize the potential return for creditors while ensuring the ongoing viability of their news and information products and the ongoing employment of hundreds of people.

12.     To that end, on September 26, 2017, the Debtors engaged Dirks, Van Essen & Murray ("Dirks Van Essen") to market substantially all of the Debtors' assets for sale.  Dirks Van Essen is the leading merger and acquisition firm in the U.S. newspaper industry and the foremost industry authority on transactions and valuations of daily newspapers.  Thirteen (13) of

---

[3]     The sale described herein excludes a certain parcel of real estate owned by Daily Gazette Company, which consists of approximately 5 acres of vacant land in Dry Fork District, Tucker County, West Virginia, that is commonly known as Tract No. 38 in Deer Ridge Section of Timberline Sub-Division, and which is not encumbered by United Bank's lien (the "Tucker County Real Estate").

138163628.1

the fifteen (15) largest newspaper companies in the U.S. have engaged Dirks, Van Essen &
Murray to assist them in divesting their own daily or non-daily newspapers.

13.     Dirks Van Essen began the marketing process by developing a confidential
information memorandum (the "CIM") and other marketing materials and identifying 15 parties
as potentially interested in purchasing the Assets.  Dirks Van Essen contacted each of the
identified parties and requested that they sign a non-disclosure agreement ("NDA") prior to
reviewing the CIM.  Of the 15 parties identified and contacted by Dirks Van Essen, 13 executed
the NDA, after which time Dirks Van Essen distributed the CIM to those thirteen parties
(collectively, the "Initial Potential Buyers").

14.     Dirks Van Essen then engaged the Initial Potential Buyers in telephone
conversations and provided each of them with access to certain information relating to the
Debtors' business.  After permitting the Initial Potential Buyers with an opportunity to conduct
their initial phase of due diligence, Dirks Van Essen delivered a letter to each of them requesting
that such buyers submit initial, written expressions of interest.  Three of the Potential Buyers
submitted such expressions of interest (collectively, the "Final Potential Buyers").

15.     Thereafter, the Final Potential Buyers were permitted access to a data room
containing substantial due diligence materials and confidential financial information, which was
continually supplemented by Dirks Van Essen in conjunction with the Debtors and their
representatives, and in response to requests by the Final Potential Buyers.  Moreover, the
Debtors' management, in cooperation with Dirks Van Essen, provided each of the Final Potential
Buyers with in-person presentations and tours of the Debtors' facility, which presentations and
tours occurred on November 7, 8 and 13, 2017.  Ultimately, the Stalking Horse Bidder submitted
the highest and best offer for the acquisition of the Debtors' Assets.

138163628.1

16.     As a direct result of that four-month process, on January 29, 2018, the Debtors

entered into the Stalking Horse APA with the Stalking Horse Bidder.  The Stalking Horse APA

evidences a value-maximizing bid with an all-in value of not less than $11,261,000 (including

the Non-Competition Payments described below), plus assumption of certain liabilities,

including applicable cure amounts relating to the assumption and assignment of executory

contracts and unexpired leases, for substantially all of the Debtors' Assets, subject to competitive

bids.

17.     The Stalking Horse APA preserves the Debtors' business as a going concern and

provides hope that many of the Debtors' employees will have the ability to keep their jobs.  The

Stalking Horse APA is not conditioned on financing or the completion of due diligence.  It is

conditioned on approval by the Court of the bidding, auction, and sale procedures enumerated

below, including post-petition marketing and competitive bidding, in consultation with United

Bank, the United States Trustee and any official committee appointed in these Chapter 11 Cases.

## THE ASSET PURCHASE AGREEMENT

18.     The Debtors are seeking approval of the Stalking Horse APA, which will also

serve as the form asset purchase agreement to be provided to all prospective bidders (each, a

"Potential Bidder") that wish to participate in the Bidding Process (as defined herein).  The

Debtors propose that the deadline for submitting a bid (the "Bid Deadline") be March 6, 2018.

19.     Certain of the key terms of the Stalking Horse APA are highlighted below:[4]

      i.     **Employee Matters / WARN Act**.  The Sale involves the sale of the
Debtors' business and assets as a going concern.  While the Debtors
expect that the Stalking Horse Bidder (or other Successful Bidder) will
hire a substantial amount of the Debtors' employees, the Stalking Horse

---

[4]     All capitalized terms used in this summary but not otherwise defined herein shall have the
meaning ascribed to such terms in the Stalking Horse APA. To the extent there are any
ambiguities or inconsistencies between this summary and the Stalking Horse APA, the Stalking
Horse APA shall govern in all respects.

Bidder has not committed to hire any particular number of employees. Accordingly, prior to the Petition Date, the Debtors issued, out of an abundance of caution, a notice to all of their employees under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, *et seq.* (the "WARN Act"), because the Debtors will have to terminate all such employees as of the Closing regardless of whether the Stalking Horse Bidder (or other Successful Bidder) agrees to hire a sufficient number of employees to avoid application of the WARN Act. *See* § 4.22. With respect to employees that the Stalking Horse Bidder does hire (the "Intended Employees"), it has agreed to be responsible for all post-Closing compensation, benefits, and other obligations with respect to such employees, including, but not limited to earned or accrued vacation obligations, sick leave and personal days. *See* § 8.2(b), (c).

ii.     **No Solicitation Restriction**. The Stalking Horse APA does not restrict the ability of the Debtors to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, and person in compliance with the Bidding Procedures Order for the purchase and sale of the Assets. Indeed, the Debtors have the responsibility and obligation to respond to inquiries or offers to purchase all or any part of the Purchased Assets and to supply information relating to the Debtors' business and Assets to prospective purchasers, all consistent with the Bidding Procedures Order. *See* § 6.1.

iii.    **Closing and Other Deadlines**. The Closing shall be held no later than the 15th day following the Bankruptcy Court's entry of the Sale Order, or as otherwise agreed to by the parties; *provided*, that to the extent the conditions set forth in Article 9 are not satisfied or so waived on or prior to such date, the period of time within with the Closing shall occur shall be automatically extended until, and the Closing shall occur promptly following such date as all of the conditions set forth in Article 9 have been satisfied or waived by the Party entitled to waive the applicable condition (the "Closing Date"). *See* § 3.1. The Debtors or the Stalking Horse Bidder may terminate the Stalking Horse APA if Closing does not occur on or before June 30, 2018 (the "Outside Date"), *provided, however*, that a party may not terminate the agreement if such party is in breach of its obligations in any material respect and such breach is the sole reason that the Closing has not occurred by such Outside Date. § 3.4(b).

The Debtors' and Stalking Horse Bidder's obligations to consummate the Closing are subject to the satisfaction or waiver on or prior to the Closing Date of certain conditions, including, but not limited to, the following:

a.      Reps & Warranties. Certain representations and warranties of the Debtors (as set forth in Article 4 of the Stalking Horse APA) are true and correct in all material respects, and certain representations and warranties of the Stalking Horse Bidder (as set forth in Article

- 8 -

5 of the Stalking Horse APA) are true and correct in all material respects. *See* §§ 9.1(a), 9.2(a).

b. <u>Deliveries</u>.  At or before Closing, the Debtors shall have delivered, among other things, an executed bill of sale, an executed assumption and assignment agreement, copies of all consents, waivers or approvals, a certified copy of the Sale Order, and documents, keys and rights of entry to permit the Stalking Horse Bidder to take immediate possession of the Purchased Assets.  *See* §§ 3.2, 9.1(c).  At or before Closing, the Stalking Horse Bidder shall have satisfied all Cure Costs with respect to the Purchaser Assumed Contracts, and shall have delivered, among other things, the adjusted Cash Purchase Price, and an executed assumption and assignment agreement.  *See* §§ 3.3, 9.2(d).

c. <u>No Prohibition of Transaction</u>.  As of the date of Closing, there shall not be in effect any Law or Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Sale.  *See* § 9.3(a).

iv.  **Asset Preservation**.   Unless the Stalking Horse Bidder otherwise consents, up until the Closing Date, the Debtors shall: conduct their Business in the ordinary course in all material respects; use commercially reasonable efforts to preserve their present business operations and goodwill; maintain presently existing insurance coverages; comply in all material respects with applicable Laws.  *See* § 7.2(a).

v.  **Excluded Assets**.   The Purchased Assets do not include the Tucker County Real Estate or: (i) any cash and cash equivalents and all rights of the Debtors in respect of bank and brokerage accounts and lock boxes in their names or held on their behalf; (ii) claims and actions arising under Sections 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code; (iii) confidential personnel records of employees not hired by the Stalking Horse Bidder; (iv) partnership agreements, membership agreements or joint venture agreements; (v) tax refunds; (vi) all contracts other than Purchaser Assumed Contracts; (vii) all rights under the Stalking Horse APA, including the Purchase Price; (viii) employee benefit plans; (ix) insurance policies and rights thereunder; (x) claims and causes of action relating to Excluded Assets; and (xi) any other item set forth in Section 1.2 of the Stalking Horse APA.  *See* § 1.2.

vi.  **Assumed Liabilities**.  The Stalking Horse Bidder has agreed to assume, among other things, (i) all liabilities under executory contracts and unexpired leases that are assumed by the Debtors and assigned to the Stalking Horse Bidder, including cure costs associated with such contracts and leases, and (ii) certain employee obligations with respect to employees

138163628.1

actually hired by the Stalking Horse Bidder, *i.e.*, Intended Employees.  *See* § 1.3.

vii.    **Good Faith Purchaser / No Successor Liability**.  The Sale Order shall provide that the Stalking Horse Bidder is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and that the Stalking Horse Bidder is not a successor to the Debtors.  *See* § 6.6(c).

viii.    **Remedies**.  In the event of a breach of the Stalking Horse APA, the non-breaching party may pursue the remedy of specific performance.  In addition, the Debtors reserve all rights and remedies available to them in the event of the Stalking Horse Bidder's breach.  *See* §§ 3.5(a), 11.2.

ix.    **Bid Protections**.  If the Stalking Horse Bidder is not the successful bidder to purchase the Purchased Assets at the Auction, and the offer of a third party offer accepted at the Auction is subsequently approved by the Bankruptcy Court and closes as provided by its terms, the Stalking Horse Bidder shall be deemed to have earned the Break-Up Fee for the time and effort associated with initial due diligence and negotiation of the Stalking Horse APA and the value of serving as the Stalking Horse Bidder for the marketing of the Purchased Assets.  § 3.5(c).

x.    **Non-Compete Compensation**.  The Stalking Horse Bidder has demanded that certain of the Debtors' principals, Elizabeth Chilton, Susan Shumate and Norman W. Shumate III, execute the Stalking Horse APA to be bound by a non-compete provision.  *See* § 11.19.  In consideration for agreeing to such non-compete provision, the individuals shall be paid directly by the Stalking Horse Bidder as follows: Elizabeth Chilton ($50,000); Susan Shumate ($150,000); and Norman W. Shumate III ($150,000).  *See* §§ 2.1(b).

xi.    **Rejection of Joint Operating Agreement**.  One of the Stalking Horse Bidder's conditions to Closing is that the Bankruptcy Court shall have entered an order rejecting that certain Second Amended and Restated Joint Operating Agreement by and among the Debtors and Charleston Publishing Company, dated as of July 23, 2010 (the "Joint Operating Agreement").  *See* § 9.1(e).

## THE BIDDING PROCEDURES

20.     By this Motion, the Debtors request entry of the Sale Procedures Order, which

will, among other things, establish the following timeline:[5]

| Proposed Sale Timeline | |
|---|---|
| Entry of Sale Procedures Order | Within fifteen (15) days of the Petition Date |
| Deadline to Serve Sale Notice and Cure Notice | Within two (2) Business Days after entry of the Sale Procedures Order |
| Cure Objection Deadline and Assignment Objection Deadline | Within ten (10) days after service of Cure Notice |
| Sale Objection Deadline | Twenty (20) days after entry of the Sale Procedures Order |
| Bid Deadline | Noon on the date that is two (2) Business Days prior to the Auction |
| Deadline to Notify Qualified Bidders | Twenty-four (24) hours prior to Auction |
| Auction (date to be set, whether or not required) | March 8, 2018 |
| Notice of Successful Bidder | One (1) Business Day after Auction |
| Sale Reply Deadline | March 9, 2018 |
| Sale Hearing | No later than three (3) days after the Auction |
| Sale Closing | On or before March 31, 2018 |

21.     The Bidding Procedures are designed to maximize value for the Debtors' estates

while ensuring an orderly sale process.  The Bidding Procedures describe, among other things,

the procedures for parties to access due diligence, the manner in which Potential Bidders and

bids become "qualified," the procedures for receipt and negotiation of bids received, the conduct

of any auction, the selection and approval of any ultimately successful bidders, and related

deadlines (collectively, the "Bidding Process").  The Bidding Process affords the Debtors a

---

[5]     Capitalized terms used, but not otherwise defined, in this timeline shall have the meaning ascribed to such terms in the Bidding Procedures.  To the extent there are any ambiguities or inconsistencies between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern in all respects.

138163628.1

sufficient opportunity to pursue a robust sale process that will maximize the value of their Assets

for the benefit of their estates.

22.    Certain of the key terms of the Bidding Procedures are highlighted below:[6]

i.      **Diligence**:  The Debtors will afford any Potential Bidders and/or Qualified Bidder such due diligence access or additional information as the Debtors, in consultation with their advisors, United Bank and, if applicable, the statutory committee appointed in these cases (the "Committee"), deem appropriate, in their reasonable discretion, subject to contractual obligations to limit access to certain proprietary information; *provided, however*, the Debtors will, in their reasonable discretion, make reasonable commercial efforts to provide Qualified Bidders with the same information provided to the Stalking Horse Bidder.  The Debtors must promptly advise the Stalking Horse Bidder in the event any other Qualified Bidder receives diligence the Stalking Horse Bidder has not previously received and shall promptly be provided with access to such diligence materials.

The due diligence period shall end on the Bid Deadline.  For the avoidance of doubt, neither the Debtors nor any of their respective representatives shall be obligated to furnish any due diligence information to any person other than a Qualified Bidder.

ii.     **Bid Deadline**:   To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (each, a Potential Bidder) must deliver a Qualified Bid to: (i) co-counsel to the Sellers, Perkins Coie LLP, 131 S. Dearborn St., Ste. 1700, Chicago, IL 60603 (Attn: Brian A. Audette (baudette@perkinscoie.com)) and Supple Law Office PLLC, 801 Viand Street, Point Pleasant, WV 25550 (Attn: Joe Supple (info@supplelaw.net)); (ii) counsel to the Stalking Horse Bidder, Steptoe & Johnson PLLC, 400 White Oaks Boulevard, Bridgeport, WV 26330 (Attn: Evans King (evans.king@steptoe-johnson.com)); (iii) counsel to United Bank,  Spilman Thomas & Battle, PLLC, 310 First St., Ste. 1100, Roanoke, VA  24002 (Attn: Peter M. Pearl (ppearl@spilmanlaw.com)); and (iv) counsel to the Committee, _____; so as to be received by the Notice Parties not later than 5:00 p.m. (prevailing Eastern Time) on the date that is two (2) Business Days prior to the Auction (the "Bid Deadline").

---

[6]    All capitalized terms used in this summary but not otherwise defined herein shall have the meaning ascribed to such terms in the Bidding Procedures. To the extent there are any ambiguities or inconsistencies between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern in all respects.

iii.  **Qualified Bidder**:  A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "Qualified Bid"):

a.  it fully discloses the identity of the Qualified Bidder;

b.  it states that the applicable Qualified Bidder offers to purchase the Purchased Assets upon terms and conditions that the Sellers reasonably determine, after consultation with United Bank and the Committee, are at least as favorable to the Sellers as those set forth in the Stalking Horse APA, and it provides a description of any anticipated regulatory or governmental approvals necessary to consummate the bid;

c.  it includes a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such bidder is selected as the Successful Bidder its offer shall remain irrevocable until the earlier of (i) the closing of the sale to the Successful Bidder, and (ii) sixty (60) days after entry of the Sale Order.  Such writing shall guaranty performance of the Qualified Bidder by its parent entities, if any, or provide such other guaranty of performance acceptable to Sellers in their reasonable discretion;

d.  confirmation that all necessary internal and shareholder approvals have been obtained prior to the bid;

e.  it includes a duly authorized and executed copy of an asset purchase agreement, including as applicable the purchase price for the Purchased Assets expressed in U.S. Dollars, together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse APA (together with exhibits, schedules, and marked copies, the "Proposed Stalking Horse APA") and the proposed form of sale approval order to approve the sale by the Bankruptcy Court, together with a copy marked to show amendments and modifications to the proposed form of sale approval order attached to the Approval Motion; provided however, that such Proposed Stalking Horse APA shall not include any financing or diligence conditions;

f.  it includes written evidence of sufficient cash on hand to fund the purchase price or sources of immediately available funds that are not conditioned on third party approvals or commitments, that will allow the Sellers to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Proposed Stalking Horse APA;

- 13 -

such written evidence shall include the most current audited and the most current unaudited financial statements, or such other financial information as may be acceptable to the Sellers in their reasonable discretion after consultation with United Bank and the Committee (collectively, the "Financials") of the Qualified Bidder, or, if the Qualified Bidder is an entity formed for the purpose of acquiring the Purchased Assets, the Financials of the Qualified Bidder's equity holder(s) or other financial backer(s) that are guaranteeing the Qualified Bidder's performance;

g.    it provides for a purchase price that exceeds the aggregate consideration to be paid to or for the benefit of the Sellers' estates set forth in the Stalking Horse APA by at least $500,000, which represents the sum of (i) the amount of the Break-Up Fee (as defined below) of $400,000, plus (ii) $100,000, and otherwise has a value to the Sellers, in the Sellers' exercise of their reasonable business judgment, after consultation with their advisors, United Bank and the Committee, that is greater or otherwise better than the value offered under the Stalking Horse APA including impact of any liabilities assumed in the Stalking Horse APA;

h.    it is accompanied by a cash deposit in the amount of 10% of the cash purchase price of the bid (the "Deposit");

i.    it does not entitle the Qualified Bidder to any break-up fee, termination fee or similar type of payment or reimbursement and confirms that, by submitting a bid, the Qualified Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its bid;

j.    it identifies with particularity which executory contracts and unexpired leases the Qualified Bidder wishes to assume and provides details of the Qualified Bidder's proposal for the treatment of related cure costs;

k.    it includes an acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Proposed Stalking Horse APA; and (iv) is not entitled to any

- 14 -

expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

l.    it includes evidence, in form and substance reasonably satisfactory to the Sellers, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Proposed Stalking Horse APA;

m.    it contains a detailed description of how the Qualified Bidder intends to treat current employees of the Sellers;

n.    it contains sufficient information concerning the Qualified Bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases to be assumed and assigned;

o.    it states that the Qualified Bidder consents to the jurisdiction of the Bankruptcy Court;

p.    it contains such other information reasonably requested by the Sellers;

q.    it complies with all requirements of the Sale Procedures Order; and

r.    it is received on or prior to the Bid Deadline.

iv.    **Notification to Qualified Bidders**:  The Debtors shall notify the Stalking Horse Bidder, all Qualified Bidders, and the Notice Parties in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid other than the Stalking Horse Bidder, whether such Qualified Bidder's bid constitutes a Qualified Bid) promptly after, and in any event on the same day as, the notification to any Qualified Bidder that their bid constitutes a Qualified Bid; *provided, however*, that such notification shall not be given later than twenty-four (24) hours prior to the Auction.

v.    **Stalking Horse Bidder**:   Notwithstanding anything in the Bidding Procedures to the contrary, the Stalking Horse Bidder is deemed to be a Qualified Bidder, and the Stalking Horse APA is deemed to be a Qualified Bid for all purposes in connection with the Bidding Procedures and the Auction, and the Stalking Horse Bidder shall not be required to take any further action to participate in the Auction (if any) or, if the Stalking Horse Bidder is the Successful Bidder, to be named the Successful Bidder at the Sale Hearing.  If the Debtors do not receive any Qualified Bids other than the Stalking Horse APA, the Debtors will not hold an Auction and the Stalking Horse Bidder will be named the Successful Bidder on the Bid Deadline.

138163628.1

vi.  **Auction, Auction Procedures, and Overbids**:  If the Debtors receive one or more Qualified Bids in addition to the Stalking Horse APA, the Debtors will conduct an auction (the "Auction") of the Purchased Assets, which shall be transcribed on a date and time and at a location to be determined. The Auction shall be conducted in accordance with the following procedures:

a.  Only the Debtors, the Notice Parties, the members of the Committee, United Bank representatives, the Stalking Horse Bidder, any other Qualified Bidders that have submitted Qualified Bids, and/or other party as the Debtors may determine to include in their discretion, in each case along with their representatives and advisors, shall be entitled to attend the Auction (such attendance to be in person); if a party that is a creditor of the Debtors, other than those listed above, would like to attend the Auction, such party shall make a request to attend the Auction in writing (which writing may be in the form of an electronic mail) and serve such request on the Notice Parties no later than 12:00 p.m. (prevailing Eastern Time) two (2) business days prior to the date of the Auction;

b.  only the Stalking Horse Bidder and such other Qualified Bidders that have submitted Qualified Bids on or prior to the Bid Deadline will be entitled to make any subsequent bids at the Auction; *provided* that all such Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person;

c.  each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

d.  at least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction; *provided* that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the date of the selection of the Successful Bidder at the conclusion of the Auction, or (ii) if selected as the Successful Bidder, until (x) the closing of the sale to the Successful Bidder, and (y) sixty (60) days after the entry of the Sale Order.  Prior to the start of the Auction, the Debtors will provide copies of the Qualified Bid which the Debtors believe, in their reasonable discretion, is the highest or otherwise best offer (the "Starting Bid") to the Stalking Horse Bidder and all other Qualified Bidders;

138163628.1

e.      all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction;

f.      the Debtors, after consultation with their advisors, United Bank, and the Committee, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Court entered in connection herewith, and (ii) provide that bids be made and received on an open basis, with all material terms of each bid to be fully disclosed to all other Qualified Bidders at the Auction and (iii) are disclosed to each Qualified Bidder at the Auction; and

g.      bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each a "Subsequent Bid") providing a net value to the estate of at least an additional $100,000.00 above the prior bid.  After the first round of bidding and between each subsequent round of bidding, the Debtors, after consultation with counsel to United Bank and Committee counsel, shall announce the bid (including the identity of that bidder and the value of such bid) that it believes to be the highest or otherwise best offer (the "Highest Bid").  A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Highest Bid. Each Qualified Bidder shall either elect to provide a higher bid or withdraw from the Auction.  Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Stalking Horse Bidder), the Debtors will give effect to the Break-Up Fee payable to the Stalking Horse Bidder under the Stalking Horse APA as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Debtors.  If the Stalking Horse Bidder bids at the Auction, the Stalking Horse Bidder will be entitled to a "credit" for the Break-Up Fee.  To the extent a Subsequent Bid has been accepted entirely or in part because of the addition, deletion or modification of a provision or provisions in the applicable Proposed APA or the Stalking Horse APA, the Debtors will identify such added, deleted or modified provision or provisions.

vii.    **Alteration of Procedures**:  The Sellers, after consultation with United Bank and the Committee, may modify the rules, procedures and deadlines set forth herein, or adopt new rules, procedures and deadlines that, in their reasonable discretion, will better promote the goals of these procedures,

namely, to maximize value for the estates; *provided* that all modifications
and additional rules, procedures and deadlines will be non-material, may
in no event extend the dates specified in Sale Procedures Order, including
permitting the submission of Qualified Bids after the close of the Auction
and otherwise not conflict with these Bidding Procedures or the Sale
Procedures Order.  All such modifications and additional rules will be
communicated to each of the Notice Parties, Potential Bidders and
Qualified Bidders.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

23.   The Debtors believe that their executory contracts and unexpired leases represent

valuable rights necessary to the continued operation of their business.  To that end, the Debtors

seek to establish the following procedures permitting them to assume and assign these contracts

and leases to the Successful Bidder and to notify counterparties to executory contracts and

unexpired leases of potential cure amounts:

i.   **Cure Notice**:  The Debtors shall, within two (2) business days after the
entry of the Sale Procedures Order, serve the Cure Notice, substantially in
the form attached hereto as <u>Exhibit E</u>,[7] upon each non-Debtor counterparty
to each Executory Contract and Unexpired Lease and their counsel (if
known).  The Cure Notice shall state the date, time and place of the Sale
Hearing, whether such Executory Contract or Unexpired Lease is
designated to be assumed and assigned, as well as the date by which any
objection to the assumption and assignment of such Executory Contract or
Unexpired Lease must be filed and served.  The Cure Notice also will
identify the amounts, if any, that the Debtors believe are owed to each
counterparty to an Executory Contract or Unexpired Lease in order to cure
any defaults that exist under such contract or lease (the "<u>Cure Amounts</u>")
pursuant to section 365 of the Bankruptcy Code.  The Cure Notice does
not constitute an admission that an Executory Contract or Unexpired
Lease is in fact an executory contract or unexpired lease, and the Debtors
reserve any and all rights with respect to the Executory Contracts and
Unexpired Leases.

ii.   **Supplemental Contracts**:  Although the Debtors have made a good faith
effort to identify all Executory Contracts and Unexpired Leases to be
assumed and assigned in connection with the Sale, they may discover

---

[7]   All capitalized terms used in this summary but not otherwise defined herein shall have the
meaning ascribed to such terms in the Cure Notice. To the extent there are any ambiguities or
inconsistencies between this summary and the Cure Notice, the terms of the Cure Notice shall
govern in all respects.

additional Executory Contracts and Unexpired Leases that the Debtors desire to assume and assign in connection therewith.  Accordingly, if, at any time after the entry of the Sale Procedures Order, the Debtors or any Qualified Bidder identify additional executory contracts or unexpired leases to be assumed and assigned as Assumed Contracts (whether before or after the closing of the sale), as applicable, the Debtors shall serve a supplemental Cure Notice (the "Supplemental Cure Notice") by facsimile, electronic transmission, hand delivery or overnight mail on the applicable non-debtor counterparty and its counsel (if known) no later than ten (10) days before the proposed effective date of the assignment.  Each Supplemental Cure Notice shall (i) state the date, time and place of the Sale Hearing, (ii) state the date by which any objection to the assumption and assignment of such Assumed Contract must be filed and served, and (iii) identify the Cure Amount.

iii.   **Supplemental Objections**:  Unless the non-debtor counterparty properly files and serves an objection to the Supplemental Cure Notice (the "Supplemental Cure Objection") within ten (10) days of the date of the Supplemental Cure Notice (the "Supplemental Cure Objection Deadline"), the Debtors shall be authorized to assume and assign the Executory Contract or Unexpired Lease, subject to the occurrence of the Closing without further notice or order of the Court.

iv.   **No Obligation to Assume**:  The inclusion of an Executory Contract or Unexpired Lease on the Cure Notice shall not obligate the Successful Bidder to take assignment of such Executory Contract or Unexpired Lease.  Only those contracts that constitute Assumed Contracts pursuant to the Stalking Horse APA or any Successful Bidder's Qualified Bid will be assumed, assigned and sold to the Successful Bidder.

v.   **Cure Objections**:   If any counterparty to an Executory Contract or Unexpired Lease objects for any reason to the Cure Amounts set forth in the Cure Notice, such counterparty must file with the Court a written objection (a "Cure Amount Objection") and serve such Cure Amount Objection so as to be received by the Objection Recipients by no later than ten (10) days after service of the Cure Notice (the "Cure Objection Deadline," and, together with the Assignment Objection Deadline and the Sale Objection Deadline (each as defined herein), the "Objection Deadlines").  Each Cure Amount Objection must set forth with specificity each and every asserted default in any Executory Contract or Unexpired Lease and the monetary cure amount asserted by such counterparty to the extent it differs from the amount, if any, specified by the Debtors in the Cure Notice.

vi.   **Disputed Cure Amounts**:  In the event that the Debtors and the non-debtor counter party to any proposed Assumed Contract cannot resolve the Cure Amount Objection or Supplemental Cure Objection, disputed Cure

138163628.1

Amounts ("Disputed Cure Amounts") shall not be paid until the resolution of any such disputes by the Court or mutual agreement of the Debtors, the Successful Bidder and the objecting party. Cure Amount Objections may be resolved by the Court at the Sale Hearing, or at a separate hearing either before or after the Sale Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely file and serve a Cure Amount Objection shall be forever barred from asserting that a Cure Amount is owed in an amount in excess of that set forth in the Cure Notice. If no timely Cure Objection is filed and served with respect to an Assumed Contract, the Cure Amount identified in the Cure Notice with respect to the Executory Contracts and Unexpired Lease will be the only amounts necessary under section 365(b) of the Bankruptcy Code to cure all monetary defaults under such Assumed Contract if the Stalking Horse Bidder (or other Successful Bidder) ultimately decides to have the applicable Assumed Contract assumed and assigned to it. Any party failing to timely file a Cure Amount Objection shall be forever barred from objecting to the Cure Amounts and from asserting any additional cure or other amounts against the Debtors, their estates or the Successful Bidder.

vii.   **Assignment Objections**: If any counterparty to an Executory Contract or Unexpired Lease objects for any reason to the assumption and assignment of such Executory Contract or Unexpired Lease with respect to the Stalking Horse Bidder (other than a Cure Amount Objection, an "Assignment Objection"), such counterparty must file and serve such Assignment Objection so as to be received by the Objection Recipients by no later than (the "Assignment Objection Deadline"): (i) ten (10) days after service of the Cure Notice; or (ii) the date otherwise specified in the Cure Notice (or, alternatively, the date set forth in the motion to assume such Assumed Contract if such contract is to be assumed and assigned after the Sale Hearing); *provided* that, if the Successful Bidder is not the Stalking Horse Bidder the Assignment Objection Deadline shall be one (1) day prior to the Sale Hearing. The Court shall make any and all determinations concerning adequate assurance of future performance under the Assumed Contracts pursuant to sections 365(b) and (f)(2) of the Bankruptcy Code at the Sale Hearing.

viii.   **Deemed Consent**:   If no objection is timely filed and served, the counterparty to an Executory Contract or Unexpired Lease shall be deemed to have consented to the assumption, assignment and sale of the Executory Contract or Unexpired Lease to any Successful Bidder if such Executory Contract or Unexpired Lease is elected by any Successful Bidder as an Assumed Contract and will be forever barred from asserting any objection with regard to such assumption, assignment and sale, except with respect to the adequate assurance of future performance by any Successful Bidder. Any objections to any Successful Bidder's proposed form of adequate assurance of future performance must be raised at the

- 20 -

Sale Hearing and will be resolved at the Sale Hearing.  The Cure Costs set forth in the Cure Notice shall be controlling, notwithstanding anything to the contrary in any Executory Contract or Unexpired Lease, or any other document, and the counterparty to the Executory Contract or Unexpired Lease shall be deemed to have consented to the Cure Costs and shall be forever barred from asserting any other claims related to such Executory Contract or Unexpired Lease against the Debtors or the Successful Bidder, or the property of any of them.

## SALE NOTICE PROCEDURES

24.     Within two (2) business days after entry of the Sale Procedures Order, the Debtors (or their agents) shall provide notice (substantially in the form of the notice (the "Sale Notice") attached to hereto as Exhibit F) of the Sale Procedures Order, the Motion, the Auction, the Objection Deadlines, and the sale hearing (the "Sale Hearing") by first-class mail upon, as applicable, (a) the Office of the United States Trustee for the Southern District of West Virginia; (b) the Office of the United States Attorney for the Southern District of West Virginia; (c) counsel to any statutory committee appointed in these cases, (d) counsel to United Bank; (e) the Internal Revenue Service; (f) counsel to the Stalking Horse Bidder; (g) all persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Assets during the previous eight months; (h) all entities known by the Debtors that may have a lien, claim, encumbrance, or other interest in the Assets (for which identifying information and addresses are available to the Debtors); (i) all non-Debtor parties to the Executory Contracts and Unexpired Leases; (j) all of the Debtors' known creditors, (k) all employees and former employees receiving benefits from the Debtors; (l) the Pension Benefit Guaranty Corporation; (n) any governmental unit known to the Debtors to have a claim in these cases; (m) the Office of the Attorney General of West Virginia; (n) the Office of the West Virginia Secretary of State; (o) all parties that have requested notice in these cases under Bankruptcy Rule 2002; and (p) all other persons as directed by the Court (collectively, the "Sale Notice Parties").

138163628.1

25.     The Debtors submit that the proposed Sale Notice, and providing notice of this Motion, the Auction and the Sale Hearing as described herein, complies fully with Bankruptcy Rule 2002 and constitutes good and adequate notice of the sale and the proceedings with respect thereto.  Therefore, the Debtors respectfully request that this Court approve the form of the Sale Notice and the notice procedures proposed above.

26.     Any and all objections, if any, to any Sale, including objections to the Auction and the selection of any Successful Bidder or Successful Bidders, must be filed by twenty (20) days after entry of the Sale Procedures Order (the "Sale Objection Deadline") and be served on (a) counsel to the Debtors, Perkins Coie LLP, 131 S. Dearborn St., Ste. 1700, Chicago, IL 60603 (Attn: Brian A. Audette (baudette@perkinscoie.com)) and Supple Law Office PLLC, 801 Viand Street, Point Pleasant, WV 25550 (Attn: Joe Supple (info@supplelaw.net)); (b) counsel to the Stalking Horse Bidder, Steptoe & Johnson PLLC, 400 White Oaks Boulevard, Bridgeport, WV 26330 (Attn: Evans King (evans.king@steptoe-johnson.com)); (c) counsel to United Bank, Spilman Thomas & Battle, PLLC, 310 First St., Ste. 1100, Roanoke, VA  24002 (Attn: Peter M. Pearl (ppearl@spilmanlaw.com)); (d) counsel to the Committee, _____;and (e) the Office of the United States Trustee for the Southern District of West Virginia (collectively, the "Objection Recipients").  All replies to such objections must be filed by two (2) days prior to the Sale Hearing.

27.     Any party failing to timely file an objection to any Sale shall be forever barred from objecting and shall be deemed to have consented to any Sale, including the transfer of the Debtors' right, title, and interest in, to and under the Debtors' Assets free and clear of any and all liens, claims, encumbrances, and other interests in accordance with a definitive agreement for a Sale.

## BASIS FOR RELIEF REQUESTED

**A.      Approval of the Sale and Bidding Procedures is Warranted Under Section 363 of the Bankruptcy Code**

28.      Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A sale of a debtor's assets pursuant to section 363(b) of the Bankruptcy Code is permissible when "a sound business justification exists." *In re Daufuskie Island Props., LLC*, 431 B.R. 626, 638-39 (Bankr. D. S.C. 2010).  The "business purpose" test is satisfied if:

> (1) a sound business reason or emergency justifies a pre-confirmation sale; (2) a sale has been proposed in good faith; (3) adequate and reasonable notice of the sale has been provided to parties-in-interest; and (4) the purchase price is fair and reasonable.

*Id.*

29.      The Debtors can and have shown that a valid business justification exists to sell their Assets at this time.  First, as set forth above, the Debtors' business has been in decline—as has the Debtors' industry as a whole—and the Debtors' can no longer satisfy their ongoing debts as they come due.  Indeed, the Debtors cannot satisfy in full their debts to the PBGC and United Bank.  Also, the Judgment Creditor will undoubtedly pursue collection of its judgment, thereby putting further strain on the Debtors' business.  Accordingly, in the Debtors' business judgment, a sale of their Assets in chapter 11 at this time is undoubtedly the best path to maximizing value and recoveries for their estates, creditors, and other stakeholders.

30.      Second, the Debtors are pursuing the sale of their Assets with the intention of maximizes the value of such Assets as a going concern for the benefit of all creditors and stakeholders.  Proceeding in this manner provides the best opportunity for the Debtors' business and legacy to be carried on for the benefit of local employees, vendors and the public at large.

- 23 -

The Debtors negotiated the terms and conditions of the Stalking Horse APA at arm's length and good faith, remaining cognizant of their duties to all stakeholders. Accordingly, the Debtors submit that they have proposed the sale that is the subject of this Motion in good faith.

31.     Third, the auction process and the time periods set forth in the Bidding Procedures are reasonable under the circumstances and provide parties with sufficient time and information necessary to formulate a bid to purchase the Assets. The Bidding Procedures balance the need for adequate and appropriate notice to parties in interest and to potential purchasers with the need to sell the Debtors' assets while they have realizable value and can be maintained as a going concern. The Debtors undertook an extensive marketing process prior to the Petition Date and will, in accordance with the Bidding Procedures, continue to give potential bidders the opportunity to perform diligence and submit bids. Accordingly, the Debtors submit that the procedures set forth herein provide all parties-in-interest with adequate and reasonable notice of the Sale and an opportunity to either bid on the Assets or solicit interest from third parties that might have an interest in submitting a Qualified Bid for the Assets.

32.     Fourth, as set forth above, the Debtors, in conjunction with Dirks Van Essen, already conducted an extensive marketing process for their business and Assets and chose to proceed pursuant to the Stalking Horse APA, as it represented the highest and best offer that was submitted for the Assets. That process, together with the additional marketing that will occur from the Petition Date up to the Bid Deadline, will, in the Debtors' business judgement, procure the highest and best price for the Debtors' Assets. Indeed, the Bidding Procedures and the Stalking Horse APA are designed to encourage as many bidders as possible to put forth their best offers, thus increasing the likelihood that the Debtors' Assets will be sold for the highest or best purchase price possible. Moreover, at the Sale Hearing, the Debtors will be prepared to present

- 24 -

evidence that the sale price for the Assets is fair and reasonable by showing that the Successful

Bidder offered the highest or best purchase offer for the Assets.  Also, the Debtors will be

prepared to present evidence at the Sale Hearing that the sale was a fairly negotiated, arm's

length transaction in which the Successful Bidder acted in good faith, and, therefore, that the

protections of section 363(m) of the Bankruptcy Code should apply.

33.     Accordingly, the Debtors request that the Court approve the proposed Sale set

forth herein.

**B.     Approval of The Break-Up Fee is Appropriate**

34.     In connection with the sale, the Debtors are seeking authorization to pay the

Break-Up Fee (if necessary) to the Stalking Horse Bidder in accordance with the Stalking Horse

APA.  Approval of bid protections like the Break-Up Fee in connection with sales pursuant to

section 363 of the Bankruptcy Code has become an established practice in chapter 11 cases.

Although bidding incentives are measured against a business judgment standard in non-

bankruptcy transactions, the administrative expense provisions of section 503(b) of the

Bankruptcy Code govern in the bankruptcy context.  *See In re Tropea*, 352 B.R. 766, 768

(Bankr. N.D. W. Va. 2006); *see also In re Lamb*, No. 96-1-1099-DK, 2002 WL 31508913

(Bankr. D. Md. Oct. 11, 2002) (whether break-up fees or expenses should be allowed is governed

by section 503(b) of the Bankruptcy Code) (citing and relying on *In re O'Brien Env. Energy,

Inc.*, 181 F.3d 527 (3d Cir. 1999)).  Accordingly, bidding incentives must provide some post-

petition benefit to a debtor's estate to be approved.  *Id.*

35.     Bid protections may be necessary to preserve the value of the estate if they

"promote more competitive bidding, such as by inducing a bid that otherwise would not have

been made and without which bidding would have been limited."  *O'Brien*, 181 F.3d at 537.

Also, if a bid protection induces a bidder to research the value of the debtor and convert the

value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit

to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its

true worth. *See In re Reliant Energy*, 594 F.3d 200, 206-07 (3d Cir. 2010).

      36.     In *In re O'Brien*, the court reviewed nine factors that are relevant in deciding

whether to award a breakup fee:

> i.     the presence of self-dealing or manipulation in negotiating the breakup fee;
>
> ii.    whether the fee harms, rather than encourages, bidding;
>
> iii.   reasonableness of the breakup fee relative to the purchase price;
>
> iv.   whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;
>
> v.    the ability of the request for a breakup fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;
>
> vi.   the correlation of the fee to a maximum of value of the debtor's estate;
>
> vii.  the support of the principal secured creditors and creditors' committees of the breakup fee;
>
> viii. the benefits of the safeguards to the debtor's estate; and
>
> ix.   the substantial adverse impact of the breakup fee on unsecured creditors, where such creditors oppose the breakup fee.

181 F.3d at 536.

      37.     The Break-Up Fee provides the type of benefits to the Debtors' estates identified

in *O'Brien* and do not implicate any of the negative factors discussed therein.  The Break-Up Fee

was negotiated in good faith and is fair and reasonable in amount—approximately 3.5% of the

purchase price under the Stalking Horse APA—particularly in light of the due diligence the

Stalking Horse Bidder must perform on the value of the Assets and the time and expense the

Stalking Horse Bidder has invested in negotiating an agreement with the Debtors.  The Break-Up

138163628.1

Fee also enables the Debtors to set an adequate floor for an Auction and ensure that any competing bid will be higher and otherwise better than the Stalking Horse APA.  In this manner, providing the Break-Up Fee to the Stalking Horse Bidder facilitates competition in the bidding process and assists the Debtors in maximizing the value of their estates.  Moreover, United Bank supports the Break-Up Fee and recognizes the benefits of procuring the Stalking Horse Bidder and setting a floor for the price of the Debtors' assets.   Finally, authorization to pay the Break-Up Fee will not diminish the value of the Debtors' estates, as the Debtors intend to consummate the transactions contemplated by the Stalking Horse APA unless they receive a higher and otherwise better bid.

38.     Accordingly, the Debtors request authorization to offer the Break-Up to the Stalking Horse Bidder pursuant to the terms of the Stalking Horse APA and the Sale Procedures Order.

## C.     The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Free and Clear Sale

39.     In the interest of attracting the best offers, the Debtors request authorization to sell the Assets free and clear of any and all liens, claims, encumbrances, and other interests in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances, and other interests attaching to the proceeds of the sale of the Assets and distributed as provided for in a further order of the Court.

40.     Under section 363(f) of the Bankruptcy Code, a debtor may sell estate property free and clear of liens, claims, encumbrances, and other interests if one of the following conditions is satisfied:

i.      applicable nonbankruptcy law permits sale of such property free and clear of such interest;

ii.     such entity consents;

iii.     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

iv.     such interest is in bona fide dispute; or

v.     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Because section 363(f) of the Bankruptcy Code is written in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens, claims, encumbrances, and other interests.  *See In re Takeout Taxi Holdings, Inc.*, 307 B.R. 525, 529 (Bankr. E.D. Va. 2004).

41.     Furthermore, section 105(a) of the Bankruptcy Code grants the Court broad discretionary powers, providing that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a).  This equitable power may be utilized to effectuate the provisions of section 363(f).  *See, e.g., MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 91 (2d Cir. 1988); *Car-Tec, Inc. v. Venture Indus., Inc. (In re Autostyle Plastics, Inc.)*, 227 B.R. 797, 800 (Bankr. W.D. Mich. 1998).

42.     Here, United Bank holds first-priority liens and security interests against the Debtors' Assets.  The Debtors have kept United Bank fully apprised of their sale efforts and United Bank has cooperated with the Debtors throughout such process.  Accordingly, the Debtors are informed and believe that United Bank consents to, and is fully supportive of, the sale of Assets pursuant to the Stalking Horse APA and the procedures described herein.  Moreover, the Debtors will be prepared to present evidence at the Sale Hearing demonstrating their compliance with section 363(f) of the Bankruptcy Code.

D.     **The Successful Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

43.     Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *Mark Bell Furniture Warehouse, Inc. v. D. M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse, Inc.)*, 992 F.2d 7, 8 (1st Cir. 1993); *In re Willemain v. Kivitz*, 164 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D. N.J. May 11, 2007); *In re Abbotts Dairies of Pa.*, 788 F.2d 143, 147 (3d Cir. 1986).

44.     The Stalking Horse APA was negotiated at arm's-length by sophisticated parties, each represented by their own advisors, and any other Qualified Bid will be negotiated at arm's-length by sophisticated parties, each represented by their own advisors.   Accordingly, the Debtors request that the Sale Order include a provision that any Successful Bidder is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.   The Debtors believe that providing any Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Assets and closing of the same will occur promptly.

E.     **Assumption, Assignment, and Sale of Executory Contracts and Unexpired Leases Should be Authorized**

45.     Under section 365(a) of the Bankruptcy Code, a debtor in possession may, subject to the court's approval, assume or reject any executory contract or unexpired lease of a debtor. 11 U.S.C. § 365(a).   The standard governing the Court's approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's business judgment supports assumption or rejection.   *See Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1046-47 (4th Cir. 1985). The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel*

*Corp. v. West Penn Power Co. (In re Wheeling Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr.

W.D. Pa. 1987) (quoting *In re Stable Mews Assocs.*, 41 B.R. at 596).   Any more exacting

scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the

Bankruptcy Code's provision for private control of administration of the estate, and threaten the

court's ability to control a case impartially.   *See Richmond Leasing Co. v. Capital Bank, N.A.*,

762 F.2d 1303, 1311 (5th Cir. 1985).   Moreover, pursuant to section 365(b) of the Bankruptcy

Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance

that the debtor will promptly cure," any default, including compensation for "actual pecuniary

loss" relating to such default.  11 U.S.C. 365(b)(1).

46.     Once an executory contract is assumed, the debtor may elect to assign such

contract.   *See In re RickelHome Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code

generally favors free assignability as a means to maximize the value of the debtor's estate."); *see

also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of

section 365(f) is to assist the trustee in realizing the full value of the debtor's assets).   Section

365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . .

only if the trustee assumes such contract . . . and adequate assurance of future performance is

provided." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance"

depends on the facts and circumstances of each case, but should be given a "practical, pragmatic

construction."   *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In re Res.

Tech., Corp.*, No. 08 C 2425, 2008 WL 4876846, *4 (Bankr. N.D. Ill. Nov. 7, 2008).   Adequate

assurance may be provided by demonstrating the assignee's financial health and experience in

managing the type of enterprise or property assigned.   *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596,

605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective

138163628.1

assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

47.    Here, the Stalking Horse Bidder has substantial experience in the Debtors' industry and the financial wherewithal to operate the Debtors' business.  The Debtors expect that any competing bidders will likewise have such experience and financial capabilities.  Moreover, any and all Successful Bidders are responsible for providing evidence of adequate assurance of future performance to the extent required in connection with the assumption and assignment of any Executory Contracts and Unexpired Leases.  All counterparties to Executory Contracts and Unexpired Leases will have an opportunity to object to any Successful Bidder's proposed form of adequate assurance of future performance, which objections will be resolved at the Sale Hearing.

48.    Similarly, the counterparties to the Executory Contracts and Unexpired Leases will have sufficient opportunity to file an objection to the proposed Cure Costs.  To the extent no objection is filed with regard to particular Cure Costs, such Cure Costs shall be binding on the applicable contract or lease counterparty.  The payment of the Cure Costs will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtors determine that a particular contract is not truly executory and does not need to be cured to transfer the Assets to the Successful Bidder.  Cure Costs disputed by any counterparties, with respect to any Executory Contracts and Unexpired Leases to be assumed and assigned to the Successful Bidder at the Closing (as defined in the Bidding Procedures), will be resolved by the Court at the Sale Hearing.

138163628.1

49.     To facilitate and effectuate the sale, the Debtors request approval under section 365 of the Bankruptcy Code of the Debtors' assumption, assignment, and sale of the Executory Contracts and Unexpired Leases to the Successful Bidder.  The Debtors further request that the Sale Order provide that the Executory Contracts and Unexpired Leases be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder, notwithstanding any provisions in the Executory Contracts and Unexpired Leases, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (3) that prohibit such assignment.

50.     Accordingly, the Debtors request authority to assume, assign, and sell executory contracts and unexpired leases under section 365 of the Bankruptcy Code.

**F.     The Non-Competition Payments are Justified Under the Circumstances**

51.     In connection with the sale described herein, the Stalking Horse Bidder has insisted that Elizabeth Chilton, Susan Shumate and Norman W. Shumate III (collectively, the "Family Members") agree to restrictive non-competition provisions included in Section 11.19 of the Stalking Horse APA.  Elizabeth Chilton is the former Publisher of the Charleston Gazette-Mail and is currently the President of Daily Gazette Company and the Chairman of its Board. Susan Shumate, Ms. Chilton's daughter, is the Publisher of the Charleston Gazette-Mail and a member of the Board of Directors of Daily Gazette Company, and her husband, Norman W. Shumate III, is the President and Chief Financial Officer of Charleston Newspapers and Vice President of the Daily Gazette Company.  As set forth in more detail in the First-Day Declaration, the Charleston Gazette-Mail has been in the Chilton family since 1912.  Moreover, Mr. and Mrs. Shumate have worked in the daily newspaper industry for the majority of their respective professional careers and have relied upon their salaries to support their family.

52.     To induce the Family Members to execute the Stalking Horse APA, thereby subjecting themselves to restrictive non-competition provisions and foregoing the opportunity to

- 32 -

work and earn a living in their specialized industry, the Stalking Horse Bidder has agreed to provide the following consideration in the form of lump sum payments to the Family Members: (a) Ms. Chilton ($50,000); (b) Mrs. Shumate ($150,000); and (c) Mr. Shumate ($150,000), which payments do not constitute consideration for the Debtors' Assets.  In the Debtors' business judgment, such consideration is reasonable under the circumstances and necessary to effectuate a sale of the Assets for the highest and best price.  Accordingly, the Court should approve the Stalking Horse APA, including the Non-Competition Payments contemplated thereby.

**G.      Relief from Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

53.      Under Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order. Fed. R. Bankr. P. 6004(h).  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.  *See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).* Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for fourteen days, unless the court orders otherwise.

54.      To preserve the value of the Debtors' estates and limit the costs of administering and preserving the Assets, it is critical that the Debtors close the sale of the Assets as soon as possible after all closing conditions have been met or waived.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

**NOTICE**

55.      Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel: (a) the Office of the United States Trustee; (b) the Office of the United States

Attorney for the Southern District of West Virginia; (c) the Internal Revenue Service; (d) the top

20 largest unsecured creditors for each of the Debtors; (e) counsel to United Bank; and (f)

counsel to the Stalking Horse Bidder.  The Debtors respectfully submit that no further notice of

this Motion is required.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested

herein and such other and further relief as it deems just and proper.

DATED:  January 30, 2018                              **SUPPLE LAW OFFICE, PLLC**

By:  */s/ Joe M. Supple*
          Joe M. Supple, Bar. No. 8013
          801 Viand St.
          Point Pleasant, WV 25550
          Telephone: 304.675.6249
          Facsimile: 304.675.4372
          joe.supple@supplelaw.net

        - and -

        Brian A. Audette, Ill. Bar No. 6277056
        PERKINS COIE LLP
        131 S. Dearborn St., Suite 1700
        Chicago, IL 60603
        Telephone: 312.324.8534
        Facsimile: 312.324.9534
        baudette@perkinscoie.com

        *Proposed Co-Counsel to the Debtors and
        Debtors-in-Possession*

138163628.1