# **EXHIBIT B**

**EXECUTION COPY**

---

**ASSET PURCHASE AND SALE AGREEMENT**

**BY AND BETWEEN**

**CHARLESTON NEWSPAPERS,**
**DAILY GAZETTE HOLDING COMPANY LLC**
**CHARLESTON NEWSPAPERS HOLDINGS, L.P.**
**DAILY GAZETTE PUBLISHING COMPANY LLC**
**DAILY GAZETTE COMPANY**
**AND**
**G-M PROPERTIES, INC.,**
**AS SELLER**

**AND**

**CHARLESTON NEWSPAPERS, LLC**
**AS PURCHASER**

**Dated as of January 30, 2018**

---

81681-0004/137515612.9

Table of Contents

Article 1 PURCHASE AND SALE ....................................................................................................... 2

    1.1     Purchase and Sale of Assets ............................................................................................. 2

    1.2     Excluded Assets ................................................................................................................. 3

    1.3     Assumption of Liabilities .................................................................................................. 4

    1.4     Excluded Liabilities .......................................................................................................... 4

    1.5     Assumed Contracts. .......................................................................................................... 5

    1.6     Further Conveyances and Assumptions. ........................................................................... 6

    1.7     Bulk Sales Laws ............................................................................................................... 6

    1.8     Receivables ....................................................................................................................... 7

    1.9     Purchased Assets sold "As Is, Where Is" ......................................................................... 7

Article 2 PURCHASE PRICE .............................................................................................................. 7

    2.1     Purchase Price and Non-Competition Payments ............................................................. 7

    2.2     Payment of the Purchase Price and Assumption of Assumed Liabilities ......................... 8

    2.3     Allocation of Purchase Price ............................................................................................ 8

    2.4     Preparation of Estimated Working Capital Adjustment Worksheet. ................................. 9

    2.5     Preparation of Final Working Capital Adjustment Worksheet. ........................................ 9

    2.6     Withholding Rights ......................................................................................................... 10

    2.7     Sale Free and Clear ........................................................................................................ 10

Article 3 CLOSING AND TERMINATION ...................................................................................... 11

    3.1     Closing Date. ................................................................................................................... 11

    3.2     Deliveries by Seller ........................................................................................................ 11

    3.3     Deliveries by Purchaser .................................................................................................. 12

    3.4     Termination of Agreement .............................................................................................. 12

    3.5     Effect of Termination. ..................................................................................................... 13

Article 4 REPRESENTATIONS AND WARRANTIES OF SELLER ............................................... 13

    4.1     Organization and Good Standing .................................................................................... 13

    4.2     Title to Assets ................................................................................................................. 13

    4.3     Authorization of Agreement ........................................................................................... 14

    4.4     Real Property. ................................................................................................................. 14

    4.5     Tangible Personal Property; Capital Leases .................................................................... 15

    4.6     Intellectual Property. ....................................................................................................... 15

    4.7     Contracts. ........................................................................................................................ 16

    4.8     Employee Benefits. ......................................................................................................... 16

    4.9     Labor. ............................................................................................................................. 16

    4.10    Litigation ........................................................................................................................ 16

i

Table of Contents
(continued)

Page

| | | | |
|---|---|---|---|
| 4.11 | Financial Advisors | ............................................................................... | 17 |
| 4.12 | Accounts Receivable | ............................................................................ | 17 |
| 4.13 | Tax Matters. | ......................................................................................... | 17 |
| 4.14 | No Undisclosed Liabilities | ................................................................... | 17 |
| 4.15 | Environmental Compliance Matters | ....................................................... | 17 |
| 4.16 | Financial Statements | ............................................................................ | 18 |
| 4.17 | Consents and Approvals | ....................................................................... | 18 |
| 4.18 | Insert/TMC Liabilities | .......................................................................... | 18 |
| 4.19 | Compliance with Laws | .......................................................................... | 18 |
| 4.20 | Circulation and Advertising Lineage | ..................................................... | 18 |
| 4.21 | WARN Act | ........................................................................................... | 19 |
| 4.22 | No Other Representations or Warranties; Schedules | ............................. | 19 |

Article 5 REPRESENTATIONS AND WARRANTIES OF PURCHASER ............................... 19

| | | | |
|---|---|---|---|
| 5.1 | Organization and Good Standing | ........................................................... | 19 |
| 5.2 | Authorization of Agreement | ................................................................... | 19 |
| 5.3 | No Violation; Consents | ......................................................................... | 19 |
| 5.4 | Litigation | .............................................................................................. | 19 |
| 5.5 | Financial Capability | ............................................................................. | 20 |
| 5.6 | Bankruptcy | ........................................................................................... | 20 |
| 5.7 | Financial Advisors | ............................................................................... | 20 |
| 5.8 | Condition of the Business and Purchased Assets | .................................. | 20 |
| 5.9 | OFAC | ................................................................................................... | 20 |

Article 6 BANKRUPTCY COURT MATTERS ...................................................................... 20

| | | | |
|---|---|---|---|
| 6.1 | Alternative Transaction. | ........................................................................ | 20 |
| 6.2 | Bankruptcy Court Approval | ................................................................... | 21 |
| 6.3 | Sale Order | ............................................................................................ | 21 |
| 6.4 | Breakup Fee | ......................................................................................... | 21 |
| 6.5 | Cure Costs | ........................................................................................... | 21 |
| 6.6 | Sale Order | ............................................................................................ | 21 |

Article 7 COVENANTS ......................................................................................................... 22

| | | | |
|---|---|---|---|
| 7.1 | Access to Information | ........................................................................... | 22 |
| 7.2 | Conduct of the Business Pending the Closing. | ..................................... | 22 |
| 7.3 | Consents | .............................................................................................. | 23 |
| 7.4 | Appropriate Action; Filings | ................................................................... | 23 |
| 7.5 | Confidentiality | ...................................................................................... | 23 |

ii

Table of Contents
(continued)

Page

| | | | |
|---|---|---|---|
| 7.6 | Preservation of Records; Cooperation | | 23 |
| 7.7 | Supplements to Schedules | | 24 |
| 7.8 | Further Assurances | | 24 |
| 7.9 | Adequate Assurance | | 24 |
| 7.10 | Conflicts and Privilege | | 24 |
| 7.11 | Intellectual Property | | 25 |
| Article 8 | EMPLOYEE AND EMPLOYEE BENEFITS MATTERS; TAX MATTERS; OTHER AGREEMENTS | | 25 |
| 8.1 | Employment. | | 25 |
| 8.2 | Employee Matters. | | 25 |
| 8.3 | Tax Matters. | | 26 |
| Article 9 | CONDITIONS TO CLOSING | | 27 |
| 9.1 | Conditions Precedent to Obligations of Purchaser | | 27 |
| 9.2 | Conditions Precedent to Obligations of Seller | | 28 |
| 9.3 | Conditions Precedent to Obligations of Purchaser and Seller | | 29 |
| 9.4 | Frustration of Closing Conditions | | 29 |
| Article 10 | LIMITATIONS | | 29 |
| 10.1 | Purchaser's Review | | 29 |
| 10.2 | No Consequential or Punitive Damages | | 29 |
| Article 11 | MISCELLANEOUS | | 29 |
| 11.1 | Survival of Representations, Warranties, Covenants and Agreements | | 29 |
| 11.2 | Remedies | | 30 |
| 11.3 | Expenses | | 30 |
| 11.4 | Non-Recourse | | 30 |
| 11.5 | Submission to Jurisdiction. | | 30 |
| 11.6 | Waiver of Jury Trial | | 31 |
| 11.7 | Time of Essence | | 31 |
| 11.8 | Entire Agreement; Amendments and Waivers | | 31 |
| 11.9 | Governing Law | | 31 |
| 11.10 | Notices | | 31 |
| 11.11 | Severability | | 33 |
| 11.12 | No Right of Set-Off | | 33 |
| 11.13 | Binding Effect; Assignment | | 33 |
| 11.14 | Headings | | 33 |
| 11.15 | Counterparts | | 33 |

iii

Table of Contents
(continued)

Page

| | | |
|---|---|---|
| 11.16 | Interpretation | 33 |
| 11.17 | Announcements | 34 |
| 11.18 | Confidentiality | 34 |
| 11.19 | Non-Competition; Non-Solicitation | 34 |
| 11.20 | Broker's Fees | 35 |

iv

Table of Contents

<u>Schedules</u>

| | |
|---|---|
| Schedule 1.0 | Select Definitions |
| Schedule A | Office Property |
| Schedule B | Parking Garage Property |
| Schedule C | Ancillary Publications |
| Schedule 1.2(m) | Excluded Assets |
| Schedule 4.1 | Subsidiaries |
| Schedule 4.4(b) | Real Property Leases |
| Schedule 4.5(a) | Personal Property Leases |
| Schedule 4.5(b) | Capital Leases |
| Schedule 4.5(c) | Exceptions to Condition of Personal Property |
| Schedule 4.6(a) | Intellectual Property Registrations |
| Schedule 4.6(b) | Intellectual Property Licenses |
| Schedule 4.6(c) | Intellectual Property Exceptions |
| Schedule 4.8(a) | Employee Benefit Plans |
| Schedule 4.10 | Litigation |
| Schedule 4.13 | Tax Returns |
| Schedule 4.15 | Environmental Compliance Matters |
| Schedule 4.17 | Consents and Approvals |
| Schedule 4.20(a) | Alliance for Audited Media Audit Reports |
| Schedule 7.2(a) | Required Conduct of Business Pending Closing |
| Schedule 8.2(g) | Person Entitled to COBRA as of the Execution Date |
| Schedule 9.1(d) | Required Consents |

<u>Exhibits</u>

| | |
|---|---|
| Exhibit 2.4 | Estimated Working Capital Adjustment Worksheet |

81681-0004/137515612.9

## ASSET PURCHASE AND SALE AGREEMENT

THIS ASSET PURCHASE AND SALE AGREEMENT (this "*Agreement*"), dated as of January 30, 2018 (the "*Execution Date*"), is made and entered into by and between Charleston Newspapers, a West Virginia unincorporated joint venture ("*Charleston Newspapers*"), Daily Gazette Holding Company LLC, a Delaware limited liability company ("*DGHC*"), Charleston Newspapers Holdings, L.P., a Delaware limited partnership ("*CH Holdings*"), Daily Gazette Publishing Company LLC, a Delaware limited liability company ("*DGPC*"), Daily Gazette Company, a West Virginia corporation ("*DGC*"), and G-M Properties, Inc., a West Virginia corporation ("*G-M*") (collectively, "*Seller*"), and Charleston Newspapers, LLC, a West Virginia limited liability company ("*Purchaser*"). Seller and Purchaser are sometimes herein referred to collectively as the "*Parties*" and each individually as a "*Party*." Capitalized terms shall have the meaning set forth on <u>Schedule 1.0</u> unless otherwise defined herein.

WITNESSETH:

WHEREAS, on January 30, 2018 (the "*Petition Date*"), Seller intends to file a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "*Bankruptcy Code*"), commencing the Bankruptcy Case in the United States Bankruptcy Court for the Southern District of West Virginia (the "*Bankruptcy Court*") following the due execution and delivery of this Agreement;

WHEREAS, DGHC owns certain intangible and other assets related to the operation of the Newspapers and is the sole general partner of CH Holdings;

WHEREAS, CH Holdings owns certain intangible and other assets related to the operation of the Newspapers and is the sole member of the DGPC which, together with CH Holdings, are the sole owners of Charleston Newspapers;

WHEREAS, DGC owns certain intangible and other assets related to the operation of the Newspapers and is the sole member of DGHC;

WHEREAS, Charleston Newspapers operates, manages and distributes the Newspapers, and certain other ancillary publications as set forth on <u>Schedule C</u> (the "*Ancillary Publications*"), in the Charleston, West Virginia area in both physical and digital formats, and directly or indirectly, through one or more wholly owned subsidiaries, owns the tangible personal property of the Business and the Office Property used in the Business;

WHEREAS, G-M owns the Parking Garage Property used in the Business;

WHEREAS, on the terms and subject to the conditions hereinafter set forth and pursuant to a Sale Order, the Parties desire to enter into this Agreement pursuant to which, among other things, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, all of Seller's right, title and interest in and to the Purchased Assets and Purchaser shall assume from Seller and thereafter pay, discharge and perform the Assumed Liabilities;

WHEREAS, in light of the current circumstances, a sale of Seller's assets is necessary to maximize value and is in the best interest of Seller and its creditors; and

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and would be consummated only pursuant to a Sale Order to be entered by the Bankruptcy Court and applicable provisions of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, representations, warranties and agreements herein contained, and intending to be legally bound hereby, the Parties hereby agree as follows:

81681-0004/137515612.9

## ARTICLE 1
## PURCHASE AND SALE

1.1     Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, transfer, assign, convey and deliver to Purchaser (or its designee), and Purchaser (or its designee) shall purchase, acquire and accept from Seller, free and clear of any and all Liens (other than Liens created by Purchaser and Permitted Liens), to the fullest extent permitted by law, including, without limitation, all of Seller's right, title and interest in, to and under any and all of the assets, properties, rights and claims of any kind or nature, whether tangible or intangible, real, personal or mixed, wherever located and whether or not carried or reflected on the books and records of Seller, which are used or useful in or held for use in connection with the operation of the Business, excluding only the Excluded Assets expressly identified in Section 1.2 (such assets, properties, rights and claims to be acquired hereunder, collectively, the "*Purchased Assets*").  Without limiting the foregoing, the Purchased Assets shall include the following:

(a)     all Accounts Receivable;

(b)     all Purchaser Assumed Contracts to be set forth on the Purchaser Assumed Contracts List (as hereinafter defined);

(c)     all rights, claims, benefits and remedies with respect to security deposits held by third parties, advances and other payments made by Seller prior to the Closing for goods and services to be received after the Closing, and all other rebates, refunds, returns, rights of setoff, rights of recoupment and credits of Seller with respect to any third party ("*Deposits*");

(d)     all tangible personal property owned by Seller related to, used in, or held for use in the conduct of the Business, including merchandise, supplies, materials, samples, machinery, equipment, Inventory, work in process, televisions, monitors, video players, computers, hardware, electronics, file servers, scanners, printers, networks, copiers, furniture, furnishings, fixtures, telephone lines, telecopy machines, telecommunications equipment, firmware, middleware, workstations, routers, hubs, switches, data communications lines, storeroom contents, spare parts, vehicles, improvements, shipping materials, packaging materials, raw materials and other consumables relating to or available for sale or use in connection with the Business, and all rights, title and interest of Seller in and to any personal property subject to a lease or financial lease that is related to, used in, or held for use in the conduct of the Business (collectively, the "*Tangible Personal Property*");

(e)     all leasehold rights, title and interests in real property and leasehold improvements, fixtures and other appurtenances held by Seller or any of its Subsidiaries, including all security deposits, reserves, prepaid rent and other rights and privileges related thereto, including without limitation all rights, claims, benefits and remedies with respect to each Real Property Lease, if any;

(f)     all rights, title and interests in the Owned Real Property, and all improvements, fixtures, and other appurtenances, including any security deposits, reserves, prepaid rent and other rights and privileges related thereto, including without limitation all rights, claims, benefits and remedies with respect to such Owned Real Property;

(g)     the Intellectual Property, together with any and all (i) corresponding rights that may be secured in connection therewith anywhere in the world, (ii) copies and electronic, tangible and other embodiments thereof, (iii) rights to collect income and royalties and to recover damages or lost profits in connection therewith, and (iv) rights to sue and recover and other rights and remedies related thereto for past, present or future infringement, dilution, misappropriation or other violation thereof;

(h)     to the extent transferable and/or assignable, after giving effect to the Sale Order, all of the rights and benefits accruing from and after the Closing under any of the Purchaser Assumed Contracts, including each Real Property Lease, if any, personal property lease or Intellectual Property License that is a Purchaser Assumed Contract;

81681-0004/137515612.9

(i)        all books and records, including blueprints, drawings and other technical papers, equipment manuals and maintenance records, inventory records and data, asset history records and data, production records and data, service records and data, quality control records and data, customer records and data, supplier records and data, sales records and data, accounting records and data (including ledgers and books of original entry), insurance records and files, Intended Employee records and files, payroll records and files, regulatory compliance records and files, environmental compliance records and files, any applicable employee safety and health laws and regulations compliance records and files, any documents relating to marketing, advertising or promotional materials, and any and all other correspondence, literature, records, data and files used in, related to, required for the conduct of or otherwise beneficial to the Business or any of the Purchased Assets, to the extent transferrable by Law ("***Books and Records***");

(j)        all rights and benefits accruing under any Licenses held, used or made by Seller in the Business to the extent assignable;

(k)        all warranties and guarantees related to the Purchased Assets, to the extent assignable, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets, and claims against suppliers and other third parties in connection with the Purchaser Assumed Contracts;

(l)        all assignable third party property and casualty insurance policy proceeds and rights thereto in respect of the Business relating to losses;

(m)        all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(n)        all non-disclosure or other confidentiality agreements entered between Seller and any potential purchaser of the Purchased Assets;

(o)        all goodwill and other intangible assets associated with the Business, including customer, distribution, and supplier lists, and any other lists proprietary to the Business (in each case, other than the Excluded Assets); and

(p)        all other assets, properties, rights and claims of Seller of any kind or nature which relate to the Business, which are used or useful in or held for use in the Business, or which relate to the Purchased Assets (in each case, other than the Excluded Assets) not otherwise described in this Section 1.1.

1.2        Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller shall retain all right, title and interest to, in and under the Excluded Assets. "***Excluded Assets***" shall mean only the following assets:

(a)        all Cash;

(b)        any (i) confidential personnel and medical records pertaining to any Employee of Seller not hired by Purchaser, and to any Intended Employee which is not permitted to be transferred to Purchaser under applicable Law; (ii) books and records that Seller is required by Law to retain or that relate exclusively to the Excluded Assets or the Excluded Liabilities, including Tax Returns, financial statements, and corporate or other entity filings; and (iii) partnership agreements, joint venture operating agreements, and other governing legal documents, qualifications to do business, taxpayer and other identification numbers, seals, minute books, equity ledgers, stock certificates and any other documentation related to the governance, organization, maintenance or existence of Seller;

(c)        any claim, right or interest of Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date;

(d)        all contracts of Seller other than the Purchaser Assumed Contracts;

81681-0004/137515612.9

(e)     all rights and claims of Seller under the Transaction Documents, including the Purchase Price;

(f)     all Employee Benefit Plans;

(g)     all deposits with respect to any professional retainers (including all legal, accounting, financial advisory, valuation, investment banking and other third party advisory or consulting fees and expenses) incurred by or on behalf of Seller or its Affiliates in connection with the Bankruptcy Case or the Transactions;

(h)     all Litigation Claims;

(i)     all deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Asset;

(j)     all insurance policies and rights thereunder, and the proceeds received after the Closing Date under insurance policies of Seller, except for all assignable third party property and casualty insurance policy proceeds and rights thereto in respect of the Business relating to losses (it being understood that Seller shall retain the right to obtain and receive refunds for prepaid third party property and casualty insurance policy and all other insurance policy premiums for Seller's coverages for periods after Closing);

(k)     the Privileged Information;

(l)     all rights, claims and causes of action of Seller solely relating to Excluded Assets; and

(m)     the assets, properties and rights of Seller set forth on Schedule 1.2(m).

1.3     Assumption of Liabilities.  On the terms contained in this Agreement, Purchaser hereby assumes and agrees to pay, discharge and perform in full when due the following (and only the following) Liabilities of Seller (the "**Assumed Liabilities**"):

(a)     all Liabilities of Seller under the Purchaser Assumed Contracts;

(b)     all Employee Obligations with respect to Intended Employees;

(c)     the Deferred Circulation Liability; and

(d)     all Liabilities with respect to Cure Costs.

1.4     Excluded Liabilities.  Purchaser shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller, other than the Assumed Liabilities (the "**Excluded Liabilities**").  Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement is intended to require Purchaser to pay, perform or otherwise discharge any Liability included in the Excluded Liabilities. Without limiting the foregoing, the following Liabilities are Excluded Liabilities under this agreement:

(a)     all Liabilities, including but not limited to all accounts payable, accrued payroll, payroll tax, other benefit liabilities, and income or business tax liabilities and other accrued expenses incurred prior to the Closing Date, other than the Current Liabilities, except to the extent that the same constitute Assumed Liabilities pursuant to Section 1.3;

(b)     all Liabilities arising out of any of the Excluded Assets;

(c)     an amount equal to all Transfer Taxes, if any;

(d)     all environmental liabilities and obligations, and all other Liabilities relating to any Laws in connection with any environmental, health or safety matters based on facts arising or existing during Seller's operation of the Business prior to the Closing Date;

(e)  all Liabilities arising from or relating to Employee Benefit Plans;

(f)  all Liabilities arising from or relating to any collective bargaining agreements, union contracts, and other similar agreements;

(g)  all Liabilities relating to any claims for infringement, dilution, misappropriation or any other violation of the Intellectual Property of a third Person arising from Seller's operation of the Business prior to the Closing Date;

(h)  all Liabilities for any Taxes of Seller including, but not limited to, Liabilities of Seller for any Taxes arising in connection with the consummation of the transactions contemplated hereby, other than those assumed pursuant to Sections 1.3(b) and 1.3(c);

(i)  all Liabilities of Seller for Taxes of any Person under Reg. § 1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by contract or otherwise.

(j)  all Liabilities for Taxes with respect to the Purchased Assets allocated under Section 8.2 hereof to any Pre-Closing Tax Period;

(k)  all Liabilities of Seller relating to claims under the WARN Act or other similar Laws, reclamation claims, and claims under Section 503(b)(9) of the Bankruptcy Code;

(l)  all Liabilities arising as a result of any Legal Proceeding initiated at any time, to the extent related to the Business or the Purchased Assets on or prior to the Closing Date, including any shareholder Legal Proceedings, actions for breach of contract, or any tort actions;

(m)  all Liabilities of Seller relating to costs and expenses of professionals retained under Sections 327, 328, 363, or 1103 of the Bankruptcy Code and all fees, if any, owed the United States Trustee under 28 U.S.C. § 1930 or otherwise, and all costs associated with the wind down of the Business and the Bankruptcy Case; and

(n)  all Liabilities incurred in the ordinary course of business existing prior to the Closing Date other than Assumed Liabilities.

1.5  Assumed Contracts.

(a)  Within five (5) Business Days after the due execution and delivery of this Agreement, Seller shall provide Purchaser with a preliminary list of all Contracts to which Seller is a party or by which Seller is bound in connection with the Business or by which the Purchased Assets may be bound or affected (the "**Contracts List**"). The Contracts List shall be deemed to be supplemented and updated upon the filing by Seller in the Bankruptcy Case of Seller's Schedule of Assets and Liabilities to include all additional Contracts disclosed in such filing not previously included on the Contracts List. Thereafter, Seller shall update the Contracts List as necessary on a weekly basis through the Closing Date. The Contracts List shall include the name of the Contract, the parties to such Contract, the date of the Contract, and the Cure Cost, if any, associated with each such Contract.

(b)  On or before seven (7) days prior to the Closing, Purchaser shall have provided to Seller a preliminary list of all Purchaser Assumed Contracts related to the Business or Purchased Assets (the "***Purchaser Assumed Contracts List***"). The date Purchaser delivers the Purchaser Assumed Contracts List to Seller is referred to herein as the "***Purchaser Assumed Contracts Notification Date***".

(c)  Notwithstanding the foregoing, Purchaser shall be entitled to amend the Purchaser Assumed Contracts List no later than one (1) Business Day before the Closing to (i) add any Contracts not previously on the Purchaser Assumed Contracts List or rejected by Seller, and/or (ii) remove any Contract previously on the Purchaser Assumed Contracts List. Any Purchaser Assumed Contracts so added to the Purchaser Assumed Contracts List before the Sale Hearing shall be Purchased Assets and any Purchaser Assumed Contracts so removed from the Purchaser Assumed Contracts List before the Sale Hearing shall be Excluded Assets.

(d)     Purchaser shall assume and agree to perform and discharge the Assumed Liabilities under the Purchaser Assumed Contracts pursuant to this Agreement and the Assignment and Assumption Agreement.  From and after the Purchaser Assumed Contracts Notification Date, Seller shall not reject any Contract then on the Purchaser Assumed Contracts List unless otherwise agreed to in writing by Purchaser.

(e)     Seller shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to Purchaser Assumed Contracts and Seller shall use its commercially reasonable efforts to take all other actions necessary to cause the Purchaser Assumed Contracts to be assigned to Purchaser as of the Closing.  At or prior to the Closing, Seller shall comply with all requirements under Section 365 of the Bankruptcy Code and all other applicable Laws necessary to assign the Purchaser Assumed Contracts to Purchaser.

(f)     Notwithstanding anything in this Agreement to the contrary, on the date any Assignable Contract is assumed and assigned to Purchaser pursuant to this Section 1.5, such Contract shall be deemed a Purchaser Assumed Contract for all purposes under this Agreement.

1.6     Further Conveyances and Assumptions.

(a)     From time to time following the Closing and except as prohibited by Law, Seller shall, at Purchaser's expense, make available to Purchaser such non-confidential data in personnel records of Intended Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)     From time to time following the Closing, Seller and Purchaser shall, at no cost to Seller, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquittances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Transaction Documents and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the Assumed Liabilities assumed by Purchaser under this Agreement and the Transaction Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

(c)     Nothing in this Agreement nor the consummation of the Transactions shall be construed as an attempt or agreement to transfer or assign any Purchased Asset, including any Contract, License, certificate, approval, authorization or other right, which is not capable of being assigned pursuant to section 365 of the Bankruptcy Code or transferred pursuant to section 363 of the Bankruptcy Code to Purchaser at the Closing ("*Nonassignable Assets*") unless and until such assignment or transfer shall be permitted.  Seller and Purchaser each shall use commercially reasonable efforts to cooperate with the other in endeavoring to obtain any required consent or relieve any applicable restriction; provided that no Party shall be obligated to incur any costs or expenses or provide any financial accommodation or other consideration of any nature to any Person to facilitate the assignment or transfer of any Nonassignable Asset.  Notwithstanding the foregoing, Seller shall not have any obligation to renew any Nonassignable Asset upon the expiration or termination thereof.

(d)     Each Nonassignable Asset shall be held, as of and from the Closing Date, for the benefit of Purchaser provided that all covenants and obligations thereunder shall be fully performed by Purchaser on Seller's behalf (to the extent such covenants and obligations are Assumed Liabilities) and all rights (to the extent such rights are Purchased Assets) existing thereunder shall be for Purchaser's account.  To the extent permitted by applicable Law, Seller shall take or cause to be taken, at Purchaser's expense, such actions as Purchaser may reasonably request which are required to be taken or appropriate in order to provide Purchaser with the benefits of the Nonassignable Asset. Seller shall promptly pay over to Purchaser the net amount (after Taxes of Seller) of all payments received by it in respect of all Nonassignable Assets, other than payments received from Purchaser pursuant to this Agreement.

1.7     Bulk Sales Laws.  Purchaser hereby waives compliance by Seller with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

1.8     Receivables.  If, following the Closing, Seller shall receive payment in respect of accounts receivable that are included in the Purchased Assets, then Seller shall hold such amounts in trust for Purchaser and shall promptly forward such payment to Purchaser.

1.9     Purchased Assets sold "As Is, Where Is".   EXCEPT AS OTHERWISE SET FORTH HEREIN, PURCHASER ACKNOWLEDGES AND AGREES THAT THE PURCHASED ASSETS SOLD PURSUANT TO THIS AGREEMENT ARE SOLD, CONVEYED, TRANSFERRED AND ASSIGNED ON AN "AS IS, WHERE IS" BASIS "WITH ALL FAULTS" AND THAT, NOTWITHSTANDING ANYTHING SET FORTH HEREIN TO THE CONTRARY, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, TERMS, CONDITIONS, UNDERSTANDINGS OR COLLATERAL AGREEMENTS OF ANY NATURE OR KIND, EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE CONCERNING THE PURCHASED ASSETS OR THE CONDITION, DESCRIPTION, QUALITY, USEFULNESS, QUANTITY OR ANY OTHER THING AFFECTING OR RELATING TO THE PURCHASED ASSETS INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH WARRANTIES ARE ALSO HEREBY EXPRESSLY DISCLAIMED.

EXCEPT AS EXPLICITLY SET FORTH IN THIS AGREEMENT, SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR OTHER INFORMATION DELIVERED OR MADE AVAILABLE BY SELLER TO PURCHASER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, THE DUE DILIGENCE MATERIALS).

PURCHASER ACKNOWLEDGES THAT IT IS A SOPHISTICATED PURCHASER WHO HAS HERETOFORE HAD OPEN ACCESS TO, AND SUFFICIENT TIME TO REVIEW, ALL INFORMATION, DOCUMENTS, AGREEMENTS, STUDIES AND TESTS RELATING TO THE PURCHASED ASSETS THAT PURCHASER DEEMED OR DEEMS NECESSARY TO REVIEW, AND HAS CONDUCTED A COMPLETE AND THOROUGH INSPECTION, ANALYSIS AND EVALUATION OF THE PURCHASED ASSETS, INCLUDING, BUT NOT LIMITED TO, ENVIRONMENTAL TESTING.  PURCHASER, FOR ITSELF AND ON BEHALF OF ITS SUCCESSORS AND ASSIGNS, HEREBY FOREVER RELEASES AND DISCHARGES SELLER, ITS CONSTITUENT OWNERS, AND THEIR RESPECTIVE AGENTS AND EMPLOYEES, FROM ANY AND ALL LIABILITY, RESPONSIBILITY, CLAIMS, DAMAGES, LOSSES AND EXPENSES, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ARISING OUT OF OR RELATED IN ANY WAY TO THE CONDITION OF THE PURCHASED ASSETS OR THEIR SUITABILITY FOR ANY PURPOSE.

PURCHASER HAS UNDERTAKEN SUCH INVESTIGATION AS PURCHASER DEEMED NECESSARY TO MAKE PURCHASER FULLY AWARE OF THE CONDITION OF THE PURCHASED ASSETS AS WELL AS ALL FACTS, CIRCUMSTANCES AND INFORMATION WHICH MAY AFFECT THE USE AND OPERATION OF THE PURCHASED ASSETS AND THE BUSINESS, AND PURCHASER COVENANTS AND WARRANTS TO SELLER THAT PURCHASER HAS RELIED AND SHALL RELY SOLELY ON PURCHASER'S OWN DUE DILIGENCE INVESTIGATION IN DETERMINING WHETHER TO PURCHASE THE PURCHASED ASSETS.   THE PROVISIONS OF THIS SECTION 1.9 SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT AND SHALL BE INCORPORATED INTO THE CLOSING DOCUMENTS TO BE DELIVERED AT CLOSING.

## ARTICLE 2
## PURCHASE PRICE

2.1     Purchase Price and Non-Competition Payments.

(a)     In consideration of the sale of the Purchased Assets to Purchaser, and upon the terms and subject to the conditions hereinafter set forth, the purchase price for the Purchased Assets shall be the aggregate of (collectively, the "**Purchase Price**"):

(i)     **$10,911,000** (the "**Cash Purchase Price**"), as adjusted on Closing pursuant to Section 2.4 and Section 2.8  and as further adjusted on the Adjustment Date pursuant to Section 2.5;

(ii)      the Cure Costs; plus

(iii)     the amount of the Assumed Liabilities.

(b)      In consideration of the Non-Competition and Non-Solicitation Covenants contained in <u>Section 11.19</u> of this Agreement, and upon the terms and subject to the conditions hereinafter set forth, Purchaser shall pay by wire transfer to the following individuals, on the Closing Date, the amounts set forth below opposite their names (collectively, the "***Non-Competition Payments***"):

| Individual | Amount |
|---|---|
| Elizabeth Chilton | $50,000 |
| Norman W. Shumate, III | $150,000 |
| Susan Chilton Shumate | $150,000 |

2.2    <u>Payment of the Purchase Price and Assumption of Assumed Liabilities</u>.  The Purchase Price shall be paid and satisfied as follows:

(a)      No later than the Execution Date, Purchaser shall pay to the Deposit Escrow Agent, as defined below, by a certified or bank check or wire transfer an amount equal to Five Hundred Forty-Five Thousand Five Hundred Fifty and 00/100 Dollars ($545,550.00) as a minimum good faith deposit (the "***Minimum Deposit Amount***") to be held in an escrow account (the "***Deposit Escrow Account***") established with UNITED BANK, a Virginia state banking corporation (the "***Deposit Escrow Agent***") and applied towards the Cash Purchase Price at the Closing in accordance with the terms of an escrow agreement in form and substance reasonably satisfactory to Seller and Purchaser (the "***Deposit Escrow Agreement***").

(b)      On Closing, Purchaser shall deposit an amount equal to Three Hundred Twenty-Five Thousand and 00/100 Dollars ($325,000.00) (the "***Adjustment Escrow Amount***") into an escrow account (the "***Adjustment Escrow Account***") established with UNITED BANK, a Virginia state banking corporation (the "***Adjustment Escrow Agent***") pursuant to the terms of an escrow agreement in form and substance reasonably satisfactory to Seller and Purchaser (the "***Adjustment Escrow Agreement***"), which Adjustment Escrow Amount shall be used solely for the satisfaction of any payment owed by Seller pursuant to <u>Section 2.5</u> hereof;

(c)      On Closing, Purchaser shall pay by wire transfer to Seller an amount equal to the Cash Purchase Price, as adjusted pursuant to <u>Section 2.4</u>, less the Minimum Deposit Amount and the Adjustment Escrow Amount.

(d)      On Closing, Purchaser shall assume the Assumed Liabilities by its execution and delivery of the Assignment and Assumption Agreement;

(e)      On Closing, Purchaser shall deliver to each of the counterparties to the Purchaser Assumed Contracts the full amount of the applicable Cure Costs for the assumption and assignment of such Purchaser Assumed Contracts by Seller to Purchaser.

2.3    <u>Allocation of Purchase Price</u>.  Within ten (10) days prior to the Closing Date, Purchaser shall prepare and deliver to Seller an allocation of the Purchase Price and any other items that are treated as additional purchase price for Tax purposes (the "***Taxable Consideration***") and the amount allocated to Seller among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury regulation (the "***Proposed Allocation***").  Seller shall have five (5) days after receipt of the Proposed Allocation to notify Purchaser in writing of any items of the Proposed Allocation that are not reasonable in Seller's good faith determination ("***Objection to Allocation***").  If Seller does not object in writing during such five (5) day period, then the Proposed Allocation shall be final and binding on all Parties.  If Seller objects in writing during such five (5) day period, then the Parties shall cooperate in

-8-

good faith to reach a mutually agreeable allocation of the Taxable Consideration, which allocation shall be binding on all Parties. If the Parties are unable to reach an agreement of Seller's Objection to Allocation prior to Closing, then any disputed items shall be referred to an independent accountant to be mutually agreed upon by Seller and Purchaser (the "***Accounting Referee***") for resolution, and the determination of the Accounting Referee shall be final and binding on the Parties. The fees and expenses of the Accounting Referee shall be paid fifty percent (50%) by Purchaser and fifty percent (50%) by Seller. In accordance with such binding allocation, Purchaser shall prepare and deliver to Seller copies of Form 8594 and any required exhibits thereto (the "***Asset Acquisition Statement***"). Purchaser shall prepare and deliver to Seller (or its designated successors) from time to time revised copies of the Asset Acquisition Statement (the "***Revised Statements***") so as to report any matters on the Asset Acquisition Statement that need updating, consistent with the agreed upon allocation. The Parties shall, and shall cause their respective controlled Affiliates, to use the allocations set forth in the Asset Acquisition Statement or, if applicable, the last Revised Statement (and file their applicable Tax Returns in accordance with applicable Law), for all Tax purposes and to file all Tax Returns (including, but not limited to, Internal Revenue Service Form 8594) in a manner consistent with such allocation statement and take no position contrary thereto, in each case, unless required to do so by applicable Tax Laws or good faith resolution of a Tax contest. Seller shall timely prepare, execute and deliver all such documents, forms and other information as are required to prepare such allocation.

2.4     <u>Preparation of Estimated Working Capital Adjustment Worksheet</u>.

(a)     No later than two (2) Business Days prior to the Closing Date, Seller shall deliver to Purchaser, in the form of <u>Exhibit 2.4</u>, the Estimated Working Capital Adjustment Worksheet. The Estimated Working Capital Adjustment Worksheet shall contain: (1) estimates of the amounts of the Current Assets as of the Closing Date (the aggregate of such estimated amounts being defined as the "***Closing Date Estimated Current Assets Amount***"), and (2) an estimate of the amount of the Current Liabilities based on its estimate of the actual balance of the Current Liabilities on the Closing Date (such estimated amounts being defined as the "***Closing Date Estimated Current Liabilities Amount***"). The Estimated Working Capital Adjustment Worksheet shall be accompanied by a written statement executed by the President of Charleston Newspapers in form and substance reasonably acceptable to Seller and Purchaser (the "***Estimated Working Capital Adjustment Worksheet Certificate***") certifying that the Estimated Working Capital Adjustment Worksheet has been prepared in good faith by Seller based upon available information as of the date of delivery of the Estimated Working Capital Adjustment Worksheet.

(b)     In the event that, after delivering the Estimated Working Capital Adjustment Worksheet but before consummation of the Closing, Seller becomes aware of any information that would render the Estimated Working Capital Adjustment Worksheet inaccurate, then Seller shall update the Estimated Working Capital Adjustment Worksheet to reflect such information and such updated Estimated Working Capital Adjustment Worksheet shall be used in determining the amount of the Cash Purchase Price to be paid by Purchaser on Closing.

(c)     The Cash Purchase Price shall be (i) increased by the amount, if any, by which the Closing Date Estimated Current Assets Amount exceeds the Closing Date Estimated Current Liabilities Amount or (ii) decreased by the amount, if any, by which the Closing Date Estimated Current Liabilities Amount exceeds the Closing Date Estimated Current Assets Amount.

2.5     <u>Preparation of Final Working Capital Adjustment Worksheet</u>.

(a)     Promptly after Closing, Purchaser shall prepare in consultation with the advisors of Purchaser that are designated by Purchaser, at Purchaser's expense, a draft of the Final Working Capital Adjustment Worksheet, which shall be delivered to Seller as soon as possible following Closing with Purchaser using commercially reasonable efforts and in no event later than ninety (90) days following the Closing Date. The Final Working Capital Adjustment Worksheet shall contain the values set forth in the Estimated Working Capital Adjustment Worksheet and shall also contain an estimate of the following amounts set forth in the "Final Closing Balance" column of the Final Working Capital Adjustment Worksheet: the Final Current Assets Amount and the Final Current Liabilities Amount.

(b)     During the period from the date of delivery of the draft Final Working Capital Adjustment Worksheet until the date no later than twenty (20) days after delivery of the Final Working Capital Adjustment Worksheet, Purchaser shall give Seller and its representatives such assistance and access to the books, records and

Purchaser's representatives as Seller and its representatives may reasonably request in order to enable them to assess the draft Final Working Capital Adjustment Worksheet. Each of the Parties shall be entitled to be present at the Closing Date inventory counts and other procedures used in the preparation of draft Final Working Capital Adjustment Worksheet.

(c)       If Seller does not give a notice of objection in accordance with Section 2.5(d), Seller shall be deemed to have accepted the draft Final Working Capital Adjustment Worksheet prepared by Purchaser, which shall be final and binding on Seller and Purchaser, and such draft Final Working Capital Adjustment Worksheet shall constitute the Final Working Capital Adjustment Worksheet for the purposes of this Agreement immediately following the expiration date for the giving of such notice of objection.

(d)       If Seller objects to any matter in the draft Final Working Capital Adjustment Worksheet prepared pursuant to this Section 2.5, then Seller shall give notice to Purchaser no later than twenty (20) days after delivery of the draft Final Working Capital Adjustment Worksheet, setting out in reasonable detail the particulars of such objection. If Seller delivers such objection within such twenty (20) day period, then Seller and Purchaser shall use reasonable efforts to resolve such objection for a period of thirty (30) days following the giving of such notice. If the matter is not resolved by the end of such thirty (30) day period, then the dispute with respect to such objection shall be submitted by Seller and Purchaser jointly to the Accounting Referee. The Accounting Referee retained shall, as promptly as practicable, make a determination of the Final Working Capital Adjustment Worksheet, which, subject to any disputes, shall be final and binding upon Seller and Purchaser and shall constitute Final Working Capital Adjustment Worksheet for the purposes of this Agreement. Any dispute with respect to the joint appointment of the Accounting Referee or with respect to any determination made by the Accounting Referee shall be referred to the Bankruptcy Court. The determination made by the Bankruptcy Court shall be final and binding upon Seller and Purchaser and, if applicable, shall constitute the Final Working Capital Adjustment Worksheet for purposes of this Agreement, and neither Seller nor Purchaser shall have any right of appeal. All fees and expenses related to the Accounting Referee or any dispute of the Accounting Referee's determination shall be paid one-half by Purchaser and one-half from the Adjustment Escrow Account.

(e)       On the Adjustment Date, the Cash Purchase Price shall be: (i) increased by the amount by which the Final Current Assets Amount exceeds the Closing Date Estimated Current Assets Amount, or decreased by the amount by which the Final Current Assets Amount is less than the Closing Date Estimated Current Assets Amount, and (ii) increased by the amount by which the Closing Date Estimated Current Liabilities Amount exceeds the Final Current Liabilities Amount, or decreased by the amount by which the Closing Date Estimated Current Liabilities Amount is less than the Final Current Liabilities Amount (the aggregate net amount of such increases and decreases to the Cash Purchase Price pursuant to clauses (i) - (iv) above being referred to as the "*Final Adjustment Amount*"). On the Adjustment Date, if the Final Adjustment Amount is a positive number, Purchaser shall pay to Seller an amount equal to the positive Final Adjustment Amount or, alternatively, if the Final Adjustment Amount is a negative number, Seller shall pay to Purchaser an amount equal to the absolute value of the negative Final Adjustment Amount. Any amounts required to be paid by Seller to Purchaser pursuant to this Section 2.5 shall be paid out of the Adjustment Escrow Account in accordance with the terms of the Adjustment Escrow Agreement. After any such payments have been made to Purchaser, the remainder of the Adjustment Escrow Amount, if any, shall be distributed to Seller, as more particularly set out in the Adjustment Escrow Agreement. Any amounts owing by Seller to Purchaser in excess of the Adjustment Escrow Amount shall be waived by Purchaser. Purchaser's sole recourse pursuant to this Section 2.5 shall be payment out of the Adjustment Escrow Account. For the avoidance of doubt, all amounts payable on the Adjustment Date under this Section 2.5 shall be treated as adjustments to the Cash Purchase Price.

2.6       Withholding Rights.   Notwithstanding anything in this Agreement to the contrary, Purchaser or its respective designee shall be entitled to withhold and deduct from any amounts payable pursuant to this Agreement such amounts as Purchaser or its respective designee are required to deduct and withhold with respect to the making of such payment under the Code or any provision of state, local or foreign Tax law. To the extent that amounts are so withheld and paid over to the appropriate Tax authority, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding were made.

2.7       Sale Free and Clear.   Seller acknowledges and agrees, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising interests as defined in 11 U.S.C. §

363(f) including but not limited to Seller's Liabilities, Legal Proceedings and Liens (other than those in favor of Purchaser created under this Agreement and/or any Transaction Documents, the Permitted Liens, if any, and Assumed Liabilities) of, against or created by any of Seller or the Estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Purchased Assets and thereupon shall attach to the Purchase Price, with the same force, effect, validity, enforceability, and priority as such Seller Liabilities, Legal Proceedings and Liens had attached to the Purchased Assets.  On the Closing Date in accordance with Section 3.1 of this Agreement, the Purchased Assets shall be transferred, conveyed and assigned to Purchaser or its designee to the fullest extent permitted by Section 363 of the Bankruptcy Code, free and clear of all Seller's Liabilities, Legal Proceedings and Liens other than the Permitted Liens, if any, interests, and the Assumed Liabilities.

### ARTICLE 3
### CLOSING AND TERMINATION

3.1    Closing Date.  The consummation and effectuation of the transactions contemplated hereby pursuant to the terms and conditions of this Agreement (the "***Closing***") shall take place by the exchange by facsimile or .pdf format of signed copies of the closing documents described below on the Closing Date at 11:00 a m. local time on the date that is no later than the fifteenth (15th) day following the entry of the Sale Order, or as otherwise agreed to by the Parties; *provided*, that, to the extent the conditions set forth in Article IX are not satisfied (except for closing conditions that by their terms can only be satisfied at the Closing) or so waived on or prior to such date, the period of time within which the Closing shall occur shall be automatically extended until, and the Closing shall occur promptly (but no later than two (2) business days) following, such date as all of the conditions set forth in Article IX have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived by the Party entitled to waive the applicable condition, unless another time or date, or both, are agreed to in writing by the Parties.  The date on which the Closing shall be held is referred to in this Agreement as the "***Closing Date***."  All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

3.2    Deliveries by Seller.  At the Closing, Seller shall deliver or cause to be delivered to Purchaser:

(a)    a duly executed bill of sale in a form agreed upon by Seller and Purchaser;

(b)    a duly executed assignment and assumption agreement in a form agreed upon by Seller and Purchaser (the "***Assignment and Assumption Agreement***");

(c)    duly executed assignments transferring all of Seller's rights, titles and interests in and to the Intellectual Property, in a form suitable for recording in the U.S. Patent and Trademark Office and U.S. Copyright Office, if applicable;

(d)    a duly executed Adjustment Escrow Agreement;

(e)    duly executed assignment and assumption agreements with respect to each Real Property Lease, if any;

(f)    copies of all consents, waivers and approvals referred to in Section 9.l(d);

(g)    a certificate of non-foreign status pursuant to Section 1445 of the Code and Treasury Regulation Section 1.1445-2(b) and a fully and properly executed IRS Form W-9;

(h)    a certified copy of the entered Sale Order;

(i)    a certificate signed by an authorized officer of Seller (in form and substance reasonably satisfactory to Purchaser) pursuant to Sections 9.1(a) and (b));

(j)      a duly executed deed and bill of sale evidencing the transfer of the Owned Real Property;

(k)      [an assignment and assumption agreement relating to the lease of the Leased Real Property;]

(l)      customary title insurance "Seller's Affidavit" satisfactory to remove any exceptions to mechanic's liens and parties in possession;

(m)      documents, keys, and rights of entry appropriate or necessary to enable Purchaser to take immediate possession of, or to immediately obtain the use and benefit of, the Purchased Assets and the Owned Real Property and to operate the Business; and

(n)      such customary instruments of transfer, assumptions, filings or documents, in form and substance reasonably satisfactory to Purchaser, as may be required to give effect to this Agreement.

3.3      Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to Seller:

(a)      the Cash Purchase Price, as adjusted pursuant to Section 2.4(c), less the Minimum Deposit Amount and the Adjustment Escrow Amount;

(b)      the Cure Costs, wired in immediately available funds to an account designated by Seller;

(c)       a duly executed Assignment and Assumption Agreement;

(d)      a duly executed assignment and assumption agreement with respect to each Real Property Lease, if any;

(e)      a duly executed Adjustment Escrow Agreement;

(f)      a certificate signed by an authorized officer of Purchaser (in form and substance reasonably satisfactory to Seller) pursuant to Sections 9.2(a) and (b); and

(g)      such other customary instruments of transfer, assumptions, filings or documents, in form and substance reasonably satisfactory to Seller, as may be required to give effect to this Agreement.

At the Closing, Purchaser also shall deliver to Elizabeth Chilton, Norman W. Shumate, III and Susan Chilton Shumate the Non-Compete Payments.

3.4      Termination of Agreement.  This Agreement may be terminated prior to the Closing Date as follows:

(a)      At any time prior to the Closing Date by the joint written consent of Seller and Purchaser;

(b)      By Seller or Purchaser if the Closing has not occurred on or before June 29, 2018 (the "***Outside Date***"); provided, however, that a Party may not terminate this Agreement pursuant to this Section 3.4(b) if such Party is in breach of its obligations hereunder in any material respect and such breach is the sole reason that the Closing has not occurred by such date;

(c)      By Seller or Purchaser, if: (i) Seller enters into a definitive agreement with respect to an Alternative Bid; or (ii) the Bankruptcy Court enters an Order approving an Alternative Bid; or (iii) if Purchaser is not the successful bidder at the Auction; provided that, if Purchaser is the only back-up bidder, then Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 3.4 until after the earlier of (A) the closing of an Alternative Transaction or (B) the Outside Date;

(d)      By Seller or Purchaser, if an Order is entered by a Governmental Authority of competent jurisdiction having valid enforcement authority permanently restraining, prohibiting or enjoining either Party from

81681-0004/137515612.9

consummating the Transactions and such Order shall have become final and non-appealable or shall not have been vacated prior to the Outside Date;

(e)    By Purchaser or Seller, if the Sale Order has not been entered by the Bankruptcy Court on or before June 14, 2018; or

(f)    By Purchaser or Seller, so long as the Party seeking to terminate the Agreement pursuant to this Section 3.4(f) is not in breach of its obligations under this Agreement in any material respect, upon a material breach of any covenant or agreement of the other Party set forth in this Agreement, or if any representation or warranty of Seller or Purchaser shall have been or becomes untrue in any material respect, in each case such that the conditions set forth in Section 9.1 or Section 9.2, respectively, as the case may be, could not be satisfied and such breach or untruth cannot be cured by the Outside Date.

3.5    Effect of Termination.

(a)    No termination of this Agreement pursuant to Section 3.4 shall be effective until notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made.  In the event that this Agreement is validly terminated as provided herein, this Agreement shall become wholly void and of no further force and effect without liability to Purchaser or Seller, or any of their respective Representatives, and each shall be fully released and discharged from any Liability or obligation after the date of such termination and such termination shall be without liability to Purchaser or Seller; provided, however, that (i) subject to Section 11.2 of this Agreement, the Parties hereto shall retain the right to pursue any remedies that they may have in contract, at law or in equity for any breach by a Party of any of their respective representations, warranties, covenants or other agreements contained in this Agreement and (ii) the rights and obligations of the Parties under Sections 3.5, 7.5 and Article 11 of this Agreement shall survive any such termination and shall be enforceable hereunder.

(b)    In the event that this Agreement is terminated as set forth in Section 3.4 above, then Seller shall return the Minimum Deposit Amount to Purchaser.

(c)    In the event that this Agreement is terminated as set forth in Section 3.4 above, then, in addition to Seller's return of the Minimum Deposit Amount to Purchaser, assuming (i) Seller enters into a definitive agreement with respect to an Alternative Bid; (ii) the Bankruptcy Court enters an Order approving an Alternative Bid; and (iii) the Alternative Transaction closes; then, Purchaser will be entitled to receive from Seller, without deduction or offset of any nature, a flat fee payment in immediately available funds in the amount of $400,000 (the "***Breakup Fee***"), which payment shall be made to Purchaser concurrently with the consummation of such Alternative Transaction.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as follows:

4.1    Organization and Good Standing.  Seller is duly organized, validly existing, in good standing and duly qualified to transact business under the laws of the jurisdiction of its formation, and is duly qualified or licensed to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and, subject to the limitations imposed on Seller as a result of having filed petitions for relief under the Bankruptcy Code, or pursuant to any Order entered by the Bankruptcy Court, Seller has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted. Seller does not have any capital stock or other equity or voting interest in any Person, except as set forth in Schedule 4.1.

4.2    Title to Assets. Each Seller has good valid title to or interest in (as applicable) all of the Purchased Assets being sold by such Seller to Purchaser hereunder.  The Purchased Assets include all tangible assets, intangible assets

and intellectual property that are necessary for the conduct of the Business immediately following the Closing Date in substantially the same manner as conducted by Seller prior to the commencement of the Bankruptcy Case.

4.3     <u>Authorization of Agreement</u>.  Subject to the entry of the Sale Order, Seller has full corporation, limited liability company or partnership power and authority to execute, deliver and perform each of the Transaction Documents to be executed or delivered by Seller in connection with the transactions contemplated therein.  The execution, delivery and performance of each of the Transaction Documents to be executed or delivered by Seller and the consummation by Seller of the transactions contemplated in this Agreement have been duly and validly approved by the directors, stockholders, managers, members and partners of Seller, as applicable, in compliance with applicable Laws and the Governing Documents of Seller.  The Transaction Documents when so executed and delivered by Seller shall constitute legal, valid and binding obligations of Seller enforceable against it in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

4.4     <u>Real Property</u>.

        (a)     Except for the Excluded Real Property, the Owned Real Property represents all of the real property owned by Seller or by any of its Affiliates used in connection with the Business. Charleston Newspapers holds fee simple title to the Office Property, and G-M holds fee simple title to the Parking Garage Property.

        (b)     <u>Schedule 4.4(b)</u> sets forth a list of all material leases or other occupancy agreements, if any, pursuant to which Seller leases real property to or from any third party (individually, a "***Real Property Lease***" and collectively, the "***Real Property Leases;***" the subject real property leased thereunder, individually, a "***Leased Property***" and collectively, the "***Leased Properties***").

        (c)     Seller has provided Purchaser with, or access to complete copies of all Real Property Leases, if any, together with all amendments, modifications, supplements, and restatements thereto.

        (d)     Each of the Real Property Leases, if any, is in full force and effect and is the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to the applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

        (e)     Seller is the only legal and beneficial owner of the Owned Real Property.

        (f)     Seller will deliver good and marketable fee simple title to the Owned Real Property to Purchaser, free and clear of all Encumbrances, except for Permitted Liens, at Closing.

        (g)     There is no proceeding in eminent domain or other similar proceeding pending or, to Seller's Knowledge, threatened, affecting the Owned Real Property. There exists no writ, injunction, decree, order, or judgment outstanding, nor any litigation pending or, to Seller's Knowledge, threatened, relating to the ownership, use, or occupancy of the Owned Real Property.

        (h)     To Seller's Knowledge, there is no violation of any Law, covenant, condition, restriction, easement, zoning requirements, agreement, or order of any Governmental Authority having jurisdiction over any of the Owned Real Property, which affects the Owned Real Property or the use or occupancy thereof.

        (i)     All material certificates of occupancy or similar Licenses of all Governmental Bodies having jurisdiction over the Owned Real Property, which are required to permit Seller to lawfully occupy such Owned Real Property and to conduct all business thereon as currently conducted have been obtained. Seller has not received any written notice from any Governmental Authority having jurisdiction over the Owned Real Property threatening to suspend, revoke, or cancel any such License.

(j)      The building, fixtures, and other improvements located on the Owned Real Property are in good and serviceable operating condition for the Business as conducted by Seller as of the Closing Date, normal wear and tear excepted.

(k)      Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code.

4.5      Tangible Personal Property; Capital Leases.

(a)      Schedule 4.5(a) sets forth all leases of Tangible Personal Property that involve annual payments in excess of $5,000 and relate to personal property used by Seller in connection with the Business or to which Seller is a party or by which the properties or assets of Seller are bound (the "***Personal Property Leases***").

(b)      Schedule 4.5(b) sets forth all capital leases that involve annual payments in excess of $5,000 and relate to property used by Seller in connection with the Business or to which Seller is a party or by which the properties or assets of Seller are bound (the "***Capital Leases***").

(c)      Except as set forth on Schedule 4.5(c), all of the Tangible Personal Property is in good and serviceable operating condition for the Business as conducted by Seller as of the Closing Date, normal wear and tear excepted.

4.6      Intellectual Property.

(a)      Schedule 4.6(a) sets forth a true and complete list of all issuances, registrations and applications for issuance or registration of Intellectual Property included in the Purchased Assets.

(b)      Schedule 4.6(b) sets forth a true and complete list of (i) all material Intellectual Property Licenses that are Purchaser Assumed Contracts (other than standard off-the-shelf, unmodified, commercially available computer software) and (ii) to Seller's Knowledge, all material oral Intellectual Property Licenses that are Purchaser Assumed Contracts, regardless of whether such Intellectual Property Licenses involve annual payments by or to Seller or an Affiliate of Seller.

(c)      With respect to all Intellectual Property used by Seller in connection with the Business, except as set forth on Schedule 4.6(c):

(i)      Seller (A) exclusively owns all right, title and interest in and to, free and clear of all Liens (other than Permitted Liens), or (B) has a valid and enforceable right to use, pursuant to an Intellectual Property License set forth in Section 4.6(b), all Intellectual Property used or held for use in connection with the operation of the Business as currently conducted, all of which rights shall survive unchanged upon the consummation of the Transactions.

(ii)      To Seller's Knowledge, the Intellectual Property is not the subject of any ownership, validity, use, or enforceability challenge or claim received by Seller in writing or, any outstanding Order restricting the use by Seller thereof or adversely affecting any of the rights of Seller thereto, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(iii)      To Seller's Knowledge, Seller has not received any written notice of any default or any event that with notice or lapse of time, or both, would constitute a default under any material Intellectual Property License that is a Purchaser Assumed Contract and to which Seller is a party or by which it is bound.  To Seller's Knowledge, no Person is infringing, diluting, misappropriating, or otherwise violating, any material Purchased Intellectual Property or any Intellectual Property exclusively licensed to Seller under an Intellectual Property License that is a Purchaser Assumed Contract.

(iv)      To Seller's Knowledge, neither Seller nor the operation of the Business as presently conducted is materially infringing, diluting, misappropriating, or otherwise violating any Intellectual Property rights of any other Person.  To Seller's Knowledge, there are no Legal Proceedings, pending or

81681-0004/137515612.9

threatened, concerning any claim that Seller or the operation of the Business has materially infringed, diluted, misappropriated, or otherwise violated any material Intellectual Property of any other Person, and Seller has not received any written notice that Seller or the Business has materially infringed, diluted, misappropriated, or otherwise violated any Intellectual Property of any other Person (including any unsolicited demand or offer to license Intellectual Property rights of a third party).

4.7     Contracts.

(a)     The Contracts List contains a true and complete list of all Contracts to which Seller is a party or by which Seller is bound in connection with the Business, or by which the Purchased Assets may be bound or affected.

(b)     To Seller's Knowledge, each of the Contracts on the Contracts List is in full force and effect and is the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

4.8     Employee Benefits.

(a)     Schedule 4.8(a) sets forth all material Employee Benefit Plans.

(b)     True, correct and complete copies of each of the material Employee Benefit Plans have been made available to Purchaser.

(c)     Each of the Employee Benefit Plans intended to qualify for tax-advantaged status under applicable Laws so qualifies.

(d)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) result in any payment becoming due to any employee of Seller; (ii) increase any benefits otherwise payable under any Employee Benefit Plan; or (iii) result in the acceleration of the time of payment or vesting of any such benefits, in each case, that would be required to be satisfied by Purchaser following the Closing.

(e)     Neither Seller, nor any Affiliate, nor any other entity under common control with Seller, as determined under Section 414(b), (c) or (m) of the Code, has maintained any plan that: (i) is a "multiemployer plan" (as defined in Section 3(37) of ERISA and Section 414(f) of the Code) or a plan maintained by more than one employer under Section 413(c) of the Code; (ii) is a defined benefit plan (as defined in Section 414(j) of the Code); or (iii) is or has been subject to the requirements of Title IV of ERISA or Section 412 of the Code.

(f)     To Seller's Knowledge, no Employee Benefit Plan, or any liability of any kind thereunder or with respect thereto, will be required by operation of law or otherwise to be transferred to Purchaser as a result of the transactions contemplated hereby.

4.9     Labor.

(a)     Seller is not a party to any labor or collective bargaining agreement.

(b)     To Seller's Knowledge there are no (i) strikes, work stoppages, work slowdowns or lockouts pending or threatened against or involving Seller, or (ii) unfair labor practice charges, grievances or complaints pending or threatened by or on behalf of any employee or group of employees of Seller, except in each case as would not reasonably be expected to have a Material Adverse Effect.

4.10    Litigation.  Except (a) as set forth on Schedule 4.10, (b) for matters before the Bankruptcy Court involving Seller or any of its Affiliates, and (c) any matters that will otherwise be resolved by the Sale Order without any Liability or restriction applicable to Purchaser or the Purchased Assets, there are no Legal Proceedings pending or,

81681-0004/137515612.9

to Seller's Knowledge, threatened against Seller or relating to the Business or any of the Purchased Assets or Assumed Liabilities, before any Governmental Authority, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.11   Financial Advisors. Except for Dirks, Van Essen & Murray, whose fees and expenses will be paid by Seller on the Closing Date, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the transactions contemplated by this Agreement.

4.12   Accounts Receivable. To Seller's Knowledge, the Accounts Receivable of Seller:  (a) have been legally and validly incurred pursuant to bona fide transactions in the ordinary course of business; (b) represent or will represent bona fide indebtedness incurred by the applicable account debtor; (c) are not subject to any set-offs or counterclaims that exceed $10,000; and (d) except for the Royal Automotive A/R, are fully collectible, net of the allowance for doubtful accounts contained in the financial statements of  Seller, in the ordinary course of business in accordance with their terms and assuming that the methods of collection practices and procedures used in collection of the accounts receivable are consistent with those historically used by Seller.

4.13   Tax Matters.

(a)   Seller has timely filed all Tax Returns that it was required to file.  All Taxes owed by Seller (whether or not shown or required to be shown on any Tax Return) have been paid.  Seller currently is not the beneficiary of any extension of time within which to file any Tax Return.  No claim has ever been made by an authority in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to taxation by that jurisdiction.  There are no liens on any of the assets of Seller that arose in connection with any failure (or alleged failure) to pay any Tax.

(b)   Seller has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.

(c)   Seller does not expect any authority to assess any additional Taxes for any period for which Tax Returns have been filed.  There is no dispute or claim concerning any Tax Liability of Seller either (i) claimed or raised by and authority in writing or (ii) as to which Seller has Knowledge.  Schedule 4.13 lists all federal, state, local and non-U.S. income Tax Returns filed with respect to Seller for taxable periods ended on or after 2015, indicates those Tax Returns that have been audited, and indicate those Tax Returns that currently are the subject of audit.  Seller has delivered to Purchaser correct and complete copies of all income Tax Returns, examination reports and statements of deficiencies assessed against or agreed to by Seller since 2015.

(d)   None of the Assumed Liabilities is an obligation to make payment that is not deductible under Code §280G or a payment that would cause adverse tax consequences under Code §409A.  Seller (i) is not a party to any tax allocation or sharing agreement, (ii) has not been a member of an Affiliated Group filing a consolidated federal income Tax Return, and (iii) has no Liability for the Taxes of any Person under Reg. § 1.1502-6 (or any similar provision of state, local or non-U.S. Law), as a transferee or successor, by contract, or otherwise.  Seller is not or has not been a party to any "reportable transaction," as defined in Code § 6707A(1) and Reg. § 1.6011-4(b).

4.14   No Undisclosed Liabilities.  Except (a) as disclosed pursuant to this Article 4 and the schedules related hereto; (b) as disclosed or reflected in Seller's most recent balance sheet; (c) as incurred in the ordinary course of business consistent with past practices since December 31, 2016; and (d) professional fees and expenses accrued in the Bankruptcy Case, there are no additional claims, liabilities, or obligations of Seller or the Business (whether accrued, absolute, contingent or otherwise), that are or would reasonably be expected to have a Material Adverse Effect on the Business.

4.15   Environmental Compliance Matters.  Except as set forth in Schedule 4.15:

(a)   To Seller's Knowledge, Seller (i) has been issued and is in compliance in with all federal, state, and local Licenses, and (ii) has filed with the applicable Governmental Authorities all applicable notifications

relating to air emissions, effluent discharges, solid and hazardous waste storage, treatment, and disposal required in connection with the operation of the Business or any businesses located on the Owned Real Property or the Leased Property as they are currently being operated.

(b)      There are no outstanding notices of violation, Liabilities, orders, claims, citations, complaints, penalty assessments, suits, or other administrative, civil, or criminal proceedings, at law or in equity, pending against Seller by any Governmental Authority, and no investigation or review is pending or, to Seller's Knowledge, threatened, against Seller by any Governmental Authority with respect to any alleged violation of any environmental Law relating to the Owned Real Property or the Leased Property.

(c)      To Seller's Knowledge, Seller is in compliance with all environmental Laws with respect to the Owned Real Property and the Leased Real Property and the operation of all businesses as currently operated on the Owned Real Property and the Leased Real Property. Seller has not received any written notice or report regarding any Liabilities or any corrective, investigatory, or remedial obligations arising under environmental Laws which relate to Seller, the Owned Real Property, the Leased Property, the Purchased Assets, the Business, or any of Seller's properties or facilities.

(d)      Seller has not entered into a contractual agreement or arrangement to assume or undertake any Liability or corrective investigatory or remedial obligation of any other Person relating to any environmental Laws.

(e)      To Seller's Knowledge, no hazardous, toxic, or polluting substances have been released, discharged, or disposed of on the Owned Real Property or the Leased Property by Seller or on any real property used by Seller in connection with the conduct of the Business in a manner requiring remediation; there are no PCBs, asbestos, or urea formaldehyde insulation present on the Owned Real Property or the Leased Property that are not in compliance with applicable environmental Laws; Seller has not received from any Governmental Authority or other Person any written requests for information, notices of claim, or demand letters, or other written notification that, in connection with the conduct of any business on the Owned Real Property or the Leased Property, or with respect to the Owned Real Property or the Leased Property, may result in Seller being responsible or potentially responsible with respect to any investigation or clean-up of hazardous, toxic, or polluting substances released at any such site

4.16    Financial Statements. The most recent financial statements provided to Purchaser have been prepared in accordance with GAAP on a basis consistent with prior periods. The most recent financial statements provided to Purchaser are accurate and complete, consistent with the books of Seller, and fairly present the financial condition and results of the operations of Seller as of the respective dates and for the respective periods indicated therein.

4.17    Consents and Approvals. Except as set forth on Schedule 4.17, no authorization, consent, or approval of, or filing with or notice to, any Governmental Authority or other Person is required to be obtained by Seller in connection with the execution and delivery of this Agreement by Seller or the performance of its obligations hereunder.

4.18    Insert/TMC Liabilities. There are no outstanding Liabilities relating to the calculation and charges to the advertising customers of the Business for insert or TMC advertising run in the Newspapers prior to the Closing Date.

4.19    Compliance with Laws. To Seller's Knowledge, Seller is currently in compliance with all Laws which are applicable to the Purchased Assets or the Business. No claims have been filed against Seller alleging a violation of any such Laws, and Seller has not received notice of any such violations.

4.20    Circulation and Advertising Lineage. Attached hereto as Schedule 4.20(a) are true and accurate copies of the two (2) most recent reports of the Alliance for Audited Media (the "Audit Reports") setting forth the circulation, paid and non-paid, of the Newspapers for the years indicated. Seller hereby represents and warrants that the information contained in the Audit Reports is true, complete, and accurate in all material respects, and that, as of the date hereof, the three month average paid print circulation of the Charleston Gazette-Mail (which excludes digital, employee, and NIE circulation) is not less than 30,588 (Tuesday through Saturday) and the three month average paid

81681-0004/137515612.9

print circulation (which excludes digital, employee and NIE circulation) of the Sunday Gazette-Mail is not less than 37,691 (Sunday).

4.21     WARN Act. Seller represents and warrants that it has or will provide notices required pursuant to the WARN Act and similar Laws substantially concurrently with the execution of this Agreement.

4.22     No Other Representations or Warranties; Schedules.   Except for the representations and warranties contained in this Article 4 (as modified by the Schedules hereto), neither Seller nor any other Person makes any express or implied representation or warranty with respect to Seller, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by the Transaction Documents, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of their respective Representatives.   Except for the representations and warranties contained in this Article 4 (as modified by the Schedules hereto), Seller expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or express warranty of merchantability or fitness for a particular purpose).   Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

5.1     Organization and Good Standing.   Purchaser is duly organized, validly existing, in good standing and duly qualified to transact business under the laws of the jurisdiction of its formation, and is duly qualified or licensed to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary.   Purchaser has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

5.2     Authorization of Agreement.   Subject to the entry of the Sale Order, Purchaser has full corporation, limited liability company or partnership power and authority to execute, deliver and perform each of the Transaction Documents to be executed or delivered by Purchaser in connection with the transactions contemplated therein.   The execution, delivery and performance of each of the Transaction Documents to be executed or delivered by Purchaser and the consummation by Purchaser of the transactions contemplated in this Agreement have been duly and validly approved by the directors, stockholders, managers, members and partners of Purchaser, as applicable, in compliance with applicable Laws and the Governing Documents of Purchaser.   The Transaction Documents when so executed and delivered by Purchaser shall constitute legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3     No Violation; Consents.   None of the execution and delivery by Purchaser of this Agreement or the Transaction Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (a) the Governing Documents of Purchaser, (b) any Contract or License to which Purchaser is a party or by which Purchaser or its properties or assets are bound, (c) any Order of any Governmental Authority applicable to Purchaser or by which any of the properties or assets of Purchaser are bound or (d) any applicable Law, except in the case of clauses (b), (c) and (d) as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.4     Litigation.   There are no Legal Proceedings pending or, to the Knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a Material Adverse Effect.

5.5    <u>Financial Capability</u>.  Purchaser (a) will have at the Closing sufficient funds available to pay the Purchase Price and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement, and (b) will have at the Closing the resources and capabilities (financial or otherwise) to perform its obligations hereunder.

5.6    <u>Bankruptcy</u>.  There are no bankruptcy, reorganization or arrangement proceedings pending against, being contemplated by, or to the Knowledge of Purchaser, threatened against Purchaser.

5.7    <u>Financial Advisors</u>.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated hereunder and no Person engaged by Purchaser is entitled to any fee or commission or like payment in respect thereof which would be payable by Seller.

5.8    <u>Condition of the Business and Purchased Assets</u>.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in <u>Article 4</u> hereof (as modified by the Schedules hereto as supplemented or amended in accordance with <u>Section 7.9</u>), and Purchaser acknowledges and agrees that, except for the representations and warranties contained herein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis.  Purchaser further represents that neither Seller nor any of its Affiliates or any other Person will have or be subject to any liability to Purchaser resulting from Purchaser's use of any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller or any of its Affiliates, the Business or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and neither Seller, nor any of its Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or Purchaser's use of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its Representatives, in connection with the sale of the Business and the Transactions.  Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Business and, in making the determination to proceed with the Transactions, Purchaser has relied solely on the results of its own independent investigation and the representations or warranties given by Seller in <u>Article 4</u> hereof (as modified by the Schedules hereto).

5.9    <u>OFAC</u>.  Purchaser is not acting, directly or indirectly for, or on behalf of, any person, group, entity or nation named by any federal executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "***Executive Order***")) or the United States Treasury Department as a terrorist, "***Specially Designated National and Blocked Person***," or other banned or blocked person, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control ("*OFAC*"), and is not engaging in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of, any such person, group, entity or nation.  Purchaser is in compliance with all laws, statutes, rules and regulations of any federal, state or local governmental authority in the United States of America applicable to Purchaser and all beneficial owners of Purchaser with respect to or arising out of the requirements of the Executive Order and other similar requirements contained in the rules and regulations of OFAC and in enabling legislation or other federal executive orders in respect thereof.

**ARTICLE 6**
**BANKRUPTCY COURT MATTERS**

6.1    <u>Alternative Transaction</u>.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller, in consultation with the Secured Lender of higher or better competing bids, of any sale, transfer, liquidation or disposition of the Business or assets of Seller, or of a plan of reorganization or liquidation with respect to the Business or assets of Seller (each an "*Alternative Bid*").  From the date hereof (and any prior time) and until the earlier of:  (i) the consummation of the Transactions and (ii) the conclusion of any bid process described in the Bidding Procedures Order, Seller is permitted to cause its Representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and Representatives) in compliance with the Bidding Procedures Order in connection with any sale

-20-

or other disposition of the Purchased Assets and the Business. In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets or the Business and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable Law, including supplying information relating to the Business and the assets of Seller to prospective purchasers.

(b)    Seller shall use commercially reasonable efforts to promptly provide, or identify and make available to Purchaser, any information concerning Seller, the Purchased Assets or the Business provided to any other bidder or prospective purchaser after the date hereof which was not previously provided to Purchaser.

6.2    <u>Bankruptcy Court Approval</u>. Seller and Purchaser acknowledge that this Agreement and the consummation of the transactions contemplated hereby are subject to Bankruptcy Court approval. Seller and Purchaser acknowledge that (a) each must comply with the Bidding Procedures Order and (b) Purchaser must provide adequate assurance of future performance within the meaning of Section 365(f)(2)(B) of the Bankruptcy Code with respect to the Purchaser Assumed Contracts. With respect to each Purchaser Assumed Contract, Purchaser shall provide adequate assurance as required under the Bankruptcy Code of the future performance by Purchaser of each Purchaser Assumed Contract. Purchaser agrees that it will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Purchaser Assumed Contracts, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information, and other documents or information for filing with the Bankruptcy Court and making Purchaser's Representatives available to testify before the Bankruptcy Court.

6.3    <u>Sale Order</u>. Subject to Seller's right to pursue an Alternative Transaction, Seller will use reasonable efforts to consummate the transactions contemplated hereby by seeking entry of the Sale Order, with one or more appropriate motion or motions and the entry of appropriate Orders of the Bankruptcy Court (all such motions and Orders being in form and substance reasonably satisfactory to Seller and Purchaser).

6.4    <u>Breakup Fee</u>. In the event that an Alternative Bid is accepted and this Agreement is terminated, then Seller shall return the Minimum Deposit Amount to Purchaser, and pay the Breakup Fee to Purchaser, as set forth in <u>Section 3.5</u> above relating to the termination of this Agreement, within thirty (30) days following the closing of such Alternative Bid. Such Breakup Fee shall be deemed an administrative expense claim for purposes of the Bankruptcy Case.

6.5    <u>Cure Costs</u>. At Closing, Seller will transfer and assign all of its rights and obligations under or with respect to the Purchaser Assumed Contracts to Purchaser pursuant to section 365 of the Bankruptcy Code and the Sale Order. In connection with such assignment and assumption, Purchaser will cure all defaults under such Assumed Purchaser Contracts to the extent required by Section 365(b) of the Bankruptcy Code. In the event that any party to a Purchaser Assumed Contract timely objects to the calculation of the Cure Cost for such Purchaser Assumed Contract and alleges that the Cure Cost exceeds the amount calculated by Seller for such Purchaser Assumed Contract, then Seller will provide written notice to Purchaser of the amount of such Cure Cost objection; and Purchaser will (i) within twenty (20) Business Days after receipt of such notice from Seller either (x) resolve the Cure Cost dispute with the party to the Purchaser Assumed Contract; or (y) notify Seller that Purchaser elects not to assume such Purchaser Assumed Contract; or (ii) take no action with respect to such notice, in which case, such Purchaser Assumed Contract will continue to be assumed by Purchaser at Closing with the Cure Cost to be paid at Closing.

6.6    <u>Sale Order</u>. The Sale Order will, among other things:

(a)    approve, pursuant to sections 105, 363, and 365 of the Bankruptcy Code:

(i)    the execution, delivery, and performance by Seller of this Agreement;

(ii)    the sale by Seller of the Purchased Assets to Purchaser on the terms set forth in this Agreement, free and clear of all Encumbrances (other than the Assumed Liabilities and the Permitted Liens); and

> (iii)     the performance by Seller of its obligations under this Agreement;

(b)     authorize and empower Seller to assign to Purchaser the Purchaser Assumed Contracts; and

(c)     find that Purchaser (or, if applicable, its assignees) is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and not a successor to Seller.

## ARTICLE 7
## COVENANTS

7.1     Access to Information.  Seller agrees that, prior to the Closing Date, Purchaser shall be entitled, through its Representatives, to (a) make such investigation of the properties, businesses and operations of the Business and (b) make such examination of the books and records of the Business, the interests owned by Seller in the Purchased Assets and the Assumed Liabilities as Purchaser reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and Seller shall cooperate fully therein.  Purchaser and its Representatives shall cooperate with Seller and its Representatives and shall use their reasonable efforts to minimize any disruption to the Business in connection with such investigation and examination.  Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Seller to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which Seller is bound.  Purchaser shall not contact any vendor or other strategic partner of Seller prior to Closing without Seller's prior written consent.

7.2     Conduct of the Business Pending the Closing.

(a)     Subject to any limitations imposed on Seller by the Bankruptcy Court and except (1) as set forth on Schedule 7.2(a), (2) as required by applicable Law, (3) as otherwise expressly contemplated by this Agreement, or (4) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Seller shall:

> (i)     conduct the Business in the ordinary course of business in all material respects;

> (ii)     use commercially reasonable efforts to (A) preserve the present business operations, organization and goodwill of the Business, and (B) preserve the present relationships with Persons having business dealings with Seller (including customers and suppliers of the Business);

> (iii)     maintain in full force and effect all of its presently existing insurance coverages relating to the Business and the Purchased Assets, and timely pay all premiums when due; and

> (iv)     comply in all material respects with applicable Laws.

(b)     Subject to any limitations imposed on Seller by the Bankruptcy Court and except (1) as required by applicable Law, (2) as otherwise contemplated by this Agreement, or (3) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Seller shall not:

> (i)     Sell, lease, transfer or remove any of the Purchased Assets (other than the sale of Inventory in the ordinary course of business) or subject any of the Purchased Assets to any Lien, except for Permitted Liens; or

> (ii)     Modify, amend, reject, waive any rights under or terminate any Purchaser Assumed Contract;

> (iii)     make any material investment of a capital nature except as necessary to maintain the Purchased Assets in good working order and to cause the Business to perform well from a financial standpoint;

(iv)     adopt or make any change in any Employee Benefit Plan;

(v)     make any change in the governing documents of any Seller that could reasonably be expected to have a Material Adverse Effect on the Purchased Assets or the Business prior to Closing;

(vi)     merge or consolidate with, or acquire all or substantially all the assets of, any other Person;

(vii)     redeem or repurchase any shares or other equity interests of Seller, or declare or pay any dividends or make any other distributions or loans to its shareholders or other equity holders;

(viii)     incur any indebtedness or borrow money (except pursuant to its working capital line of credit from United Bank), make any loans or advances to any Person, or assume, guarantee, endorse, or otherwise become responsible for the obligation of any other Person;

(ix)     use any of the Purchased Assets except in the ordinary course of business; or

(x)     agree to do anything prohibited by this Section 7.2.

7.3    Consents.  Seller shall use commercially reasonable efforts, and Purchaser shall cooperate with Seller, to obtain at the earliest practicable date all consents and approvals required to consummate the Transactions, including the consents and approvals listed on Schedule 9.1(d); *provided, however*, that neither Seller nor Purchaser shall be obligated to (a) pay any consideration therefore to any third party from whom consent or approval is requested, or (b) agree to any restrictions on its ability to operate the Business or the Purchased Assets or hold or exercise ownership over the Purchased Assets, or initiate any litigation or Legal Proceedings to obtain any such consent or approval.

7.4    Appropriate Action; Filings.  Through the Closing Date, Seller and Purchaser shall cooperate with each other and use (and shall cause their respective controlled Affiliates to use) commercially reasonable efforts:  (a) to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable on its part under this Agreement, applicable Law or otherwise to consummate and make effective the Transactions; (b) to obtain promptly from any Governmental Authority any Orders or Licenses required to be obtained by Seller or Purchaser or any of their respective Affiliates in connection with the authorization, execution, delivery and performance of this Agreement and the consummation of the Transactions; (c) to promptly make all necessary filings and thereafter make any other required submissions with respect to this Agreement and prompt consummation of the Transactions required under any applicable Law; and (d) to provide prompt notification to the other Party of any actions pursuant to clauses (a)-(c) of this Section 7.4; *provided, however*, that nothing in this Section 7.4 shall be construed as altering the rights or obligations of Seller under Sections 7.1, 7.2 and 7.3; and provided further, that Seller shall not be obligated to pay any consideration or incur any costs to obtain any approvals or consents from third parties, whether or not they may be necessary, proper or advisable to consummate the Transactions.

7.5    Confidentiality.  Purchaser acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under Section 7.1, and is subject to the terms of the Confidentiality Agreement dated October 2, 2017 between Seller and Purchaser (the "***Confidentiality Agreement***"), the terms of which are incorporated herein by reference.  Purchaser acknowledges and understands that this Agreement may be made available by Seller to prospective bidders and that such disclosure shall not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.  The provisions of this Section 7.5 shall survive the Closing.

7.6    Preservation of Records; Cooperation.  Seller and Purchaser shall (and shall cause their controlled Affiliates to) preserve and keep in their possession all records held by them on and after the date hereof relating to the Purchased Assets for a period of two (2) years or such longer period as may be required by applicable Law (provided, however, that in no event shall Seller be required to preserve such records after the Bankruptcy Case is

closed, converted or dismissed) and shall make such records and personnel available to the other Party as may reasonably be required by such Party, including in connection with any insurance claims or Legal Proceedings involving the Purchased Assets, or any governmental investigations of Seller or Purchaser or any of their respective Affiliates related to the Purchased Assets or in order to enable Seller or Purchaser or any of their respective Affiliates to comply with their respective obligations under the Transaction Documents; provided, further, that in no event shall either Party be obligated to disclose any information which would jeopardize any privilege available to such Party or any of its Affiliates relating to such information or which would cause such Party or any of its Affiliates to breach a confidentiality obligation to which it is bound.  Purchaser further acknowledges that Seller shall be entitled to copy any such records, at Seller's sole cost and expense, and to retain copies of such records. After the expiration of any applicable retention period, before Purchaser shall dispose of any of such records, at least sixty (60) days' prior written notice to such effect shall be given by Purchaser to Seller or its successors (or a Person designated by Seller) and Seller or its successors (or a Person designated by Seller) shall have the opportunity (but not the obligation), at its sole cost and expense, to remove and retain all or any part of such records as they may in their sole discretion select.  In the event Seller wishes to destroy any records after the Bankruptcy Case is closed, before Seller shall dispose of any of such records, at least thirty (30) days' prior written notice to such effect shall be given by Seller to Purchaser or its successors (or a Person designated by Purchaser) and Purchaser or its successors (or a Person designated by Purchaser) shall have the opportunity (but not the obligation), at its sole cost and expense, to remove and retain all or any part of such records as it may in its sole discretion select.

7.7    Supplements to Schedules.  Seller may, by written notice to Purchaser from time to time prior to the Closing Date, supplement or amend the Schedules provided pursuant to Article 4, including in response to any changes or updates to the Purchaser Assumed Contracts List made by Purchaser.  Such supplements or amendments shall be effective to cure and correct, for all purposes, any breach of any representation or warranty which would have existed if Seller had not made such supplements or amendments.  All references to Schedules that are supplemented or amended pursuant to this Section 7.7 shall be deemed to be a reference to such Schedule as supplemented or amended.

7.8    Further Assurances.  Seller and Purchaser shall use their commercially reasonable efforts to (a) take all actions necessary or appropriate to consummate the Transactions and (b) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transactions.

7.9    Adequate Assurance.  Purchaser will timely provide such information to Seller, as Seller believes is reasonably necessary to provide "adequate assurance," as that term is used in Section 365 of the Bankruptcy Code, with respect to the Purchaser Assumed Contracts.

7.10    Conflicts and Privilege.  The parties acknowledge that Seller, or an Affiliate thereof, has retained Perkins Coie LLP ("PC") to act as its counsel in connection with the Transactions and the Bankruptcy Case, that Seller is an Affiliate of Chilton/Shumate family and its other equity holders (the "Seller Representative"), that PC has not acted as counsel for any other party in connection with the transactions contemplated hereby, and that none of the other parties, including Purchaser, has the status of a client of PC for conflict of interest or any other purposes as a result thereof.  Purchaser hereby agrees that, in the event that a dispute arises after the Closing between Purchaser and Seller or the Seller Representative, PC may represent Seller and/or the Seller Representative in such dispute even though the interests of Seller or the Seller Representative may be directly adverse to Purchaser, and even though PC may have represented Seller in a matter substantially related to such dispute or may be handling ongoing matters for Purchaser or Seller.  Purchaser further agrees that, as to all communications among PC and Purchaser, Seller or the Seller Representative that relate in any way to the Transactions or the Bankruptcy Case contemplated by this Agreement, the attorney-client privilege and the exception of client confidence belongs solely to the Seller Representative and may be controlled only by the Seller Representative and shall not pass to or be claimed by Purchaser, because the interests of the Purchaser and its Affiliates were directly adverse to Seller and the Seller Representative at the time such communications were made.  This right to the attorney-client privilege shall exist even if such communications may exist on Seller's computer system or in documents or Privileged Information in Purchaser's possession.  Purchaser shall not assert waiver of the attorney-client privilege by virtue of such disclosure.  Purchaser shall not use or permit to be used any such communications, documents or Privileged Information in any litigation against Seller or its shareholders.  Notwithstanding the foregoing, in the event that a dispute arises between Purchaser and a Person other than a party to this Agreement after the Closing, Purchaser may assert the attorney-client privilege to prevent disclosure to such third-party of confidential communications by PC to

such Person; provided, however, that Purchaser may not waive such privilege without the prior written consent of the Seller Representative.

7.11   <u>Intellectual Property</u>. Consistent with Seller's transfer to Purchaser of all Intellectual Property, including the names of the Business, the Newspapers, and the Ancillary Publications, Seller, at Purchaser's sole cost and expense, shall take all action reasonably requested by Purchaser as is necessary and proper to (i) transfer any and all trade names to Purchaser as soon as reasonably practicable following the Closing, (ii) to change each Seller's name to a name that does not include the words "Charleston Newspapers" or "Daily Gazette" and (iii) provide evidence reasonably satisfactory to Purchaser evidencing the foregoing (it being understood and agreed that Seller shall be under no obligation to execute and deliver any document, to take any action or to pay any filing or transfer fee related to the foregoing unless Seller shall have received from Purchaser funds reasonably deemed sufficient by Seller to cover all costs and expenses of Seller in connection with the requested document, action, filing or transfer).

## ARTICLE 8
## EMPLOYEE AND EMPLOYEE BENEFITS MATTERS; TAX MATTERS; OTHER AGREEMENTS

8.1   <u>Employment</u>.

(a)   *Intended Employees*.  Purchaser shall be permitted to interview such of Seller's employees as it chooses prior to the Closing, and shall offer employment to such employees on Seller's payroll as of the Closing Date as it may choose. Purchaser shall furnish Seller with a list of those employees to whom it intends to offer employment within five (5) days prior to Closing. Any such offer by Purchaser shall be contingent upon the issuance of the Sale Order of the Bankruptcy Court.  Each employee who (i) accepts Purchaser's offer, (ii) executes and delivers an offer letter in the form delivered by Purchaser and (iii) actually performs services for Purchaser on the first Business Day following the Closing Date, shall be deemed an "***Intended Employee***."

(b)   *Standard Procedure*.  Pursuant to the "***Standard Procedure***" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320, (i) Purchaser and Seller shall report on a predecessor/successor basis as set forth therein, and (ii) Purchaser will undertake to file (or cause to be filed) a Form W-2 for each such Intended Employee with respect to the portion of the year during which such Employee is employed by Purchaser that includes the Closing Date, excluding the portion of such year that such Employee was employed by Seller.

8.2   <u>Employee Matters</u>.

(a)   *Paid Time Off*. Seller shall pay all payroll obligations of the Business (including all commissions and incentive plan payments) earned or accrued for all periods prior to the Closing Date, as well as all earned or accrued vacation obligations, sick leave, or personal days, and any other paid time off for any employees of the Business not hired by Purchaser, and for all Intended Employees to the extent that such paid time off does not qualify as an Employee Obligation, and shall file all applicable payroll returns and pay all payroll taxes when due for periods ending prior to the Closing Date.

(b)   *Employee Benefit Plans*. Purchaser shall not assume any of Seller's Employee Benefit Plans (including its vacation policy) or any obligations thereunder; *provided, however*, that Purchaser shall be responsible for the Employee Obligations of the Intended Employees and shall be responsible for COBRA coverages for all Employees under <u>Section 8.2(g)</u>.  Seller shall continue to maintain any Employee Benefit Plan that is a welfare plan as defined in Section 3(1) of ERISA until the Closing Date, and Seller shall continue to provide all benefits for claims incurred prior to the Closing Date under any Seller Employee Benefit Plan that is a welfare plan to any individuals covered under any such Plan.

(c)   *Post-Closing Compensation of Intended Employees*. Purchaser shall be responsible for all post-Closing compensation, benefits, or other obligations with respect to the employees that it hires, including the Employee Obligations. Except for the Employee Obligations of the Intended Employees, Purchaser shall not be responsible to pay (i) any benefit that was earned at any time under any benefit Employee Benefit Plan of Seller, or (ii) any other obligation to any hired employee relating to such hired employee's period of employment with Seller.

81681-0004/137515612.9

(d)    *No Reliance*. Nothing in this Agreement, whether express or implied, will be considered to establish any enforceable rights, legal or equitable, in any Person other than Purchaser or Seller, including, without limitation, any employee of Seller, any employee of Purchaser, any beneficiary of such employee, or any other Person.

(e)    *Employment Changes*. From and after the Closing Date, Purchaser shall have sole discretion over the hiring, promotion, retention, termination, and all other terms and conditions of the employment of the Intended Employees and any other Person hired by Purchaser, whether or not an employee of Seller.

(f)    *Severance*. Seller shall be and remain solely responsible for all termination and severance Liabilities and obligations arising under any plan, program, policy or agreement of or with Seller or its Affiliates which arise on or prior to the Closing Date.

(g)    *COBRA*. Purchaser shall provide health care continuation coverage in accordance with ERISA or Section 4980B of the Code to all Employees as of the Closing Date and their respective qualified beneficiaries as of the Closing Date, all former Employees and their qualified beneficiaries who are entitled to such coverage as of the Closing Date under the Employee Benefit Plans, and all other "affected employees" as defined for purposes of ERISA and Section 4980B of the Code and their qualified beneficiaries, and Seller has set forth on Schedule 8.2(g) all Persons entitled to such coverage as of the Execution Date.

(h)    *Employment and Benefit Changes*.  Nothing contained in Section 8.1 or elsewhere in this Agreement shall be construed to prevent the termination of employment of any Intended Employee or any guaranty of or change in the employee benefits available to any Intended Employee.

(i)    *Key Employees*. Seller shall use its commercially reasonable best efforts to retain the services of the key employees occupying the positions of VP of Advertising, VP of Production, VP of Circulation, Head of IT, Controller, Executive Editor, and the newsroom general managers during the period pending the Closing Date in order to preserve and maximize the ongoing enterprise value of the Business, including, but not limited to, payment of such additional compensation and incentive bonuses as may be necessary or appropriate to induce such key employees to remain in the employ of Seller and to consider becoming a Intended Employee should Purchaser so elect. This is deemed an essential element of this Agreement by Purchaser given the unique nature of the Purchased Assets, the position of the Newspapers in the region, the institutional knowledge and expertise of these personnel, and general employee morale.  Nothing herein shall be deemed to require that Purchaser hire any such individual as an Intended Employee or assume any liability to any such employees.

8.3    Tax Matters.

(a)    *Transfer Taxes*.  To the extent not exempt under Section 1146(c) of the Bankruptcy Code in connection with the Chapter 11 Cases, all sales, transfer, filing, recordation, registration, documentary, stamp and similar Taxes incurred in connection with the consummation of the Transactions (collectively, "***Transfer Taxes***"), whether levied on Purchaser or Seller, shall be shared equally between Purchaser and Seller and, to the extent practicable, prorated at Closing.  On or before the Closing Date, Purchaser shall prepare at Purchaser's expense, with Seller's cooperation, any necessary Tax Returns and other documentation with respect to any Transfer Taxes, and the Party required by law to file such Tax Return shall timely do so.  The costs of preparing such Tax Returns and other documentation with respect to any Transfer Taxes shall be borne by Purchaser.

(b)    *Allocation of Taxes*.  Whenever it is necessary to determine liability for Taxes in respect of the Seller, the Purchaser or the Purchased Assets for a Straddle Period, the portion of such Tax which relates to the portion of the Straddle Period ending on the Closing Date shall (i) in the case of any Taxes, other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period; and (ii) in the case of any Tax based upon or related to income or receipts, be deemed equal to the amount which would be payable on the basis of an interim closing of the books as of the end of the Closing Date.  In the event of a disagreement with respect to any Tax Returns under this Section 8.4(b), the disagreeing Party shall promptly notify the other Party in writing of any items of the Tax Return that are not reasonable in such Party's good faith determination ("***Objection***

*to Tax Return*"). If no Objection to Tax Return is raised in writing by either Party, then the determination shall be final and binding on all Parties. If an Objection to Tax Return is raised, the Parties shall cooperate in good faith to reach a mutually agreeable resolution which shall be binding on all Parties. If the Parties are unable to reach a resolution within thirty (30) days of a notice of Objection to Tax Return, then any disputed items shall be referred to the Accounting Referee for resolution, and the determination of the Accounting Referee shall be final and binding on the Parties. The fees and expenses of the Accounting Referee shall be paid fifty percent (50%) by Purchaser and fifty percent (50%) by Seller.

(c)     *Tax Claims*. Seller, at its expense, shall have the right, but not the obligation, to control the conduct of the portion of the defense of any audit, claim, proceeding, investigation, or other controversy relating solely to Taxes ("*Tax Claim*") for which Seller is liable pursuant to Section 1.4; provided, however, that Seller will not have the right to settle any such Tax Claim if the resolution or determination of such Tax Claim is reasonably likely to adversely affect Purchaser without first obtaining Purchaser's written consent, such consent to not be unreasonably withheld, conditioned or delayed. Purchaser shall control the conduct of all other Tax Claims; provided, however, that if such Tax Claim, if successful, could reasonably be expected to result in any Tax for which Seller may be responsible under this Agreement, Purchaser shall (i) promptly notify Seller in writing of such claim, (ii) notify Seller of any significant developments regarding such claim, (iii) consider in good faith recommendations of Seller in connection with such claim, and (iv) not settle any such claim without first obtaining Seller's written consent, such consent to not be unreasonably withheld, conditioned or delayed (provided however that a failure to give any such notice to Seller shall not affect Seller's obligations under this Agreement except to the extent that Seller has been actually prejudiced as a result of such failure).

(d)     *Cooperation*. Seller, on the one hand, and Purchaser, on the other, shall provide each other, with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes. Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Taxing Authorities. Any information obtained under this Section 8.4 shall be kept confidential except to the extent disclosure of such information may be necessary or appropriate in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding.

## ARTICLE 9
## CONDITIONS TO CLOSING

9.1     Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser, in its reasonable discretion, in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Seller set forth in this Agreement shall be true and correct at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date); provided, however, that in the event of a breach of a representation or warranty other than a representation or warranty qualified by materiality or Material Adverse Effect, the condition set forth in this Section 9.l(a) shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a Material Adverse Effect; and Purchaser shall have received a certificate signed by an authorized officer of Seller (in form and substance reasonably satisfactory to Purchaser), dated the Closing Date, to such effect;

(b)     Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the forgoing effect;

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 3.2;

(d)        all material consents (or in lieu thereof waivers) described on Schedule 9.1(d) (i) shall have been obtained, (ii) shall be in form and substance reasonably satisfactory to Purchaser, (iii) shall not be subject to the satisfaction of any condition that has not been satisfied or waived and (iv) shall be in full force and effect, except where the failure to obtain any such consent (or in lieu thereof waiver) could not reasonably be expected, individually or in the aggregate with other such failures, to result in a Material Adverse Effect;

(e)        the Bankruptcy Court shall have entered an order rejecting the Joint Operating Agreement pursuant to Section 365 of the Bankruptcy Code;

(f)        the Bankruptcy Court shall have entered the Sale Order, providing for the sale to Purchaser of the Purchased Assets, free and clear of all liens, claims, and encumbrances, including but not limited to the claims of MediaNews Group, Inc., Digital First, and Charleston Publishing Company, and the terms of the Joint Operating Agreement;

(g)        Seller shall have completed the abatement, removal, encapsulation and/or remediation of all friable asbestos from the Owned Real Property, and shall have delivered to Purchaser a report of a qualified asbestos abatement contractor certifying same;

(h)        Seller shall have completed the removal and satisfactory disposal from the Owned Real Property of all old computers no longer in use in the Business, all old batteries no longer in use in the Business, and all drums containing old ink, photo fixer, and developer or other chemicals no longer used in the Business;

(i)        Purchaser shall have obtained, at Purchaser's expense, an owner's title insurance policy from a nationally known title insurance company showing good and marketable title in and to the Owned Real Property, subject only to (i) such non-standard title exceptions as may be acceptable to Purchaser or as do not otherwise cause a Material Adverse Effect on the intended use of the Owned Real Property, and (ii) standard title exceptions; and

(j)        Purchaser shall have obtained, at Purchaser's expense, a current certified ALTA survey of the Owned Real Property disclosing no survey defects as would reasonably be expected to have or result in a Material Adverse Effect.

9.2        Conditions Precedent to Obligations of Seller.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller, in its reasonable discretion, in whole or in part to the extent permitted by applicable Law):

(a)        the representations and warranties of Purchaser set forth in this Agreement shall be true and correct at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date); provided, however, that in the event of a breach of a representation or warranty other than a representation or warranty qualified by materiality or Material Adverse Effect, the condition set forth in this Section 9.2(a) shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a Material Adverse Effect, and Seller shall have received a certificate signed by an authorized officer of Purchaser (in form and substance reasonably satisfactory to Seller), dated the Closing Date, to such effect;

(b)        Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(c)        Purchaser shall have paid in full or otherwise satisfied all Cure Costs with respect to the Purchaser Assumed Contracts set forth on the Purchaser Assumed Contracts List prior to or on the Closing Date; and

(d)        Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 3.3.

9.3    Conditions Precedent to Obligations of Purchaser and Seller.  The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Law or Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(b)    sixty (60) days shall have elapsed since the date Seller delivered all notices required pursuant to the WARN Act of the mass termination of its employees; and

(c)    the Bankruptcy Court shall have entered the Sale Order.

9.4    Frustration of Closing Conditions.  Neither Seller nor Purchaser may rely on the failure of any condition set forth in Section 9.1, Section 9.2 or Section 9.3, as the case may be, if such failure was caused primarily by such Party's failure to comply with any provision of this Agreement.

**ARTICLE 10**
**LIMITATIONS**

10.1    Purchaser's Review.

(a)    *No Reliance*.  Purchaser has had the opportunity to ask questions, and has received sufficient answers, in connection with its decision to enter into this Agreement and to consummate the Transactions.  In connection with the execution and delivery of this Agreement and the consummation of the Transactions, Purchaser has not relied upon any representation, warranty, statement, advice, document, projection, or other information of any type provided by Seller or its Affiliates or any of their respective Representatives, except for those representations and warranties expressly set forth in Article 4.  In deciding to enter into this Agreement, and to consummate the Transactions, Purchaser has relied solely upon its own knowledge, investigation, judgment and analysis (and that of its Representatives) and not on any disclosure or representation made by, or any duty to disclose on the part of, Seller or its Affiliates or any of their respective Representatives, other than the express representations and warranties of Seller set forth in Article 4.

(b)    *Limited Duties*.  Any and all duties and obligations which any Party may have to any other Party with respect to or in connection with the Purchased Assets, this Agreement or the Transactions are limited to those specifically set forth in this Agreement, the Transaction Documents or any instrument delivered hereunder or thereunder.  Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement, the Transaction Documents or any instrument delivered hereunder or thereunder on the basis of any legal or equitable principle or on any other basis whatsoever.

10.2    No Consequential or Punitive Damages.    NO PARTY (NOR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (NOR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

**ARTICLE 11**
**MISCELLANEOUS**

11.1    Survival of Representations, Warranties, Covenants and Agreements.  The representations and warranties of any Party made herein, in any Transaction Document or in any other instrument delivered pursuant to this Agreement shall terminate at the Closing, or, subject to Section 3.5, upon termination of this Agreement pursuant to Section 3.4, and, following the Closing or the termination of this Agreement, as the case may be, and

-29-

notwithstanding anything to the contrary contained herein or pursuant to applicable Law other than Section 3.5, there shall be no Liability in respect thereof on the part of any Party or any of its Representatives other than pursuant to Section 3.5.  Except with respect to covenants or agreements which are to be performed on or prior to the Closing, all covenants and agreements contained in this Agreement shall survive the Closing in accordance with their respective terms; provided, that any covenant or agreement contained herein whose survival is not limited by its terms shall survive until fully performed in accordance with its terms.

11.2    Remedies.  The Parties acknowledge and agree that:  (i) each Party recognizes that if such Party breaches or refuses to perform any such covenant, monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries, (ii) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants, (iii) if any Legal Proceeding is brought by the non-breaching Party or Parties to enforce such covenants, the Party in breach shall waive the defense that there is an adequate remedy at law, (iv) each Party agrees to waive any requirement for the security or posting of any bond in connection with any Legal Proceeding seeking specific performance of, or to enjoin the violation of, such covenants, and (v) each Party agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants. Further, in the event of any breach prior to the Closing by Seller of any of Seller's agreements, representations, or warranties contained herein or in the Bidding Procedures Order or the Sale Order, including any breach that is material or willful, and Purchaser elects to terminate this Agreement pursuant to Section 3.4, Purchaser's sole and exclusive remedy shall be to seek and enforce its rights, if any, to the return of the Minimum Deposit Amount and the payment of the Breakup Fee, if applicable as set forth in Section 3.5, and Purchaser shall not have any further cause of action for damages, specific performance or any other legal or equitable relief against Seller with respect thereto.  Notwithstanding the foregoing and anything to the contrary in this Agreement, each Party may seek specific performance in order to require the other Party to close the transactions contemplated by this Agreement.

11.3    Expenses.  Except as otherwise set forth in this Agreement, each Party shall bear its own expenses (including attorneys' fees) incurred in connection with the negotiation and execution of the Transaction Documents; provided, however, Seller shall bear sole responsibility for any governmental charges relating to any UCC-3 filing fees, DOT, filing fees and other amounts payable in respect of transfer filings in connection with the transactions contemplated by this Agreement. Ad valorem, real property taxes, rents, service charges, utilities, and other charges relating to the Owned Real Property shall be pro-rated on a daily basis between Purchaser and Seller as of the Closing Date. Seller and Purchaser shall share equally all applicable sales, use, and transfer taxes, and all documentary, filing, transfer, recording, and other closing costs fees payable as a result of the transfer of the Owned Real Property.

11.4    Non-Recourse.  The Parties acknowledge and agree that no past, present or future Representative or Affiliate of the Parties to this Agreement, in such capacity, shall have any liability for any obligations or liabilities of Purchaser or Seller, as applicable, under this Agreement or for any claim based on, in respect of, or by reason of, the Transactions.

11.5    Submission to Jurisdiction.

(a)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes among the Parties which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Legal Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and shall receive notices at such locations as indicated in Section 11.10; provided, however, that if the Bankruptcy Case has been fully and finally dismissed and the Bankruptcy Court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of West Virginia sitting in Kanawha County.

(b)    The Parties hereby unconditionally and irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any dispute arising out of or relating to this Agreement or any of the Transactions brought in any court specified in subsection (a)

81681-0004/137515612.9

above, or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c)    Each of the Parties hereby consents to process being served by any Party in any Legal Proceedings by the mailing of a copy thereof in accordance with the provisions of Section 11.10; provided, however, that such service shall not be effective until the actual receipt thereof by the Party being served.

11.6    Waiver of Jury Trial. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.6.

11.7    Time of Essence. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

11.8    Entire Agreement; Amendments and Waivers. This Agreement (including the Schedules and Exhibits hereto) and the other Transaction Documents represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersede all prior discussions and agreements between the Parties with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

11.9    Governing Law. THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, AND ANY CLAIM OR CONTROVERSY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN OR IN CONNECTION WITH THIS AGREEMENT OR AS AN INDUCEMENT TO ENTER INTO THIS AGREEMENT), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED, AND DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF WEST VIRGINIA (WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

11.10    Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested,

postage prepaid. Such communications must be sent to the respective Parties at the addresses indicated below (or at such other address for a Party as shall be specified in a notice given in accordance with this Section):

*If to Seller:*

Charleston Newspapers
Daily Gazette Holding Company LLC
Charleston Newspapers Holdings, L.P.
Daily Gazette Publishing Company LLC
Daily Gazette Company
G-M Properties, Inc.
1001 W. Virginia Street East
Charleston, WV  25301
Attn:    Norman W. Shumate, III
Phone:  (304) 348-1716
Fax:     (304) 348-1795
Email:   tshumate@wvgazette.com

*With a copy to:*

Perkins Coie LLP
131 South Dearborn Street
Suite 1700
Chicago, IL  60603
Attn:    Michael Owen, Esq. and Brian Audette, Esq.
Phone:  (312) 324-8402
           (312) 324-8534
Fax:     (312) 324-9467
E-mail:  mowen@perkinscoie.com
           baudette@perkinscoie.com

*If to Purchaser:*

Charleston Newspapers, LLC
c/o The Nutting Company, Inc.
1500 Main Street
Wheeling, WV 26003
Attn:    Robert M. Nutting, President and CEO
Phone:  (304) 233-0100
Fax:     (304) 233-9397
Email:

*With a copy to:*

Steptoe & Johnson PLLC
400 White Oaks Blvd.
Bridgeport, WV 26330
Attn:    Evans L. King, Jr., Esq. and Mera L. Kutrovac, Esq.
Phone:  (304) 933-8132
           (724) 749-3175
Fax:     (304) 933-8742
           (304) 933-8790
Email:   Evans.King@steptoe-johnson.com
           Mera.Kutrovac@steptoe-johnson.com

-32-

11.11    Severability.  If any term or provision of this Agreement is invalid, illegal or incapable of being enforced by Law or public policy, all other terms and provisions hereof shall nevertheless remain in full force and effect so long as the legal substance of the Transactions is not affected in any manner materially adverse to any Party.  Upon such determination that any term or provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

11.12    No Right of Set-Off.    Purchaser for itself and for its Affiliates, successors and assigns hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Purchaser or any of its Affiliates, successors and assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith, except from the Adjustment Escrow Account.  Seller, for itself and for its Affiliates, successors and assigns hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Seller or any of its Affiliates, successors and assigns have or may have with respect to any payments to be made by Seller pursuant to this Agreement or any other document or instrument delivered by Seller in connection herewith except as set forth herein.

11.13    Binding Effect; Assignment.  This Agreement shall be binding solely upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a Party to this Agreement except to the extent provided in Section 11.4.  No assignment of this Agreement or of any rights or obligations hereunder may be made by any Party (by operation of law or otherwise) without the prior written consent of the other Party and any attempted assignment without the required consents shall be void; *provided, however*, that (a) prior to the Closing, Purchaser may assign this Agreement and any or all rights or obligations hereunder (including Purchaser's right to purchase the Purchased Assets and assume the Assumed Liabilities) to any Affiliate of Purchaser and (b) after or in connection with the Closing, Purchaser (or its permitted assignee) shall have the right to assign its rights and/or delegate its obligations hereunder (i) to any Affiliates, (ii) to any financing sources for collateral purposes or (iii) to any subsequent purchaser of all or any portion of the stock or assets of Purchaser or the Business.  Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires. Notwithstanding the foregoing, this Agreement will be binding upon the Purchaser and, subject to entry of the Bidding Procedures Order (with respect to the matters covered thereby) and the Sale Order, the Seller, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case, and will inure to the benefit of such parties and their respective successors and permitted assigns.

11.14    Headings.  The Article and Section headings in the Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

11.15    Counterparts.  This Agreement may be executed and delivered (including by electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.16    Interpretation.  The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." Any reference in this Agreement to "$" shall mean United States dollars.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.  Any agreement, instrument, statute or regulation defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument, statute or regulation as from time to time amended, modified or supplemented including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes or regulations) by succession of comparable successor statutes or regulations and references to all attachments thereto and instruments incorporated therein.  References to a Person are also to its successors and

permitted assigns. All Article and Section references herein are to Articles and Sections of this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter set forth in any Schedule annexed hereto shall be deemed to be referred to and incorporated in all other Schedules to which such matter's application or relevance to a representation or warranty in any other Section of the Agreement is reasonably apparent on its face. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement. This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if all Parties had prepared it and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

11.17   <u>Announcements</u>. Except as may be required in order to obtain any consents contemplated by this Agreement or as required by applicable Law, no announcements or disclosures concerning the transactions under this Agreement may be made by either Party, its employees, shareholders, directors, members, managers, agents, or representatives to the public, suppliers, or customers of the Business, unless previously approved by all of the Parties hereto. Seller and Purchaser shall cooperate in making a joint announcement of the transaction contemplated by this Agreement to Seller's employees.

11.18   <u>Confidentiality</u>. The Parties hereto shall keep confidential and cause their Affiliates to keep confidential all proprietary information of the other Party received to date and hereafter received concerning the business and affairs of Seller, Purchaser, the Business, the Purchased Assets, and the terms and conditions of this Agreement (collectively, "***Confidential Information***"), except as required by applicable Law. The Parties further agree to maintain the Confidential Information in the strictest of confidence and to treat and take precautions with respect to the same as if it were its own confidential information. If any third party attempts to compel the disclosure of Confidential Information through a subpoena or other processes of any court, the Party from whom Confidential Information is requested shall give notice to the other Party and shall cooperate in opposing any such disclosure, and specifically shall not disclose any Confidential Information until an order is made by such court requiring such disclosure and such order becomes final. The Party not opposing disclosure shall execute such documents as may reasonably be necessary to enable the Party opposing the disclosure to represent both Parties for such purpose. In the event that a third party seeks to compel disclosure, as contemplated herein, the Party from whom Confidential Information is requested shall provide notice via facsimile and overnight mail to the other Party at the address set forth in <u>Section 11.10</u>.

11.19   <u>Non-Competition; Non-Solicitation</u>. Seller, its Affiliates, Elizabeth Chilton, Norman W. Shumate, III, and Susan Chilton Shumate (Elizabeth Chilton, Norman W. Shumate, III, and Susan Chilton Shumate, collectively, the "***Additional Non-Compete Parties***", and, together with Seller and its other Affiliates, the "***Non-Compete Parties***") covenant and agree that they will not at any time for a period of two (2) years from the Closing Date, within Kanawha County, West Virginia, or in any county contiguous thereto, individually or in partnership or jointly or in conjunction with any Person, whether as principal, agent, shareholder, owner, investor, lender, director, officer, employee, member, manager, partner, consultant, broker, advisor, trustee, or in any other manner or capacity whatsoever, whether directly or indirectly: (i) carry on, or be engaged in, concerned with or interested in, directly or indirectly, any activity or business that competes with the Business, or any other activities incidental thereto (it being understood that the foregoing shall not be deemed to prohibit any Non-Compete Party from engaging in Permitted Activities (as such term is defined below)); (ii) encourage service providers or customers of the Newspapers or the Business to cease doing business with Purchaser; or (iii) solicit the services of any employee, manager, or officer of Purchaser or its Affiliates, or persuade or attempt to persuade any such individual to terminate his or her employment with Purchaser or its Affiliates, or hire or employ or otherwise engage any such individual as an employee, independent contractor, or otherwise, in each case, for so long as such individual remains in the employ of Purchaser. Notwithstanding the foregoing, any Non-Compete Party or its, his or her Affiliates may own, solely as a passive investment, securities of any Person traded on any national securities exchange if such Person does not, directly or indirectly, own 5% or more of any class of securities of such Person in the aggregate. As used in this Section 11.19, "***Permitted Activities***" shall mean to carry on, or be engaged in, concerned with or interested in, directly or indirectly, individually or in partnership or jointly or in conjunction with any Person, whether as principal, agent, shareholder, owner, investor, lender, director, officer, employee, member, manager, partner, consultant, broker, advisor, trustee, or in any other manner or capacity whatsoever, whether directly or indirectly: (i)

any non-profit civic, charitable, and social activities related to public interest or philanthropy, including fundraising, volunteering, endowment management and development, and being a member of, sponsoring, taking leadership positions in, and serving on boards of non-profit: clubs, foundations, service organizations, hospitals, libraries, schools, colleges, universities, symphonies, art societies, and other civic, social and charitable non-profit institutions; (ii) screenwriting, acting, and performing for the fine arts; (iii) teaching for an educational institution; (iv) political discourse and organizing and/or campaigning in political campaigns; (v) public speaking engagements for entities not engaged in the Business; or (vi) the exercise of freedom of thought and expression, freedom of the press, and other rights guaranteed by the U.S. Constitution and the Bill of Rights.

The Non-Compete Parties acknowledge and agree that the provisions hereof are reasonable in order to protect the Business and proprietary interests of the Business both as to the duration of time and the geographic limitation herein provided, based on the present business, plans, and prospects of the Business and the Confidential Information to which they have had access, and that compliance with the provisions hereof will not be an unreasonable hardship or deprive them of a means of livelihood. They further acknowledge that this Section is intended to induce Purchaser to close on the transactions contemplated by this Agreement.

The Non-Compete Parties acknowledge and agree that a breach or threatened breach by any of the Non-Compete Parties or the non-performance of the covenants or promises contained herein by any of the Non-Compete Parties may cause serious and irreparable harm to Purchaser and the Business and that any remedy at law, including any award of money damages, may be inadequate. Accordingly, the Non-Compete Parties agree and accept that Purchaser may, in addition to any other claim for relief, enforce the provisions of this Agreement by injunction, restraining order, or other equitable relief, and each Party agrees not to plead sufficiency of damages as a defense in any proceeding for injunctive or other equitable relief, and agrees that such equitable relief may be sought in any proceedings to enforce the provisions of this Agreement

11.20    Broker's Fees. The Parties acknowledge that neither is aware of any claim for brokerage, agency, finder's fee, or commission in connection with the transactions contemplated hereby and agree that if such claim should arise through or by virtue of any action taken by it, such Party shall indemnify the other in respect thereof, except for the fee of Dirks Van Essen & Murray, which shall be the responsibility of Seller.

*[The Remainder of This Page Is Intentionally Left Blank]*

81681-0004/137515612.9

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its respective officers thereunto duly authorized, as applicable, all as of the date first above written.

**SELLER:**

**CHARLESTON NEWSPAPERS**, an unincorporated West Virginia joint venture

**By:**   **Charleston Newspapers Holdings, L.P.,** a Delaware limited partnership, its general partner

By:   Daily Gazette Holding Company, LLC, a Delaware limited liability company, its general partner

By:   Daily Gazette Company, a West Virginia corporation, its sole member

By:   *Elizabeth E. Chilton*
Elizabeth E. Chilton, President

**By:**   **Daily Gazette Publishing Company, LLC,** a Delaware limited liability company, its general partner

By:   Charleston Newspapers Holdings, L.P., a Delaware limited partnership, its sole member

By:   Daily Gazette Holding Company, LLC, a Delaware limited liability company, its general partner

By:   Daily Gazette Company, a West Virginia corporation, its sole member

By:   *Elizabeth E. Chilton*
Elizabeth E. Chilton, President

**DAILY GAZETTE HOLDING COMPANY, LLC,** a Delaware limited liability company

By:   Daily Gazette Company, a West Virginia corporation, its sole member

By:   *Elizabeth E. Chilton*
Elizabeth E. Chilton, President

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its respective officers thereunto duly authorized, as applicable, all as of the date first above written.

**CHARLESTON NEWSPAPERS HOLDINGS, L.P.**, a Delaware limited partnership

By:   Daily Gazette Holding Company, LLC, a Delaware limited liability company,
      its general partner

    By:   Daily Gazette Company, a West Virginia corporation, its sole member

        By:   *Elizabeth E. Chilton*
            Elizabeth E. Chilton, President

**DAILY GAZETTE PUBLISHING COMPANY, LLC**, a Delaware limited liability company

By:   Charleston Newspapers Holdings, L.P., a Delaware limited partnership,
      its sole member

    By:   Daily Gazette Holding Company, LLC, a Delaware limited liability company,
      its general partner

        By:   Daily Gazette Company, a West Virginia corporation,
        its sole member

            By:   *Elizabeth E. Chilton*
                Elizabeth E. Chilton, President

**DAILY GAZETTE COMPANY**, a West Virginia corporation

By:   *Elizabeth E. Chilton*
    Elizabeth E. Chilton, President

**G-M PROPERTIES, INC.**, a West Virginia corporation

By:   *Elizabeth E. Chilton*
    Elizabeth E. Chilton, President

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its respective officers thereunto duly authorized, as applicable, all as of the date first above written.

**PURCHASER:**

**CHARLESTON NEWSPAPERS, LLC,** a West Virginia limited liability company

By:     The Nutting Company, Inc., its sole member

By:     _____

Robert M. Nutting, President & CEO

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed by its respective officers thereunto duly authorized, as applicable, all as of the date first above written.

**ADDITIONAL NON-COMPETE PARTIES,**
<u>**solely for purposes of Section 11.19**</u>:


_____
**ELIZABETH E. CHILTON**


_____
**NORMAN W. SHUMATE, III**


_____
**SUSAN CHILTON SHUMATE**

## SCHEDULE 1.0
## SELECT DEFINITIONS

"Accounts Receivable" means accounts receivable of Seller, including progress billings, and notes receivable and other rights to payment (whether current or noncurrent), including credit card receivables, including in respect to goods shipped, products sold, licenses granted, services rendered or otherwise associated with the Business and all causes of action specifically pertaining to the collection of the foregoing, which shall be adjusted as of the Closing Date for (i) all bankrupt accounts, (ii) all accounts turned over for collection, (iii) all accounts of customers no longer in business, and (iv) all accounts disputed in whole or in part by the customer, and shall be valued using the following formula:

96% of all current accounts receivable

91% of all accounts receivable aged for 30-59 days

75% of all accounts receivable aged for 60-89 days

40% of all accounts receivable 90 days and older

Each credit in accounts receivable will be reclassified as a Current Liability if there is not a net receivable balance due from the respective customer.

"Adjustment Date" means the first Business Day after the Final Working Capital Adjustment Worksheet is finally determined in accordance with Section 2.5.

"Affiliate" (and, with a correlative meaning "affiliated") means, with respect to any Person, any direct or indirect subsidiary of such Person, and any other Person that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such first Person.  As used in this definition, "control" (including with correlative meanings, "controlled by" and "under common control with") means possession, directly or indirectly, of power to direct or cause the direction of the management or policies (whether through ownership of securities or partnership or other ownership interests, by Contract or otherwise).

"Alternative Bid" has the meaning set forth in Section 6.1.

"Alternative Transaction" means one or more agreements to sell, transfer, or otherwise dispose of any material portion of the Purchased Assets in a transaction or series of transactions (other than in the ordinary course of business) with one or more Persons, other than Purchaser, pursuant to an Alternative Bid that actually closes.

"Assignable Contract" means any Contract subject to the Bankruptcy Case to which Seller is a party that Seller is permitted under the Bankruptcy Code to sell or assign, other than an Employee Benefit Plan.

"Auction" has meaning specified in the Bidding Procedures Order.

"Audit Reports" has the meaning set forth in Section 4.22.

"Bankruptcy Case" means the Chapter 11 case commenced by Seller on [_____], Case No [_____].

"Bidding Procedures Order" means the Final Order of the Bankruptcy Court that was entered in the Bankruptcy Case on [_____], setting forth the bidding procedures for the Auction.

"Books and Records" has the meaning set forth in Section 1.1(h).

"Breakup Fee" has the meaning set forth in Section 3.5.

"<u>Business</u>" means the operation, management, publication and distribution of the Newspapers and the Ancillary Publications, whether in digital or physical form, and the operation and management of Convergent Digital Marketing.

"<u>Business Day</u>" means a day other than a Saturday, Sunday or other day on which commercial banks in Charleston, West Virginia are authorized or required by Law to close.

"<u>Cash</u>" means the aggregate amount of the cash and cash equivalents held by Seller and all rights of Seller in respect of bank and brokerage accounts and lock boxes in their names or held on its behalf, net of all "cut" but un-cashed checks outstanding, plus the amount of all marketable securities owned by Seller, in each case as of the close of business on the Closing Date.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 3.1</u> hereof.

"<u>Closing Date Estimated Current Liabilities Amount</u>" has the meaning set forth in <u>Section 2.4(b)</u>.

"<u>Closing Date Estimated Current Assets Amount</u>" has the meaning set forth in <u>Section 2.4(b)</u>.

"<u>COBRA</u>" means the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code any of any similar state law.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Committee</u>" means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case.

"<u>Contract</u>" means any legally binding contract, purchase order, sales order, indenture, note, bond, loan, instrument, lease, mortgage, commitment or other agreement, other than the Excluded Contracts.

"<u>Contract Rights</u>" means all rights, claims, benefits and remedies with respect to any Contract or other consensual and legally binding obligation between Seller, on the one hand, and any other Person, on the other hand assigned to Purchaser pursuant to the terms of this Agreement.

"<u>Cure Costs</u>" means, the amounts which must be paid and obligations that otherwise must be satisfied, including pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of any Purchaser Assumed Contracts, which shall not include any costs that have been paid in the ordinary course of Seller's business, or which are paid pursuant to an order of the Bankruptcy Court.

"<u>Current Assets</u>" means Accounts Receivable (excluding the Royal Automotive A/R) and Inventory.

"<u>Current Liabilities</u>" means the following liabilities of Seller: (1) credit balances in accounts receivable (which shall be reclassified as current liabilities and excluded from Accounts Receivable), (2) Employee Obligations, and (3) the Deferred Circulation Liability.

"<u>Deferred Circulation Liability</u>" means the obligation of Seller as of the Closing Date to complete delivery of the Newspapers pursuant to paid up subscription agreements relating to the Business, which were incurred by Seller in the ordinary course of business, and shall reflect the full amount of such liability without subscriber discounts.

"<u>Deposits</u>" has the meaning set forth in <u>Section 1.1</u>.

"<u>Employee Benefit Plans</u>" means all employment benefit plans (as defined in Section 3(3) of ERISA), all employment or individual compensation agreements, and all other plans, policies, agreements, payroll practices or arrangements providing any bonus, incentive, retention, equity or equity based compensation, deferred compensation, stock purchase, severance pay, disability, welfare benefit, workers compensation plans, pension benefit, life insurance, medical insurance, fringe benefits, educational assistance, tax gross up, change in control, or other material employee benefit, in each case as to which Seller has any Liability as of the Closing Date with respect

to any current or former officers, employees or directors of Seller or any Subsidiary or Seller Affiliates, and shall specifically include all Liabilities of Seller and any Subsidiary or Seller Affiliates under Title IV of ERISA and any other single employer plan, multiemployer plan or multiple employer plan (and any trusts, 501(9) organizations, insurance (including fiduciary insurance), administrative or other service contracts relating thereto).

"Employee Obligations" means, with respect to the Intended Employees, any obligations accrued as of the Closing Date with respect to earned or accrued vacation obligations and sick and personal days (only to the extent such sick or personal days are recognized on the Closing Date balance sheet of Seller); provided, however, the definition of "Employee Obligations" does not include any Employee Benefit Plans.

"Encumbrances" means any encumbrance, lien, pledge, mortgage, security interest, adverse claim, restriction, reservation, easement, option, encroachment, preemptive right or privilege of any nature or kind, or any contract or agreement to create any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Estate" means the estate created in the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code.

"Estimated Working Capital Adjustment Worksheet Certificate" means (a) the estimated Working Capital Spreadsheet of the of Seller in forma of Exhibit 2.4 to the Agreement as of 12:01 a m. on the Closing Date prepared by Seller in good faith using (i) the books and records of the Seller and (ii) the best estimates of Seller based upon all relevant information then available to Seller on a consistent basis and applying the same accounting principles, policies and practices as were used in preparing the balance sheet of Seller contained within the financial statements of Seller as the same were made available to Purchaser and (b) a statement setting forth in reasonable detail the Closing Date Estimated Current Assets Amount and the Closing Date Estimated Current Liabilities Amount, in each case as determined from such balance sheet of Seller.

"Excluded Assets" has the meaning set forth in Section 1.2.

"Excluded Contracts" means the Contracts described on Schedule 1.2(m).

"Excluded Real Property" means the real estate and the improvements, if any, thereon commonly known as Parcel 38 in the Timberline Subdivision, Tucker County, West Virginia and legally described on Schedule 1.2(m).

"Final Adjustment Amount" has the meaning set forth in Section 2.5.

"Final Order" means an action taken or order issued by the applicable Governmental Authority as to which: (i) no request for stay of the action or order is pending, no such stay is in effect, and if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or order is pending, and if any deadline for filing such rehearing or reconsideration is designated by statute or regulation, it is passed, including any extensions thereof; (iii) the Governmental Authority does not have the action or order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Final Current Assets Amount" means the aggregate amount of the Current Asset Components as of the Closing Date, as shown on the Final Working Capital Adjustment Worksheet.

"Final Current Liabilities Amount" means the aggregate amount of the Current Liabilities as of the Closing Date, as shown on the Final Working Capital Adjustment Worksheet.

"Final Working Capital Adjustment Worksheet" means (a) the Working Capital Adjustment Worksheet of Seller as of 12:01 a.m. on the Closing Date prepared in accordance with the same accounting principles, policies and

practices as were used in preparing the Estimated Working Capital Adjustment Worksheet and (b) a statement setting forth in reasonable detail the Final Current Assets Amount and the Final Current Liabilities Amount, in each case as determined in accordance with Exhibit 2.4 and this Agreement.

"GAAP" means United States generally accepted accounting principles as in effect from time to time and applied on a basis consistent with prior periods.

"Governing Documents" means the agreements and instruments by which any Person (other than an individual) establishes its legal existence and/or governs its internal affairs.  For example, (i) the Governing Documents of a corporation include its certificate or articles of incorporation (or other instrument of formation) and all amendments thereto, its by-laws (or equivalent) and all amendments thereto, its minute books and copies of all resolutions, written consents and other corporate actions of its shareholders and directors, its equity ledgers and all other stock records, (ii) the Governing Documents of a limited partnership include its certificate of limited partnership (or other instrument of formation) and all amendments thereto, its limited partnership agreement and all amendments thereto, any resolutions, written consents and other formal actions of its partners and its equity ledgers and other partnership interest records, and (iii) the Governing Documents of a limited liability company include its certificate of formation (or other instrument of formation) and all amendments thereto, its limited liability company agreement or operating agreement and all amendments thereto, any resolutions, written consents and other formal actions of its members and managers and its equity ledgers and other limited liability company interest records.

"Governmental Authority" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to the United States or to a foreign federal, state or local government, any governmental authority, agency, department, board, commission or instrumentality or any political subdivision thereof, and any tribunal or court or arbitrator(s) of competent jurisdiction, and shall include the Bankruptcy Court.

"Indebtedness" of any Person means, without duplication: (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business); (iii) all obligations of such Person under Capital Leases; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations, "keep well" agreements, agreements to maintain or contribute cash or capital to any Person or other similar agreements or arrangements; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Intellectual Property" means each of Seller's intellectual property and proprietary rights related to the Business existing immediately prior to, and to be assigned to Purchaser at, the Closing, of any type arising from or in respect of the following in any jurisdiction throughout the world: all (i) inventions, discoveries, industrial designs, utility models, business methods, patents and patent applications (including provisional and Patent Cooperation Treaty applications), including continuations, divisionals, continuations-in-part, provisional, applications, reexaminations and reissues, extensions, renewals and any patents that may be issued with respect to the foregoing; (ii) trademarks, service marks, design marks, certification marks, collective marks, trade names, business names, assumed names, d/b/a's, fictitious names, brand names, trade dress, logos, slogans, publication titles, websites, uniform resource identifiers, rights in design,  symbols, other indicia of source or origin, phone numbers, toll free phone numbers, internet domain names and corporate names, and general intangibles of a like nature and other indicia of origin or quality, whether registered, unregistered or arising by Law, and all applications, registrations, and renewals for any of the foregoing, together with the goodwill, registrations, and applications associated with and symbolized by each of the foregoing; (iii) published and unpublished works of authorship in any medium, whether copyrightable or not (including databases and other compilations of information, computer software and programs, source code, object code, algorithms, and other similar materials and Internet website content), copyrights and moral rights therein and thereto, and registrations and applications therefore, and all applications issuances, renewals, extensions, restorations and reversions thereof; (iv) Trade Secrets; (v) Intellectual Property Licenses; and (vi) all other intellectual property,

together with all rights to collect income and royalties and to recover damages or lost profits in connection therewith and all rights to sue and recover and other rights and remedies related thereto for past, present or future infringement, dilution, misappropriation or other violation relating to any of the foregoing.

"Intellectual Property Licenses" means (i) any Contract that contains any grant by Seller to any third Person of any license, sublicense, right, permission or consent to use, publish, perform, exploit, or covenant not to sue, with respect to any of the Intellectual Property, and (ii) any Contract that contains any grant by any third Person to Seller of any license, sublicense, right, permission or consent to use, publish, perform, exploit, or covenant not to sue, with respect to any Intellectual Property of such third Person.

"Intended Employees" has the meaning set forth in Section 8.1.

"Inventory" means all inventory of any kind or nature, whether or not prepaid, and wherever located, held or owned by Seller, including (i) inventory that is in the production process and has not yet been completed (or "work-in-process"), (ii) inventory that has completed the production process (or "finished goods"), and (iii) raw materials, but excluding any obsolete or unusable inventory.

"IRS" means the United States Internal Revenue Service.

"Joint Operating Agreement" means that certain Joint Operating Agreement between the *Charleston Gazette* and the *Charleston Daily Mail*.

"Knowledge" (and derivations thereof) means, when used with respect to Seller, the actual knowledge (after reasonable investigation) of the senior executive team and any department heads of the Business, including but not limited to: Elizabeth Chilton, Norman W. Shumate, III, and Susan Chilton Shumate.

"Law" means any foreign, federal, state or local law (including common law), statute, code, ordinance, rule, regulation, Final Order or other requirement enacted, promulgated, issued or entered by a Governmental Authority.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, arbitration, claim, inquiry, proceedings (public or private) or investigation by or before a Governmental Authority of any nature, civil, criminal, regulatory or otherwise, in law or in equity.

"Liabilities" means any and all debts, losses, liabilities, claims (including claims as defined in the Bankruptcy Code), damages, fees, expenses, fines, costs, royalties, proceedings, deficiencies or obligations (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims, and any out-of-pocket costs and expenses in connection therewith (including legal counsels', accountants', or other fees and expenses incurred in defending any action or in investigating any of the same or in asserting any rights thereunder or hereunder).

"Licenses" means any approvals, authorizations, registrations, consents, licenses, permits or certificates.

"Lien" means any lien, license, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, right of first offer, hypothecation, assignment, deposit, arrangement, easement, servitude, transfer restriction under any shareholder or similar agreement or encumbrance or any other preference, priority or other security agreement or preferential arrangement, restriction or limitation of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, and financing statement perfecting a security interest under the Uniform Commercial Code as in effect from time to time in the State of West Virginia or comparable law of any jurisdiction), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non contingent, material or non material, known or unknown.

"Litigation Claims" means all of Seller's actions, rights, claims and causes of action of any kind or nature in connection with, resulting from or arising under Chapter 5 of the Bankruptcy Code.

"Material Adverse Effect" means any change, circumstance, fact, condition or event that, individually or in the aggregate with any other change, circumstance, fact, condition or event having an effect of $10,000.00 or more, (a) has or could reasonably be expected to have a materially adverse effect on (i) the Business, financial condition, results of operations, properties or assets of Seller (taken as a whole) as the same shall have existed as of the date hereof, or (ii) the ability of Seller or Purchaser to materially perform their respective obligations under this Agreement, or (b) prevents or materially delays the consummation of the Transactions, in each case other than adverse change, circumstance, fact, condition or event resulting from one or more of the following: (i) the condition of the economy or the securities markets in general, or any outbreak of hostilities, terrorist activities or war involving the United States of America; (ii) the announcements, pendency or consummation of the sale of the Purchased Assets, provided that the result thereof would not reasonably be expected to prevent the Business from operating substantially in the ordinary course of business; (iii) any changes in applicable Laws or accounting rules; or (iv) any material breach by the breaching Party of any covenant or agreement herein or any representation or warranty of the breaching Party having been or having become untrue in any material respect as of the date hereof which shall not be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect for the non-breaching Party.

"Newspapers" means the *Charleston Gazette-Mail* and the *Sunday Gazette-Mail*, successor publications to *The Charleston Gazette* and the *Charleston Daily Mail.*

"Office Property" means that certain lot or parcel of land, together with the buildings, structures, and improvements thereon and appurtenances thereto, more commonly known as 1001 Virginia Street East, City of Charleston, Charleston East Tax District, Kanawha County, West Virginia, as more particularly described on Schedule A attached hereto and made a part hereof.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

"Owned Real Property" means the Office Property and the Parking Garage Property.

"Parking Garage Property" means that certain lot or parcel of land, together with the buildings, structures, and improvements thereon and appurtenances thereto, more commonly known as 925 Virginia Street East, City of Charleston, Charleston East Tax District, Kanawha County, West Virginia, as more particularly described on Schedule B attached hereto and made a part hereof.

"Permitted Liens" means:

       (a)     with respect to the Owned Real Property and the Leased Property and to the extent that they do not materially interfere with the ownership, occupancy, use or operation of such property in the manner and for the purposes heretofore used by Seller in connection with the Business, any easements, restrictive covenants, and rights-of-way on, over or in respect of any such property;

       (b)     all rights reserved to or vested in any Governmental Authority to control or regulate the Purchased Assets and all obligations and duties under all applicable Laws or under any permit issued by any Governmental Authority;

       (c)     statutory Liens for current and future Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith;

       (d)     statutory Liens arising in the ordinary course of business that are not overdue and that do not materially affect the value or use of the affected assets;

       (e)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(f)  any Lien that pursuant to section 363(f) or sections 1123 and 1129 of the Bankruptcy Code will be released from the Purchased Assets upon entry of the Sale Order; and

(g)  other Liens that will be released on or prior to Closing at no cost or expense to Purchaser.

"Person" means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and all Governmental Authorities.

"Petition Date" has the meaning set forth in the Recitals.

"Pre-Closing Tax Period" means any Tax period (or the portion thereof) ending on or before the Closing Date (including the portion of any Straddle Period ending on the Closing Date).

"Privileged Information" means all marketing materials, plans, strategies, projections, records, files, data, lists, bids, offers, deliberations and other materials relating to the Transactions and the Bankruptcy Case, all correspondence, emails, files, memoranda, briefs, documents, drafts, files and other communications between Seller, its shareholders, officers, and/or directors, on the one hand, and counsel to Seller, on the other hand, all as relating to the negotiation, documentation and closing of the Transactions and the Bankruptcy Case, and all other documents and material of Seller covered by the attorney-client, work-product or other applicable legal privileges.

"Purchaser Assumed Contract" means, to the extent assignable pursuant to section 365 of the Bankruptcy Code, each Contract set forth on the Purchaser Assumed Contracts List and corresponding Contract Rights thereunder (as may be modified prior to the Closing pursuant to Section 1.5) to be assigned to Purchaser under section 365 of the Bankruptcy Code.

"Representatives" of a Person means its officers, directors, managers, employees, attorneys, investment bankers, accountants, trustees and other agents and representatives.

"Royal Automotive A/R" means the Account Receivable in the approximate outstanding amount of $53,400 on the Execution Date owed by Royal Automotive that is past due more than 90 days.

"Sale Hearing" has the meaning given to such term in the Bidding Procedures Order.

"Sale Order" means a Final Order of the Bankruptcy Court issued pursuant to sections 105, 363, 365, 1123 and/or 1129 (as applicable) of the Bankruptcy Code agreed upon by Purchaser and Seller, which Final Order approves the sale to Purchaser under this Agreement and all of the terms and conditions hereof, and approves and authorizes Seller to consummate the Transactions and enter into the Transaction Documents with such modifications as are satisfactory to Seller and Purchaser. Without limiting the generality of the foregoing, such Final Order shall specifically include, among other things, provisions ordering that in the event that the Bankruptcy Case is converted to a case under chapter 7 of the Bankruptcy Code, the Sale Order shall be binding on the chapter 7 trustee in such chapter 7 case.

"Secured Lender" means United Bank.

"Straddle Period" means any Tax period beginning on or before, and ending after, the Closing Date.

"Subsidiary" or "subsidiary" means, with respect to any Person, any corporation, limited liability company, joint venture or partnership of which such Person (a) beneficially owns, either directly or indirectly, at least fifty percent (50%) of (i) the total combined voting power of all classes of voting securities of such entity entitled, under ordinary circumstances, to vote in the election of directors or other governing body of such Person, (ii) the total combined equity interests, or (iii) the capital or profit interests, in the case of a partnership; or (b) otherwise has the power to vote or to direct the voting of sufficient equity interests to elect a majority of the board of directors or similar governing body of such Person.

"Tangible Personal Property" has the meaning set forth in Section 1.1(d).

"Tax" means all federal, state, provincial, territorial, municipal, local or foreign income, profits, gross receipts, environmental (including taxes under Code Section 59A), customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, employment, escheat, abandon or unclaimed property, social security, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts and other similar charges and assessments of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed by or on behalf of any Governmental Authority, and including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"Tax Returns" means any report, return, declaration, claim for refund, information report or return or statement required to be supplied to a Taxing Authority in connection with Taxes, including any schedule or attachment thereto or amendment thereof.

"Taxing Authority" means any Governmental Authority exercising any authority to impose, regulate, levy, assess or administer the imposition of any Tax.

"Trade Secrets" means confidential and proprietary information, trade secrets, technical expertise and know-how, including methods, processes, techniques, business plans, marketing plans, recipes, schematics, concepts, software and databases (including data source code, object code, algorithms, models, and methodology and all related documentations), formulae, drawings, prototypes, models, specifications, proposals, designs, devices, technology, technical data, business data, financial data, marketing data, research and development, pricing and cost information, and customer and supplier information and lists.

"Transaction Documents" means this Agreement, the bill of sale, the Assignment and Assumption Agreement, the assignment and assumption agreements with respect to each Real Property Lease, if any, the deed and bill of sale related to the transfer of the Owned Real Property, and all other Contracts and agreements necessary to effectuate the Transactions.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents.

"Transfer Taxes" has the meaning set forth in Section 8.4.

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (1988) and any similar state or local "mass layoff" or "plant closing" laws.

DISCLOSURE SCHEDULES

These Disclosure Schedules (these "Schedules") are attached to the Asset Purchase and Sale Agreement dated as of January 30, 2018 (the "Agreement") among Charleston Newspapers, Daily Gazette Holding Company LLC, Charleston Newspapers Holdings, LP, Daily Gazette Publishing Company, Daily Gazette Company and G-M Properties, Inc., collectively, as Seller, and Charleston Newspapers, LLC as Purchaser.

Capitalized terms used but not elsewhere defined in these Schedules shall have the respective meanings ascribed to such terms in the Agreement.

These Schedules are delivered to Purchaser as of the Execution Date.

These Schedules have been prepared and delivered in accordance with the Agreement.  Certain agreements and other matters are listed in these Schedules for informational purposes only, notwithstanding the fact that, because they do not rise above the applicable materiality thresholds or otherwise, they are not required by be listed herein by the terms of the Agreement.

In no event shall the listing of such agreements or other matters in these Schedules be deemed or interpreted to broaden or otherwise amplify the Seller's representations and warranties or covenants contained in the Agreement, and nothing in these Schedules shall influence the construction or interpretation of any of the representations or warranties contained in the Agreement.  The headings contained in these Schedules are for convenience of reference only and shall not be deemed to modify or influence the interpretation of the information contained in these Schedules or the Agreement.  Items disclosed in any section of these Schedules shall be deemed to have been disclosed for all purposes of the Agreement.  Furthermore, the disclosure of a particular item of information in these Schedules shall not be taken as an admission by Seller that such disclosure is required to be made under the terms of any of such representations and warranties.

<u>Schedule A</u>

Office Property Description

All that certain tract or parcel of land, together with the improvements thereon and the appurtenances thereunto belonging, situate in the City of Charleston, Charleston East Tax District, Kanawha County, West Virginia, said tract or parcel being more particularly bounded and described as follows:

Beginning at a P.K. nail in concrete at the intersection of the southerly line of McFarland Street with the westerly line of Virginia Street East, said point being the beginning corner of First Parcel described in deed from Clay Communications Investors to Lincoln Publishing dated May 28, 1987 and recorded in the office of the Clerk of the Kanawha County Commission in Deed Book 2166, at page 151, and running thence from said beginning point with the westerly line of Virginia Street East

1.  S. 40° 14' E., 129.73 feet to a P.K. nail in concrete at the common corner to parcel owned by Kanawha Presbyterian Church being described in Deed Book 2296, at page 511; thence running with three (3) common lines to said church
2.  S. 49° 44' W., 145.61 feet to a point on 3 story building, thence
3.  S. 49° 08' W., 106.55 feet to a point on 3 story building, thence
4.  S. 49° 14' W., 147.65 feet  to a P.K. nail in concrete in the easterly line of Kanawha Boulevard East; thence running with the easterly line of Kanawha Boulevard East,
5.  N. 35° 07' W., 66.06 feet to a P.K. nail in concrete, thence
6.  N. 35° 42' W., 70.20 feet to a P.K. nail in concrete at the intersection of the easterly line of Kanawha Boulevard East with the southerly line of McFarland Street; thence with the southerly line of McFarland Street,
7.  N. 49° 58' E., 136.99 feet to a P.K. nail in concrete; thence
8.  N. 49° 58' E., 105.72 feet to a P.K. nail; thence
9.  S. 40° 15' E., 2.35 feet to a P.K. nail; thence
10. N. 49° 57' E., 145.63 feet to the point of beginning, containing 52,290.51 square feet, or 1.2004 acres, more or less.

And being the same property conveyed to Charleston Newspapers by Thomas Newspapers, Inc. by deed dated August 12, 1998, of record in the said Clerk's office in Deed Book 2449, at page 280.

Together with that certain Deed of Easement dated August 18, 2000 by and between The City of Charleston and Charleston Newspapers, of record in Kanawha County Deed Book 2508, at page 343.

Schedule B

Parking Garage Property Description

All that certain lot or parcel of land, together with the appurtenances thereunto belonging, situate in the City of Charleston, Kanawha County, West Virginia, and more particularly bounded and described as follows:

BEGINNING at a P.K. nail at back of walk intersection at the intersection of the northwesterly line of McFarland with the northeast line of Kanawha Boulevard East, said point being the southwest corner of said Tract No. II hereby described, and running thence from said beginning point with the northeast line of Kanawha Boulevard East,

1.  N. 34° 55' W., 61.22 feet to an iron pin the common corner to the parcel of land now or formerly owned by Eastern Associates, a West Virginia limited partnership, being described in Deed Book 1817, at page 80; thence leaving said line of Kanawha Boulevard East and running with common lines between Tract No. II and Eastern with five (5) common lines thereof,
2.  N. 49° 23' E., 81.40 feet to a cooper plug; thence
3.  N. 40° 12' W., 0.50 feet to a point on wall of one story brick building; thence
4.  N. 50° 58' E., 57.91 feet to an old nail in side of building; thence
5.  N. 50° 23' E., 2.73 feet to a railroad spike; thence
6.  N. 40° 48' W., 66.83 feet to a P.K. nail in asphalt; thence leaving common line to Eastern and running
7.  N. 50° 16' E., 86.81 feet to a P.K. nail in asphalt; thence
8.  N. 49° 55' E., 150.00 feet to a tack in wood plug in drill hole in concrete sidewalk in the southwesterly line of Virginia Street East; thence running with the southwesterly line of Virginia Street East,
9.  S. 40° 05' E., 66.00 feet to a P.K. nail in concrete; thence continuing with said street line,
10. S. 40° 05' E., 59.48 feet to a P.K. nail at the intersection of the southwesterly line of Virginia Street East with the northwesterly line of McFarland Street; thence running with the northwesterly line of McFarland Street,
11. S. 49° 13' 18" W., 161.35 feet to a P.K. nail in concrete; thence
12. S. 50° 06' W., 77.77 feet to a P.K. nail in concrete; thence
13. S. 49° 49' W., 144.40 feet to the point of beginning, containing 0.8916 acres, or 38,837.36 square feet, more or less.

The Parking Garage Property being the same property conveyed to G-M Properties, Inc., by the Charleston Newspapers by deed dated April 9, 2001, of record in the aforesaid Clerk's office in Kanawha County Deed Book 2522, at page 197.

81681-0004/137515612.9

<u>Schedule C</u>

Ancillary Publications


Pulse

Metro West

Metro East

Putnam Review

The Clipper

special event publications, including Health Care Connections and WVU Game Day

All other publications published and/or distributed by Seller

Schedule 1.2(m)

Excluded Assets

1.      The real estate and the improvements, if any, thereon, located in Tucker County, West Virginia and legally described as follows:

TRACT NO. 38, "DEER RIDGE SECTION" OF TIMBERLINE SUB-DIVISION FOR ALLEGHENY PROPERTIES, INC.

All that certain tract or parcel of land, together with the improvements thereon and the appurtenances thereunto belonging, situate in the Dry Fork District, Tucker County, West Virginia, said tract or parcel containing approximately 5.32 acres, and being more particularly described by the Survey dated October – December, 1973, by Leon J. Wilson, Surveyor, L.L.S. 296, of Petersburg, West Virginia, and further described as follows:

1.      There is recorded in Plat Record Book 1, Pages 83 and 234 in the Tucker County Clerk's Office a Plat of Survey for Allegheny Properties, Inc., a West Virginia corporation, showing "Timberline" Development for Deer Ridge, Sand Springs, and Cabin Mountain Sections and included therein are the roadways and rights of ways and metes and bounds description of the tract herein described, as well as the conservancy area description, and reference is made to said plat for all pertinent purposes.

2.      The tract herein described is part of the same real estate conveyed Allegheny Properties, Inc. by Lester H. Harman and Ruther Arman, Attorneys in Fact for Eston Harman et al., by deed dated November 29, 1972, and of record in the Tucker County Clerk's office in Deed Book 83 at Page 54 and reference is hereby made to said deed for all pertinent purposes.

2.      The following Contracts, which shall constitute Excluded Contracts:

a.      Second Amended and Restated Joint Operating Agreement dated as of July 23, 2010, as amended, among Daily Gazette Company, Daily Gazette Holding Company, LLC, Charleston Newspapers, Charleston Newspapers Holding, L.P., Daily Gazette Publishing Company LLC and Charleston Publishing Company.

b.      Any and all Contracts, if any, related to the real estate and the improvements, if any, thereon described in item 1 above.

3.      Any and all capital stock, limited liability company membership interests, and general or limited partnership interests, and any all options, warrants and other rights to acquire capital stock, limited liability company membership interests, general or limited partnership interests in any entity that comprise Seller, and all benefits, rights, profits, proceeds, and avails thereof.

4.      Any and all intercompany loans, notes, advances and other similar obligations between or among the entities that comprise Seller.

5.      The Privileged Information.

Schedule 4.1

Subsidiaries

Please see attached organizational chart.



**Charleston Newspapers**
As of April 1, 2014

Schedule 4.4(b)

Real Property Leases

1.      Lease of the Owned Real Estate from G-M Properties, landlord, to Charleston Newspapers, tenant.

2.      The following Building/Storage Rental Depots:

| BUILDING/STORAGE RENTAL DEPOTS | | | | | | |
|---|---|---|---|---|---|---|
| Monthly | | Leased Period | | Address | Phone # | |
| $400.00 | Putnam Co. Chamber of Commerce | Lease ended 9/31/17 - now monthly | | PO Box 553  Teays, WV  25569 | 304-757-6510 | |
| $63.00 | American Self Storage | Monthly | | PO Box 1608  Lewisburg, WV  24901 | 304-645-9010 | |
| $120.00 | EBG - Eric Gardner | Monthly | | PO Box 376  East Bank, WV  25067 | 304-949-5938 | |
| $145.00 | CMR | Monthly | | PO Box 515  Smithers, WV  25186 | 304-442-8057 | |
| $155.00 | Secure Storage LLC | Monthly | | 800 Northside Dr., Suite 27  Summersville, WV  26651 | 304-872-4841 | |
| $85.00 | Hide-A-Way Storage | Monthly | | 4294 Evans View Rd.,  Evans, WV  25241 | | |
| $85.00 | B & T Storage | Monthly | | PO Box 99 Cora, WV  25614 | 304-239-2835 | |
| $100.00 | VENABLE-COLLINS INC | Monthly | | 226 Timber Trail Rd.,  Charleston, WV  25304 | | |
| $350.00 | Teays Valley Storage | Monthly | | PO Box 423  Scott Depot, WV  25560 | 304-757-7927 | |
| $1,503.00 | | | | | | |

Schedule 4.5(a)

Personal Property Leases

LEASED EQUIPMENT

| Description | Model | Serial # | Monthly Payments | Period |
|---|---|---|---|---|
| Konica Copier | C554E | A5AY010013770 | $646.20 | 5/2015 -11/2019 |
| Stapling Finisher | FS534 | | | |
| Fax Kit | FK511 | | | |
| 2x500 Sheet Paper Feed Cabinet | PC210 | | | |

| Description | Model | Serial # | Quarterly Payments | |
|---|---|---|---|---|
| Postage Meter | 4W00 | 349940 | $1,073.55 | 11/30/17 - 2/27/18 |
| Touch Display | MSD1 | 107308 | | |
| Equipment Service Agreement | | | $311.25 | |

See also attached schedule of service contracts relating to hardware.

| Vendor | Period | PeriodYear | InvoiceDate | Center | Account | Subaccount | UnitCost | | | Description | Cost/Period | Used | Carry | 2018 Expense | 2019 Expense | Total Expense | Notes: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PitneyBowes Inc | 3 | 2018 | 3/1/2018 | 101 | 1431 | | $357.85 | | | PB SendPro P1500 WOW Q2 | $357.85 | 1 | | $357.85 | | $357.85 | |
| PitneyBowes Inc | 6 | 2018 | 6/1/2018 | 101 | 1431 | | $357.85 | | | PB SendPro P1500 WOW Q3 | $357.85 | 1 | | $357.85 | | $357.85 | |
| PitneyBowes Inc | 9 | 2018 | 9/1/2018 | 101 | 1431 | | $357.85 | | | PB SendPro P1500 WOW Q4 | $357.85 | 1 | | $357.85 | | $357.85 | |
| | 12 | 2018 | 12/1/2018 | 101 | 1431 | | $357.85 | | | PB SendPro P1500 WOW Q1 2019 | $357.85 | | 1 | $0.00 | $357.85 | $357.85 | This is now a lease for equipment and maint. |
| | | | | | | | | | | | | | | | | | |
| Park Place Technologies -LLC | 1 | 2018 | 1/1/2018 | 101 | 1431 | | $479.61 | | | Editorial Servers, February 2018 | $479.61 | 1 | | $479.61 | | $479.61 | |
| Park Place Technologies -LLC | 2 | 2018 | 2/1/2018 | 101 | 1431 | | $479.61 | | | Editorial Servers,  March 2018 | $479.61 | 1 | | $479.61 | | $479.61 | |
| Park Place Technologies -LLC | 3 | 2018 | 3/1/2018 | 101 | 1431 | | $479.61 | | | Editorial Servers, April 2018 | $479.61 | 1 | | $479.61 | | $479.61 | |
| Park Place Technologies -LLC | 4 | 2018 | 4/1/2018 | 101 | 1431 | | $479.61 | | | Editorial Servers, May 2018 | $479.61 | 1 | | $479.61 | | $479.61 | |
| Park Place Technologies -LLC | 5 | 2018 | 5/1/2018 | 101 | 1431 | | $479.61 | | | Editorial Servers, June 2018 | $479.61 | 1 | | $479.61 | | $479.61 | |
| Park Place Technologies -LLC | 6 | 2018 | 6/1/2018 | 101 | 1431 | | $479.61 | | | Editorial Servers, July 2018 | $479.61 | 1 | | $479.61 | | $479.61 | |
| Park Place Technologies -LLC | 7 | 2018 | 7/1/2018 | 101 | 1431 | | $479.61 | | | Editorial Servers, August 2018 | $479.61 | 1 | | $479.61 | | $479.61 | |
| Park Place Technologies -LLC | 8 | 2018 | 8/1/2018 | 101 | 1431 | | $479.61 | | | Editorial Servers, September 2018 | $479.61 | 1 | | $479.61 | | $479.61 | |
| Park Place Technologies -LLC | 9 | 2018 | 9/1/2018 | 101 | 1431 | | $479.61 | | | Editorial Servers,October 2018 | $479.61 | 1 | | $479.61 | | $479.61 | |
| Park Place Technologies -LLC | 10 | 2018 | 10/1/2018 | 101 | 1431 | | $479.61 | | | Editorial Servers, November 2018 | $479.61 | 1 | | $479.61 | | $479.61 | |
| Park Place Technologies -LLC | 11 | 2018 | 11/1/2018 | 101 | 1431 | | $479.61 | | | Editorial Servers, December 2018 | $479.61 | | 1 | | 479.61 | $479.61 | |
| Park Place Technologies -LLC | 12 | 2018 | 12/1/2018 | 101 | 1431 | | $479.61 | | | Editorial Servers, January 2019 | | | | | | | |
| | | | | 101 | 1431 | | $3,885.00 | | | Kodak Cree Trendsetter CTP Service Contract 8/1/18- 8/1/2019 | $3,885.00 | 5 | 8 | $777.00 | $485.63 | $3,885.00 | This could have been in prepress budget in 2017 |
| | | | | | | | | | | | | | | | | | |
| DecisionOne Corporation (Line Printers) | 1 | 2018 | 1/9/2018 | 101 | 1431 | | $432.35 | | | IBM Line Printer Maintenance for February 2018 | $432.35 | 1 | | $432.35 | | $432.35 | |
| DecisionOne Corporation | 2 | 2018 | 2/13/2018 | 101 | 1431 | | $432.35 | | | IBM Line Printer Maintenance for March 2018 | $432.35 | 1 | | $432.35 | | $432.35 | |
| DecisionOne Corporation | 3 | 2018 | 3/13/2018 | 101 | 1431 | | $432.35 | | | IBM Line Printer Maintenance for April  2018 | $432.35 | 1 | | $432.35 | | $432.35 | |
| DecisionOne Corporation | 4 | 2018 | 4/11/2018 | 101 | 1431 | | $432.35 | | | IBM Line Printer Maintenance for May 2018 | $432.35 | 1 | | $432.35 | | $432.35 | |
| DecisionOne Corporation | 5 | 2018 | 5/8/2018 | 101 | 1431 | | $432.35 | | | IBM Line Printer Maintenance for June 2018 | $432.35 | 1 | | $432.35 | | $432.35 | |
| DecisionOne Corporation | 6 | 2018 | 6/12/2018 | 101 | 1431 | | $432.35 | | | IBM Line Printer Maintenance for July 2018 | $432.35 | 1 | | $432.35 | | $432.35 | |
| DecisionOne Corporation | 7 | 2018 | 7/10/2018 | 101 | 1431 | | $432.35 | | | IBM Line Printer Maintenance for August 2018 | $432.35 | 1 | | $432.35 | | $432.35 | |
| DecisionOne Corporation | 8 | 2018 | 8/14/2018 | 101 | 1431 | | $432.35 | | | IBM Line Printer Maintenance for September 2018 | $432.35 | 1 | | $432.35 | | $432.35 | |
| DecisionOne Corporation | 9 | 2018 | 9/11/2018 | 101 | 1431 | | $432.35 | | | IBM Line Printer Maintenance for October 2018 | $432.35 | 1 | | $432.35 | | $432.35 | |
| DecisionOne Corporation | 10 | 2018 | 10/9/2018 | 101 | 1431 | | $432.35 | | | IBM Line Printer Maintenance for November 2018 | $432.35 | 1 | | $432.35 | | $432.35 | |
| DecisionOne Corporation | 11 | 2018 | 11/13/2018 | 101 | 1431 | | $432.35 | | | IBM Line Printer Maintenance for December 2018 | $432.35 | 1 | | $432.35 | | $432.35 | |
| DecisionOne Corporation | 12 | 2018 | 11/13/2018 | 101 | 1431 | | $432.35 | | | IBM Line Printer Maintenance for January 2019 | $432.35 | | 1 | | $432.35 | $432.35 | |
| | | | 8/8/2018 | 101 | 1431 | | $2,374.98 | | | AS400 Software  Maint.9/22/18-9/21/19 | $2,374.98 | 3 | 9 | $791.66 | $263.89 | $2,374.98 | |
| Software Information Systems,LLC | 8 | 2017 | 8/8/2018 | 101 | 1431 | | $1,829.13 | | | AS400 Hardware Maint. 9/22/18 - 9/21/19 | $1,829.13 | 3 | 9 | $609.71 | $203.24 | $1,829.13 | |
| | | | | | | | | | | | | | | | | | |
| Telcom & Data, Inc. | 8 | 2018 | 8/1/2018 | 101 | 1431 | | $9,136.00 | | | Mitel Phone System Hardware and Software Maint. Contract | $9,136.00 | 5 | 8 | $1,827.20 | $1,142.00 | $9,136.00 replaces old PBX maint. | |
| | | | | | | | | | | Annual Totals | | | | 15110.68 | 3364.56 | $29,600.03 | |
| | | | | | | | | | | 2018 Monthly Expense | | | | $1,259.22 | | | |

<u>Schedule 4.5(b)</u>

Capital Leases

1.      Telephone System:  Frontier Systems 3 year lease term starting August 2017/ First 12 months $4,268/mo plus taxes (approximately $500 per month)/ Final 24 months $2,174/mo plus taxes (approximately $500 per month)

Schedule 4.5(c)

Exceptions to Condition of Personal Property

None

<u>Schedule 4.6(a)</u>

Intellectual Property Registrations

See attached Schedule of Domain Names.

Charleston Newspapers Domain Names 1-29-18

304digital.com
appalachianegames.com
autobeat.com
charlestondailymail.com
charlestongazette-mail.com
charlestonwv.news
cncustomerservice.com
cnpapers.com
cnpapers.net
cnpapersdr.com
cnphotostore.com
convergentdigitalmarketing.com
convergentdm.com
dailymailwv.com
festivallcharleston.com
gazette-mail.com
gazette-mailcars.com
gazette-mailcelebrations.com
gazette-mailclassifieds.com
gazette-mailcoupons.com
gazette-mailhomes.com
gazette-mailjobs.com
gazette-mailpersonals.com
gazette-mailpets.com
gazette-mailphotos.com
gazette-mailrealestate.com
gazettemailautos.com
gazettemailcars.com
gazettemailcars.com
gazettemailcelebrations.com
gazettemailclassifieds.com
gazettemailcontests.com
gazettemaildigital.com
gazettemailfootball.com

gazettemailhomes.com
gazettemailjobs.com
gazettemailpersonals.com
gazettemailpets.com
gazettemailphotos.com
gazettemailpreps.com
gazettemailrealestate.com
gmcontests.com
itsjustabadhouse.net
kvneightbors.com
livewellwestvirginia.com
livewellwv.org
lovenissanofstalbans.com
lovenissanwv.com
metrokanawha.com
metroputnam.com
mondaybookclub.com
mountainstatesingles.com
mountainstatetravel.com
moutainstatejobs.com
pscswv.com
pulsewv.com
putnamreview.com
putnamreview.info
putnamreview.net
putnamreview.org
saturdaygazettemail.com
shoplocalwv.com
sundaygazettemail.com
thecharlestongazette.com
thegazz.com
wv360.com
wvaxis.com
wvbizfinder.com
wvcareersite.com
wvcarfinder.com
wvcgm.com

wvcoupons.com
wvdealfinder.com
wvdigitalmarketing.com
wvflipside.com
wvgazette.com
wvgazette.xxx
wvgazettemail.com
wvhealthbeat.com
wvhousefinder.com
wvjobfinder.com
wvjobfinder.net
wvjobfinder.org
wvmarketplace.com
wvmetrowest.com
wvpropertyfinder.com
wvrealestatefinder.com
wvrealnews.com
wvrealtyfinder.com
wvrentalfinder.com
wvstyleteam.com
wvtruckfinder.com

<u>Schedule 4.6(b)</u>

Intellectual Property Licenses

See attached schedule of software licenses/leases.

| InvoiceDate | Name | UnitCost | Description | Date From | Date To | Months | 2017 | Carry over | Cost/Mo | Used | Carry over | 2018 will cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/14/2017 | Newscycle Solutions - Adbase | $18,304.68 | Adbase Maintenance 9/1/17-8/31/18 (15.25+% - $2357.66) | 9/1/2017 | 8/31/2018 | 12 | 4 | 8 $ | 1,525.39 | $ 6,101.56 | $ 12,203.12 | $20,360.68 |
| 10/3/2017 | Newscycle Solutions - DTI Circ | $5,000.00 | DTI Prepaid Support Services Block - Upgrade to 2017 version | 10/3/2018 | 10/3/2018 | 3 | 3 | 0 $ | 1,666.67 | $ 5,000.00 | $   - | $ 5,000.00 |
| 12/31/2017 | Newscycle Solutions - DTI Circ | $50,807.00 | DTI Circ Software Maintenance 2018 | 1/1/2018 | 12/31/2018 | 12 | 0 | 12 $ | 4,233.92 | $   - | $ 50,807.00 | $ 51,807.00 |
| 1/1/2017 | Edgil Associates, Inc. | $250.00 | Edgil 2018 Annual Escrow Service Fee | 1/1/2018 | 12/31/2018 | 12 | 12 | 0 $ | 20.83 | $ 250.00 | $ 250.00 | |
| 1/30/2017 | Edgil Associates, Inc. | $725.21 | EdgCapture base fee 194.01 | 1/1/2018 | 1/31/2018 | 1 | 1 | 0 $ | 725.21 | $ 725.21 | $ 725.21 | |
| 2/28/2017 | Edgil Associates, Inc. | $725.21 | EdgCapture monthly transaction volume fee 465.64 | 2/1/2018 | 2/28/2018 | 1 | 1 | 0 $ | 725.21 | $ 725.21 | $ 725.21 | |
| 3/30/2017 | Edgil Associates, Inc. | $725.21 | EdgCapture R4 Enhanced 40.56 | 3/1/2018 | 3/31/2018 | 1 | 1 | 0 $ | 725.21 | $ 725.21 | $ 725.21 | |
| 4/30/2017 | Edgil Associates, Inc. | $725.21 | EdgCapture Level III $25.00 | 4/1/2018 | 4/31/2018 | 1 | 1 | 0 $ | 725.21 | $ 725.21 | $ 725.21 | |
| 5/30/2017 | Edgil Associates, Inc. | $725.21 | Monthly Total 725.21 | 5/1/2018 | 12/31/2018 | 1 | 1 | 0 $ | 725.21 | $ 725.21 | $ 725.21 | |
| 6/30/2017 | Edgil Associates, Inc. | $725.21 | | 6/1/2018 | 6/31/2018 | 1 | 1 | 0 $ | 725.21 | $ 725.21 | $ 725.21 | |
| 7/30/2017 | Edgil Associates, Inc. | $725.21 | | 7/1/2018 | 7/31/2018 | 1 | 1 | 0 $ | 725.21 | $ 725.21 | $ 725.21 | |
| 8/30/2017 | Edgil Associates, Inc. | $725.21 | | 8/1/2018 | 8/31/2018 | 1 | 1 | 0 $ | 725.21 | $ 725.21 | $ 725.21 | |
| 9/30/2017 | Edgil Associates, Inc. | $725.21 | | 9/1/2018 | 9/31/2018 | 1 | 1 | 0 $ | 725.21 | $ 725.21 | $ 725.21 | |
| 10/30/2017 | Edgil Associates, Inc. | $725.21 | | 10/1/2018 | 10/31/2018 | 1 | 1 | 0 $ | 725.21 | $ 725.21 | $ 725.21 | |
| 11/30/2017 | Edgil Associates, Inc. | $725.21 | | 11/1/2018 | 11/31/2018 | 1 | 1 | 0 $ | 725.21 | $ 725.21 | $ 725.21 | |
| 12/30/2017 | Edgil Associates, Inc. | $725.21 | | 12/1/2018 | 12/31/2018 | 1 | 1 | 0 $ | 725.21 | $ 725.21 | $ 725.21 | |
| | | | Edgil Totals | 1/1/2014 | 1/31/2014 | 1 | 0 | 1 $ | 725.21 | $   - | $ 725.21 | $ 8,702.52 |
| 6/19/2017 | Microsoft | $105.93 | Office 365 Michael Moncada | 6/19/2017 | 6/19/2017 | 12 | 6 | 6 $ | 8.83 | $ 52.97 | $ 52.97 | $ 105.93 |
| 6/7/2017 | Remote Access | $1,110.00 | Splashtop Remote Access | 6/7/2017 | 6/7/2018 | 12 | 6 | 6 $ | 92.50 | $ 555.00 | $ 555.00 | $ 1,110.00 |
| 8/21/2017 | | $976.00 | Backup Assist Network Backup 101.1640 | 8/21/2017 | 8/21/2018 | 12 | 4 | 8 $ | 81.33 | $ 325.33 | $ 650.67 | $ 976.00 |
| 7/20/2017 | Melissa Data Corporation | $1,395.00 | Mailers+4 Pro 1yr subscription renewal 8/1/17-18 | 8/1/2017 | 7/31/2018 | 12 | 5 | 7 $ | 116.25 | $ 581.25 | $ 813.75 | $ 1,395.00 |
| 3/25/2017 | Presteligence | $2,520.00 | NewsXtreme & 1-Micro Rip 24-7 Cover 4/18/17 to 4/17/18 | 4/8/2017 | 4/7/2017 | 12 | 8 | 4 $ | 210.00 | $ 1,680.00 | $ 840.00 | $ 2,520.00 |
| 5/1/2017 | ProData | $380.00 | SQL maintenance 7/1/17 - 6/30/18 | 7/1/2017 | 6/30/2018 | 12 | 6 | 6 $ | 31.67 | $ 190.00 | $ 190.00 | $ 380.00 |
| 12/1/2017 | Software Consulting Services | $3,302.40 | Layout 8000 Software Maintenance 2018 | 12/1/2018 | 2/31/2018 | 12 | 12 | 0 $ | 275.20 | $ 3,302.40 | $   - | $ 3,302.40 |
| 5/8/2017 | Thunderstone Software | $1 614.00 | Texis Library maintenance 6/24/13 - 6/23/14 | 6/24/2017 | 6/23/2018 | 12 | 6 | 6 $ | 134.50 | $ 807.00 | $ 807.00 | $ 1,614.00 |
| 12/1/2018 | Dell | $1,744.00 | Dell Sonicwall Annual Support | 12/1/2018 | 12/31/2018 | 12 | 12 | 0 | $145.33 | $1,744.00 | $0.00 | $1,744.00 |
| 9/26/2014 | United Bankcard | $12,635.00 | Softmart:2yr Symantec AV renewal-All Departments | 11/4/2018 | 11/4/2020 | 24 | 2 | 22 $ | 526.46 | $ 1,052.92 | $ 11,582.08 | $ 4,211.67 |
| 5/8/17 | Electronic Storage - LASERVAULT | $ 2,700.00 | LaserVault 1 year | 8/26/2017 | 8/31/2018 | 12 | 0 | 0 $ | 540.00 | $   - | $   - | $ 900.00 |
| 1/1/2015 | United - Adobe Monthly Fees | $ 10,678.20 | Adobe CC Monthly - 11 CC 3 Photoshop CC 1 Indesign CC $889.85/monthly 11 CC 3 Photoshop CC 1 Indesign CC | 1/1/2018 | 12/31/2018 | 12 | | | | | | $ 4,318.80 |
| 9/11/2017 | ONEVISION,INC. | $ 12,924.00 | Azura - Prepress (2-Copies) | 10/1/2018 | 9/30/2018 | 12 | 3 | 9 $ | 1,077.00 | $ 3,231.00 | $ 9,693.00 | $ 12,924.00 |
| 3/25/2017 | SOUTHERN LITHOPLATE | $ 5,500.00 | | 5/1/2018 | 4/30/2019 | 12 | 8 | 4 $ | 458.33 | $ 3,666.67 | $ 1,833.33 | $ 5,500.00 |
| **$140,648.73** | | | | | | | | | | $37,242.61 | $99,705.65 | $126,872.00 |
| | | | | | | | | | | $136,948.26 USED | | |

| | | 2018 Prepaid Expense | $ 121,371.96 | Prepaid Expense for 2018 - Planned | | 2018 Prepaid Expenses | |
|---|---|---|---|---|---|---|---|
| 1 | PREPAID EXPENSE | $ 10,572.67 | | | | PREPAID EXPEN | $ 10,572.67 |
| 2 | PREPAID EXPENSE | $ 10,572.67 | | | | PREPAID EXPEN | $ 10,572.67 |
| 3 | PREPAID EXPENSE | $ 10,572.67 | | | | PREPAID EXPEN | $ 10,572.67 |
| 4 | PREPAID EXPENSE | $ 10,572.67 | | | | PREPAID EXPEN | $ 10,572.67 |
| 5 | PREPAID EXPENSE | $ 10,572.67 | | | | PREPAID EXPEN | $ 10,572.67 |
| 6 | PREPAID EXPENSE | $ 10,572.67 | | | | PREPAID EXPEN | $ 10,572.67 |
| 7 | PREPAID EXPENSE | $ 10,572.67 | | | | PREPAID EXPEN | $ 10,572.67 |
| 8 | PREPAID EXPENSE | $ 10,572.67 | | | | PREPAID EXPEN | $ 10,572.67 |
| 9 | PREPAID EXPENSE | $ 10,572.67 | | | | PREPAID EXPEN | $ 10,572.67 |
| 10 | PREPAID EXPENSE | $ 10,572.67 | | | | PREPAID EXPEN | $ 10,572.67 |
| 11 | PREPAID EXPENSE | $ 10,572.67 | | | | PREPAID EXPEN | $ 10,572.67 |
| | To adjust PPD Main | $ | | | | To adjust PPD | $   - |
| 12 | PREPAID EXPENSE | $ 10,572.67 | | | | PREPAID EXPEN | $ 10,572.67 |
| | Misc. A/P Accruals | $   - | | | | Misc. A/P Accr | $   - |
| | | | | | | | $ 126,872.00 |
| | | | | | | | $ 10,572.67 |
| | | | | | | | $ 10,572.67 |

<u>Schedule 4.6(c)</u>

Intellectual Property Exceptions

None

<u>Schedule 4.8(a)</u>

Employee Benefit Plans

1.      Medical Plan – Highmark Blue Cross Blue Shield West Virginia

2.      Dental Plan – Guardian, Delta Dental PPO, Preferred Provider Network

3.      Vision Plan – Guardian, Davis Vision Network

4.      Disability – Guardian Life Insurance Company of America

5.      Life – Guardian Life Insurance Company of America

6.      401(k) Plan - no employer match.

Summaries, Premium Structure and Coverages available on request.

Vacation Policy available on request.

None of the Employee Benefit Plans are to be assumed by Purchaser except for the Employee Obligations (as defined in the Agreement), and the obligation of Purchaser to provide COBRA coverage as provided in Section 8.2(g)..

Schedule 4.10

Litigation

1.    MediaNews Group, Inc., et al., Plaintiffs, v. Daily Gazette Company, et al, Defendants, Civil Action No. 2:17-cv-03921 pending in the United States District Court for the Southern District of West Virginia, Charleston Division

2.    The following age discrimination cases pending in the Circuit Court of Kanawha County, West Virginia:

     a.    Dunbar vs Daily Gazette Company and Daily Gazette Publishing Company LLC d/b/a Charleston Newspapers; countersuit filed Charleston Newspapers vs. Dunbar

     b.    Starsick vs Daily Gazette Company and Daily Gazette Publishing Company LLC d/b/a Charleston Newspapers; countersuit filed Charleston Newspapers vs Starsick

     c.    Jarret vs Daily Gazette Company and Daily Gazette Publishing Company LLC d/b/a Charleston Newspapers

<u>Schedule 4.13</u>

Tax Returns

1.    Daily Gazette Company – Taxable Year ending December 31, 2016

      a.    U.S. Federal Income Tax Return for an S Corporation Form 1120S

      b.    West Virginia Income Tax Return Form SPF-100

2.    Charleston Newspapers Holdings, LP – Taxable Year ending December 31, 2016

      a.    U.S. Return of Partnership Income Form 1065

      b.    West Virginia Income/Business Franchise Tax Return Form SPF - 100

3.    G-M Properties – Taxable Year ending December 31, 2016

      a.    U.S. Corporation Income Tax Return Form 1120

      b.    West Virginia Corporation Income Tax Return Form CNF-120

<u>Schedule 4.15</u>

Environmental Compliance Matters

Matters disclosed in the Phase I Environmental Site Assessment dated November 3, 2017, VERTEX Project No: 47362, Prepared by The Vertex Companies, Inc. for Charleston Newspapers, a true, correct, and complete copy of which has been provided to Purchaser.

<u>Schedule 4.17</u>

Consents and Approvals

1.      Consent of Daily Gazette Company Shareholders.

2.      Consent of United Bank.

<u>Schedule 4.20(a)</u>

Two Most Recent Alliance for Audited Media Audit Reports

Delivered to Purchaser.

<u>Schedule 7,2(a)</u>

Required Conduct of Business Pending Closing

1.      Seller may sell, lease, or otherwise dispose of the real estate and the improvements, if any, thereon described at item 1 in <u>Schedule 1.2(m)</u>, and use the proceeds thereof for any purpose it deems appropriate.

<u>Schedule 8.2(g)</u>

Persons Entitled to COBRA as of the Execution Date

Linda Jarrett + Spouse - Medical, Dental, Vision

Jennifer Starsick - Medical and  Dental

Tina Taylor - Vision and Dental

Kent Sowards will be adding COBRA starting February 1, 2018.

<u>Schedule 9.1(d)</u>

Required Consents

1.      The Consents set forth on Schedule 4.17.

<u>Exhibit 2.4</u>

Estimated Working Capital Adjustment Worksheet

Please see attached.

ESTIMATED WORKING CAPITAL ADJUSTMENT WORKSHEET CERTIFICATE

This Estimated Working Capital Adjustment Worksheet (this "Worksheet") is the Estimated Working Capital Adjustment Worksheet referred to in Section 2.4 of the Asset Purchase and Sale Agreement dated as of January 30, 2018 (the "APA") among Charleston Newspapers, Daily Gazette Holding Company LLC, Charleston Newspapers Holdings, LP, Daily Gazette Publishing Company, Daily Gazette Company and G-M Properties, Inc., collectively, as Seller, and Charleston Newspapers, LLC as Purchaser.  Capitalized terms used but not elsewhere defined herein shall have the respective meanings ascribed to such terms in the APA.  This Worksheet is delivered to Purchaser as of _____, 2018 (the "Delivery Date").

| Item | Gross Amount | Multiplier | Net Amount |
|---|---|---|---|
| Current Assets: | | | |
| Accounts Receivable:[1] | | | |
| (a)  current accounts receivable: | $_____ | 96% | $_____ |
| (b)  accounts receivable aged 30 – 59 days: | $_____ | 91% | $_____ |
| (c)  accounts receivable aged 60 – 89 days: | $_____ | 75% | $_____ |
| (d)  accounts receivable 90 days and older | $_____ | 40% | $_____ |
| (e)  Accounts Receivable (sum of (a) + (b) + (c) + (d)): | | | $_____ |
| (f)  Inventory: | | | $_____ |
| (g)  Closing Date Estimated Current Assets Amount ((e) + (f)): | | | $_____ |
| Current Liabilities: | | | |
| (h)  credit balances in Accounts Receivable: | | | $_____ |
| (i)  earned or accrued vacation obligations to Intended Employees: | | | $_____ |
| (j)  earned or accrued sick  or personal days recognized on the balance sheet of Seller to Intended Employees | | | $_____ |
| (k)  Employee Obligations ((i) + (j)): | | | $_____ |
| (l)  Deferred Circulation Liability: | | | $_____ |
| (m)  Closing Date Estimated Current Liabilities Amount (sum of (h) + (k) + (l)): | | | $_____ |

---

[1] Excludes and eliminates the Royal Automotive A/R and all intercompany accounts receivable, loans and advances.

| (n) | Estimated Working Capital Adjustment (sum of ((g) – (m))): | | | $_____ |
|---|---|---|---|---|

The undersigned hereby certifies that this Worksheet has been prepared in good faith by Seller based upon available information as of the Delivery Date.

Charleston Newspapers

By:    _____
Norman W. Shumate, III
President