## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Daily Gazette Company, *et al.*, | ) | Case No. 18-20028 |
| | ) | |
| Debtors. [1] | ) | (Jointly Administered) |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER
## APPROVING KEY EMPLOYEE INCENTIVE PLAN

Daily Gazette Company, and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), hereby move (this "Motion") this Court, pursuant to sections 105(a), 363(b) and 503(c) of title 11 of the United States Code (the "Bankruptcy Code"), for entry of an order, substantially in the form attached hereto as Exhibit A (the "Proposed Order"), approving a key employee incentive plan (the "KEIP"), the terms of which are set forth herein and in Exhibit B attached hereto. In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of Norman W. Shumate III in Support of Chapter 11 Filings and First-Day Motions (the "First-Day Declaration") [Dkt. #2]. In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

---

[1]    The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's taxpayer identification number are as follows: Daily Gazette Company (4480); Daily Gazette Holding Company, LLC (2981); Charleston Newspapers Holdings, L.P. (3028); Daily Gazette Publishing Company, LLC (3074); Charleston Newspapers (6079); and G-M Properties, Inc. (4124). The Debtors' headquarters are located at 1001 Virginia St. E, Charleston, West Virginia 25301.

2.      This is a core proceeding under 28 U.S.C. § 157(b), and the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a), 363(b) and 503(c) of the Bankruptcy Code.

## BACKGROUND

### A.      Chapter 11 Filing and Proposed Asset Sale

5.      On January 30, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are continuing to operate and maintain their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or creditors' committee has been appointed in these Chapter 11 Cases.

6.      The Debtors, headquartered in Charleston, West Virginia, collectively operate privately owned information and entertainment businesses consisting of the flagship newspaper, The Charleston Gazette-Mail, as well as a related website, weekly publications, a saturation mail product and the following verticals: www.wvcarfinder.com; www.wvrealestatefinder.com; www.wvjobfinder.com; and www.gazettemailclassifieds.com.  The Debtors employ, collectively, approximately 210 people, approximately 170 of which are full-time employees and 40 of which are part-timers.

7.      In the past several years, competition from alternative news sources and a general decline in newspaper readership have contributed to a decline in the Debtors' revenue.

Additionally, competition from internet-based advertising alternatives has eroded traditional print media sources of revenue for the Debtors and across the newspaper industry.

8.      In response to declining revenues, the Debtors have worked hard to implement all reasonable measures to minimize operational expenses.  As much as possible, the Debtors have reduced headcount, minimized unprofitable activities, and carefully implemented certain price increases.   The Debtors have also placed a greater emphasis on increasing their digital advertising services to keep pace with the rapidly changing digital marketplace.

9.      Notwithstanding the Debtors' strategic measures to reduce expenses and increase revenues while maintaining the highest quality product that the Charleston region has come to expect, the Debtors have not been able to fully achieve their goals to enable them to continue operating under their current circumstances.  For example, not only have the Debtors been forced to contend with a rapidly changing newspaper environment, but also an arbitration award of nearly $4 million was entered and confirmed against Daily Gazette and DGHC in favor of MediaNews Group, Inc. and Charleston Publishing Company prior to the Petition Date, the Debtors owe more than $12 million to the Pension Benefit Guaranty Corporation in connection with the prepetition termination of Charleston Newspapers' retirement plan, and the Debtors can no longer satisfy their ongoing obligations to their secured lender, United Bank, Inc., to which, as of the Petition Date, the Debtors' owed approximately $15.6 million.

10.      Accordingly, the Debtors have made the decision to sell substantially all of their assets pursuant to section 363 of the Bankruptcy Code (the "Sale").  The Debtors believe that a sale of their assets and operations will maximize the potential return for creditors while ensuring the ongoing viability of their news and information products and the ongoing employment of hundreds of people.   Additional information about the Debtors, including their business

3

operations and the events leading up to the filing of the Chapter 11 Cases, can be found in the First-Day Declaration.

**B.      The Debtors' Need for the KEIP**

11.      The success of the Debtors' Sale, including their ability in the interim to preserve and enhance their cash position and to market their assets appropriately, will determine the level of recovery that the Debtors' stakeholders will ultimately realize.   The most important components of the Debtors' activities during their transition into Chapter 11 and leading up to the Sale are (a) the management of their finances, (b) maintaining business and advertising relationships, and (c) continuing to publish superior news content in an efficient and professional manner and maintaining human capital.   Accordingly, the Debtors have identified nine individuals (the "Key Employees") whose services and efforts are critical to preserving the value of the Debtor's assets and ensuring a successful Sale.   Accordingly, Daily Gazette Company's Board of Directors (the "Board"),[2] with input from the Debtors' advisors, believe that it is essential—and in the best interests of the estates and all creditors and shareholders—to motivate and incentivize the Key Employees to set forth an effort that will achieve the best and highest price for the Debtors' assets.

12.      A successful Sale will require an intensity of effort and performance from the Key Employees that goes well above the ordinary responsibilities of their positions.  It will require the coordinated efforts of the Key Employees to engage in a concerted effort to identify, target and solicit interest in the Debtors' assets from potential purchasers that may assign varying value to some or all of the Debtors' assets and personnel, depending on the integration of the Debtors' business into that of the purchaser following the Sale.  This will in turn require, *inter alia*, intimate knowledge of the current and potential value of the Debtors' relationships with their

---

[2]      None of the Board members are participants in the KEIP.

customers, advertisers, and employees as set against the mercurial news media landscape. It will also require facilitating and conducting an expeditious diligence, auction (if required) and Sale process.

13.     The Key Employees are certain irreplaceable employees of the Debtors that have deep institutional knowledge and experience necessary to achieve a successful Sale. Moreover, the Key Employees' understanding of the Debtors' employees, business processes, operations, industry contacts and relationships with the Debtors' vendors are necessary to minimize the costs of administration and promote a robust marketing and sales process. The Debtors believe the Key Employees have developed relationships and possess knowledge that will be invaluable to further marketing the Debtors' assets, evaluating competing bids, and negotiating a successful Sale.

14.     The KEIP is narrow in scope and covers only the Key Employees who are critical to successful Sale efforts. Indeed, the Stalking Horse APA for the sale of the Debtors' assets requires the Debtors to use commercially reasonable best efforts to retain the services of the Key Employees pending the Sale to preserve and maximize the ongoing enterprise value of the Debtors' business. Accordingly, the Debtors and the Board, in their sound business judgment, have developed the KEIP, and believe that it is important and necessary to quickly implement this incentive plan that would motivate and reward the continued dedication and efforts of the Key Employees.

### THE PROPOSED KEIP

**A.     Key Employee Participant Groups**

15.     The KEIP provides incentive-based cash awards to the Key Employees to provide efforts in maximizing the value received for the Debtors' assets. The most senior executives of the Debtors, Norman W. Shumate III (President and Chief Financial Officer) and Susan Shumate

138253754.1

(Publisher), do not participate in the KEIP.  The Key Employees and their respective job titles

are as follows:

➢ **Michael Moncada, Vice President - Advertising**:

   o Mr. Moncada's primarily focuses on retail and classified sales, metro advertising, marketing and art.  Mr. Moncada is a strategic digital sales and marketing leader with decades of experience in executive and national and internationals sales management, executive regional management, and strategic planning.  Mr. Moncada is invaluable to the Debtors' advertising business, which is a substantial revenue-generator for the business.

➢ **Linda Hennen, Controller**:

   o Ms. Hennen is intimately involved with all daily operations of the Debtors' accounting department.  Ms. Hennen also oversees the Debtors' computer operators, a group that conducts daily operations for circulation and accounting.  Ms. Hennen has more than 20 years of experience in office management, accounts management and bookkeeping with high-volume manufacturers.  Ms. Hennen's skills and resources are necessary to ensure proper accounting and reporting while the Debtors' operate in Chapter 11.

➢ **Joel Armstrong, Director of IT**:

   o Mr. Armstrong has been with the Charleston Gazette-Mail for more than 28 years.  Mr. Armstrong leads the Debtors' internet services department, which includes oversight of all employees under the internet services, computer services and internet technology departments.  Mr. Armstrong's extensive institutional knowledge and resources are critical to the Debtors' as they try to preserve and maximize the value of their business leading up to the Sale.

➢ **Jim Heady, Vice President - Circulation**:

   o Since 2013, Mr. Heady has held leadership roles in both the circulation and advertising departments.  Currently, Mr. Heady focuses exclusively on the Debtors' critical need to maintain, and ideally increase, the Debtors' circulation.  Mr. Heady has over 25 years of experience in circulation and marketing with other news organizations, including the Winnipeg Free Press, Athens Banner-Herald and The Florida Times Union.

➢ **Rob Byers, Executive Editor**:

   o Mr. Byers is the executive editor of the Charleston Gazette-Mail, critically ensuring that only the highest quality news, material and other information is delivered to the Debtors' customers.  Mr. Byers' services are critical to

138253754.1

maintaining the quality of news content that has come to be expected of the Charleston Gazette-Mail and any disruption in his services would directly disrupt the Debtors' ability to produce a quality product to their customers.  In addition, Mr. Byers recently won the award for best news columnist from the West Virginia Press Association.

➤ **Patricia Miller, Editorial Page Editor**:

  o As Editorial Page Editor, Ms. Miller is responsible for editing daily and Sunday papers. Ms. Miller's services are critical to the Debtors' ongoing editorial content and without such services the Debtors' operations would be unnecessarily disrupted, thereby jeopardizing the Debtors' efforts to preserve and maximize the value of their business.

➤ **Eric Eyre, Ken Ward, Phil Kabler, GM's - Newsroom**:

  o Mr. Eyre, Mr. Ward and Mr. Kabler constitute the heart and soul of the Charleston Gazette-Mail's newsroom by ensuring the publication of timely, relevant and informative news.  Indeed, Mr. Eyre—an 18-year veteran of the Charleston Gazette-Mail—recently won a Pulitzer Prize for investigative reporting for his coverage of the opioid crisis in small-town West-Virginia.  He, along with Mr. Ward and Mr. Kabler, are critical to maintaining the integrity and professionalism of the Charleston Gazette-Mail's content.  Absent their contributions to the Debtors' business, content could suffer, thereby reducing circulation and subscriber revenues.

16.     Each of the functions performed by these individuals is critical to ensuring a successful Sale at the best and highest price available.  While the Key Employees are critical to the Debtors' business and daily operations, none of the Key Employees have a controlling interest in the Debtors, can dictate corporate policy or approve of the disposition of corporate assets.  Similarly, none of the Key Employees have any control or authority over setting or paying the salaries of the Debtors' employees, and none of the Key Employees had any input regarding the KEIP or its terms.

**B.     Overview of the KEIP**

17.     Under the KEIP, each Key Employee can earn an incentive-based bonus designed to achieve a successful Sale of the Debtors' business and assets for the best and highest price.  Specifically, under the KEIP, the Key Employees may earn a bonus (the "Transaction Bonus")

7

equal to approximately twenty-five percent (25%) of their yearly salary, for a total bonus pay-out of $151,250. Each Transaction Bonus is earned only upon closing of the Sale and will only be paid from Sale proceeds, upon which United Bank has a lien.[3] Each Transaction Bonus is to be paid upon closing of a Sale to the Key Employees who either (x) remain employed by the Debtors on the date of the closing of the Sale, or (y) are involuntarily terminated without cause, die, or become disabled prior to the closing of such Sale.

18.    On the other hand, in the event no Sale occurs, no payouts will be made under the KEIP. Likewise, if a Key Employee is terminated for "cause" or such Key Employee voluntarily resigns from his or her position for a reason other than a material reduction in such Key Employee's salary, such Key Employee will not be entitled to a Transaction Bonus. As such, the bonus payment under the KEIP is specifically designed to incentivize the Key Employees to go beyond their ordinary job functions and take all necessary steps to ensure that the Debtors' assets will be sold to a purchaser at the best and highest price.

19.    In formulating the KEIP with the input and assistance of their counsel and Dirks Van Essen & Murray, the Board determined that the KEIP must be (a) market-based and (b) performance-linked. The KEIP was ultimately designed to keep the Debtors' Key Employees' total compensation at a market rate and to enhance value in the Debtors' estates. Accordingly, the Key Employees are only eligible to earn incentive payments if the Debtors consummate a successful Sale of their business and assets. Further, the amount of the Transaction Bonus payments is based upon a percentage of each Key Employee's annual base salary and, thus, is tied to the Key Employee's job level and duties.

---

[3]    United Bank has agreed, subject to Court approval, to permit payment of the Transaction Bonuses from its collateral, *i.e.*, the proceeds of Sale.

## RELIEF REQUESTED

20.     By this Motion, the Debtors seek entry of an order, pursuant to sections 105(a), 363(b) and 503(c)(3) of the Bankruptcy Code, and in substantially the form attached hereto as Exhibit A, authorizing the Debtors to implement the KEIP, and thereby motivate the Key Employees instrumental to the success of a Sale.

## BASIS FOR RELIEF REQUESTED

### A.     Implementing the KEIP is a Sound Exercise of the Debtor's Business Judgment

21.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).  To approve the use of estate property outside the ordinary course of business under Section 363(b)(1), a debtor must show that the decision to use the property was based on the debtor's sound business judgment. *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (citing *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (finding that "a judge determining a 363(b) application [must] expressly find from the evidence presented . . . at the hearing a good business reason to grant such application")); *In re Gordon Props., LLC*, 504 B.R. 415, 419 (Bankr. E.D. Va. 2013).

22.     A debtor's showing of a sound business justification need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *See Lionel Corp.*, 722 F.2d at 1071; *see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 155 (Bankr. D. Del. 1999) (finding that an employee incentive and

138253754.1

severance program satisfied the business judgment standard because stabilizing attrition and increasing morale were necessary to a successful restructuring).

23.     Once the debtor has articulated a valid business purpose, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief that the action was in the best interest of the company.  *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992).  To that end, courts are cautious not to substitute their own business judgment for the debtor's judgment. *See, e.g., Chaney v. Official Comm. of Unsecured Creditors (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 410-11 (S.D.N.Y. 1997).

24.     In the context of applying the business judgment standard to the approval of a debtor's key employee incentive plan, bankruptcy courts have considered the following non-exhaustive factors:

- Is the plan calculated to achieve the desired performance?

- Is the cost of the plan reasonable in the context of the debtor's assets and liabilities?

- Is the scope of the plan fair and reasonable, *i.e.*, does it apply to all employees or discriminate unfairly?

- Is the plan consistent with industry standards?

- What process did the debtor use to investigate the need for a plan and determine which employees need to be motivated?

- Did the debtor receive independent counsel in performing due diligence and creating and authorizing the incentive compensation?

*See In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006) ("Dana II"); *see also In re Alpha Natural Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) (listing factors); *In re Global Homes Prods.*, LLC, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (same).  In this case, the

Debtors and the Board believe that the proposed KEIP satisfies the requirements of the business judgment standard and conforms to the prevailing practices.

(i)      _The KEIP Is Calculated to Achieve a Desired Performance_

25.      The KEIP is designed to incentivize the Key Employees to create a robust and value-producing bidding and Sale process.  Key Employees will only receive the Transaction Bonus if a successful Sale is consummated and the current structure of the Stalking Horse APA requires the Debtors to use their commercially reasonable best efforts to retain the Key Employees pending a Sale, thereby emphasizing the critical nature of the Key Employees and their ongoing contributions to the Debtors' business.  Thus, the Key Employees will be incentivized to perform at their maximum capacity to consummate a Sale that will be in the best interests of the Debtors' estates.

26.      Here, the proposed KEIP provides necessary incentives to motivate the Key Employees to undertake every possible effort to ensure a Sale is consummated that achieves the highest and best price for the Debtors' assets and the greatest returns to stakeholders.  Given the volatility of the Debtors' industry, the value of the Debtors' relationships with their customers, employees, and other human resources, and the range of value that the Debtors might receive from potential purchasers depending on their respective aims and existing capabilities, a successful Sale will require substantial effort, time and energy from the Key Employees—going well above their normal job functions.

27.      The Debtors believe that the KEIP is a targeted incentive program designed to provide the appropriate incentives for the Key Employees to perform at their highest levels in light of the tasks ahead of them.  The activities and efforts required of the Key Employees will most certainly require them "to do more" by, among other things, negotiating with customers and

11

creditors and optimizing their contributions to assist with the consummation of a Sale. *See In re*

*Borders Group, Inc.*, 453 B.R. 459, 472 (Bankr. S.D.N.Y. 2011).

(ii)    *The Cost of the KEIP is Reasonable*

28.    The KEIP provides these incentives at a cost that is reasonable in the context of

the Debtors' total assets and liabilities and the purchase price submitted by the Stalking Horse

Bidder for the Debtors' business and assets.  Indeed, the Transaction Bonuses, if paid in full,

represent only approximately 1.4% of the total purchase price under the Stalking Horse APA.

Moreover, as set forth above, the Transaction Bonuses will be paid solely from the proceeds of

the Sale, which represents United Bank's collateral.

(iii)    The KEIP is Fair and Reasonable in Scope, Consistent with Industry
Standards, and was Properly Investigated by the Debtors and the Board

29.    The KEIP is also fair and reasonable in scope.  The KEIP is conservative in

nature, focusing only on the remaining Key Employees whose knowledge, leadership and active

participation is indispensable to achieving a successful Sale.  The Debtors' and Board's

investigation also revealed that incentive plans similar to the KEIP are common in the newspaper

industry, as it is critical for continuity of operations leading up to and directly following a sale.

The Debtors further engaged in appropriate efforts in connection with considering the need for a

KEIP and the potential structures of a KEIP.  The Debtors specifically focused on incentivizing a

limited number of Key Employees (not including the most senior executives) absolutely

necessary to the success of the business and the Sale.  Moreover, the Debtors' professionals,

including their legal and restructuring professionals, and Dirks, Van Essen & Murray (the

leading merger and acquisition firm in the U.S. newspaper industry), advised and assisted the

Debtors in designing the KEIP based on market standards.  Accordingly, in the exercise of their

business judgment, the Debtors properly investigated the need for, and the proper scope of, a KEIP in accordance with advice and counsel from qualified independent advisors.

30.     In light of the foregoing, the Debtors believe that the incentives created by the KEIP are reasonable and appropriate, and approval of the KEIP will motivate the Key Employees, thereby ensuring that value for all parties in interest is maximized.  Absent the KEIP, the Key Employees may not go above and beyond to maintain and maximize the value of the Debtors' business and assets, thereby jeopardizing the Sale and chilling any further bidding on the Debtors' business and assets.  Therefore, the Debtors respectfully submit that the decision to adopt the KEIP is a sound exercise of their business judgment and a proper use of its resources under Section 363 of the Bankruptcy Code.

**B.      Section 503(c) is Satisfied Because the KEIP is not a Retention or Severance Plan, Meets the "Business Judgment" Standard and is Justified by the Facts and Circumstances of These Cases**

31.     Section 503(c) of the Bankruptcy Code provides criteria for courts to use in approving certain types of payments to insiders and "other transfers or obligations that are outside the ordinary course of business." Section 503(c) is comprised of three elements: (a) a general prohibition of retention plans; (b) limitations on severance payments; and (c) standards governing other transfers to managers.  For reasons set forth herein, the KEIP does not implicate any of the limitations set forth in section 503(c) of the Bankruptcy Code.

(i)      *Sections 503(c)(1) and 503(c)(2) Do Not Bar the KEIP*

32.     By its plain language, section 503(c)(1) pertains solely to retention plans and section 503(c)(2) addresses the requirements only for severance plans.  Neither provision applies to performance or incentive-based plans.  While sections 503(c)(1) and 503(c)(2) may prohibit, for insiders, "retention" plans and "severance" payments, respectively, nothing in section 503(c) precludes a chapter 11 debtor from offering reasonable compensation or incentives to key

13

employees, including insiders, for their contributions to a debtor's organization.   Indeed, the

KEIP was designed to avoid the limitations expressed in section 503(c)(1)-(2).  That is, the KEIP

does not provide for severance payments and does not include payments to "insiders."   Even if

the KEIP is construed as a "retention" plan, it is still permissible because none of the Key

Employees are directors of the Debtors; nor do any of the Key Employees exert sufficient control

over the Debtors' business and affairs to render them "officers."

33.      Insiders include, among other individuals, directors, officers and persons "in

control" of the debtor.  11 U.S.C. § 101(31(B).  The determination of whether one is an insider

"can . . . be determined on a case-by-case basis based on the totality of the circumstances,

including the degree of an individual's involvement in a debtor's affairs." *Borders Group*, 453

B.R. at 469.  In that regard, labels are not dispositive in determining whether an employee is an

"insider."  Indeed, "[t]he label an employer chooses to attach to a position is not dispositive for

purposes of insider analysis." *In re Global Aviation Holdings Inc.*, 478 B.R. 142, 148 (Bankr.

E.D.N.Y. 2012).  Rather, "insiders must have 'at least a controlling interest in the debtor or . . .

exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and

the disposition of corporate assets.'" *Borders Group*, 453 B.R. at 469.  As set forth above,

notwithstanding any title given to the Key Employees, none of them have a "controlling interest"

in any of the Debtors.  Nor do any of the Key Employees possess the authority necessary to

dictate the Debtors' corporate policy or dispose of any of the Debtors' assets.  Moreover, none of

the Key Employees has any control over their own salaries or the salaries of any of the Debtors'

other employees.  Further, none of the Key Employees participated in the implementation or

approval of the KEIP.  Accordingly, none of the Key Employees is an "insider" of the Debtors.

14

34.     Moreover, while it is true that the KEIP may encourage the Key Employees to remain with the company, that, in and of itself, does not convert the KEIP into a "retention" plan. *See United Mine Workers of Am. 1974 Pension Plan & Trust v. Alpha Natural Res., Inc.*, 553 B.R. 556, 559 (E.D. Va. 2016) (stating that "a legitimate incentive plan may still have some retentive effect").  In fact, all successful incentive plans have the indirect benefit of incentivizing an employee to remain with the company. *See In re Global Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (finding that the proposed incentive plans were "primarily incentivizing and only coincidentally retentive" and noting "[t]he fact . . . that all compensation has a retention element does not reduce the Court's conviction" that Debtors' primary goal in approving the incentive plans was "to create value by motivating performance").  This benefit, however, does not detract from the primary purpose of the KEIP, which is to provide motivation to the Key Employees to maximize business performance and motivate the workforce to consummate a Sale for the benefit of creditors and stakeholders.

   (ii) *The Requirements of 503(c)(3) Are Satisfied, as Approval of The KEIP Within the Sound Business Judgment of the Debtors and Justified Under the Facts and Circumstances of This Case*

35.     Section 503(c)(3) precludes payment as an administrative expense of "other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3).  This section poses no impediment to the KEIP.  The standard for approval under that section—the "business judgment" standard—is essentially the same as the standard for similar transactions under section 363(b)(1) of the Bankruptcy Code. *See Alpha Natural Res.*, 546 B.R. at 356 (stating that "[t]he Court of Appeals for the Fourth Circuit has not elaborated on the 'facts and circumstances' standard under § 503(c)(3).  However, a majority of courts outside the Fourth Circuit agree that the 'facts and circumstances' test of § 503(c)(3) is identical to the business judgment test under § 363(b)(1).").

As discussed above, because the Debtors have employed proper business judgment in seeking authorization for the KEIP, which is fair and reasonable, payments pursuant to the KEIP should be permitted under Section 503(c)(3) of the Bankruptcy Code.  It is essential that the Key Employees be assured that the KEIP will be approved.  Otherwise, they may leave the Debtors for alternative employment at a time that is critical for the Debtors to operate optimally to maximize the value of their assets and business.

36.     Thus, as discussed above, the Debtors believe the KEIP satisfies the requirements under Section 363(b)(1) and, as such, respectfully submit that the KEIP meets the business judgment standard, is fair and reasonable under the circumstances of these Chapter 11 Cases and does not run afoul of section 503(c)(3).

WHEREFORE, the Debtors respectfully request entry of the Proposed Order, substantially in the form attached hereto as Exhibit A, granting the relief requested herein and such other and further relief as is just.

Dated:  February 9, 2018

**PERKINS COIE LLP**

By: /s/ Brian A. Audette
Brian A. Audette (IL Bar No. 6277056)
(Admitted Pro Hac Vice)
131 S. Dearborn St., Suite 1700
Chicago, IL 60603
Telephone: 312.324.8534
baudette@perkinscoie.com

-and-
Joe M. Supple, Bar. No. 8013
SUPPLE LAW OFFICE, PLLC
801 Viand St.
Point Pleasant, WV 25550
Telephone: 304.675.6249
joe.supple@supplelaw.net

*Proposed Counsel to the Debtors and Debtors in Possession*

16

# **<u>EXHIBIT A</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Daily Gazette Company, *et al.*, | ) | Case No. 18-20028 |
| | ) | |
| Debtors. [1] | ) | (Jointly Administered) |

## **ORDER APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for entry of an order, pursuant to sections 105(a), 363(b) and 503(c) of the Bankruptcy Code, approving the Debtors' Key Employee Incentive Plan (the "KEIP"), a copy of which is attached to the Motion as Exhibit B; and upon the record of the hearing on the Motion, if any; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court being able to issue a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this District is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been given under the circumstances; and it appearing that no other or further notice of the Motion is required; and this Court having found that good and sufficient cause exists for the relief granted by this Order, it is hereby

---

[1]    The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's taxpayer identification number are as follows: Daily Gazette Company (4480); Daily Gazette Holding Company, LLC (2981); Charleston Newspapers Holdings, L.P. (3028); Daily Gazette Publishing Company, LLC (3074); Charleston Newspapers (6079); and G-M Properties, Inc. (4124).  The Debtors' headquarters are located at 1001 Virginia St. E, Charleston, West Virginia 25301.

[2]    Capitalized terms used in this Order but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      The Debtors KEIP, in the form attached to the Motion as Exhibit B, is approved in all respects.

3.      The Debtors are authorized to pay the Key Employees the incentive payments earned under the KEIP in accordance with the terms and conditions of the KEIP.

4.      All payments made pursuant to this Order constitute transfers and obligations permitted by 11 U.S.C. § 503(c)(3).

5.      Nothing in the Motion or this Order, nor as a result of the Debtors' payment of any obligation pursuant to this Order, shall be deemed or construed as an admission as to the validity or priority of any claim against the Debtors or an approval or assumption of any employment or insurance agreement pursuant to 11 U.S.C. § 365.

6.      The notice of the relief requested in the Motion satisfies Bankruptcy Rule 6004(a) and, pursuant to Bankruptcy Rule 6004(h), the terms and provisions of this Order shall be immediately effective and enforceable upon its entry.

7.      The Debtors are authorized to take all steps necessary or appropriate to carry out the terms of this Order.

8.      This Court shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Order.

138257748.1

# <u>EXHIBIT B</u>

**CHARLESTON NEWSPAPERS**
**KEY EMPLOYEE INCENTIVE PLAN**
**JANUARY 29, 2018**

Section 1.  *Purpose*.  The purpose of this Key Employee Incentive Plan (the "**Plan**"), to be implemented only upon a final order entered by the United States Bankruptcy Court for the Southern District of West Virginia (such implementation date, the "**Effective Date**"), is to promote the interests of Daily Gazette Company, Daily Gazette Holding Company, LLC, Charleston Newspapers Holdings, L.P., Daily Gazette Publishing Company, LLC, Charleston Newspapers, and G-M Properties, Inc. (together and notwithstanding legal and actual separateness, the "**Company**") by providing incentives to key personnel of the Company to make extraordinary efforts to execute the strategic objectives of the Company by means most beneficial to the Company, its creditors and other stakeholders.

Section 2.  *Definitions*.  As used in this Plan, the following terms shall have the meanings indicated.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*.

"**Board**" means the Board of Directors of Daily Gazette Company.

"**Bonus**" means the cash amount that becomes payable to a Participant upon the occurrence of a Sale Transaction.

"**Cause**" means the occurrence of any of the following with respect to a Participant, if such occurrence is confirmed by a finding of the Board:

(a)     any material act of fraud or embezzlement by the Participant in connection with the Participant's responsibilities as an employee;

(b)     the Participant's intentional and material falsification of any employment or Company records;

(c)     the Participant's improper disclosure of the Company's confidential or proprietary information or material breach of any confidentiality or assignment and invention agreement with the Company;

(d)     any act of gross misconduct by the Participant that has or is reasonably expected to have a material detrimental effect on the Company's reputation or business;

(e)     the Participant's consistent or gross inattention, as documented in writing by the Board on an ongoing basis, to the essential functions of the position; or

(f)     the Participant's being convicted of a felony.

"**Disability**" means "permanent and total disability" as defined in Section 22(e)(3) of the Internal Revenue Code of 1986, as amended from time to time, and the rules, regulations and guidance thereunder.

138004039.1

"**Good Reason**" means, with respect to a Participant, a material reduction in the Participant's then-current base salary.

"**Notice Agreement**" means the written notice provided by the Company pursuant to the consent of the Board to each Participant, which includes a copy of this Plan setting forth the terms of such Participant's eligibility for a Bonus.

"**Participant**" means an individual listed on Annex A.

"**Payment Event**" means the consummation of a Sale Transaction.

"**Sale Transaction**" means any transaction or series of related transactions approved by the Bankruptcy Court that constitute the disposition to one or more third parties (including, without limitation, any person, group of persons, partnership, corporation or other entity, and also including, among others, any of the existing owners or stockholders (in each such case only to the extent there is an additional bona fide third party offer), employees, or creditors of the Company and/or the affiliates of each) in one or a series of related transactions of (a) all or substantially all equity interests of the Company and/or (b) all or a majority of the assets or operations of the Company or any joint venture or partnership or other entity formed by it, in either case, including, without limitation, through a sale or exchange of capital stock, options or assets with or without a purchase option, a merger, consolidation or other business combination, an exchange or tender offer, or any similar transaction, including, without limitation, any sale transaction under sections 363, 1129 or any other provision of the Bankruptcy Code.

Section 3.  *Administration*.  This Plan shall be administered by the Board. Subject to the terms of this Plan, the Board shall have full power and authority to make determinations and take any other action that the Board deems necessary or desirable for the administration of this Plan.

Section 4.  *Bonuses*.

(a)      *Payment of Bonuses*.  Subject to the conditions set forth in Sections 4(c) and 6, each Participant shall receive a Bonus in cash from the Company if (i) a Payment Event occurs and (ii) such Participant remains employed by the Company as of the occurrence of such Payment Event.  The amount of such Bonus shall be in the amount(s) set forth on Annex A.  Each Bonus shall be paid on or within ten business days after the occurrence of such Payment Event.

(b)      *Effect of Involuntary Termination*.  If before the occurrence of a Payment Event, (i) a Participant's employment is terminated by the Company without Cause, (ii) a Participant's employment is terminated due to a resignation for Good Reason or (iii) a Participant dies or becomes Disabled while an employee of the Company, then on or within ten business days after such Payment Event occurs, such Participant shall be entitled to receive the Bonus to which such Participant would otherwise have been entitled if such Participant had remained employed with the Company through the occurrence of such Payment Event.

(c)      *Effect of Other Termination*.  If before a Payment Event, (i) a Participant's employment is terminated by the Company for Cause or (ii) a Participant resigns from his or her position with the Company in circumstances that do not constitute Good Reason, such Participant shall not be eligible to receive a Bonus.

- 2 -

(d)     *No Redistribution of Forfeited Bonuses*.  In the event that a Participant is not entitled for any reason to receive a Bonus under this Plan (including due to a forfeiture under Section 4(c)), the portion of the Bonus that would have been received by such Participant shall be forfeited and shall not be redistributed to the other Participants.

Section 5.  *One-Time Bonus*.  Any Bonus paid hereunder is a one-time, special bonus and shall not be included for purposes of computing or determining any Participant's compensation under any retirement or benefit plans of the Company.

Section 6.  *Conditions for Receipt of Bonus*.  Subject to Section 4(c), the receipt of any Bonus hereunder shall be subject to the obligation of the Participant from the date hereof until the occurrence of a Payment Event to affirmatively assist the Board and the Company, and their advisors and affiliates, in the successful completion of the Payment Event contemplated hereby.

Section 7.  *Return of Property*.  If a Participant's employment with the Company is terminated for any reason, such Participant will surrender to the Company all memoranda, books, papers, plans, information, letters and other data of the Company, and all copies thereof or therefrom, and all other property belonging to or in any way relating to the business of the Company.

Section 8.  *Miscellaneous*.

(a)     *Governing Law*.  This Plan and the Notice Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of West Virginia, without reference to principles of conflict of laws.

(b)     *Entire Agreement; Amendments*.  This Plan and the Notice Agreement set forth the entire agreement with respect to the Bonuses described herein and supersede all prior agreements or other arrangements or communications with respect to such matters and any other performance-based bonuses.  The Board may amend, alter, suspend, discontinue, or terminate the Plan or any portion thereof at any time; *provided*, *however*, that the Board may not, without consent of the applicable Participant, waive, amend, alter or suspend the terms of the Plan to adversely affect any Participant after the Participant has been selected by the Board for participation in the Plan and notified of such participation pursuant to a Notice Agreement, except as otherwise set forth in the Plan.

(c)     *No Waiver*.  The failure of the Company or any Participant to insist upon strict adherence to any term of this Plan on any occasion shall not be considered a waiver of such party's rights or deprive such party of the right thereafter to insist upon strict adherence to that term or any other term of this Plan.

(d)     *Severability*.  In the event that any one or more of the provisions of this Plan shall be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions of this Plan outstanding shall not be affected thereby.

(e)     *Successors; Binding Agreement*.  This Plan shall inure to the benefit of and be binding upon the personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees of the Company and the Participants, except that under no

circumstances shall the buyer in any Sale Transaction be considered a successor of the Company or otherwise incur liability under this Plan as a result of the Sale Transaction.

(f)     *Notice*.  For the purpose of this Plan, notices and all other communications provided for in this Plan shall be in writing and shall be deemed to have been duly given when delivered or mailed by United States registered mail, return receipt requested, postage prepaid, addressed to: (i) the Company at 1001 Virginia St. E, Charleston, West Virginia 25301, Attention: Board of Directors; (ii) counsel to the Company at Perkins Coie LLP, 131 S. Dearborn St., Ste. 1700, Chicago, Illinois 60603 (Attn: Brian A. Audette, Esq.); and to (iii) a Participant at the address of such Participant as set forth on the Participant's Form W-2 with respect to the Company, or to such other address or counsel as either party may have furnished to the other in writing in accordance herewith, except that notice of change of address shall be effective only upon receipt.

(g)     *Withholding Taxes*.  The Company may withhold from any amounts payable under this Plan such U.S. federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

(h)     *No Rights Other Than Those Expressly Created*.  Neither this Plan nor any action taken hereunder shall be construed as (i) giving a Participant any right to be retained as an employee of, or continue to be affiliated with, the Company, or otherwise (ii) creating a trust of any kind or a fiduciary relationship of any kind between the Participant and the Company.

(i)     *Term of Plan*.  This Plan shall remain in effect from the date hereof until the occurrence of a Payment Event, and the provisions of Section 7 and Section 8 hereof shall survive any termination of this Plan.

Annex A

| Participant | Bonus |
|---|---|
| Michael Moncada | $25,000 |
| James Heady | $25,000 |
| Patricia Miller | $12,500 |
| Joel Armstrong | $18,125 |
| Linda Hennen | $18,000 |
| Robert Byers | $16,875 |
| Eric Eyre | $12,000 |
| Kenneth Ward | $11,875 |
| Philip Kabler | $11,875 |