# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Daily Gazette Company, *et al.*, | ) | Case No. 18-20028 |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |

## SUPPLEMENTAL DECLARATION OF NORMAN W. SHUMATE III IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING KEY EMPLOYEE INCENTIVE PLAN

I, Norman W. Shumate III, declare as follows:

1. I offer this Declaration in support of *Debtors' Motion for Entry of an Order Approving Key Employee Incentive Plan* [Dkt. #67] (the "Motion"),[2] which I incorporate by reference. I am the President and Chief Financial Officer of Debtor Charleston Newspapers. I have held the position of Chief Financial Officer since 2004, and I have held the title of President since 2013. I am also the Vice President of Debtor Daily Gazette Company and have held that title since 2000. I am authorized to submit this Declaration in support of the Motion.

2. The only Key Employees who hold titles customarily associated with officers are (a) James Heady, Vice President of Audience Development (Circulation), and (b) Michael Moncada, Vice President of Advertising. While both Mr. Heady and Mr. Moncada have input regarding the preparation of Charleston Newspapers' yearly budget with respect to their respective departments, neither has the authority to establish or finalize the budget or make changes to such budget, as all such authority is vested in myself. Further, neither Mr. Heady,

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's taxpayer identification number are as follows: Daily Gazette Company (4480); Daily Gazette Holding Company, LLC (2981); Charleston Newspapers Holdings, L.P. (3028); Daily Gazette Publishing Company, LLC (3074); Charleston Newspapers (6079); and G-M Properties, Inc. (4124). The Debtors' headquarters are located at 1001 Virginia St. E, Charleston, West Virginia 25301.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1

Mr. Moncada nor any of the other Key Employees had any input, authority, control or vote in any way relating to the KEIP.

3. None of the Key Employees' respective positions with Charleston Newspapers is provided for in any of the Debtors' by-laws, articles of organization, articles of incorporation, operating agreements, partnership agreements or other corporate organization documents.

4. None of the Key Employees is elected by any board of directors, board of managers, general partners, and/or managing members of any of the Debtors.

5. None of the Key Employees is: (a) a member, partner, or shareholders of any of the Debtors; (b) an equity holder of any of the Debtors; or (c) a relative of (i) mine, (ii) any member of any of the Debtors' boards of directors or managers or (ii) any insider of the Debtors.

6. The Key Employees each oversee their respective departments in connection with the operation of the Debtors' business and they are each critical to the sustained operation of such departments, which, in turn, renders them critical to the overall operation of the Debtors' core business. The Key Employees were selected for participation in the KEIP because: (a) they have the highest likelihood to leave for alternative employment given their extensive experience and expertise in their respective roles; (b) their absence would create a hardship to, and in many cases cripple, the Debtors' business; and (c) it would be time consuming and burdensome to find replacements and, even if such replacement was found quickly, he or she would need time to transition into the role, which time the Debtors' cannot afford in light of the pending sale transaction.

7. It is critical for the Debtors to operate optimally at a time when they are trying to solicit additional interest in their assets to facilitate a competitive bidding process and achieve the highest sale price possible. To do so, the Debtors must be able to convey to potential bidders

that their business remains strong, as the alternative could chill interest from prospective purchasers. I believe that the KEIP will incentivize the Key Employees to continue working diligently, which will maintain, if not increase, the value of the Debtors business, thereby generating a sale at the highest price possible.

8. I am informed and believe that similar key employee incentive plans are common in the newspaper industry when an owner is in the process of selling its business. I am also informed and believe that the KEIP described in the Motion is market-based and limited only to that which has been deemed necessary to ensure that the Key Employees are incentivized to continue working at an optimal level pending the successful consummation of a sale. For example, I studied the Key Employee Incentive Plan proposed and approved in *In re Herald Media Holdings, Inc., et al.*, No. 17-12881 (Bankr. D. Del.). In that case, I am informed and believe based upon my review and analysis of publicly available information that three individual key employees are entitled to be paid in the aggregate $185,000 upon the consummation of a going-concern sale transaction—two key employees are each entitled to $70,000 and a third key employee is entitled to $45,000. Here, the aggregate amount of proposed Transaction Bonuses anticipated to be paid to the Key Employees totals $151,250, and no single Key Employee is expected to receive more than $25,000.

9. Absent the KEIP, the Debtors may not be able to generate any additional interest in their business, as such business would be jeopardized if one or more of the Key Employees ceased working. While I and the Daily Gazette Company's Board of Directors would have liked to provide similar incentives to all employees, the Debtors' precarious financial condition and limited access to cash forced the Debtors to limit the plan to only those nine employees who are deemed essential to the viability of the Debtors' day-to-day ongoing business.

10. Finally, as set forth in the Motion, the Stalking Horse APA for the sale of the Debtors' assets requires the Debtors to use commercially reasonable best efforts to retain the services of the Key Employees pending the Sale to preserve and maximize the ongoing enterprise value of the Debtors' business. Moreover, United Bank has consented to the KEIP, which will be paid from United Bank's collateral, *i.e.*, the sale proceeds.

Dated: February 27, 2018

/s/ Norman W. Shumate III
Norman W. Shumate III