**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Daily Gazette Company, *et al.*, | ) | Case No. 18-20028 |
| | ) | (Jointly Administered) |
| Debtors.[1] | ) | |

**FINAL ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION
FINANCING WITH PRIORITY OVER CERTAIN ADMINISTRATIVE EXPENSES
AND SECURED BY LIENS ON PROPERTY OF THE ESTATE PURSUANT TO 11
U.S.C. § 364, (II) AUTHORIZING DEBTORS TO USE CASH COLLATERAL AND
OTHER COLLATERAL AND GRANTING ADEQUATE PROTECTION PURSUANT
TO 11 U.S.C. §§ 361 AND 363, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in

possession (the "Debtors") for the entry of interim and final orders, pursuant to sections 105(a),

361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004

and 9014, and Local Rule 4001-2, (a) authorizing Debtors to obtain and use debtor-in-possession

financing with priority over certain administrative expenses and secured by liens on property of

the Debtors' estates; (b) authorizing the Debtors to use cash collateral and other collateral and

---

[1]     The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's taxpayer
identification number are as follows: Daily Gazette Company (4480); Daily Gazette Holding
Company, LLC (2981); Charleston Newspapers Holdings, L.P. (3028); Daily Gazette Publishing
Company, LLC (3074); Charleston Newspapers (6079); and G-M Properties, Inc. (4124).  The
Debtors' headquarters are located at 1001 Virginia St. E, Charleston, West Virginia 25301.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in
the Motion.

grant adequate protection; (c) modifying the automatic stay to the extent necessary to implement

the terms of the DIP Orders; (d) scheduling a final hearing; and (e) granting related relief; the

Court having entered an interim order granting the Motion on February 1, 2018 [Dkt. #39]; and

upon the record of the hearing on this Motion, if any; and due and proper notice of the Motion

having been given under the circumstances; and this Court having found that good and sufficient

cause exists for the relief granted by this Final Order, and after due deliberation thereon,

### THE COURT HERBY FINDS AND DETERMINES THAT:

1.      On January 30, 2018 (the "Petition Date"), the Debtors each filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code, and the Debtors have continued in

possession of their property and continued to operate and manage their businesses as debtors-in-

possession pursuant to 11 U.S.C. §§ 1107 and 1108.  These cases are being jointly administered.

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and

157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this District

and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief

requested in the Motion are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code,

Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Local Rule 4001-2.

3.      The Debtors are seeking this Court's authorization to (i) obtain post-petition

financing in an amount up to $400,000.00, and (ii) use cash collateral, pursuant to sections 105,

361, 362, 363 and 364(c) and 364(d) of the Bankruptcy Code.

4.      The Debtors' business generally consists of the operation, publishing and printing

of the Charleston Gazette-Mail, including all other operations and business functions relating to

such publication, and the printing of certain third-party publications (the "Business").

5.      The Debtors, either as a principal obligor or guarantor, are each indebted to

United Bank (the "Bank") pursuant that certain Amended and Restated Loan Agreement dated as

- 2 -

of May 18, 2011 (as amended, restated, supplemented or otherwise modified from time to time, the "Bank Loan Agreement"), pursuant to which the Bank made loans and has extended other credit accommodations to one or more of the Debtors (the "Bank Loan"), as evidenced by that certain Consolidated Renewal Promissory Note dated January 28, 2014, payable to the order of the Bank in the principal amount of $20,738,922.22 (the "Bank Note").

6.      The Debtors acknowledge and agree that as of the Petition Date, the principal balance due under the Bank Loan was $15,659,437.09 (the "Pre-Petition Principal Balance").  In addition, the Debtors acknowledge and agree that interest, fees, charges and costs of collection, including attorneys' fees are owed under the Bank Loan (the "Pre-Petition Interest, Fees and Costs").  The Pre-Petition Balance and the Pre-Petition Interest, Fees and Costs are collectively referred to herein as the "Pre-Petition Indebtedness."

7.      The Pre-Petition Indebtedness is secured by all tangible and intangible personal property owned by one or more of the Debtors and used in the Business (collectively, the "Personal Property"), pursuant to certain security documents and pledge agreements entered into among one or more of the Debtors and the Bank (as amended, restated, supplemented, or otherwise modified from time to time, collectively, the "Personal Property Security Documents").

8.      The Pre-Petition Indebtedness is further secured pursuant to that certain Amended and Restated Deed of Trust, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing dated May 18, 2011, as amended, restated, supplemented or otherwise modified from time to time (the "Borrower Deed of Trust"), from Charleston Newspapers as grantor, for the benefit of the Bank, granting an interest in certain real property located in Kanawha County, West Virginia (the "Borrower Real Property").

138894080.2

9.     The Pre-Petition Indebtedness is further secured pursuant to that certain Amended and Restated Deed of Trust, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing dated May 18, 2011, as amended, restated, supplemented or otherwise modified from time to time  (the "G-M Deed of Trust"), from G-M Properties, as grantor, for the benefit of the Bank granting an interest in certain real property located in Kanawha County, West Virginia (the "G-M Real Property", and together with the Borrower Real Property, the "Real Property"; the Personal Property and the Real Property are hereinafter collectively referred to as the "Pre-Petition Collateral").   The G-M Deed of Trust and the Borrower Deed of Trust are collectively referred to herein as the "Deeds of Trust."  The Deeds of Trust and the Personal Property Security Documents are collectively referred to herein as the "Pre-Petition Security Documents."   The Pre-Petition Security Documents together with the Bank Loan Agreement, the Bank Note and all other documents executed and delivered by the Debtors in connection with the Bank Loan are hereinafter collectively referred to as the "Pre-Petition Loan Documents."  Any and all security interests and liens on the Pre-Petition Collateral created by the Pre-Petition Loan Documents or otherwise created to secure any obligations of the Debtors to Bank are collectively referred to herein the "Pre-Petition Bank Liens."  The Debtors acknowledge and agree that the Pre-petition Bank Liens constitute valid, binding, enforceable, non-avoidable, and properly perfected liens on the Pre-petition Collateral and remain senior in priority over any and all other liens on the Pre-Petition Collateral.

10.     The Debtors acknowledge and agree they have no valid claims (as such term is defined in § 101(5) of the Bankruptcy Code) or causes of action against the Bank relating to the DIP Loan (defined below), the DIP Loan Agreement (defined below), the Pre-Petition Loan Documents, and/or the transactions contemplated hereunder or thereunder, including the administration thereof and to the extent the Debtors later contend such claims may exist, the

Debtors hereby stipulate and agree that they forever, unconditionally and irrevocably release, discharge and acquit the Bank from such claim.

11.     The Debtors are seeking authorization to obtain post-petition financing in an amount up to $400,000.00.  The Bank has agreed to provide the Debtors with post-petition financing (the "DIP Loan"), as allowed by sections 364(c) and 346(d) of the Bankruptcy Code, in an amount not to exceed $400,000.00  (the "Post-Petition Indebtedness"), upon the terms and conditions set forth in the Post-Petition Loan and Security Agreement and related documents (collectively, the "DIP Loan Agreement"), an executed copy of which is attached hereto as Exhibit A.

12.     The Debtors represent that:  (i) the Debtors are attempting to sell the Business as a going-concern; (ii) an immediate and critical need exists for the Debtors to obtain funds in order to continue the operation of the Business; (iii) without such funds, the Debtors may not be able to pay operating expenses during this sensitive period in a manner that will avoid irreparable harm to the Business and the Debtors' estates; and (iv) at this time, the ability of the Debtors to finance their respective operations and the availability to them of sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money is vital to maintain the Business through the conclusion of the sale process and to preserve going concern value of the Debtors' estates.

13.     The Debtors are unable to obtain the adequate funds in the form of unsecured credit or unsecured debt allowable under § 503(b)(1) of the Bankruptcy Code as an administrative expense pursuant to §§ 364(a) or (b) of the Bankruptcy Code.

14.     The Bank is willing to provide the financing contemplated herein, all on the terms and subject to the conditions set forth in the DIP  Loan Agreement and upon a finding by the Court that such financing is essential to the Debtors' estates and is being provided in good faith,

- 5 -

and that the Bank's superpriority claims and other protections granted pursuant to this Final Order will not be affected by any subsequent renewal or modification of this Final Order or any other order, as provided in § 364(e) of the Bankruptcy Code.

15.     The ability of the Debtors to finance their operations and the availability to the Debtors of sufficient working capital through the incurrence of new indebtedness for borrowed money and other financial accommodations is in the best interests of the Debtors and their creditors and estates.  The financing authorized hereunder is vital to avoid immediate and irreparable harm to the Debtors' estates and to allow the sale of the Business as a going-concern.

16.     The superpriority status of the Post-Petition Indebtedness will not extend to any prepetition claims the Bank may have against the Debtors.

17.     Based on the record before the Court, the DIP Loan has been negotiated in good faith and at arm's length among the Debtors and the Bank, and credit extended and loans made to the Debtors shall be deemed to have been extended, issued, made, or consented to, as the case may be, in good faith within the meaning of § 364(e) of the Bankruptcy Code.

18.     The terms of the DIP Loan Agreement are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

19.     In addition to the DIP Loan, the Debtors have an immediate need to use cash collateral (as defined in § 363(a) of the Code) arising from the Pre-Petition Collateral of the Bank as set forth herein (the "Cash Collateral") to maintain, preserve and protect their assets. Cash on hand as of the Petition Date generated from the Pre-Petition Collateral, post-petition collections of pre-petition receivables and proceeds from the post-petition sale of other Pre-Petition Collateral in which the Bank has an interest may be Cash Collateral.  The Debtors represent that they are without sufficient funds to support the sale of the Business as a going

- 6 -

concern unless Cash Collateral is made available and that the present circumstances require the Debtors to make use of Cash Collateral in order to maintain the estates and conclude the sale process.

20.     Good cause has been shown for the entry of this Final Order. Among other things, entry of this Final Order will preserve and maximize the realizable value of the Debtors' assets, permit the Debtors to maintain, preserve and protect assets and allow the Debtors to go forward with the sale of the Business.

21.     The Debtors, to the best of their knowledge, information and belief, warrant and represent that the Budget, a copy of with is attached as Exhibit A to the DIP Loan Agreement, includes all reasonable, necessary and foreseeable expenses to be incurred in the ordinary course of business in connection with the operations of the Business for the Usage Period (defined below).

22.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law. To the extent any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

A.     Any objections to entry of the relief granted by this Final Order to the extent not otherwise withdrawn are overruled on the merits.

B.     The Debtors shall be, and hereby are, authorized to execute and deliver the DIP Loan Agreement and any related documents, and to perform their respective obligations thereunder in accordance with the terms thereof.

138894080.2

C.      The DIP Loan Agreement constitutes valid, binding obligations of the Debtors, enforceable against the Debtors in accordance with its terms.

D.      The automatic stay in effect pursuant to section 362 of the Bankruptcy Code, be, and it hereby is, vacated and modified so as to permit (i) all payments and applications with respect to the obligations as provided in the DIP Loan Agreement and this Final Order, (ii) the Bank to exercise, upon the occurrence and continuation of an event of default, and the giving of five (5) days' written notice to any Official Committee of Unsecured Creditors appointed in this case, the Office of the United States Trustee and Debtors' counsel, all rights and remedies the Bank has pursuant to the DIP Loan Agreement and under this Final Order; and (iii) the implementation of other provisions of this Final Order.

E.      The Debtors are authorized and directed to take and effect all actions, to execute and deliver all agreements, instruments and documents and to pay all present and future fees, costs, expenses and taxes that may be provided for under or required or necessary for their performance under the DIP Loan Agreement.

F.      The "Carve-Out", as set forth in the Budget, shall be for (i) fees and expenses of professionals retained in these cases by the Debtors, and (ii) claims for the unpaid fees of the United States Trustee or the Clerk of the Court payable pursuant to 28 U.S.C. § 1930(a). Nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in the Carve-Out.  The Carve-Out and disbursements set forth in the Budget shall not be used for the payment of professional fees, disbursements, costs or expenses incurred by any party in interest to assert or prosecute any claims, causes of action or other challenge arising under or related to the DIP Loan Agreement, the Pre-Petition Loan Documents or the Pre-Petition Liens.

138894080.2

G.      The Post-Petition Indebtedness shall constitute, in accordance with section 364(c) of the Bankruptcy Code, claims against the Debtors in their chapter 11 cases which are administrative expense claims having priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code and further, shall constitute a first priority lien in and security interest in all tangible and intangible unencumbered assets of the Debtors (now or hereafter acquired and all proceeds thereof).  The Post-Petition Indebtedness shall, in accordance with section 364(d) of the Bankruptcy Code, be secured by a first priority priming lien on and security interest in all assets of the Debtors, including but not limited to Cash Collateral, but excluding the Tucker County Real Estate.  No costs or administrative expenses which have been or may be incurred in the Debtors' chapter 11 cases, and no priority claims, are or will be prior to or on a parity with the claims of the Bank with respect to the Post-Petition Indebtedness.  No other claim having a priority superior to or *pari passu* with that granted by this Final Order to the Bank shall be granted while any portion of the Post-Petition Indebtedness or the Pre-Petition Indebtedness remains outstanding.

H.      The Debtors may use Cash Collateral and the proceeds of the loans and advances made pursuant to the DIP Loan Agreement only for the purposes specifically set forth in the DIP Loan Agreement and the Budget.

I.      The Post-Petition Indebtedness shall become due and payable as provided in the DIP Loan Agreement.

J.      Nothing contained herein shall limit the rights of the Bank to seek relief from the automatic stay of section 362 of the Bankruptcy Code at any future time.

K.      No failure or delay on the part of the Bank in exercising any right, power or privilege provided for in this Final Order or the DIP Loan Agreement shall operate as a waiver thereof.

138894080.2

L.      Without limiting the rights of access and information afforded the Bank under the DIP Loan Agreement, the Debtors shall permit representatives, agents and/or employees of the Bank to have reasonable access to such entities' premises and their records during normal business hours (without unreasonable interference with the proper operation of the Debtors' businesses) and shall cooperate, consult with, and provide to such persons all such non-privileged information as they may reasonably request.

M.      If any or all of the provisions of this Final Order or the DIP Loan Agreement are hereafter modified, vacated, amended or stayed by subsequent order of this Court or any other court, such modification, vacatur, amendment or stay shall not affect the validity of any obligation to the Bank that is or was incurred prior to the effective date of such modification, vacatur, amendment or stay, or the validity and enforceability of any priority authorized or created by this Final Order or the DIP Loan Agreement and, notwithstanding any such modification, vacatur, amendment or stay, any obligations of the Debtors pursuant to this Final Order or the DIP Loan Agreement arising prior to the effective date of such modification, vacatur, amendment or stay shall be governed in all respects by the original provisions of this Final Order and the DIP Loan Agreement, and the use of Cash Collateral and the validity of any such credit extended pursuant to this Final Order or the DIP Loan Agreement is subject to the protection accorded under § 364(e) of the Bankruptcy Code.

N.      This Final Order shall supersede and govern over the terms of the DIP Loan Agreement, to the extent such terms are inconsistent with this Final Order.

O.      The Debtors shall be and are hereby authorized to use Cash Collateral pursuant to the terms of the Budget through the earliest of (i) the date the Debtors' right to use Cash Collateral terminates in accordance with the terms of this Final Order or (ii) entry of a final order authorizing the use of Cash Collateral (the "Usage Period"). Unless the Bank shall otherwise

138894080.2

agree in writing, the amount of Cash Collateral which Debtors may use on an accrual basis during the Usage Period shall not exceed five percent (10%) of the gross amount included in the Budget and ten percent (10%) of each line item amount in the Budget.  The Debtors shall only be authorized to use Cash Collateral for the actual and necessary expenses of operating the Business pursuant to the Budget, as set forth above.  Unless otherwise authorized by order of the Court, Debtors shall not use Cash Collateral for payment of any pre-petition indebtedness or obligations of, or pre-petition claims against, the Debtors.

P.     As adequate protection, the Bank shall have a continuing lien and security interest in all post-petition assets (the "Post-Petition Collateral"), to the same extent, type and priority as the Bank has in the Pre-Petition Collateral subordinate only to the liens granted to the Bank under the DIP Loan Agreement.  These liens and security interests (the "Post-Petition Security Interests") shall continue to be perfected, enforceable, continuing, choate and effective without the necessity of the Bank taking any other action, including the filing of any additional security documents with respect thereto.  The Bank may, at its option, require the Debtors to execute additional security documents including, UCC financing statements to reflect the Post-Petition Security Interests.  The Post-Petition Security Interests are granted to secure all obligations under the Pre-Petition Indebtedness.

Q.     The Debtors shall provide to the Bank copies of monthly operating reports as filed with the Court and periodic financial information pursuant to the DIP Loan Agreement.

R.     All Cash Collateral shall be deposited in the debtor-in possession accounts which shall be maintained with the Bank, unless otherwise agreed to by the Bank in writing.

S.     The Debtors shall at all times (a) segregate and account for all Cash Collateral that comes into their respective possession, custody or control, and (b) provide the reporting required in the DIP Loan Agreement.

138894080.2

T.      The Debtors shall maintain, keep and preserve the Pre-Petition Collateral and the Post-Petition Collateral in accordance with the terms and provisions of the Pre-Petition Loan Documents and the DIP Loan Agreement and shall provide proof of insurance satisfactory to the Bank upon the Bank's request. In no event shall the Bank be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Pre-Petition Collateral or the Post-Petition Collateral.

U.      Should the Debtors use Cash Collateral or proceeds from the DIP Loan for any purpose not authorized herein, the respective security interests and liens of the Bank granted hereunder shall automatically attach to any assets acquired with such Cash Collateral or loan proceeds.

V.      The Debtors shall not make any payments to insiders (as such term is defined by section 101(31) of the Bankruptcy Code) from Cash Collateral other than the payment of salaries for necessary work actually performed and for reimbursement of reasonable expenses actually incurred provided that the salaries of and reimbursements to any employees, including insiders of the Debtors and the Debtors shall not, unless otherwise ordered by the Court, increase from their pre-petition levels during the term of this Final Order.

W.      Nothing herein shall be deemed to be a consent by the Bank to subordinate its secured claim to the administrative expenses of this bankruptcy proceeding or any superseding proceeding under the Bankruptcy Code, and the Debtors hereby waive their right to surcharge the Bank or any portion of the Pre-Petition or Post-Petition Collateral pursuant to section 506(c) of the Bankruptcy Code.  No costs, expenses, fees or charges incurred by the Debtors or any other party in connection with the preservation or disposition of the Pre-Petition Collateral or the Post-Petition Collateral whether or not incurred in connection with these Chapter 11 Cases shall

138894080.2

be charged to or recovered from the Bank or the Pre-Petition Collateral or Post-Petition Collateral whether pursuant to section 506(c) of the Bankruptcy Code or otherwise.

X.      To the extent that any part of the Cash Collateral is used by the Debtors for purposes not permitted by this Final Order or to the extent that the value of the Pre-Petition Collateral or the Post-Petition Collateral diminishes during the course of this case and in the event the value of the Pre-Petition Collateral and the Post-Petition Collateral is less than the Pre-Petition Indebtedness such that the Bank is undercollateralized, the Bank shall have an allowed claim up to the amount of such deficiency in collateral value (the "Deficiency Amount"), which claim shall have priority over all other administrative expenses allowable under Bankruptcy Code § 507(a)(1) all as contemplated by § 507(b) of the Bankruptcy Code.  The foregoing is without prejudice to any other claim that the Bank may have under § 507(b) of the Bankruptcy Code arising under the circumstances contemplated by § 507(b) of the Bankruptcy Code.

Y.      The full amount of any diminution in value of the Pre-Petition and Post-Petition Collateral up to the Deficiency Amount shall be given priority status under section 364(c)(1) and section 507(b) of the Bankruptcy Code.

Z.      No provision in this Final Order is intended as a waiver, release or modification of obligations of third-party guarantors under any guarantees or of the obligations of the Debtors, nor does the Bank make any representations or agreement whatsoever that it will forbear from enforcing its rights against any non-debtor guarantors.

AA.     Any committee appointed in this case and creditors shall have forty-five (45) days from the date that the Bank files its proof of claim within which to object to the extent, validity, priority or perfection of the liens of the Bank or the claim of the Bank (the "Claim Objection Deadline").

138894080.2

BB.    This Final Order is not intended nor shall it be construed as a waiver or limitation in any way by the Bank of any rights or remedies it may have under the Pre-Petition Loan Documents, the DIP Loan Agreement, the Bankruptcy Code, or other applicable law which it may have against any party except as specifically set forth herein, including but not limited to the right to request additional adequate protection of its interest in the Pre-Petition or Post-Petition Collateral or the collateral granted herein, file a motion for relief from or modification of the automatic stay under section 362 of the Bankruptcy Code, request the appointment of a trustee or examiner or, as permitted under the Bankruptcy Code, propose a Chapter 11 plan or plans and nothing contained herein shall be construed as an indication that the Bank regards itself as being fully and adequately protected.

CC.    The Debtors' authorization to use Cash Collateral and to incur indebtedness under the DIP Loan Agreement pursuant to this Final Order shall remain in effect until the earlier of (i) a default under this Final Order, (ii) maturity under the terms of the DIP Loan Agreement, and (iii) further order of the Court.  The Bank shall have the absolute right to terminate the Debtors' right to use Cash Collateral or terminate the DIP Loan without the necessity of further hearing for (i) the failure of the Debtors to comply with the provisions of this Final Order or the DIP Loan Agreement, (ii) the conversion of these cases from chapter 11 to chapter 7 of the Bankruptcy Code, or (iii) the appointment of a chapter 11 trustee in these cases.  Termination of the right to use Cash Collateral or termination of the DIP Loan is effective upon the forwarding of written notice by electronic mail to counsel for the Debtors and by electronic mail to counsel for the any committee and the Debtors' failure to remedy such noticed default within five (5) days of such written notice.  Upon the termination of the right to use Cash Collateral, the Debtors shall segregate and account for all Cash Collateral in their possession or coming into their possession.

138894080.2

DD.    The Bank shall retain all liens and security interests held by it until the Pre-Petition Indebtedness is paid in full or until entry of an order of the Court, acceptable to the Bank, approving a sale of the Business in which the liens of the Bank shall attach to any proceeds from such sale according to the terms and conditions of any such order approving such sale.

EE.    The provisions of this Final Order shall be binding upon and shall inure to the benefit of the Bank and the Debtors and their respective successors and assigns, including any trustee or other representative hereinafter appointed for the Debtors' estates.

FF.    This Final Order shall take effect and be fully enforceable nunc pro tunc to the Petition Date immediately upon entry hereof, notwithstanding the possible application of Rules 6004(h), 7062, 9014 of the Bankruptcy Rules, or otherwise.

GG.    The Bank or any successor shall not be deemed to be in control of the operations of the Debtors or any affiliate (as defined in § 101(2) of the Bankruptcy Code) of the Debtors, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or any affiliate of the Debtors.

HH.    The Bank shall have the unqualified right to credit bid up to the full amount of its Pre-Petition Indebtedness and Post-Petition Indebtedness in any sale of the Pre-Petition Collateral and the Post-Petition Collateral.  In the event the Bank does not credit bid, the Pre-Petition Lien and the Post-Petition Lien of the Bank shall attach to proceeds of any sale of the Pre-Petition Collateral and the Post-Petition Collateral with the same priority as set forth in this Final Order and the DIP Loan Agreement.

138894080.2

# **EXHIBIT A**

## POST-PETITION LOAN AND SECURITY AGREEMENT

THIS POST-PETITION LOAN AND SECURITY AGREEMENT (the "Agreement") is dated as of February _, 2018, by and among Charleston Newspapers, a West Virginia unincorporated joint venture, Daily Gazette Holding Company, LLC, a Delaware limited liability company, Charleston Newspapers Holdings, L.P., a Delaware limited partnership, Daily Gazette Publishing Company, LLC, a Delaware limited liability company, Daily Gazette Company, a West Virginia corporation and G-M Properties, Inc., a West Virginia corporation, (jointly and severally, the "Borrowers" and, each, a "Borrower"); and United Bank, a Virginia banking corporation f/k/a United Bank, Inc., a West Virginia banking corporation ("Lender").

## RECITALS:

WHEREAS, Borrowers are debtors-in-possession under Chapter 11 of the Bankruptcy Code in cases (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the Southern District of West Virginia (together with any other court having jurisdiction over the Chapter 11 Cases or any proceedings therein from time to time, the "Bankruptcy Court"), as Case Nos. 18-20028, 18-20029, 18-20030, 18-20032, 18-20033, and 18- 20034, as administratively consolidated as Case No. 18- 20028. Borrowers have requested that Lender extend financing to Borrowers in connection with the Chapter 11 Cases in accordance with the provisions of this Agreement.

WHEREAS, Lender is willing to make the Post-Petition Loan to Borrowers, subject to the terms and conditions of this Agreement and subject to the terms and conditions set forth in the orders of the Bankruptcy Court approving the proposed financing.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained and to induce Lender to extend credit to Borrowers, the parties agree as follows:

1.    DEFINITIONS; RELATED TERMS.

1.1    Certain UCC Terms. Any term used in this Agreement or in any financing statement filed in connection herewith which is defined in the UCC and not otherwise defined in this Agreement or in any other Post-Petition Loan Document shall have the meaning given to the term in the UCC.

1.2    Defined Terms. Capitalized terms that are not otherwise defined herein shall have the meanings set forth in this Section 1.2.

"363 Sale Benchmarks" shall mean certain benchmarks related to the sale of all or substantially all of the Borrowers' assets pursuant to Section 363 of the Bankruptcy Code, as set forth in Exhibit B.

"Acceptable 363 Sale" means a sale of all or substantially all of the Borrowers' assets pursuant to Section 363 of the Bankruptcy Code pursuant to the Asset Purchase Agreement or an Alternative Transaction (as defined in the Asset Purchase Agreement), which shall close on or before the Maturity Date.

1

"Administrative Claim" means any Claim of a Person that is entitled in any of the Chapter 11 Cases to priority treatment under section 503(b) of the Bankruptcy Code.

"Advance" means the cash proceeds of the Post-Petition Loan which the Lender advances to, or for the benefit of, Borrowers, as principal disbursement under the Post-Petition Loan, all subject to and in accordance with the provisions of this Agreement.

"Advance Request" means a request for an Advance under the Post-Petition Loan in accordance with Section 2 utilizing such form of request as approved by Lender.

"Agreement" has the meaning given to such term in the preamble hereto.

"Affiliate," means, with respect to any Person, (a) any other Person directly or indirectly owning 5% or more of the Equity Interests of such Person or of which such Person owns 5% or more of such Equity Interests; (b) any other Person controlling, controlled by, or under common control with such Person; (c) any officer, director, or employee of such Person or any Affiliate of such Person; and (d) any family member or Affiliate of such Person.

"Asset Purchase Agreement" means that certain Asset Purchase Agreement between Borrowers, as sellers, and Charleston Newspapers, Inc., as buyer, dated as of January 29, 2018.

"Avoidance Claim" means any claim that could be asserted by or on behalf of the Borrowers or the Estate against a Person under 11 U.S.C. §§ 502(b), 544, 545, 546, 547, 548, 549, 550, 551 or 553.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" shall have the meaning assigned to it in the preamble hereto.

"Borrower" has the meaning given such term in the preamble of this Agreement.

"Borrowers" has the meaning given such term in the preamble of this Agreement.

"Borrowers' Bank Account" means each of those certain Deposit Accounts maintained by Borrowers with Lender, including the Funding Account, the Operating Account and the Collections Accounts, respectively.

"Budget" means a cash flow forecast, in form and substance reasonably acceptable to Lender, projecting Borrowers' cash receipts and disbursements (including the costs of the Chapter 11 Cases), weekly Post-Petition Loan balance and Excess Availability on a weekly basis from the Petition Date through March 31, 2018, a copy of which is attached to the Post-Petition Loan Motion and which is attached hereto as Exhibit A, as such budget may be modified, extended or supplemented from time to time with Lender's prior written consent.

"Business Day" means any weekday on which Lender is open for business in Charleston, West Virginia.

"Cash Collateral" means (a) cash or Cash Equivalents, and any interest earned thereon, that is deposited with Lender as security for the Obligations to the extent provided in the Agreement or (b) any proceeds of the Collateral.

2

"Cash Equivalents" means (i) marketable direct obligations issued or unconditionally guaranteed by the United States government and backed by the full faith and credit of the United States government having maturities of not more than twelve months from the date of acquisition, (ii) domestic certificates of deposit and time deposits having maturities of not more than twelve months from the date of acquisition, bankers' acceptances have maturities of not more than twelve months from the date of acquisition and overnight bank deposits, in each case issued by Lender or any commercial bank organized under the laws of the U.S., any state thereof, or the District of Columbia, which at the time of acquisition are rated A-1 (or better) by S&P or P-1 (or better) by Moody's, and (unless issued by Lender) not subject to offset rights in favor of such bank arising from any banking relationships with such bank, (iii) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clauses (i) and (ii) entered into with Lender or any financial institution meeting the qualifications specified in clause (ii) above; and (iv) commercial paper having at the time of investment therein or a contractual commitment to invest therein a rating of A-1 (or better) by S&P or P-1 (or better) by Moody's, and having a maturity within nine months after the date of acquisition thereof.

"Chapter 11 Cases" shall have the meaning assigned to such term in the Recitals.

"Claim" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.

"Closing Date" means the date on which Lender first makes an Advance under the Post-Petition Loan.

"Collateral" means the following property of each Borrower, wherever located and whether now owned by such Borrower or hereafter acquired, including but not limited to (a) all Real Property (excluding the Tucker County Real Estate); (b) all Inventory; (c) all General Intangibles; (d) all Accounts; (e) all Chattel Paper; (f) all Instruments and Documents and any other instrument or intangible representing payment for goods or services; (g) all Equipment and titled rolling stock; (h) all Deposit Accounts and funds on deposit therein, including but not limited to Borrowers' Bank Accounts, and funds otherwise on deposit with or under the Control of Lender or its agents or correspondents; (i) all Fixtures located at or affixed to the Real Property; and (j) all parts, replacements, substitutions, profits, products, Accessions, cash and non-cash Proceeds, and Supporting Obligations of any of the foregoing (including, but not limited to, insurance proceeds) in any form and wherever located. Collateral also includes (x) all written or electronically recorded books and records relating to any such Collateral and other rights relating thereto and (y) any other real or personal property as to which Lender, at any time of determination, has a Lien to secure the Obligations; provided, however, that "Collateral" shall not include Avoidance Claims and any proceeds of property recovered in connection with the successful prosecution or settlement of Avoidance Claims; provided, further, however that if Borrowers grant or consent to any Lien or security interest in Avoidance Claims or any proceeds of property recovered in connection with the successful prosecution or settlement of Avoidance Claims, then such property will become part of the Collateral automatically and without further action.

"Collections Accounts" means Borrower accounts maintained with Lender with account numbers ending in 1399 and 1445, respectively.

"Commitment Termination Date" means the earliest to occur of (a) the Maturity Date; (b) the sale of all or substantially all of the assets of Borrowers; (c) the date on which the Borrowers terminate this Agreement and the Post-Petition Loan Commitment pursuant to Section 2.11; (d) the date on which

Lender terminates its Post-Petition Loan Commitments pursuant to Section 8.2(a) hereof; (e) the date on which Lender is granted relief from the automatic stay; and (f) the date on which any of the Chapter 11 Cases is dismissed or converted to Chapter 7 of the Bankruptcy Code.

"Committee" means a creditors' or equity security holders' committee appointed in the Chapter 11 Cases by the Office of the U.S. Trustee.

"Contingent Obligation" means, with respect to any Person, any obligation of such Person arising from any guaranty, indemnity, or other assurance of payment or performance of any Debt, lease, dividend or other obligation of any primary obligor in any manner, whether directly or indirectly.

"Control" means, with respect to any asset, right, or property with respect to which a security interest therein is perfected by a secured party's having "control" thereof (whether pursuant to the terms of an agreement or through the existence of certain facts and circumstances), that Lender has "control" of such asset, right, or property in accordance with the terms of Article 9 of the UCC.

"Daily Available Cash" means all amounts over $50,000 in the Operating Account.

"Debt" means, with respect to any Person, all liabilities of such Person as determined under GAAP, irrespective of whether such liabilities are subject to compromise, and all obligations which such Person has guaranteed or indorsed or is otherwise secondarily or jointly liable for, and shall include, without limitation, (a) all obligations for borrowed money or purchased assets; (b) obligations secured by assets whether or not any personal liability exists; (c) the capitalized amount of any capital or finance lease obligations; (d) the unfunded portion of pension or benefit plans or other similar liabilities; (e) obligations as a general partner; (f) Contingent Obligations pursuant to guaranties of obligations that constitute Debt, indorsements (other than indorsements of Instruments in the ordinary course of business for purposes of collection), letters of credit and other secondary liabilities, whether incurred directly, secondarily, or jointly; and (g) obligations for deposits.

"Deeds of Trust" means such deeds or mortgages necessary to give to Lender a Lien with respect to the Mortgaged Real Property.

"Default" means any event or circumstance which, upon satisfaction of any requirement for the giving of notice or the lapse of time would constitute an Event of Default.

"Default Rate" means, as of any date, a rate per annum that is equal to, in the case of the principal amount of the Post-Petition Loan outstanding on such date, 2.00% in excess of the Fixed Rate applicable to the Post-Petition Loan (or portion thereof) on such date.

"Dollars" or "$" means United States dollars.

"Equity Interest" means, with respect to any Person, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interest in (however designated) equity of such Person, including, without limitation, any common stock, preferred stock, limited or general partnership interests, and limited liability company membership interests, whether voting or non-voting.

"ERISA" means the Employee Retirement Income Security Act of 1974.

4

"Estate" means, with respect to each Borrower, the estate created in the Chapter 11 Cases pursuant to 11 U.S.C. § 541(a).

"Event of Default" has the meaning given such term in Section 8.1.

"Excess Availability" means, at any date of determination, the amount by which (a) the Post-Petition Loan Commitment on such date exceeds (b) the Obligations on such date.

"Final Financing Order" means an order which is entered by the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c) on motion by Borrowers that is acceptable to Lender, which order is in form and substance acceptable to Lender in all respects, authorizes the incurrence by Borrowers of post-petition secured and superpriority Debt under the Post-Petition Loan in accordance with the Post-Petition Loan Documents, affords adequate protection in favor of Lender under the Pre-Petition Loan Documents, and has not been vacated, revised, modified, amended or stayed in a manner or to an extent unacceptable to Lender in its discretion.

"Financing Orders" means, collectively, the Interim Financing Order and the Final Financing Order.

"Fixed Commitment Amount" means the sum of $400,000.00.

"Fixed Rate" means a fiscal interest rate of 6.73% per annum.

"Funding Account" means a Deposit Account maintained by a Borrower with Lender for the purpose of depositing or disbursing Advances under the Post-Petition Loan.

"GAAP" means generally accepted accounting principles as in effect in the United States from time to time,

"Governmental Entity" means any (a) court (whether in law or at equity or trial or appellate), tribunal, or arbitrator or arbitration proceeding and (b) any local, city, state, federal, municipal or quasi-municipal, foreign, or international government or any subdivision, agency, authority, commission, bureau, branch, regulatory body, or other body thereof.

"Interim Financing Order" means an order which is entered by the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c) on motion by Borrowers that is acceptable to Lender, which order is in form and substance reasonably acceptable to Lender in all respects, authorizes the incurrence by Borrowers, during the Interim Period, of post-petition secured and superpriority Debt under the Post-Petition Loan in accordance with the Post-Petition Loan Documents, and has not been vacated, reversed, modified, amended or stayed in a manner or to an extent unacceptable to Lender in its discretion.

"Interim Period" means the period commencing upon the entry of the Interim Financing Order and ending upon the entry of the Final Financing Order.

"Item" means any "item" as defined in Section 4-104 of the UCC, and shall also mean and include checks, drafts, money orders or other media of payment.

"Jurisdiction" means the State of West Virginia.

"Lien" means any lien (statutory or otherwise), mortgage, deed of trust, deed to secure debt, pledge, hypothecation, security interest, trust arrangement, security deed, financing lease, collateral assignment, encumbrance, conditional sale or title retention agreement, or any other interest in property designed to secure the repayment or performance of any obligation, whether arising by agreement or under any statute or law or otherwise.

"Loss" has the meaning given such term in Section 6.4(b).

"Material Adverse Effect" means any (a) material adverse effect upon the validity, performance, or enforceability of any of the Post-Petition Loan Documents or any of the transactions contemplated hereby or thereby; (b) material adverse effect upon the properties, business, prospects, or condition (financial or otherwise) of any Borrower; (c) material adverse effect upon the ability of any Borrower to fulfill any obligation under any of the Post-Petition Loan Documents or the Asset Purchase Agreement; or (d) material adverse effect on the Collateral.

"Material Agreement" means any agreement to which any Borrower is a party (other than the Post-Petition Loan Documents) for which breach, termination, cancellation, nonperformance, or failure to renew could reasonably be expected to have a Material Adverse Effect.

"Maturity Date" means March 31, 2018.

"Mortgaged Real Property" means all real property over which Lender has been granted at any time a Lien pursuant to the terms of the Financing Orders.

"Obligations" means all indebtedness, obligations and liabilities at any time incurred by any Borrower to Lender after the Petition Date (other than interest, fees or other charges accruing with respect to the Pre-Petition Debt), whether related or unrelated to the Post-Petition Loan or the Post-Petition Loan Documents.

"Obligor" means Borrowers and any other Person that is at any time liable for any payment of the whole of any part of the Obligations or that has granted in favor of Lender a Lien upon any of such Person's assets to secure payment of any of the Obligations.

"Operating Account" means Borrower account maintained with Lender with account number ending in 1461.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Permitted Debt" has the meaning set forth in Section 7.1 hereof.

"Permitted Liens" has the meaning set forth in Section 7.2 hereof.

"Person" means any natural person, corporation, unincorporated organization, trust, joint-stock company, joint venture, association, company, limited or general partnership, limited liability company, any government or any agency or political subdivision of any government, or any other entity or organization.

"Petition Date" means January 30, 2018.

"Post-Petition Loan" means the Post-Petition Loan to be made by Lender to Borrowers pursuant to Section 2.

"Post-Petition Loan Commitment" means, on any date, the commitment of Lender, subject to the terms and conditions herein, to make the Post-Petition Loan in accordance with and subject to the provisions of Section 2 in an aggregate amount not to exceed $400,000.00.

"Post-Petition Loan Documents" means this Agreement and each other now existing or hereafter arising document, agreement, or instrument evidencing, describing, guaranteeing, or securing the Obligations or delivered in connection with this Agreement, including without limitation the Post-Petition Note, each Deed of Trust, each Security Agreement, UCC financing statements and the Financing Orders.

"Post-Petition Loan Motion" means the motion of Borrowers filed with the Bankruptcy Court in the Chapter 11 Cases seeking approval of the financing under the Post-Petition Loan pursuant to this Agreement.

"Post-Petition Loan Term" means the period from and including the Closing Date to (but not including) the Commitment Termination Date.

"Post-Petition Note" has the meaning set forth in Section 2.3 and any other promissory note now or hereafter evidencing any Obligations, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

"Pre-Petition Debt" means all Debts and other obligations of Borrowers or any other Obligor to Lender on the Petition Date under any of the Pre-Petition Loan Documents, whether direct or indirect, absolute or contingent or due or to become due, including all interest thereon accruing prior to or after the Petition Date and all legal fees and collection expenses heretofore or hereafter incurred in collecting any of such indebtedness.

"Pre-Petition Lender" means Lender.

"Pre-Petition Loan Documents" means any loan agreement entered into prior to the Petition Date and amendments thereto, together with all instruments, agreements, pledges, guaranties, assignments, deeds of trust and other documents executed in connection therewith or with reference thereto or to evidence or secure payment of the whole or any part of the Pre-Petition Debt.

"Professional Expenses" means the fees and reimbursable expenses of a Professional Person.

"Professional Person" means a Person who is an attorney, or other professional person and who is retained, with Bankruptcy Court approval, by (i) Borrowers pursuant to Section 327 of the Bankruptcy Code or (ii) a Committee pursuant to Sections 327 and 1103(a) of the Bankruptcy Code.

"Properly Contested" means, in the case of any Debt of any Borrower (including any taxes) which is not paid when due or payable by reason of such Borrower's bona fide dispute over its liability therefor or the amount thereof, such Debt is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted.

7

"Real Property" means all right, title and interest of a Borrower (whether as owner, lessor or lessee) at any time or times held by such Borrower in any real property or any buildings, structures, parking areas or other improvements thereon.

"Sale Order" means one or more orders of the Bankruptcy Court approving the sale of Collateral which is the subject of the Asset Purchase Agreement or agreement with respect to an Alternative Transaction, free and clear of all Liens pursuant to Section 363 of the Bankruptcy Code.

"Secured Claim" means a Claim against a Borrower in the Chapter 11 Case of such Borrower that arose prior to the Petition Date and that is secured by a Lien upon any asset of such Borrower in existence on the Petition Date.

"Security Agreement" means this Agreement as it relates to a security interest in the Collateral, and any other mortgage instrument, deed of trust, life insurance assignment, security agreement, or similar agreement or instrument now or hereafter executed by any Borrower or other Person granting Lender a Lien in any property to secure the Obligations.

"Senior Officer" means, as to any Borrower, the chief executive officer, chief financial officer, chief legal officer, manager (with respect to any manager-managed limited liability company), or president of such Borrower.

"Taxes" means any present or future taxes, levies, imposts, duties, fees, assessments, deductions, withholdings or other charges of whatever nature imposed or levied by the United States, or any state, local or foreign government or department, agency or other political subdivision, including interest and penalties.

"Tucker County Real Estate" means that certain parcel of real estate owned by Daily Gazette Company, which consists of approximately 5 acres of vacant land in Dry Fork District, Tucker    County, West Virginia, that is commonly known as Tract No. 38 in Deer Ridge Section of Timberline Sub-Division.

"UCC" means the Uniform Commercial Code (or any successor statute), as adopted and in force in the Jurisdiction or, when the laws of any other state govern the method or manner of the perfection or enforcement of any Lien in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such other state.

"U.S." means the United States of America.

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

1.3    Financial Terms.  All financial terms used herein shall have the meanings assigned to them under GAAP unless another meaning shall be specified.

1.4    Rules of Construction. The terms "herein," "hereof," and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph, or subdivision. Any pronoun used shall be deemed to cover all genders. In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding." The section titles and list of exhibits appear

8

as a matter of convenience only and shall not affect the interpretation of this Agreement. All references to (a) statutes and related regulations shall include all related rules and implementing regulations and any amendments of same and any successor statutes, rules, and regulations; (b) any agreement, instrument, or other documents (including any of the Post-Petition Loan Documents) shall include any and all modifications and supplements thereto and any and all restatements, extensions, or renewals thereof to the extent such modifications, supplements, restatements, extensions, or renewals of any such documents are permitted by the terms thereof; (c) to any property of any Borrower shall mean and include all property of the Borrowers' bankruptcy estates; (d) any Person (including Borrowers or Lender) shall mean and include the successors and permitted assigns of such Person; (e) "including" and "include" shall be understood to mean "including, without limitation," regardless of whether the "without limitation" is included in some instances and not in others. A Default or an Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing by Lender pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided in this Agreement. An Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by Lender. Whenever the phrase "to Borrowers' knowledge" or words of similar import relating to the knowledge or the awareness of a Borrower are used in this Agreement or other Post-Petition Loan Documents, such phrase shall mean and refer to (i) the actual knowledge of a Senior Officer of any Borrower or (ii) the knowledge that a Senior Officer of any Borrower would have obtained if he or she had engaged in good faith and diligent performance of his or her duties.

## 2.    THE CREDIT FACILITY.

### 2.1    Post-Petition Loan Commitment.

(a)    Subject to the terms and conditions of this Agreement, Lender agrees to make Advances under the Post-Petition Loan to Borrowers from time to time during the Post-Petition Loan Term. Lender shall have no obligation to make an Advance under the Post-Petition Loan if doing so would, after giving effect thereto, cause the aggregate Advances made under the Post-Petition Loan to exceed the Post-Petition Loan Commitment. Within the foregoing limit and subject to the terms and conditions of this Agreement, Borrowers may borrow, repay, and reborrow the principal amount of the Post-Petition Loan at any time during the Post-Petition Loan Term. Borrowers shall use the proceeds of the Post-Petition Loan only in accordance with Section 2.2 and the Financing Orders.

(b)    Irrespective of the foregoing, Lender shall have no obligation under the Post-Petition Loan Commitment to make Advances in excess of $400,000.00 at any time when the outstanding balance of the Post-Petition Loan is $400,000.00 or more, unless Lender determines in connection with the approval of each Advance Request that it is reasonably likely that the transaction which is the subject of the Asset Purchase Agreement or an Alternative Transaction (as defined in the Asset Purchase Agreement) will be consummated in accordance with its terms. This determination shall be made in Lender's discretion based upon all information made available to Lender.

### 2.2    Use of Proceeds. The proceeds of the Post-Petition Loan shall be used by Borrower during the pendency of the Chapter 11 Cases in accordance with the Budget. Notwithstanding anything to the contrary contained herein, in no event shall proceeds of the Post-Petition Loan or any Cash

Collateral be used to pay (i) any Claims that arose prior to the Petition Date, except the Pre-Petition Debt to the extent set forth in the Budget and any other Claims that are authorized to be paid by the Bankruptcy Court or (ii) Professional Expenses incurred in connection with the assertion of or joinder in any claim, counterclaim, action, contested matter, objection, defense or other proceeding, the purpose of which is to seek or the result of which would be to obtain any order, judgment, declaration, or similar relief (a) seeking damages from Lender on account of any alleged cause of action arising on, before or after the Petition Date; (b) invalidating, setting aside, avoiding or subordinating, in whole or in part, (i) any of the Pre-Petition Debt or Obligations or (ii) any of the Liens in any of the Collateral granted to Lender under this Agreement, any other Post-Petition Loan Document or the Financing Orders or under any of the Pre-Petition Loan Documents; (c) declaring any of the Post-Petition Loan Documents or Pre-Petition Loan Documents to be invalid, not binding or unenforceable in any respect; (d) preventing, enjoining, hindering or otherwise delaying Lender's enforcement of any of the Post-Petition Loan Documents or Pre-Petition Loan Documents or any realization upon any Collateral (unless such enforcement or realization is in direct violation of an explicit provision in any of the Financing Orders); (e) declaring any Liens granted or purported to be granted under any of the Post-Petition Loan Documents or Pre-Petition Loan Documents to have a priority other than the priority set forth therein; (f) objecting to the amount or method of calculation by Lender of the Pre-Petition Debt or any of the Obligations, or any accounting rendered by Lender with respect to any of those obligations; or (g) seeking to use the cash proceeds of any of the Collateral without the prior written consent of Lender. Nothing in this Section 2.2 shall be construed to waive Lender's right to object to any requests, motions or applications made in or filed with the Bankruptcy Court.

2.3    Post-Petition Note. On the Closing Date, Borrowers shall execute and deliver to Lender a promissory note in the form of Exhibit C attached hereto and made a part hereof (the "Post-Petition Note"), which Post-Petition Note, together with Lender's records, shall evidence the Post-Petition Loan and interest accruing thereon.

2.4    Interest.

(a)    Agreement to Pay Interest. Each Borrower agrees to pay interest on all unpaid principal amounts of the Post-Petition Loan from the respective date each Advance under the Post-Petition Loan is made until such Post-Petition Loan is paid (whether at stated maturity, upon acceleration, or otherwise) at the rates of interest and at the times set forth in this Agreement.

(b)    Interest Rate. The Post-Petition Loan shall bear interest at the Fixed Rate. All interest on the Post-Petition Loan and on all other Obligations shall be calculated on the presumed basis of a year of 360 days, for the actual number of days elapsed.

(c)    Default Rate. At Lender's option, during the existence of any Event of Default, the principal amount of all Obligations shall bear interest at the Default Rate. In any event, the Default Rate shall automatically and without notice apply from the time Lender accelerates or is deemed to have accelerated the Obligations pursuant to Section 8.2 until such Obligations or any judgment thereon is paid in full.

2.5    Method of Requesting Advances.

(a)     Provisions Regarding Funding of Advances. Lender shall have no obligation to honor any request for an Advance under the Post-Petition Loan if:

(i)     such request is deemed made after the Commitment Termination Date;

(ii)     doing so would cause the Post-Petition Loan Commitment to be exceeded; or

(iii)     Lender determines that any condition precedent in Section 4.2 hereof or any other condition precedent to the making of such Advance is not then satisfied or will not be satisfied when such Advance is to be made; provided, Lender may make such Advance in its discretion and without regard to the existence of, and without being deemed to have waived, any Default or Event of Default which may then exist or arise from the making of such Advance.

(b)     Making Requests. Each Advance Request shall be in writing, shall be from a Person authorized to make such request, and shall specify (i) the date for the Advance under the Post-Petition Loan, which date must be a Business Day; (ii) lawful instructions for the disbursement of the proceeds of such Advance; provided that, if such instructions are not included, the proceeds will be deposited into the Funding Account; (iii) a description of the expenses to be covered by such Advance sufficient to determine compliance with the Budget; and (iv) such other information Lender may require from time to time related to the requested Advance.

(c)     Timing and Acceptance of Requests. Requests made under this Section 2.5 are irrevocable. Requests under this Section 2.5 which Lender receives after 12:00 noon (Charleston, West Virginia time) shall be deemed received on the next Business Day. Lender's acceptance of an Advance Request under this Section 2.5 shall be indicated by its making the Advance requested. Lender shall make such Advance under the Post-Petition Loan in immediately available funds on the same Business Day as the Advance Request is deemed to have been received, subject to such delays as Lender may reasonably require to confirm that all conditions precedent to making such Advance under the Post-Petition Loan have been satisfied or waived by Lender, provided, however, such confirmation shall be given no later than two (2) Business Days from the day of the Advance Request.

2.6     Repayment of Post-Petition Loan.

(a)     Repayment of Obligations Generally. All of the Obligations shall be payable in accordance with the terms of this Agreement and any Post-Petition Note, without defense, offset or counterclaim and in immediately available funds. Prepayment may occur at any time without premium or other prepayment charge of any other nature.

(b)     All outstanding principal and accrued interest under the Post-Petition Loan shall be due and payable on the Commitment Termination Date.

2.7     Daily Available Cash. After an Advance under this Agreement, Daily Available Cash shall be automatically swept by Lender out of the Operating Account and applied to the outstanding principal balance under the Post-Petition Loan until such time as the principal balance under the Post-Petition Loan is $0.00.

2.8     Effect of Commitment Termination. On the Commitment Termination Date, all

of the Obligations shall be immediately due and payable, and Lender shall have no further obligation to make an Advance under the Post-Petition Loan. All undertakings, agreements, covenants, warranties and representations of Borrowers contained in the Post-Petition Loan Documents shall survive any such termination and Lender shall retain its Liens upon all of the Collateral and all of its rights and remedies under the Post-Petition Loan Documents notwithstanding such termination until full payment of the Obligations.

2.9    Additional Payment Provisions. During the existence of any Event of Default, Lender may, without notice to, or the consent of, any Borrower, debit any Borrowers' Bank Account, other Deposit Account, or other account over which Lender has Control and apply such amounts to the payment of Obligations which are then due and payable.

2.10 Fees and Reimbursement Obligations.   Borrowers shall reimburse Lender for all legal, accounting, appraisal and other fees and expenses incurred by Lender (including reasonable fees and expenses of Lender's professionals) in connection with (i) the negotiation and preparation of any of the Post-Petition Loan Documents, any amendment or modification thereto, any waiver of any Default or Event of Default thereunder, or any restructuring or forbearance with respect thereto; (ii) the administration of the Post-Petition Loan Documents and the transactions contemplated thereby; (iii) action taken to perfect or maintain the perfection or priority of any of Lender's Liens with respect to any of the Collateral; (iv) any inspection of or audits conducted with respect to any of Borrowers' books and records or any of the Collateral, including audits and appraisals; (v) any effort to verify, protect, preserve, or restore any of the Collateral or to collect, sell, liquidate or otherwise dispose of or realize upon any of the Collateral; (vi) any litigation, contest, dispute, suit, proceeding or action (whether instituted by or against Lender, any Obligor or any other Person) in any way arising out of or relating to any of the Collateral (or the validity, perfection or priority of any of Lender's Liens thereon), any of the Post-Petition Loan Documents or the validity or allowance of the Obligations, (vii) the monitoring of, participation in and protection or enforcement of any rights or remedies of Lender in the Chapter 11 Cases or any other insolvency proceeding; and (viii) any other action taken by Lender to enforce any of the rights or remedies of Lender against any Obligor or any Account Debtors to enforce collection of the Obligations or payments with respect to any of the Collateral. All amounts chargeable to Borrowers under this Section 2.10 shall constitute Obligations that are secured by all of the Collateral and, subject to the applicable provisions of the Financing Orders.

2.11 Termination. Borrowers may terminate this Agreement and the Post-Petition Loan Commitment before the Commitment Termination Date, in whole but not in part, by giving Lender 10 days' prior written notice; provided, however, no such termination by Borrowers shall be effective until full payment of all Obligations has occurred. Any notice of termination shall be irrevocable. Lender may terminate this Agreement and the Post-Petition Loan Commitment at any time prior to the Maturity Date, without notice, during the existence of an Event of Default.

2.12 USA Patriot Act Notice. To help fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each Person who opens an account. For purposes of this section, account shall be understood to include Post-Petition Loan accounts.

3.    SECURITY AGREEMENT.

12

3.1    Security Interest.

(a)    As security for the full payment of the Obligations, each Borrower hereby grants to Lender a continuing Lien on and security interest in and to all right, title, and interest of such Borrower in and to the Collateral, whether now owned or hereafter acquired by such Borrower (irrespective of whether the same existed on or is created or acquired after the Petition Date and wherever located).

(b)    Except as expressly required by the Security Agreements or applicable law, Lender shall have no obligation to (i) exercise any degree of care in connection with any Collateral in its possession or (ii) take any steps necessary to preserve any rights in the Collateral or to preserve any rights in the Collateral against senior or prior parties (which steps each Borrower agrees to take).

3.2    Liens Under Financing Orders. The Financing Orders shall authorize the Liens and security interests granted to Lender pursuant to the provisions of this Section 3.

3.3    Administrative Priority. Subject to the entry of the Interim Financing Order, the Obligations will constitute allowed super-priority administrative expenses in the Chapter 11 Cases, having priority in payment over all other administrative expenses and unsecured claims against Borrowers of any kind or nature, whether now existing or hereafter arising, including all administrative expenses or Claims of the kind specified in or arising or ordered under Sections 105, 326, 328, 503(b), 506(e), 507(a), 507(b), 546(c) and 1114 of the Bankruptcy Code.

3.4    Financing Statements; Fixture Filings; Power of Attorney. Each Borrower authorizes Lender to file any financing statements (and other similar filings or public records or notices relating to the perfection of Liens), record Deeds of Trust, fixture filings, and amendments thereto relating to the Collateral which Lender deems appropriate, in form and substance required by Lender. Each Borrower appoints Lender as its attorney-in-fact to perform all acts which Lender deems appropriate to perfect and to continue perfection of the Lien granted to Lender under any Security Agreement, including, without limitation, (a) the filing of financing statements (and other similar filings or public records or notices relating to the perfection of Liens), recordation of Deeds of Trust, fixture filings, and amendments. (b) the execution in such Borrower's name of any agreements providing for Control over any applicable Collateral, and (c) if there is an Event of Default, the indorsement, presentation, and collection on behalf of such Borrower and in such Borrower's name of any Items or other documents necessary or desirable to collect any amounts which such Borrower may be owed, such power of attorney being coupled with an interest and is therefore irrevocable. If there is an Event of Default, each Borrower grants Lender a license or other right to use, without charge, such Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks and advertising matter, and any property of a similar nature, as it pertains to the Collateral, in advertising for sale and selling any Collateral, and each such Borrower's rights under all licenses and all franchise agreements shall inure to Lender's benefit. Irrespective of any steps taken by Lender to perfect any security interest or other Lien granted or conveyed to Lender pursuant to any of the Post-Petition Loan Documents, all security interests and other Liens at any time granted or conveyed, or otherwise conferred upon, Lender pursuant to the Post-Petition Loan Documents or the Financing Orders shall be automatically perfected as provided in the Financing Orders without the necessity of the filing or recording of any other instrument or agreement, the taking of possession of any of the Collateral or any other action on the part of Lender.

13

3.5    Entry. Lender may enter Borrowers' premises with reasonable notice and during normal business hours so long as no Default or Event of Default is then in effect, and Lender may enter such premises at any time with or without notice at any time that a Default or Event of Default exists. Each Borrower waives, as to Lender and its agents, any now existing or hereafter arising claim based upon trespass or any similar cause of action for entering upon any premises where Collateral may be located, provided such entry is consistent with the terms of this Agreement. Each Borrower also waives, as to Lender, any Lien it may have in and to the assets of any other Borrower stored at or located on any premises or real property owned, leased, or controlled by, or in the possession of, such Borrower.

3.6    Waiver of Marshaling. Each Borrower hereby waives any right it may have to require marshaling of its assets.

3.7    Control; Further Assurances. Each Borrower will, at its expense, cooperate with Lender in (a) obtaining Control of or Control agreements with respect to Collateral for which Control or a Control agreement is required for perfection of Lender's security interest under the UCC and (b) perfecting Lender's Lien in the Collateral.

3.8    Lien Priority. The Liens and security interests granted to Lender pursuant to the provisions of this Section 3 and pursuant to any of the other Post-Petition Loan Documents shall be first priority Liens and security interests in the Collateral.

## 4.    CONDITIONS PRECEDENT TO EXTENSIONS OF CREDIT.

4.1    Conditions Precedent to Initial Advance. In addition to any other requirement set forth in this Agreement, Lender shall not be required to make an Advance under the Post-Petition Loan or make any other extensions of credit hereunder unless and until the following conditions shall have been satisfied, in the opinion of Lender and its counsel:

(a)    Post-Petition Loan Documents and Supporting Documents. In connection with the initial Advance under the Post-Petition Loan, Borrowers shall cause to be delivered to Lender the following documents and items (each of which must be in form and substance satisfactory to Lender):

(i)    This Agreement;

(ii)    Deeds of Trust;

(iii)    The Post-Petition Note;

(iv)    If requested by Lender, a copy of the governing instruments of each Borrower, and good standing certificates of each Borrower and Affiliate, if any, certified by the appropriate official of their respective states of incorporation and each state in which such Borrower is qualified to do business;

(v)    If requested by Lender, incumbency certificate and certified resolutions of the board of directors (or other appropriate governing body) of each Borrower and each other Person executing any Post-Petition Loan Documents (other than Lender), signed by the secretary or another authorized officer of such Borrower or such other Person, authorizing (A) the filing of the Chapter 11 Cases and (B) the execution, delivery, and

14

performance of the Post-Petition Loan Documents, the Borrowers' incurrence of the Obligations thereunder and the grant of Liens in favor of Lender as provided in the Agreement and the Financing Orders;

(vi)    If requested by Lender, a Certificate duly completed by Borrowers as to the current financial condition of the Borrowers as represented to Lender, together with all supporting statements, schedules, and reconciliations as required by Lender;

(vii)    In the discretion of Lender, UCC-1 searches and other Lien searches satisfactory to Lender showing no existing security interests in or Liens on the Collateral (other than Permitted Liens acceptable to Lender);

(viii)    A Budget in form and substance satisfactory to Lender;

(ix)    If requested by Lender, satisfactory evidence of insurance meeting the requirements of Section 6.4;

(b)    Conditions. In connection with the initial Advance under the Post-Petition Loan, the following conditions shall have been satisfied or waived by Lender:

(i)    The Chapter 11 Cases shall have been commenced on or before January 30, 2018;

(ii)    The Interim Financing Order (A) shall have been entered after proper notice and a hearing and sufficient presentation of evidence, in Lender's view, to support all findings of fact and conclusions of law set forth in Lender's approved form of interim financing order; (B) shall be in full force and effect and shall not have been vacated, reversed, modified or stayed in any respect (and, if such order is the subject of a pending appeal, no performance of any obligation of any party shall have been stayed pending such appeal); and (C) shall be in form and substance approved by Lender.

(iii)    There is not pending any motion which, if granted by the Bankruptcy Court, would result in an Event of Default;

(iv)    All of the "first day orders" shall have been presented to the Bankruptcy Court at or about the time of the commencement of the Chapter 11 Cases (including orders with respect to maintenance of Borrowers' cash management system) and such orders shall be satisfactory in form, scope and substance to Lender; and

(v)    The Asset Purchase Agreement shall have been approved by Lender in its discretion and shall be in full force and effect and free from default by any party thereto.

4.2    Conditions Precedent to Each Post-Petition Loan. In addition to any other requirements set forth in this Agreement, Lender shall not be required to make an Advance under the Post-Petition Loan unless and until each of the following conditions shall have been satisfied, in Lender's sole opinion, and each request for an Advance under the Post-Petition Loan (whether or not a written Notice of Borrowing is required) shall be deemed to be a representation that all such conditions have been satisfied:

15

(a)     Notice of Borrowing. Borrowers shall have delivered to Lender an Advance Request and such other information as Lender may request;

(b)     Compliance with Budget. The Advance is consistent with the Budget;

(c)     No Default. No Default shall have occurred and be continuing or would result from the making of the requested Advance under the Post-Petition Loan;

(d)     Correctness of Representations. All representations and warranties made to Lender by any Borrower in any Post-Petition Loan Document or otherwise in writing shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of date of the requested Advance under the Post-Petition Loan;

(e)     Limitations Not Exceeded. The funding of any Advance under the Post-Petition Loan would not exceed the Post-Petition Loan Commitment;

(f)     Status of Asset Purchase Agreement. The Asset Purchase Agreement shall continue to be in full force and effect and free from default by any party thereto, with no event or circumstance having arisen which in Lender's judgment makes it unlikely that the transaction which is the subject of the Asset Purchase Agreement will be consummated within the time period set forth therein for the closing to occur, taking into consideration the Borrowers' requirements for funds to continue in operation until the closing occurs;

(g)     Further Assurances. Each Borrower shall have delivered such further information, documentation or assurances as Lender may reasonably require, which may include UCC financing statements (and other similar filings or public records or notices relating to the perfection of Liens), Deeds of Trust and, if applicable, certificates of title covering the Collateral shall duly have been recorded or filed in the manner and places required by law to establish, preserve, protect, and perfect the interests and rights created or intended to be created by the Security Agreements and all taxes, fees, and other charges in connection with the execution, delivery, and filing and recording of the Security Agreements and the financing statements (and any other similar filings or public records or notices relating to the perfection of Liens) shall have been paid ; and

(h)     Financing Orders.

(i)     The Interim Financing Order or the Final Financing Order, as applicable, shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect.

(ii)     With respect to all Advances under the Post-Petition Loan requested more than 30 days after the Petition Date, the final hearing on the Post-Petition Loan Motion shall have been held, with the presentation of evidence and the resolution of any objections to the Post-Petition Loan Motion or the proposed Final Financing Order in a manner satisfactory to Lender, and the Final Financing Order shall have been entered, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of Lender; and

(iii)    The Final Financing Order, when issued, shall be in form and substance approved by Lender.

(i)    Sale Order. The Sale Order, when entered by the Bankruptcy Court, shall be in form and substance approved by Lender.

## 5.    REPRESENTATIONS AND WARRANTIES.

To induce Lender to enter into this Agreement and to make the Post-Petition Loan or extend credit as provided for herein, each Borrower makes the following representations and warranties, all of which shall survive the execution and delivery of the Post-Petition Loan Documents. Unless otherwise specified, such representations and warranties shall be deemed made as of the date hereof and as of the date of each request for a Post-Petition Loan or extension of credit hereunder:

5.1    Valid Existence and Power. Each Borrower, as applicable, is a limited liability company, corporation, joint venture or limited partnership, validly existing, and in good standing under the laws of the jurisdiction of its incorporation and is duly qualified or licensed to transact business in all places where the failure to be so qualified could reasonably be likely to have a Material Adverse Effect. Each of such Borrower has the power to make and perform the Post-Petition Loan Documents executed by it and, subject to entry of the Interim Financing Order by the Bankruptcy Court, all Post-Petition Loan Documents will constitute the legal, valid, and binding obligations of such Borrower, enforceable in accordance with their respective terms, subject only to bankruptcy and similar laws affecting creditors' rights generally.

5.2    Litigation. Except for matters arising prior to the Petition Date that are subject to the automatic stay of the Bankruptcy Code, there are no suits or proceedings pending or, to such Borrower's knowledge, threatened by or before any Governmental Entity against or affecting any Borrower or their respective assets, which if adversely determined could reasonably be expected to have a Material Adverse Effect.

5.3    Authorizations. All authorizations, consents, approvals, and licenses required under applicable law for the conduct of any business in which Borrower is engaged have been duly issued and are in full force and effect.

5.4    Title. Each Borrower has good title to all of the assets shown in its financial statements free and clear of all Liens, except Permitted Liens. One or more of the Borrowers alone has full ownership rights in all Collateral.

5.5    Collateral.  Upon entry of the Interim Financing Order, and thereafter upon entry of the Final Financing Order, the security interests and Liens granted to Lender herein, pursuant to any other Security Agreement and pursuant to the Financing Orders (a) constitute and, as to subsequently acquired property included in the Collateral covered by the Security Agreement, will constitute, security interests under the UCC entitled to all of the rights, benefits, and priorities provided by the UCC and valid liens on the Mortgaged Real Property and (b) as to such subsequently acquired Collateral, will be fully perfected, superior, and prior to the rights of all other Persons, now existing or hereafter arising. All of the Collateral is intended for use solely in Borrowers' business.

17

5.6 <u>Taxes.</u> Except as each Borrower has disclosed to Lender in writing on or before the Closing Date, each Borrower has filed all federal and state income and other tax returns which are required to be filed, and have paid all Taxes as shown on said returns and all Taxes, including withholding, FICA, and ad valorem taxes, shown on all assessments received by it to the extent that such taxes have become due. No Borrower is subject to any federal, state, or local tax Liens nor has such Person received any notice of deficiency or other official notice to pay any taxes.

5.7 <u>Labor Law Matters.</u> No goods or services have been or will be produced by any Borrower in violation of any applicable labor laws or regulations or any collective bargaining agreement or other labor agreements or in violation of any minimum wage, wage-and-hour or other similar laws or regulations.

5.8 <u>Accounts.</u>  To the best of the Borrowers' knowledge, information and belief, each Account, Instrument, Chattel Paper, and other writing constituting any portion of the Collateral (a) is genuine and enforceable in accordance with its terms except for such limits thereon arising from bankruptcy and similar laws relating to creditors' rights; (d) arises from a bona fide sale of goods or delivery of services in the ordinary course of business and in accordance with the terms and conditions of any applicable purchase order, contract or agreement; (e) except for Liens securing the Pre-Petition Debt is free of all Liens; and (f) is for a liquidated amount maturing as stated in the invoice therefor.

5.9 <u>Judgment Liens.</u> Except as Borrowers have disclosed to Lender in writing on or before the Closing Date, no Borrower, nor any of their respective assets, is subject to any unpaid judgments (whether or not stayed) or any judgment Liens in any jurisdiction.

5.10 <u>Insider.</u> Such Borrower is not, and no Person having "control" (as that term is defined in 12 U.S.C. § 375(b)(5) or in regulations promulgated pursuant thereto) of Borrower is, an "executive officer," "director," or "principal shareholder" (as those terms are defined in 12 U.S.C. § 375(b) or in regulations promulgated pursuant thereto) of Lender, of a bank holding company of which Lender is a subsidiary, or of any subsidiary of a bank holding company of which Lender is a subsidiary.

5.11 <u>Compliance with Covenants; No Default.</u> Such Borrower is, and upon the making of the extensions of credit on the Closing Date will be, in compliance with all of the covenants hereof. No Default is in existence, and the execution, delivery, and performance of the Post-Petition Loan Documents and the making of the extensions of credit on the Closing Date will not cause a Default.

## 6.    AFFIRMATIVE COVENANTS OF BORROWERS.

Each Borrower covenants and agrees that from the date hereof until the full payment of the Obligations, such Borrower:

6.1    <u>Use of Post-Petition Loan Proceeds.</u> Shall use the proceeds of the Post-Petition Loan only in accordance with the uses permitted by Section 2.2 and shall furnish Lender all evidence it may require with respect to such uses.

6.2    <u>Compliance with Bankruptcy Code, Rules and Orders.</u> Shall comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Financing Orders and all other orders entered by the Bankruptcy Court in the Chapter 11 Cases.

6.3    <u>Maintenance of Business and Properties.</u> Shall at all times: (a) (i) maintain,

18

preserve, and protect all Collateral and the remainder of its property used or useful in the conduct of its business, (ii) keep the same in good repair, working order, and condition (subject to ordinary wear and tear and loss by condemnation and insured casualty), and (iii) make, or cause to be made, all material needful and proper repairs, renewals, replacements, betterments, and improvements thereto so that the business carried on in connection therewith may be conducted properly and in accordance with standards generally accepted in businesses of a similar type and size; and (b) maintain and keep in full force and effect all licenses and permits necessary to the proper conduct of its business.

6.4    Insurance.

(a)    Shall: (i) maintain (A) such liability insurance, workers' compensation insurance, business interruption insurance, and casualty insurance in amounts equal to the greater of (1) such amounts that may be required by law and (2) such amounts that are customary and usual for prudent businesses in its industry and (B) any other insurance that may be reasonably required by Lender; and (ii) insure and keep insured all Collateral and other properties with insurance companies acceptable to Lender. All hazard insurance covering Collateral shall be in amounts reasonably acceptable to Lender, shall name and directly insure Lender as secured party and lender loss payee and shall not be terminable except in the event of a sale of the Collateral and otherwise upon 30 days' written notice to Lender. As Lender may request from time to time, Borrower shall furnish Lender copies of all such policies and evidence of insurance in the form of an Acord Form 27 with respect to casualty and property insurance and an Acord Form 25 with respect to liability insurance.

(b)    If any of such Borrower's real property or Equipment suffers a casualty or is condemned by a Governmental Entity (each, a "Loss"), all proceeds of such Loss shall be paid over to Lender for application to the Obligations and the Pre-Petition Indebtedness in accordance with this Agreement.

6.5    Certain Notices. Shall provide Lender immediate notice of: (a) the occurrence of a Default or Event of Default and what action (if any) such Borrower is taking to correct the same; (b) any damage or loss to property in excess of $25,000 (in each case, other than matters arising prior to the Petition Date that are subject to the automatic stay under the Bankruptcy Code); (c) any notice from taxing authorities as to claimed deficiencies or any tax lien; (d) any rejection, return, offset, dispute, loss, or other circumstance having a Material Adverse Effect on any Collateral; (e) the cancellation or termination of or any default (by any party thereto) under, any Material Agreement; (f) any loss or threatened loss of material licenses or permits which could reasonably be expected to have a Material Adverse Effect; (g) any pleading filed with the Bankruptcy Court seeking relief from the automatic stay, conversion or dismissal of any of the Chapter 11 Cases or reclamation of any Collateral; (h) other than the offer pursuant to the Asset Purchase Agreement, any offer or other expression of interest from any Person to purchase any of the Collateral (other than sales of Inventory in the ordinary course of business). Borrowers shall provide, or shall cause its counsel in the Chapter 11 Cases to provide, Lender's counsel with (x) copies of all pleadings, motions, reports, applications and other papers filed by Borrowers with the Bankruptcy Court to the extent such document has not otherwise been provided pursuant to an order of the Bankruptcy Court establishing notice procedures in the Chapter 11 Cases or otherwise as well as (y) copies of all billing and expense statements received from any Professional Person. Borrowers shall include counsel for Lender on any "Special Notice List" or other similar list of parties to be served with papers in the Chapter 11 Cases.

19

6.6    Inspections of Books and Records and Field Examinations; Appraisals.    Shall permit Lender and its agents to conduct inspections, verifications (of accounts and otherwise), appraisals, and field examinations of the Collateral and such Person's other property and books and records at such times and with such frequency as Lender may request from time to time, with reasonable notice thereof.

6.7    Financial Information. Shall maintain books and records in accordance with GAAP and shall furnish to Lender the following periodic financial information each certified by a Senior Officer of the Borrowers:

(a)    On a bi-weekly basis a rolling 13 week cash flow statement with comparison to prior period results in a format acceptable to Lender;

(b)    On a bi-weekly basis a comparison of budgeted income and expenses to the actual amounts received and expended for each line item for the previous week;

(c)    On a bi-weekly basis a current inventory list;

(d)    On a bi-weekly basis a current aging accounts receivable report;

(e)    On a monthly basis a profit and loss statement; and

(f)    Such other reports as Lender may from time to time require in its discretion, each prepared with respect to such periods and with respect to such information and reporting as Lender may request.

6.8    Payment of Taxes. Shall pay before delinquent all of its Taxes unless such Taxes are being Properly Contested and unless such Taxes accrued or arose prior to the Petition Date and payment thereof has not been approved by the Bankruptcy Court.

6.9 Compliance with Laws. Shall comply in all material respects with all laws, regulations, ordinances, and other legal requirements, including, without limitation, ERISA, the Bankruptcy Code, all securities laws, and environmental laws. Each Borrower shall promptly report to Lender any notices of any violations of such laws or regulations received from any Governmental Entity, along with such Borrower's proposed corrective action as to such violation.

6.10 Further Assurances. Shall at any time upon the request of Lender take such further action or execute or deliver to Lender any and all financing statements, fixture filings, security agreements, pledges, assignments, indorsements of certificates of title, mortgages, deeds of trust, opinions of counsel, and all other documents (collectively, the "Additional Documents") that Lender may request in form and substance satisfactory to Lender, to create, perfect, and continue perfected or to better perfect Lender's Liens in all of the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect Liens in favor of Lender in any Real Property of the Borrowers, except the Tucker County Real Estate, and in order to fully consummate all of the transactions contemplated hereby and under the other Post-Petition Loan Documents. To the maximum extent permitted by applicable law, each Borrower authorizes Lender to execute any such Additional Documents in the applicable Borrower's name and authorizes Lender to file such executed Additional Documents in any appropriate filing office.

20

6.11 <u>Covenants Regarding Collateral.</u> Each Borrower:

(a)    Shall use the Collateral only in the ordinary course of its business and will not permit the Collateral to be used in violation of (i) any applicable law where any such resulting violation could reasonably be expected to have a Material Adverse Effect or (ii) any policy of insurance;

(b)    Shall defend the Collateral against all claims and demands of all Persons, except for Permitted Liens;

(c)    Within 10 Business Days after Lender's request, shall deliver to Lender the original certificates of title or similar title documents for all of such Borrower's owned vehicles and Equipment which are subject to certificate of title or similar statutes (as contemplated in Section 9-311 of the UCC) and take such further actions from time to time as Lender requests for purposes of perfecting Lender's security interest in and to such vehicles and Equipment.

6.12 <u>Compliance with Bankruptcy Code, Rules and Orders.</u> Borrowers shall comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Financing Orders and all other orders entered by the Bankruptcy Court in the Chapter 11 Cases.

6.13 <u>Compliance with Milestones.</u> Take all actions reasonably necessary to achieve the 363 Sale Benchmarks set forth on Exhibit B by the dates specified therein (or such later date as Lender may agree to in its discretion).

6.14 <u>Access and Cooperation.</u> Each Borrower:

(a)    Shall, upon reasonable notice, provide Lender with reasonable access to Borrower or its professionals retained by Borrowers in the Chapter 11 Cases, provided that Borrowers shall have the right to be present at any such meetings.

(b)    Shall provide their full cooperation and assistance to Lender professionals.

6.15 <u>Compliance with the Asset Purchase Agreement.</u> Borrowers shall at all times use commercially reasonable efforts to comply with the terms and conditions of the Asset Purchase Agreement and avoid any breach or default by any of the Borrowers or Affiliates, if any, thereunder.

**7.    NEGATIVE COVENANTS OF BORROWERS**

Each Borrower covenants and agrees that from the date hereof and until the full payment of all Obligations and the termination of this Agreement, each Borrower:

7.1    <u>Debt.</u> Shall not create or permit to exist any Debt, including any guaranties or other Contingent Obligation, except the following (collectively, "Permitted Debt"):

(a)    The Obligations;

(b)    Debts that existed on the Petition Date, including the Pre-Petition Debt, that were not created in violation of the Pre-Petition Loan Documents; and

(c)     Debts incurred in the administration of the Chapter 11 Cases on an unsecured basis, consistent with the Budget and not in violation of this Agreement or the Financing Orders.

7.2     Liens. Shall not create or permit or suffer to exist any Liens on any of its property except the following (collectively, "Permitted Liens"):

(a)     Liens securing the Obligations;

(b)     Liens securing the Pre-Petition Debt;

(c)     Liens in existence on the Petition Date that were not created or suffered to exist in violation of the Pre-Petition Loan Documents; and

(d)     Liens arising after the Petition Date for Taxes, assessments, and charges or levies instituted or levied by any Governmental Entity which are not yet due and payable or which are being Properly Contested.

7.3     Accounts.  Except as authorized by the Bankruptcy Court or as set forth in the Asset Purchase Agreement or pursuant to an Alternative Transaction (as defined in the Asset Purchase Agreement), Borrowers shall not sell, assign, or discount any of its Accounts, Chattel Paper, or Instruments.

7.4 Tangible Collateral. Shall not, except to the extent otherwise permitted herein or as otherwise permitted by Lender in writing, (a) allow any Collateral to be commingled with, or become an Accession to or part of any property of any other Person or (b) allow any Collateral to become a Fixture.

7.5 Deposit Accounts; Exclusive Control.  Shall not open or maintain any Deposit Accounts except for (i) Borrowers' Bank Accounts with Lender; and (ii) Deposit Accounts previously disclosed to Lender in writing.

7.6 Amendments to Certain Documents and Instruments.  Shall not enter into, consent to, or accept any amendments to the Asset Purchase Agreement without Lender's prior written consent.

7.7 Payment of Claims. Shall not make any payment of principal or interest on account of any Claim against any Borrower that arose prior to the Petition Date, other than Claims that are authorized to be paid by the Bankruptcy Court, consistent with and disclosed in the Budget.

7.8 Filing of Motions and Applications. Apply to the Bankruptcy Court for authority to (i) take any action that is prohibited by the terms of any of the Post-Petition Loan Documents, (ii) refrain from taking any action that is required to be taken by the terms of any Post-Petition Loan Documents or the Financing Orders, or (iii) permit any Debt or Claim incurred after the Petition Date to be *pari passu* with or senior to any of the Obligations.

7.9 Modifications to Financing Orders. Seek or consent to any amendment, supplement or any other modification of any of the terms of the Financing Orders without Lender's consent.

7.10 Compliance with Budget.  Borrowers shall not allow actual disbursements for the term of the Budget to exceed an amount equal to 10% of the disbursements projected in the Budget.  Borrowers

shall not allow actual collections for each week of the Budget to be less than 10% of the collections projected in the Budget.

8.    **DEFAULT.**

8.1    <u>Events of Default.</u> Each of the following shall constitute an "Event of Default":

(a)    Any Borrower shall fail to comply with the terms of this Agreement; or

(b)    The issuance of the Interim Financing Order, the Final Financing Order or the Sale Order, or any amendment or modification thereof if Lender deems any such order unacceptable in its discretion.

(c)    Any representation or warranty made by any Borrower or any other party to any Post-Petition Loan Document (other than Lender) in this Agreement or any other Post-Petition Loan Document, or in any certificate or report furnished in connection with this Agreement or any other Post-Petition Loan Document, shall prove to have been untrue or incorrect in any material respect when made; or

(d)    The occurrence of any event of default or breach by Borrowers of the Asset Purchase Agreement or the Asset Purchase Agreement is terminated for any reason other than as a result of a breach by the purchaser thereunder or Bankruptcy Court's entry of an order approving an Alternative Transaction (as defined in the Asset Purchase Agreement); or

(e)    Loss, theft, damage, or destruction of any material portion of the Collateral for which there is either no insurance coverage or for which, in Lender's reasonable opinion, there is insufficient insurance coverage; or

(f)    Borrowers shall fail to comply with any of the provisions of the Financing Orders; Borrowers shall fail to achieve the 363 Sale Benchmarks set forth on Exhibit B to this Agreement on or before the date specified on such exhibit; a trustee shall be appointed in one or more of the Chapter 11 Cases; an examiner shall be appointed in one or more of the Chapter 11 Cases under Section 1106(b) of the Bankruptcy Code; a Chapter 11 Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or a motion for any such dismissal shall be filed by Borrowers; there shall be filed by Borrowers any motion to sell all or a substantial part of the Collateral pursuant to a sale that would not constitute an Acceptable 363 Sale; any Borrower shall file any motion to alter, amend, vacate, supplement, modify, or reconsider, in any respect, either of the Financing Orders or either of the Financing Orders is amended, vacated, stayed, reversed or otherwise modified (in each case, without Lender's prior written consent); the Bankruptcy Court shall enter an order granting to any Person other than Lender relief from the automatic stay to foreclose upon a Lien with respect to any of the Collateral (to the extent that such Lien is junior in priority to the Liens securing the Pre-Petition Debt); an order shall be entered for the substantive consolidation of the bankruptcy estate of any Borrower with any other Person that is not a Borrower unless the order of substantive consolidation provides that the assets of such Borrower remain subject to the Liens of the Lender and the Pre-Petition Lender securing the Obligations and the Pre-Petition Debt, respectively; Borrowers shall not have sufficient Excess Availability for a period of 30 consecutive days to pay, or shall otherwise fail to pay as and when due and payable, all costs and expenses of administration that are incurred by it in the Chapter 11 Cases that are due and payable; Borrowers shall file a motion or other request with the

23

Bankruptcy Court seeking authority to use any cash proceeds of the Collateral or to obtain any financing under Section 364(d) of the Bankruptcy Code secured by a priming Lien, or Lien of equal priority with Lender's Liens, upon any Collateral, in each case without Lender's prior written consent; an application shall be filed by Borrowers for the approval of any superpriority claim in the Chapter 11 Cases that is *pari passu* with or senior to the Obligations or there shall arise or be granted any such *pari passu* or superpriority claim; Borrowers shall file any action, suit or other proceeding or contested matter challenging the validity, perfection or priority of any Liens of Lender securing the Pre-Petition Debt, or the validity or enforceability of any of the Pre-Petition Loan Documents, or asserting any Avoidance Claims against Lender or seeking to recover any monetary damages from Lender; or, without Lender's consent, any Borrower shall discontinue or suspend all or any material part of its business operations or commence an orderly wind-down or liquidation of its business.

8.2      Remedies. During the existence of any Default, Lender may, without notice to any Borrower and at its option, refuse to make the Post-Petition Loan or Advance to any Borrower. During the existence of any Event of Default, but subject at all times to any limitations in the Financing Orders, Lender may, at its option, exercise from time to time all rights and remedies available to Lender under the Post-Petition Loan Documents to enforce collection of the Obligations then outstanding and may take any or all of the following actions:

(a)      Lender may declare any or all Obligations to be immediately due and payable (if not earlier demanded), terminate its obligation to make Post-Petition Loans or Advances to Borrowers, exercise any remedy available to Lender hereunder or at law, and take any action or exercise any remedy provided herein or in any other Post-Petition Loan Document or under applicable law.

(b)      Without waiving any of its other rights hereunder or under any other Post-Petition Loan Document, Lender shall have all rights and remedies of a secured party under the UCC (and the Uniform Commercial Code of any other applicable jurisdiction).  If requested by Lender, Borrowers will promptly assemble the Collateral and make it available to Lender at a place designated by Lender.

(c)      Each Borrower hereby grants Lender a worldwide, non-exclusive, and royalty-free license to use solely during the existence of an Event of Default such Borrower's trademarks, service marks, and trade names for purposes of invoicing and collecting Accounts and otherwise disposing of or liquidating Collateral.

(d)      Each Borrower irrevocably consents to any act by Lender or its agents in entering upon any premises for the purposes of either (a) inspecting any Collateral or (b) taking possession of any Collateral.

8.3      Deposits; Insurance. Each Borrower (a) authorizes Lender to, during the existence of an Event of Default, collect and apply against the Obligations when due any refund of insurance premiums or any insurance proceeds payable on account of the loss or damage to any Collateral and (b) irrevocably appoints Lender as its attorney-in-fact to indorse any check or draft or take other action necessary to obtain such funds.

9.      MISCELLANEOUS.

9.1      No Waiver, Remedies Cumulative. No failure or delay on the part of Lender to

24

exercise any right under this Agreement, any other Post-Petition Loan Document, or applicable law shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and are in addition to any other remedies provided by applicable law, any Post-Petition Loan Document, or otherwise.

9.2    Survival of Representations. All representations and warranties made in this Agreement and the other Post-Petition Loan Documents shall survive the making of any extension of credit hereunder and the delivery of any Post-Petition Note and shall continue in full force and effect until the full and final payment and performance of the Obligations and the termination of this Agreement.

9.3    Lender Costs. Each Borrower's obligation for reimbursement for all of the obligations, penalties, fees, costs (including reasonable attorneys' fees), and expenses of Lender shall be part of the Obligations and shall be secured by the Collateral.

9.4    Notices. Any notice or other communication hereunder to any party hereto or thereto shall be by hand delivery, overnight delivery via nationally recognized overnight delivery service, facsimile with receipt confirmed, or registered or certified United States mail with return receipt and unless otherwise provided herein shall be deemed to have been given or made when delivered, faxed or, if sent via United States mail, when receipt therefor is signed by the receiver, postage prepaid, addressed to the party at its address specified below (or at any other address that the party may hereafter specify to the other parties in writing):

If to the Lender:

United Bank
500 Virginia Street
P.O. Box 393
Charleston, West Virginia 25322
Attention: Larry Salyers
Facsimile No.: 304-348-8327

With a copy (that shall not be effective for notice purposes) to:

Peter M. Pearl
Spilman Thomas & Battle, PLLC
310 First Street, Suite 1100 (ZIP 24011)
Post Office Box 90
Roanoke, VA 24002-0090
Facsimile No.: 540.342.4480
PPearl@spilmanlaw.com

25

If to a Borrower:

> Charleston Newspapers
> 1001 Virginia Street, East
> Charleston, West Virginia 25301
> Attention: Norman W. Shumate, III
> Facsimile No.:  304-348-1795

with a copy (that shall not be effective for notice purposes) to:

> Brian A. Audette
> Perkins Coie LLP
> 131 South Dearborn Street, Suite 1700
> Chicago, IL 60603-5559
> PHONE: 312.324.8534
> FAX: 312.324.9534
> E-MAIL: BAudette@perkinscoie.com

9.5    Governing Law. This Agreement and the other Post-Petition Loan Documents shall be deemed contracts made under the laws of the State of West Virginia and shall be governed by and construed in accordance with the laws of the State of West Virginia (excluding its conflict of laws provisions if such provisions would require application of the laws of another jurisdiction) except insofar as (a) the laws of another jurisdiction may, by reason of mandatory provisions of law, govern the perfection, priority, or enforcement of security interests in the Collateral or (b) the terms of such Post-Petition Loan Document expressly state that the law of a different jurisdiction shall govern and, to the extent applicable, the Bankruptcy Code.

9.6    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of each Borrower and Lender and their respective successors and assigns; provided, that (a) no Borrower may assign any of its rights hereunder without the prior written consent of Lender, and any such assignment made without such consent will be void in all respects and (b) neither this Agreement nor any of the other Post-Petition Loan Documents shall inure to the benefit of any trustee appointed in the Chapter 11 Cases or any Chapter 7 case of Borrowers without Lender's express written consent.

9.7    Counterparts; Facsimile Signatures. This Agreement and any amendments, waivers, or consents relating hereto may be executed in any number of counterparts and by different parties hereto or thereto in separate counterparts, each of which when so executed and delivered shall be deemed an original and all of which when taken together shall constitute but one and the same instrument. Any signature delivered by a party hereto or to any amendment, waiver, or consent relating hereto by facsimile transmission or by electronic email in Adobe Corporation's Portable Document Format (or PDF) shall be deemed to be an original signature hereto.

9.8    No Usury. Regardless of any other provision of this Agreement, any Note, or in any other Post-Petition Loan Document, if for any reason the effective rate of interest payable hereunder or thereunder should exceed the maximum lawful rate of interest, the effective rate of interest shall be

26

deemed reduced to, and shall be, such maximum lawful rate of interest. Any amount paid or collected by Lender as interest which would be in excess of the amount permitted by applicable law shall be deemed applied to the reduction of the principal balance of the Obligations and not to the payment of interest, but if such Obligations have been or are thereby paid in full, the excess shall be returned to the Person paying same, such application to the principal balance of the Obligations or the refunding of excess to be a complete settlement and acquittance thereof.

9.9   Powers. All powers of attorney granted to Lender are coupled with an interest and are irrevocable.

9.10 Approvals; Amendments. If this Agreement calls for Lender's approval or consent, such approval or consent may be given or withheld in the discretion of Lender unless otherwise specified herein. This Agreement and the other Post-Petition Loan Documents may not be modified, altered, or amended, except by an agreement in writing signed by Borrowers and Lender.

9.11 Assignments. Nothing in this Agreement or any other Post-Petition Loan Document shall prohibit Lender from pledging or assigning this Agreement and Lender's rights under any of the other Post-Petition Loan Documents, including Collateral therefor, without Borrowers' consent.

9.12 Additional Terms Relating to Joint and Several Obligations of Borrowers. Each of the Borrowers is accepting joint and several liability hereunder in consideration or the financial accommodation to be provided by Lender under this Agreement, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of each of the Borrowers to accept joint and several liability for the obligations of each of them.   Except as otherwise expressly provided herein, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Post-Petition Loan made under this Agreement, notice of occurrence of any Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Lender under or in respect of any of the Obligations, any requirement of diligence and, generally, all demands, notices and other formalities of every kind in connection with this Agreement.

9.13 Distributions. Except to the extent otherwise permitted herein or required by the Bankruptcy Code or by order of the Bankruptcy Court, Borrower shall make no distribution of assets except in full satisfaction all Obligations and then payment on the Pre-Petition Debt.

9.14 Additional Provisions. Time is of the essence of this Agreement and the other Post-Petition Loan Documents. No provision of this Agreement or any of the other Post-Petition Loan Documents shall be construed against or interpreted to the disadvantage of any party hereto by any Governmental Entity by reason of such party having or being deemed to have structured, drafted or dictated such provision.

9.15 Integration; Final Agreement. This Agreement and the other Post-Petition Loan Documents, together with all other instruments, agreements, and certificates executed by the parties in connection therewith or with reference thereto, embody the entire understanding and agreement between the parties hereto and thereto with respect to the subject matter hereof and thereof and supersede all prior agreements, understandings and inducements, whether express or implied, oral or written. There are no unwritten oral agreements between the parties.

9.16 LIMITATION ON LIABILITY; WAIVER OF PUNITIVE DAMAGES. EACH OF THE PARTIES HERETO, INCLUDING LENDER BY ACCEPTANCE HEREOF, AGREES THAT IN ANY

JUDICIAL, MEDIATION, OR ARBITRATION PROCEEDING OR ANY CLAIM OR CONTROVERSY BETWEEN OR AMONG THEM (A "DISPUTE") THAT MAY ARISE OUT OF OR BE IN ANY WAY CONNECTED WITH THIS AGREEMENT, THE POST-PETITION LOAN DOCUMENTS, OR ANY OTHER AGREEMENT OR DOCUMENT BETWEEN OR AMONG THEM OR THE OBLIGATIONS EVIDENCED HEREBY OR RELATED HERETO, IN NO EVENT SHALL ANY PARTY HAVE A REMEDY OF, OR BE LIABLE TO THE OTHER FOR, (a) INDIRECT, SPECIAL, OR CONSEQUENTIAL DAMAGES OR (b) PUNITIVE OR EXEMPLARY DAMAGES. EACH OF THE PARTIES HEREBY EXPRESSLY WAIVES ANY RIGHT OR CLAIM TO PUNITIVE OR EXEMPLARY DAMAGES THEY MAY HAVE OR WHICH MAY ARISE IN THE FUTURE IN CONNECTION WITH ANY DISPUTE, REGARDLESS OF WHETHER THE DISPUTE IS RESOLVED BY ARBITRATION, MEDIATION, JUDICIALLY, OR OTHERWISE.

9.17 WAIVER OF JURY TRIAL. TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH BORROWER, BY EXECUTION HEREOF, AND LENDER, BY ACCEPTANCE HEREOF, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE POST-PETITION LOAN DOCUMENTS OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO ENTER INTO AND ACCEPT THIS AGREEMENT. EACH OF THE PARTIES AGREES THAT THE TERMS HEREOF SHALL SUPERSEDE AND REPLACE ANY PRIOR AGREEMENT RELATED TO ARBITRATION OF DISPUTES BETWEEN THE PARTIES CONTAINED IN ANY POST-PETITION LOAN DOCUMENT OR ANY OTHER DOCUMENT OR AGREEMENT HERETOFORE EXECUTED IN CONNECTION WITH, RELATED TO OR BEING REPLACED, SUPPLEMENTED, EXTENDED OR MODIFIED BY, THIS AGREEMENT.

9.18 Submission to Jurisdiction; Venue.

(a) Any legal action or proceeding with respect to this Agreement or any other Post-Petition Loan Document shall be brought in the Bankruptcy Court, and, by execution and delivery of this Agreement, each Borrower irrevocably accepts for itself and in respect of its property, generally and unconditionally, the nonexclusive jurisdiction of the Bankruptcy Court, and agrees to be bound by the other provisions set forth in this Section 9.18.

(b) Each Borrower hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement or any other Post-Petition Loan Document brought in the Bankruptcy Court.

9.19 No Tax Advice. Each Borrower hereby acknowledges and agrees that, with respect to all tax and accounting matters relating to this Agreement, the other Post-Petition Loan Documents, or the transactions contemplated herein and therein, it has not relied on any representations made, consultation provided by, or advice given or rendered by Lender or Lender's representatives, agents, or employees, and, instead, each Borrower has sought, and relied upon, the advice of its own tax and accounting professionals with respect to all such matters.

**[The remainder of this page intentionally left blank; signatures on following pages.]**

28

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed under seal as of the day and year first above written.

**BORROWERS:**

**CHARLESTON NEWSPAPERS**

By:    Charleston Newspapers Holdings, L.P.   ,
        Its General Partner

By:    Daily Gazette Holding Company, LLC,
        Its General Partner

By:    Daily Gazette Company,
        Its Member

WITNESS/ATTEST:

By:    *Elizabeth E. Chilton*
        Elizabeth E. Chilton
        Its President

By:    Daily Gazette Publishing Company, LLC,
        Its General Partner

By:    Charleston Newspapers Holdings, L.P.,
        Its Member

By:    Daily Gazette Holding Company, LLC,
        Its General Partner

By:    Daily Gazette Company,
        Its Member

WITNESS/ATTEST:

By:    *Elizabeth E Chilton*
        Elizabeth E. Chilton
        Its President

**CHARLESTON NEWSPAPERS
HOLDINGS, L.P.**

By:    Daily Gazette Company,
        Its Member

WITNESS/ATTEST:

By:    *Elizabeth E. Chilton*
        Elizabeth E. Chilton
        Its President

[**Signatures continued on following page**]

**G-M PROPERTIES, INC.**

WITNESS/ATTEST:

By: _Elizabeth E. Chilton_
    Elizabeth E. Chilton
    Its President


**DAILY GAZETTE HOLDING
COMPANY, LLC**

By:    Daily Gazette Company,
        Its Member

WITNESS/ATTEST:

By: _Elizabeth E. Chilton_
    Elizabeth E. Chilton
    Its President

**DAILY GAZETTE COMPANY**

WITNESS/ATTEST:

By: _Elizabeth E. Chilton_
    Elizabeth E. Chilton
    Its President


**DAILY GAZETTE PUBLISHING
COMPANY, LLC**

By:    Charleston Newspapers Holdings, L.P.,
        Its Member

By:    Daily Gazette Holding Company, LLC,
        Its General Partner

By:    Daily Gazette Company,
        Its Member

WITNESS/ATTEST:

By: _Elizabeth E. Chilton_
    Elizabeth E. Chilton
    Its President

**[Signatures continued on following page]**

30

**LENDER:**

**UNITED BANK**

WITNESS/ATTEST:

_____(SEAL)

_____

By: Matthew M. Bond

Its:  Vice President

**Exhibit A**

**Budget**

Debtor: Daily Gazette Company and its Subsidiaries
Weekly Cash Flow Projection

| | Feb 4 | Feb 11 | Feb 18 | Feb 25 | Mar 4 | Mar 11 | Mar 18 | Mar 25 | Apr 1 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts:** | | | | | | | | | | |
| Gross Cash Receipts | 345,000 | 330,000 | 340,000 | 341,000 | 405,000 | 330,000 | 340,000 | 330,000 | 347,500 | 3,108,500 |
| **Disbursements** | | | | | | | | | | |
| Salaries & Wages & Payroll Taxes | 276,827 | | 272,200 | | 272,200 | | 270,200 | | 270,200 | 1,361,627 |
| Supplies | 68,123 | 57,800 | 57,800 | 87,800 | 46,800 | 57,800 | 67,800 | 87,800 | 57,800 | 589,523 |
| Distribution Expenses | 25,000 | 112,500 | 47,500 | 47,500 | 47,500 | 114,500 | 47,500 | 47,500 | 47,500 | 537,000 |
| Services | 16,750 | 16,750 | 15,450 | 14,500 | 14,500 | 19,250 | 17,000 | 14,500 | 11,750 | 140,450 |
| Promotion & Marketing | 2,750 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 22,750 |
| Travel & Meals | 7,850 | 3,850 | 3,850 | 3,850 | 8,100 | 3,850 | 3,850 | 3,850 | 3,850 | 42,900 |
| Rentals | 0 | 0 | 0 | 2,250 | 0 | 0 | 0 | 0 | 2,250 | 4,500 |
| Utilities | 27,750 | 2,750 | 3,500 | 2,750 | 25,000 | 2,750 | 2,500 | 2,500 | 25,000 | 94,500 |
| Repairs & Maintenance | 9,700 | 10,650 | 9,700 | 5,700 | 4,450 | 4,200 | 6,150 | 5,700 | 5,650 | 61,900 |
| Administrative | 43,750 | 52,500 | 27,500 | 8,150 | 21,500 | 45,450 | 22,500 | 25,000 | 28,500 | 274,850 |
| Legal Fees | | | | | | | | | | |
| Total Operating Disbursements | 478,500 | 259,300 | 440,000 | 175,000 | 442,550 | 250,300 | 440,000 | 189,350 | 455,000 | 3,130,000 |
| | | | | | | | | | | |
| Capital Expenditures | | | | | | | | | | 0 |
| | | | | | | | | | | |
| **Carve-Out** | | | | | | | | | | |
| US Trustee Fees | | | | | | | | | 31,425 | 31,425 |
| Debtors' Legal Fees | | | | | 125,000 | | | | 125,000 | 250,000 |
| Total Disbursements | 478,500 | 259,300 | 440,000 | 175,000 | 567,550 | 250,300 | 440,000 | 189,350 | 611,425 | 3,411,425 |
| Operating Cash – Beginning Balance | 255,754 | 122,254 | 192,954 | 92,954 | 258,954 | 96,404 | 176,104 | 76,104 | 216,754 | 255,754 |
| DIP Facility (draw) | | | | | | | | | 50,000 | 50,000 |
| Change in Cash | (133,500) | 70,700 | (100,000) | 166,000 | (162,550) | 79,700 | (100,000) | 140,650 | (213,925) | (252,925) |
| Operating Cash – Ending Balance | 122,254 | 192,954 | 92,954 | 258,954 | 96,404 | 176,104 | 76,104 | 216,754 | 2,829 | 2,829 |

## Exhibit B

### Benchmarks

| Date | Action |
|---|---|
| On or before the date that is 2 days after the Petition Date | The Borrowers will have filed a motion to sell all or substantially all of their assets pursuant to Section 363 of the Bankruptcy Code (the "363 Sale") |
| On or before the date that is 15 days after the Petition Date | The Bankruptcy Court will have entered an order approving bidding procedures for the 363 Sale ("Sales Procedure Order"). |
| March 8, 2018 | The 363 Sale auction will have been held (the "Auction Date"). |
| On or before the date that is 3 days after the Auction Date | The Bankruptcy Court will have entered an order approving the 363 Sale. |
| On or before March 31, 2018 | The closing of the 363 Sale will have occurred. |

All 363 Sale Benchmarks set forth in this Exhibit B may be modified only by written consent of United Bank or order of the Bankruptcy Court.

**Exhibit C**

**Form of Post-Petition Note**

## POST-PETITION NOTE

$400,000.00

February ___, 2018
Charleston, West Virginia

      FOR VALUE RECEIVED, the undersigned **CHARLESTON NEWSPAPERS, CHARLESTON NEWSPAPERS HOLDINGS, L.P., G-M PROPERTIES, INC., ABRY CHARLESTON, INC., RIDGEVIEW EXPRESS DELIVERY, LLC, DAILY GAZETTE HOLDING COMPANY, LLC, DAILY GAZETTE COMPANY, DAILY GAZETTE PUBLISHING COMPANY, LLC,** (jointly and severally, the "Borrowers"), hereby unconditionally promise to pay to the order of **UNITED BANK**, for itself with interest in the Post-Petition Loan (defined below), the principal amount of $400,000.00 or, if less, the then unpaid principal amount of Advances by Lender to Borrowers pursuant to the Post-Petition Loan Agreement, dated as of February __, 2018, among Borrowers and Lender (the "Post-Petition Loan Agreement"). Capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Post-Petition Loan Agreement.

      Borrowers further unconditionally promise to pay to Lender interest on the unpaid principal amount of the Post-Petition Loan until paid at the rate or rates per annum, from the dates and payable on the dates set forth in the Post-Petition Loan and Security Agreement.

      This Post-Petition Note (this "Post-Petition Note") is the promissory note referred to in Section 2.3 of the Post-Petition Loan Agreement. This Post-Petition Note is given subject to the provisions of the Post-Petition Loan Agreement, which, among other things, contains provisions for prepayment of the principal hereof without fee or premium prior to the maturity. In case an Event of Default shall occur and be continuing, the principal of and accrued interest on this Post-Petition Note may be declared to be due and payable in the manner and with the effect provided in the Post-Petition Loan Agreement.

      Borrowers hereby waive presentment, demand, protest or notice of any kind in connection with this Post-Petition Note.

      THIS POST-PETITION NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF WEST VIRGINIA.

[Signature Pages Follow]

35

IN WITNESS WHEREOF, the parties hereto have caused this Post-Petition Note, dated February __, 2018, to be duly executed under seal as of the day and year first above written.

**CHARLESTON NEWSPAPERS**

By:    Charleston Newspapers Holdings, L.P.  ,
        Its General Partner

By:    Daily Gazette Holding Company, LLC,
        Its General Partner

By:    Daily Gazette Company,
        Its Member

WITNESS/ATTEST:

By:    *Elizabeth E. Chilton*
        Elizabeth E. Chilton
        Its President

By:    Daily Gazette Publishing Company, LLC,
        Its General Partner

By:    Charleston Newspapers Holdings, L.P.,
        Its Member

By:    Daily Gazette Holding Company, LLC,
        Its General Partner

By:    Daily Gazette Company,
        Its Member

WITNESS/ATTEST:

By:    *Elizabeth E. Chilton*
        Elizabeth E. Chilton
        Its President

**CHARLESTON NEWSPAPERS
HOLDINGS, L.P.**

By:    Daily Gazette Company,
        Its Member

WITNESS/ATTEST:

By:    *Elizabeth E. Chilton*
        Elizabeth E. Chilton
        Its President

**G-M PROPERTIES, INC.**

WITNESS/ATTEST:

By:    *Elizabeth E. Chilton*
        Elizabeth E. Chilton
        Its President

36

**DAILY GAZETTE HOLDING COMPANY, LLC**

By: Daily Gazette Company,
  Its Member

WITNESS/ATTEST:

By: Elizabeth E. Chilton
  Elizabeth E. Chilton
  Its President

**DAILY GAZETTE COMPANY**

WITNESS/ATTEST:

By: Elizabeth E. Chilton
  Elizabeth E. Chilton
  Its President

**DAILY GAZETTE PUBLISHING COMPANY, LLC**

By: Charleston Newspapers Holdings, L.P.,
  Its Member

By: Daily Gazette Holding Company, LLC,
  Its General Partner

By: Daily Gazette Company, Its Member

WITNESS/ATTEST:

By: Elizabeth E. Chilton
  Elizabeth E. Chilton
  Its President

37