# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Daily Gazette Company, *et al.*, | ) | Case No. 18-20028 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

## DEBTORS' MOTION FOR AUTHORITY TO DISBURSE NET SALE PROCEEDS

Daily Gazette Company, and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), hereby move (this "Motion"), for entry of an order authorizing the Debtors to disburse certain net sale proceeds, and respectfully state as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2. This is a core proceeding under 28 U.S.C. § 157(b), and the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's taxpayer identification number are as follows: Daily Gazette Company (4480); Daily Gazette Holding Company, LLC (2981); Charleston Newspapers Holdings, L.P. (3028); Daily Gazette Publishing Company, LLC (3074); Charleston Newspapers (6079); and G-M Properties, Inc. (4124). The Debtors' headquarters are located at 1001 Virginia St. E, Charleston, West Virginia 25301.

## BACKGROUND

**A.     Chapter 11 Filings And The Debtors' Business**

4.      On January 30, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are continuing to operate and maintain their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or creditors' committee has been appointed in these Chapter 11 Cases.

5.      The Debtors, headquartered in Charleston, West Virginia, collectively operate privately owned information and entertainment businesses consisting of the flagship newspaper, The Charleston Gazette-Mail, as well as a related website, weekly publications, a saturation mail product and the following verticals: www.wvcarfinder.com; www.wvrealestatefinder.com; www.wvjobfinder.com; and www.gazettemailclassifieds.com.  As of the Petition Date, the Debtors employed, collectively, approximately 210 people, approximately 170 of which are full-time employees and 40 of which are part-timers.

**B.     United Bank Liens**

6.      On the Petition Date, the Debtors filed the Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing with Priority Over Certain Administrative Expenses and Secured by Liens on Property of the Estate Pursuant to 11 U.S.C. § 364, (II) Authorizing Debtors to Use Cash Collateral and Other Collateral and Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief.

7.      On February 1, 2018, the Court entered the Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing with Priority Over Certain Administrative Expenses and Secured by Liens on Property of the Estate Pursuant to 11 U.S.C. § 364, (II) Authorizing Debtors

to Use Cash Collateral and Other Collateral and Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief (the "Interim Order").

8. Among other things, pursuant to the Interim Order, the Debtors acknowledged and agreed that: (a) the principal amount owed to United Bank as of the Petition Date is $15,659,437.09 and that United Bank is entitled to certain additional interest, fees, charges and costs of collection, including attorneys' fees (the "Pre-Petition Indebtedness"); (b) the Pre-Petition Indebtedness is secured (the "Pre-Petition Liens") by substantially all of the Debtors' tangible and intangible personal property and all of the Debtors' real property (collectively, the "Pre-Petition Collateral");[2] (c) they have no valid claims or causes of action against United Bank; and (d) the Pre-Petition Liens constitute valid, binding, enforceable, non-avoidable, and properly perfected liens on the Pre-Petition Collateral and remain senior in priority over any and all other liens on the Pre-Petition Collateral. Moreover, the Debtors were authorized to use cash collateral pursuant to the terms of a budget (the "Initial Budget") through March, 2018. As adequate protection for the Debtors' use of cash collateral, the Interim Order provided that United Bank shall have a continuing lien and security interest in all post-petition assets of the Debtors to the same extent, type and priority as United Bank has in the Pre-Petition Collateral. Further, creditors were granted 45 days from the date that United Bank files its proof of claim to object to the extent, validity, priority or perfection of United Bank's liens.[3]

---

[2] Daily Gazette Company owns a parcel of unimproved real property in Dry Fork District, Tucker County, West Virginia, which is commonly known as Tract No. 38 in Deer Ridge Section of Timberline Sub-Division, and which is not subject to a United Bank lien and is not part of the sale transaction described herein.

[3] Pursuant to the Interim Order, the Debtors were also authorized to borrow up to $400,000 from United Bank in form of debtor-in-possession financing to sustain their post-petition operations. To date, the Debtors have not borrowed any such funds from United Bank and do not anticipate the need to do so in the future.

9. On February 6, 2018, United Bank filed its secured proof of claim in the amount of $16,505,381.73 (the "United Bank Claim"). Accordingly, pursuant to the Interim Order, objections to United Bank's liens must be filed on or before March 23, 2018 (the "Objection Deadline").

10. On March 12, 2018, the Court entered the Final Order (I) Authorizing Debtors to Obtain Postpetition Financing with Priority Over Certain Administrative Expenses and Secured by Liens on Property of the Estate Pursuant to 11 U.S.C. § 364, (II) Authorizing Debtors to Use Cash Collateral and Other Collateral and Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief (the "Final Order"). Among other things, the Final Order (a) included the same acknowledgements and agreements of the Debtors set forth above, (b) authorized the Debtors' use of cash collateral pursuant to the Initial Budget, (c) included the same adequate protection for the benefit of United Bank described above, and (c) included the same Objection Deadline.

C. **The Key Employee Incentive Plan**

11. On February 9, 2018, the Debtors filed their motion to approve a Key Employee Incentive Plan, whereby the Debtors requested authority to pay certain Transaction Bonuses to certain Key Employees in the aggregate amount of $151,250 (the "Key Employee Compensation") upon the closing of a sale of substantially all of the Debtors' assets. At the hearing on this motion on March 9, 2018, the Court indicated that it would grant the motion; however, the order has not yet been entered on the docket for these Chapter 11 Cases.

138967089.3

**D.     The Sale Process**

12.     Prior to the Petition Date, the Debtors engaged Dirks, Van Essen & Murray ("Dirks Van Essen") to market substantially all of the Debtors' assets for sale.  As a result of Dirks Van Essen's efforts, on January 29, 2018, the Debtors entered into an asset purchase agreement (the "Stalking Horse APA") with Charleston Newspapers, LLC (the "Stalking Horse Bidder"), which Stalking Horse APA was subject to higher and better bids.

13.     On the Petition Date, the Debtors filed Debtors' Motion Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code for: (I) an Order (A) Approving and Authorizing Bidding Procedures in Connection with the Sale of Substantially all of the Debtors' Assets, (B) Approving and Authorizing the Break-Up Fee, (C) Scheduling the Related Auction and Hearing to Consider Approval of the Sale, (D) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (E) Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief; and (II) An Order (A) Authorizing the Sale of Substantially all the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (B) Authorizing and Approving the Debtors' Performance Under the Asset Purchase Agreement, (C) Approving the Assumption and Assignment of Certain of the Debtors' Executory Contracts and Unexpired Leases Related Thereto, and (D) Granting Related Relief.

14.     On February 1, 2018, the Court entered the Order (A) Approving and Authorizing Bidding Procedures in Connection with the Sale of Substantially all the Debtors' Assets, (B) Approving and Authorizing the Break-Up Fee, (C) Scheduling the Related Auction and Hearing to Consider Approval of the Sale, (D) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (E) Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief (the "Bid Procedures Order").

138967089.3

Among other things, the Bid Procedures Order approved a break-up fee in the amount of $400,000 (the "Break-Up Fee") for the benefit of the Stalking Horse Bidder to the extent the Debtors' accepted a competing bid and closed a transaction with a competing bidder. Also, the Bid Procedures Order provided that: (a) competing bids were due by March 6, 2018; (b) to the extent any competition bids were received, the Debtors would conduct an auction (the "Auction") for the sale of their assets on March 8, 2018; and (c) the hearing to approve the sale of the Debtors' assets would be held on March 9, 2018.

15. On February 13, 2018, the Court entered an Order Authorizing the Employment and Retention of Dirks Van Essen & Murray as Broker for the Debtors *Nunc Pro Tunc* to the Petition Date and Waiving Certain U.S. Trustee Time-Keeping Guidelines, which, among other things, approved Dirks Van Essen's compensation consisting of: (a) a commission at the time of a closing of 1.3% of the gross purchase price; and (b) reimbursement of all reasonable expenses for travel (the "Dirks Van Essen Compensation").

16. On March 6, 2018, the Debtors received a competing bid for the acquisition of their assets from HD Media Company, LLC ("HD Media") pursuant to the terms of an asset purchase agreement (the "HD Media APA") that included a gross purchase price of $11,487,243 (the "Purchase Price"). Prior to the Auction, the Stalking Horse Bidder informed the Debtors that it did not wish to increase its bid or participate in the Auction. Accordingly, on March 8, 2018, the Debtors named HD Media as the successful bidder pursuant to the HD Media APA.

17. On March 12, 2018, the Court entered the Order (A) Authorizing the Sale of Substantially all of the Debtors' Assets Free and Clear of all Liens, Claims, Encumbrances, and Other Interests, (B) Authorizing and Approving the Debtors' Performance Under the Asset Purchase Agreement, (C) Approving the Assumption and Assignment of Certain of the Debtors'

Executory Contracts and Unexpired Leases Related Thereto, and (D) Granting Related Relief (the "Sale Order"). Among other things, the Sale Order approved the HD Media APA and authorized the Debtors to perform pursuant to it. The Debtors expect to close on or before March 31, 2018 (the "Closing"). Because the Stalking Horse Bidder was not the successful bidder following an Auction, the Debtors are obligated to pay the Break-Up Fee to the Stalking Horse Bidder upon Closing.

18.     The HD Media APA contemplates working capital adjustments as of the Closing and a final true-up post-closing (the "Final Adjustment") that will affect the purchase price under the HD Media APA. While the Debtors expect that such Final Adjustment will ultimately result in an increase to the purchase price (the "Working Capital Increase"), they are nevertheless obligated under the HD Media APA to reserve $325,000 from the sale proceeds (the "Working Capital Reserve") to account for the unlikely scenario in which the Final Adjustment favors HD Media, thereby reducing the purchase price and entitling HD Media to a return of a portion of the purchase price.

E.      **The Debtors' Wind Down**

19.     Following the Closing, the Debtors will no longer conduct their business as it existed prior to the Closing. Nevertheless, the Debtors will be obligated to prepare and file monthly operating reports, ensure that all undisputed administrative expense claims incurred by the Debtors following the Petition Date and up to Closing are paid in full, including, without limitation, trade debts, employee obligations, U.S. Trustee fees and the Debtors' legal fees (collectively, the "Administrative Costs"). Moreover, the Debtors intend to perform certain wind-down functions following Closing, which include, without limitation: (a) terminating or rolling over any remaining employee benefits, including the Debtors' 401(k) plan and other related retirement benefits; (b) retaining an accountant to prepare 2017 and 2018 tax returns; (c)

properly dissolving the Debtors and any non-debtor affiliates pursuant to applicable law; and (d) such other tasks necessary to efficiently wind-down the Debtors' business and affairs (collectively, the "Wind Down Expenses", and together with the Administrative Costs, the "Remaining Debtor Obligations"). Attached hereto as Exhibit A is a budget (the "Supplemental Budget") reflecting the Debtors' best estimate of the total cost of the Remaining Debtor Obligations, which total approximately $1,345,818.

20. In addition, at Closing, the Debtors will be required to pay: (a) the Break-Up Fee; (b) the Key Employee Compensation; (c) the Dirks Van Essen Compensation; and (d) such other costs the Debtors may be obligated to pay in connection with and upon Closing, such as the Debtors' estates' share of unpaid property taxes relating to the pre-Closing period and certain employee expenses relating to those employees not hired by HD Media (collectively, the "Closing Costs"). The obligations described in (a) through (c) above are expected to total approximately $700,000—the only unknown at this time consisting of Dirks Van Essen's out-of-pocket expenses. The obligations described in (d) will not be known until Closing.

## RELIEF REQUESTED

21. All of the Debtors' cash on hand, including the approximately $400,000 that the Debtors estimate they will possess as of the Closing, consists of United Bank's collateral (the "Cash on Hand"). Similarly, with one exception,[4] all of the proceeds expected from the sale of the Debtors' assets pursuant to the HD Media APA, including any Working Capital Increase (the "Sale Proceeds", and together with the Cash on Hand, the "Closing Cash") consists of United

---

[4] The Debtors are informed and believe that United Bank does not have a perfected security interest in dozens of vehicles owned by the Debtors that will be sold pursuant to the HD Media APA (collectively, the "Vehicles"). However, the Vehicles have minimal value, as their owner, Charleston Newspapers, valued them collectively at $41,275.25. *See* Charleston Newspapers' Schedules of Assets and Liabilities [Dkt. #107]. Any sale proceeds attributable to the Vehicles will be used to satisfy the Closing Costs and/or undisputed Remaining Debtor Obligations.

Bank's collateral. However, United Bank has agreed that the Closing Costs and undisputed Remaining Debtor Obligations may be paid from the Closing Cash. After the payment of all Closing Costs, retaining the Working Capital Reserve, and reserving for the satisfaction of the Remaining Debtor Obligations, the Debtors will possess certain excess Closing Cash, which cannot be precisely determined until Closing (the "Net Sale Proceeds").

22. By this motion, and provided that no challenges to United Bank's liens are filed on or before the Objection Deadline, the Debtors request authority to distribute the Net Sale Proceeds to United Bank upon Closing. The Debtors believe such relief is justified and appropriate under the circumstances because this relief will permit United Bank to recover a substantial part of its collateral within the first quarter of 2018 while also enabling the Debtors to properly and efficiently satisfy the obligations described herein in full for the benefit of the Debtors' estates, creditors, parties-in-interest and other stakeholders. Out of an abundance of caution, the Debtors also request the authority to pay the Dirks Van Essen Compensation to Dirks Van Essen upon Closing.

23. Moreover, to the extent the Debtors have any remaining Closing Cash after satisfying all of their undisputed Remaining Debtor Obligations, the Debtors anticipate that such cash will be paid to United Bank. To the extent that the Debtors do not have sufficient Closing Cash to satisfy all of the undisputed Remaining Debtor Obligations, the Debtors are informed and believe that United Bank will reasonably cooperate with the Debtors to ensure that all such undisputed obligations are paid in full.

24. To the extent the Debtors' requested relief is construed as the use of their property outside the ordinary course of business, such relief is justified pursuant to section 363(b) of the Bankruptcy Code, which provides, in pertinent part, that: "[t]he trustee, after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  To approve the use of estate property outside the ordinary course of business under section 363(b)(1), a debtor must show that the decision to use the property was based on the debtor's sound business judgment.  *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (citing *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (finding that "a judge determining a 363(b) application [must] expressly find from the evidence presented . . . at the hearing a good business reason to grant such application")); *In re Gordon Props., LLC*, 504 B.R. 415, 419 (Bankr. E.D. Va. 2013).

25.  A debtor's showing of a sound business justification need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *See Lionel Corp.,* 722 F.2d at 1071.

26.  Here, payment of the Net Sale Proceeds to United Bank upon Closing represents a sound exercise of the Debtors' business judgment.  The relief sought herein strikes an appropriate balance between the Debtors' obligations to its secured lender, United Bank, and its obligation to satisfy the Remaining Debtor Obligations for the benefit of its estate, creditors and other parties-in-interest.  Accordingly, the Debtors submit that the relief requested herein is appropriate under the circumstances and the Court should grant this Motion.

## **NOTICE**

27.  This Motion has been served upon: (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the Southern District of West Virginia; (c) the Internal Revenue Service; (d) counsel to United Bank; (f) the Debtors' top 20 largest unsecured

138967089.3

creditors; and (h) all parties that have requested notice and/or have appeared in these Chapter 11 Cases.

WHEREFORE, the Debtors respectfully request the entry of an order (a) authorizing them to disburse the Net Sale Proceeds to United Bank upon Closing, (b) authorizing them to pay to Dirks Van Essen the Dirks Van Essen Compensation upon Closing, and (c) granting such other and further relief as is just.

Dated:  March 16, 2018

**PERKINS COIE LLP**

By: /s/      *Brian A. Audette*
Brian A. Audette (IL Bar No. 6277056)
(Admitted Pro Hac Vice)
131 S. Dearborn St., Suite 1700
Chicago, IL 60603
Telephone: 312.324.8534
baudette@perkinscoie.com

-and-

Joe M. Supple, Bar. No. 8013
SUPPLE LAW OFFICE, PLLC
801 Viand St.
Point Pleasant, WV 25550
Telephone: 304.675.6249
joe.supple@supplelaw.net

*Co-Counsel to the Debtors and Debtors in Possession*

138967089.3