

Frank W. Volk, Chief Judge
United States Bankruptcy Court
Southern District of West Virginia

ENTERED: 3/30/2018 at 9:01 am

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE: | LEAD CASE NO. 2:18-bk-20028 |
| | *Joint Administration* |
| DAILY GAZETTE COMPANY, | |
| DAILY GAZETTE HOLDING | CHAPTER 11 |
| COMPANY, LLC, | |
| CHARLESTON NEWSPAPERS | JUDGE FRANK W. VOLK |
| HOLDINGS, L.P., | |
| DAILY GAZETTE PUBLISHING | |
| COMPANY, LLC, | |
| CHARLESTON NEWSPAPERS, and | |
| G-M PROPERTIES, INC., | |
| Debtors. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending is the above-listed Joint Debtors' Motion to Authorize Disbursement of Net Sale Proceeds ("Motion to Authorize") [Dckt. 152], along with a Joint Objection by MediaNews Group, Inc. and Charleston Publishing Company ("Joint Objection") [Dckt. 170].

The Court heard the matter in the afternoon on Wednesday, March 28, 2018. Inasmuch as the Joint Objection had been filed the day prior to the hearing on the Motion to Authorize, the Court provided the Joint Debtors and United Bank an opportunity to respond to the Joint Objection by noon on Thursday, March 29, 2018, with any reply from MediaNews Group, Inc. and Charleston Publishing Company (together, "MediaNews") by 5:00 p.m. on Thursday, March 29, 2018. The Court advised the parties to expect its written opinion no later than 9:00 a.m. on Friday, March 30, 2018, prior to the closing that date on the sale transactions. Having received the aforementioned responses and reply the matter is ready for adjudication.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court is vested with jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

## I.

On January 30, 2018, the Joint Debtors petitioned for relief under Chapter 11 of the Bankruptcy Code ("Petition Date"). On February 1, 2018, the Court entered the Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing with Priority Over Certain Administrative Expenses and Secured by Liens on Property of the Estate Pursuant to 11 U.S.C. § 364, (II) Authorizing Debtors to Use Cash Collateral and Other Collateral and Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief (the "Interim Order") [Dckt. 39]. The Final Order was entered on March 12, 2018 [Dckt. 140].

Pursuant to the Interim and Final Orders, the Joint Debtors agreed that: (1) the principal amount owed to United Bank as of the Petition Date is $15,659,437.09 and that United Bank is entitled to certain additional interest, fees, charges and costs of collection, including attorney fees ("Pre-Petition Indebtedness"); (2) the Pre-Petition Indebtedness is secured by substantially all of the Joint Debtors' tangible and intangible personal property and all of the Joint Debtors' real property ("Pre-Petition Liens"); (3) they have no valid claims against United Bank; and (4) the Pre-Petition Liens constitute valid, binding, enforceable, non-avoidable, and properly perfected liens on all pre-petition collateral and remain senior in priority over all other liens thereon.

Additionally, the Joint Debtors were authorized to use cash collateral pursuant to the terms of a budget ("Initial Budget") through March 2018. As adequate protection for the Joint

2

Debtors' use of cash collateral, the Interim and Final Orders provided that United Bank would have a continuing lien and security interest on all post-petition assets of the Joint Debtors to the same extent, type and priority as United Bank has in the pre-petition collateral.

Creditors were allotted 45 days from the date that United Bank filed its proof of claim to object to the extent, validity, priority or perfection of United Bank's liens. On February 6, 2018, United Bank filed its secured proof of claim in the amount of $16,505,381.73. Pursuant to the Interim and Final Orders, objections to United Bank's lien were due by March 23, 2018. No objections were filed.

On February 1, 2018, the Court entered the Order Approving and Authorizing Bidding Procedures in Connection with the Sale of Substantially all the Debtors' Assets ("Bidding Procedure Order") [Dckt. 63]. The Bidding Procedure Order approved, *inter alia*, a break-up fee of $400,000 for the benefit of the Stalking Horse Bidder (an entity that ultimately did not participate in the auction), set forth the procedures for bidding, and set the auction and hearing to approve the sale dates. On February 13, 2018, the Court entered an Order Authorizing the Employment and Retention of Dirks Van Essen & Murray as Broker for the Debtors which, among other things, approved Dirks Van Essen's compensation consisting of: (1) a commission at the time of a closing of 1.3% of the gross purchase price; and (2) reimbursement of all reasonable expenses for travel (the "Dirks Van Essen Compensation") [Dckt. 86].

On March 8, 2018, the Joint Debtors named HD Media as the successful bidder with the gross purchase price of $11,487,243. After a hearing, and having received no objections to any matter taken up to that point, the Court entered the Order Authorizing the Sale of Substantially all of the Debtors' Assets Free and Clear of all Liens, Claims, Encumbrances, and Other Interests ("Sale Order") on March 12, 2018 [Dckt. 141]. Foremost, the Sale Order sanctioned

the HD Media Asset Purchase Agreement and authorized the Joint Debtors to perform pursuant thereto.

On March 16, 2018, the Joint Debtors filed the instant Motion to Authorize. The filing provided that all of the Joint Debtors' cash on hand and all of the expected sale proceeds were part and parcel of United Bank's collateral, with the exception of dozens of vehicles that have a collective value of $41,275.25. The Joint Debtors additionally stated in the Motion to Authorize that retained funds in the amount of $1,345,818 ("Holdback") will be set aside for the winding down of their affairs, including the payment of administrative claims. In addition to the Holdback, Joint Debtors are also required to pay: (1) a break-up fee with the Stalking Horse Bidder; (2) certain key employee compensation; (3) compensation to Dirks Van Essen for brokerage services; and (4) other closing costs. After those amounts, tallying approximately $700,000, have been paid, the residue will consist of the Net Sale Proceeds. Joint Debtors are requesting authorization upon closing to disburse the Net Sale Proceeds to United Bank and to pay Dirks Van Essen.

As noted, over ten days after the Motion to Authorize was filed, and one day prior to the hearing thereon, MediaNews filed its Objection on March 27, 2018. MediaNews contends that the proposed disbursement violates (1) the principles of the Bankruptcy Code and the Supreme Court's holding in *Czyzewski v. Jevic Holding Corp.*, -- U.S. --, 137 S. Ct. 973, 978 (2017), and (2) the requirements under 11 U.S.C. § 363(b) for a sale, including the business judgment standard.

Yesterday afternoon, on March 29, 2018, the Joint Debtors filed their Response [Dckt. 172]. In the Response, the Joint Debtors acknowledge that the Sale did not generate enough money to make a distribution to general unsecured creditors. They counter, however, that these Chapter 11 cases and the sale have benefited the community, employees, contract counter-parties, vendors, and the news-reading public. The Joint Debtors further note that the Motion to Authorize

4

seeks only the authorization to disburse the Net Sale Proceeds, not to conclude the case, inasmuch as other matters are extant.

Later that same afternoon, United Bank also filed its Response [Dckt. 173], in which it asserts the sale was a collaborative effort that resulted in the preservation of a going concern, with resultant benefits accruing to others beyond itself. United Bank also insists that MediaNews had the opportunity to object to the Sale Motion but sat idle, meaning that authorization is now a final order immune from challenge.

MediaNews filed its Reply on March 29, 2018 [Dckt. 174]. The Reply reiterates the *Jevic* contentions and maintains, in seeming contrast to its opening brief, that it does not object to the sale or closing. It claims the objection is directed toward essentially all of the Net Sale Proceeds being paid to United Bank.

Given the equivocal nature of MediaNews' position, a portion of the discussion that follows must addresses the integrity and permissibility of the sale.

## II.

### A.   United Bank's Lien

Before reaching MediaNews' two challenges, a brief discussion is warranted respecting United Bank's lien.[1]   As noted, the Interim and Final Orders prescribed a March 23,

---

[1] For the first time in its Reply, MediaNews notes the bar date for general unsecured creditors does not pass until May 30, 2018. It contends that any action affecting the potential recovery of these creditors is premature.

As noted recently by Judge Chambers, "Raising a new argument in a reply, apart from the practice's departure from the purpose of the reply generally, denies the non-moving party an opportunity to respond, which it is ordinarily due. The aberrant practice thus generally results in waiver of the new argument. *Moss v. Experian Information Solutions, Inc.*, 2017 WL 1128636, at *3 (S.D. W. Va. 2017). Were the argument not foreclosed procedurally, however, it is not

2018, deadline for objection to United Bank's Proof of Claim.  No objections were filed and leave was not sought to tender a late objection.  There is thus no basis at this juncture to conclude that United Bank holds anything other than a properly perfected security interest in the entirety of the Net Sale Proceeds.

**B.      The Asserted Noncompliance with the Code and the Putative Impact of *Jevic***

MediaNews asserts that the Joint Debtors have violated a basic Chapter 11 tenet by proposing a distribution to, essentially, a lone secured creditor. It invokes *Jevic* in aid of that contention.

The point of a Chapter 11 reorganization is the "negotiat[ion of] a plan that will govern the distribution of valuable assets from the debtor's estate and often keep[s] the business operating as a going concern." *Jevic*, 137 S. Ct. at 978.  Although somewhat atypical, a section 363 sale is simply "a less common way of effecting a bankruptcy." *Elliott v. General Motors LLC (In Matter of Motors Liquidation Company)*, 829 F.3d 135, 145 (2d Cir. 2016) (citing *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1066-70 (2d Cir. 1983)). In a Chapter 11 sale context, the debtor, in lieu of a plan, simply "sells its primary assets to a successor corporation, which immediately takes over the business." *Id.*

In *Jevic*, the bankruptcy court had approved dismissal as part of a settlement scheme that purported to make payments to high-priority claimants (such as those seeking

---

meritorious. In sum, the bar date has no bearing on the present proceedings.  Following the closing of this 363(b) sale, the Net Sale Proceeds will be distributed to United Bank. No unsecured creditors would be entitled to share in any portion.  Additionally, assets will remain in the case even following the Net Sale Proceeds distribution, including the multitude of vehicles earlier mentioned and the Tucker County property. Accordingly, the argument is meritless, assuming it is properly reached.

administrative expenses) and general unsecured creditors, but without recompense to mid-priority-level wage claimants. *Jevic*, 137 S. Ct. at 981. That structured settlement thus departed from the Code's priority rubric. The Supreme Court rejected the settlement as an attempt to "circumvent the Code's procedural safeguards" and disallowed structured dismissals offending the Code's priority scheme.

The decision in *Jevic* thus bears no similarity to this proceeding. Foremost, the Supreme Court was reviewing a structured dismissal of a case rather than the Code-sanctioned sale and distribution process here involved. A vast expanse separates, on the one hand, the proposed distribution to United Bank, which holds an uncontested security interest in the underlying assets, and, on the other, the priority shell game of sorts involved in *Jevic*. The proposed disbursement would result in an orderly payment of administrative claims, such as attorney fees and United States Trustee fees, followed by payment to an undisputed secured creditor with essentially a blanket lien covering in excess of the Net Sale Proceeds. The proposal neither runs afoul of *Jevic* nor the Code generally. MediaNews' contentions to the contrary, which include reference to certain legislative history sources, are meritless.

## C.    The Business Judgment Standard Under Section 363(b)[2]

As noted previously, some Chapter 11 cases proceed with a sale of substantially all of the debtor's assets instead of the lengthy plan process. *Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 36 n.2 (2008); *General Motors*, 829 F.3d at 145-46. Although, "[i]n

---

[2] At the outset of this section, the Court notes that this portion of MediaNews' challenge goes more to the sale itself, rather than distribution of the proceeds. Although the Court finds the following arguments to thus be inappropriate in the context of the Motion to Authorize, it will nonetheless address the assertions fully.

. . . [a sale] scenario, the debtor typically submits for confirmation a plan of liquidation . . .
providing for the distribution of the proceeds resulting from the sale," that is not always the case,
and a debtor will sometimes simply submit a section 363(b) motion to sell. *Piccadilly
Cafeterias*, 554 U.S. at 36 n.2; *see, e.g. In re Flour City Bagels, LLC*, 557 B.R. 53 (Bankr.
W.D.N.Y. 2016); *In re Boston Generating, LLC*, 440 B.R. 302 (Bankr. S.D.N.Y. 2010).

Under section 363(b), the debtor is saddled with the obligation of "demonstrating
that a use, sale or lease out of the ordinary course of business will aid the debtor's reorganization."
*Lionel*, 722 F.2d at 1071. That is no small task in the mine run of cases. The Second Circuit in the
*Lionel* case articulated the prevailing standard for judicial approval of a section 363(b) sale prior
to or in place of a Chapter 11 Plan: the judge must "expressly find from the evidence presented . .
. a good business reason to grant such an application." *Id.*

The *Lionel* Court elaborated on that rule, cautioning bankruptcy courts to "consider
all salient factors pertaining to the proceeding and . . . act to further the diverse interests of the
debtor, creditors, and equity holders, alike." *Id.* The analysis involves a number of considerations:

> [T]he proportionate value of the asset to the estate as a whole, the
> amount of elapsed time since the filing, the likelihood that a plan of
> reorganization will be proposed and confirmed in the near future,
> the effect of the proposed disposition on future plans of
> reorganization, the proceeds to be obtained from the disposition vis-
> a-vis any appraisals of the property, which of the alternatives of use,
> sale or lease the proposal envisions and, *most importantly* perhaps,
> whether the asset is increasing or decreasing in value. This list is not
> intended to be exclusive, but merely to provide guidance to the
> bankruptcy judge.

*Id.* (emphasis added). Other courts have added additional factors to that list, such as:

> (i) whether adequate and reasonable notice has been provided to
> parties in interest, including full disclosure of the sale terms and the
> debtor's relationship with the purchaser, (ii) whether the sale price
> is fair and reasonable, and (iii) whether the proposed buyer is
> proceeding in good faith.

*Flour City Bagels*, 557 B.R. at 77-78 (citing to a list of three cases). Importantly, "[s]ection 363(b) should be interpreted liberally to provide a bankruptcy judge with 'substantial freedom to tailor his orders to meet differing circumstances.'" *The Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 154 (D. Del. 1999) (quoting *Lionel*, 722 F.2d at 1069). In the *Lionel* case, the sole justification for the section 363(b) sale of the debtor's stock interest was the Unsecured Creditor's Committee's demand that the interest be liquidated.  Unsurprisingly, the Second Circuit concluded there was no good business reason for the sale. *Lionel*, 722 F.2d at 1071.

A bankruptcy court in the Fifth Circuit, in *In re Gulf Coast Oil Corp.*, provided a thorough and helpful summary of the law surrounding section 363(b) sales outside of a Chapter 11 Plan, as follows:

Under the existing jurisprudence:

- The debtor in possession or trustee in a chapter 11 case must consider its fiduciary duties to all creditors and interest holders before seeking approval of a transaction under § 363(b).

- The movant must establish a business justification for the transaction and the bankruptcy court must conclude, from the evidence, that the movant satisfied its fiduciary obligations and established a valid business justification.

- A sale, use, or lease of property under § 363(b) is not *per se* prohibited even though it purports to sell all, or virtually all, of the property of the estate, but such sales (or proposed sales of the crown jewel assets of the estate) are subject to special scrutiny.

- Parties that oppose § 363(b) transactions on the basis that they constitute a *sub rosa* chapter 11 plan must articulate the specific rights that they contend are denied by the transaction.

- Although the bankruptcy court need not turn every § 363(b) hearing into a mini-confirmation hearing, the bankruptcy court must not authorize a § 363(b) transaction if the transaction would effectively evade the "carefully

9

crafted scheme" of the chapter 11 plan confirmation process, such as by denying §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) rights.

•    If the bankruptcy court concludes that such rights are denied, then the bankruptcy court can only approve the transaction if it fashions an appropriate protective measure modeled on those which would attend a reorganization plan.

•    Transactions that explicitly release all (or virtually all) claims against the estate, predetermine the structure of a plan of reorganization, and explicitly obligate parties to vote for or against a plan are not authorized under § 363(b).

*In re Gulf Coast Oil Corp.*, 404 B.R. 407, 422 (Bankr. S.D. Tex. 2009). That same court set forth

several factors to evaluate when approving a section 363(b) sale such as this one. *Id.* at 423-24.

They are as follows:

1.  Is there evidence of a need for speed?

2.  What is the business justification?

3.  Is the case sufficiently mature to assure due process?

4.  Is the proposed APA sufficiently straightforward to facilitate competitive bids or is the purchaser the only potential interested party?

5.  Have the assets been aggressively marketed in an active market?

6.  Are the fiduciaries that control the debtor truly disinterested?

7.  Does the proposed sale include all of a debtor's assets and does it include the "crown jewel"?

8.  What extraordinary protections does the purchaser want?

9.  How burdensome would it be to propose the sale as part of confirmation of a chapter 11 plan?

*Id.* The United States Bankruptcy Court for the Eastern District of Virginia applied these factors

in *In re On-Site Sourcing, Inc.*, 412 B.R. 817 (Bankr. E.D. Va. 2009). In the *On-Site* case, the

Bankruptcy Court, in approving the sale generally, actually *removed* a provision from the sale

agreement that created a carve-out for general unsecured creditors, saying that it "effectively

evade[d] the carefully crafted scheme of the chapter 11 plan confirmation process." *On-Site*, 412 B.R. at 826.

Turning to the instant case, the initial two factors are properly considered in tandem. First, there are a bevy of justifiable and "good" business reasons supporting the impending sale. First, at the heart of this controversy is the largest circulation newspaper in the Capitol city and surrounding areas. It was birthed almost simultaneously with our State and has been vigorously kicking ever since. Among its many journalistic accomplishments is a coveted Pulitzer Prize.

The newspaper employed approximately 210 individuals, at least 160 of which have been retained by the purchaser, HD Media, through this sale process. During the pendency of this proceeding, operations have continued unabated; 125 of 132 executory contracts and unexpired leases have been assumed by the purchaser. As evidenced by letters filed by employees and community members, the Charleston area was well-nigh desperate to save this local newspaper.[3]

Sadly, newspapers are experiencing a host of challenges in the Information Age. It was no small feat that the Joint Debtors were able to find a buyer at a reasonable price. The lack of interest in the bidding process, and the departure of the Stalking Horse Bidder, confirm that time was indeed of the essence to this transaction; the delay caused by the traditional Chapter 11 plan process would doubtless have further chilled interest. There was, indeed, a "need for speed,"

---

[3] Courts have understandably found job preservation, continuity of a business and continuation of an important community service to be important in the "good business judgment" evaluation.  For example, in the *Rausch* case, a section 363(b) sale was approved because it was "a sale to individuals or an entity which intend[ed] to continue the debtor as a viable company employing people and producing a product which has a worldwide market. . . . It would be a substantial loss to [the] community in jobs and commerce to grant . . . [the] motion to deny the sale merely because an alternative way of achieving the sale result is available under other sections of the Bankruptcy Code." *In re Rausch Mfg. Co.*, 59 B.R. 501, 503 (Bankr. D. Minn. 1985).

as the Joint Debtors were diminishing in value the longer their untenable financial position continued.

Respecting due process, notice was spread far and wide not only through the traditional channels but through the intense media scrutiny that developed about the proceeding. No interested party seriously contended that a slower pace was the wisest course.

Respecting the content of the APA and the marketing process, no concerns arise. The APA and related documents answered all material questions, supplemented by further information provided upon request. No one has objected to a lack of clarity in those written materials. Additionally, as noted, the sale itself was achieved by auction, through which competitive bids were encouraged and, in fact, received. Further, prior to the petition filing and the sale, it is uncontested that the assets were aggressively and thoroughly marketed. The auction process undoubtedly produced the highest price possible for the vast majority of the Joint Debtors' assets and, despite MediaNews recent protestations, a far greater purchase price was garnered through this method than would have resulted from a Chapter 7 liquidation.

This is not a situation where United Bank, the main creditor, manipulated the Joint Debtors into selling assets outside of a Chapter 11 Plan solely for its own benefit. Instead, the Charleston area has reaped the reward of continuing a wide circulation newspaper, hundreds of employees continue to earn a paycheck to support their families, and contracts with local vendors have been salvaged, among many other dividends. Further, there remain assets to administer in the Joint Debtors' estate, potentially for the benefit of creditors. Indeed, as United Bank notes in its Response, it would likely have been better off financially if either the sale had been consummated with the Stalking Horse Bidder outside the reorganization process or if the cases were converted to Chapter 7 post-closing.

This case is simply not susceptible to characterization as a "sell and dismiss" artifice, with its concomitant and impermissible intention of depriving legitimate creditors of a return. Instead, the Joint Debtors are attempting to wind down and transfer the business to HD Media with as little disruption as possible. It just so happens, as is often the case in bankruptcy, that all of the major assets are secured by liens in favor of one creditor. If this lone consideration was the hallmark of an impermissible section 363(b) sale, or of an outcome generally violative of the Bankruptcy Code, then our commercial landscape would look vastly different than it does today.  And although MediaNews seeks to hold the sale proceeds in reserve for later distribution, it offers no strong justification for doing so.

MediaNews cites several decisions in support of its contrary position. None of them are either binding or analogous to the circumstances here presented.

Having considered the foregoing and additional factors, the process leading to the sale, and the sale itself, raise no concerns for the Court; indeed a result has materialized that perhaps few thought possible.  The Court, accordingly, finds that there is abundant business justifications for the section 363(b) sale. Those same factors and others also weigh favorably in approving the proposed disbursement.

### III.

Inasmuch as the proposed distribution neither violates the Bankruptcy Code nor the decision in the *Jevic* case, and that the sale and proposed distribution are supported by sound business justifications and reason,

**IT IS ORDERED** that the Joint Debtors' Motion to Authorize Disbursement of Net Sale Proceeds [dckt. 152] be, and is hereby, **GRANTED.**